| | |
|---|---|
| Chad J. Husnick, P.C.<br>**KIRKLAND & ELLIS LLP**<br>**KIRKLAND & ELLIS INTERNATIONAL LLP**<br>333 West Wolf Point Plaza<br>Chicago, Illinois 60654<br>Telephone:    (312) 862-2000<br>Facsimile:    (312) 862-2200 | Margaret Reiney<br>Jimmy Ryan<br>**KIRKLAND & ELLIS LLP**<br>**KIRKLAND & ELLIS INTERNATIONAL LLP**<br>601 Lexington Avenue<br>New York, New York 10022<br>Telephone:    (212) 446-4800<br>Facsimile:    (212) 446-4900 |

*Counsel to the Foreign Representative*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 15 |
| | ) | |
| GRUPO ANTOLIN-IRAUSA, S.A.U.,[1] | ) | Case No. 26-11679 (____) |
| | ) | |
| Debtors in a Foreign Proceeding. | ) | (Joint Administration Requested) |
| | ) | |

**VERIFIED PETITION FOR (I) RECOGNITION OF FOREIGN**
**MAIN PROCEEDING, (II) RECOGNITION OF FOREIGN REPRESENTATIVE,**
**AND (III) RELATED RELIEF UNDER CHAPTER 15 OF THE BANKRUPTCY CODE**

Cristina Blanco Santo Tomás (the "Foreign Representative"), in her capacity as the authorized foreign representative of the above-captioned debtors (collectively, the "Debtors" and together with their non-Debtor direct and indirect subsidiaries, "Grupo Antolin" or the "Company"), each of which is a party to a foreign proceeding in Spain (the "Spanish Proceeding") before the *Sección de lo Mercantil del Tribunal de Instancia de Burgos, Plaza número 1* (the "Spanish Court"), respectfully submits this verified petition (together with the official form petitions filed concurrently herewith, the "Verified Petition") and requests recognition and related relief.  The Verified Petition requests recognition of the Spanish

---

[1]    A complete list of each of the Debtors in these chapter 15 cases may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/Antolin.  The location of Debtor Grupo Antolin-Irausa, S.A.U.'s corporate headquarters and the Debtors' service address in these chapter 15 cases is C/Vitoria número 307 / Burgos / 09007 / Spain.

Proceeding as a "foreign main proceeding" with respect to each of the Debtors and certain related relief pursuant to sections 105(a), 1504, 1507, 1509, 1515, 1516, 1517, 1520, and 1521 of title 11 of the United States Code (the "Bankruptcy Code").[2]

In support of the Verified Petition, the Foreign Representative has filed contemporaneously herewith (a) the *Declaration of Cristina Blanco Santo Tomás Pursuant to 11 U.S.C. § 1515 and Rule 1007(a)(4) of the Federal Rules of Bankruptcy Procedure and in Support of Verified Petition for (I) Recognition of Foreign Main Proceeding, (II) Recognition of Foreign Representative, and (III) Related Relief Under Chapter 15 of the Bankruptcy Code* (the "Declaration of the Foreign Representative") and (b) the *Declaration of Ferran Foix Miralles in Support of Verified Petition for (I) Recognition of Foreign Main Proceeding, (II) Recognition of Foreign Representative, and (III) Related Relief Under Chapter 15 of the Bankruptcy Code* (the "Declaration of the Foreign Counsel"), each of which is incorporated herein by reference.

**Preliminary Statement**

1.    Grupo Antolin is an industry-leading global supplier of automotive interior solutions, supplying automotive components to many of the world's leading original equipment manufacturers ("OEMs").  Founded in 1950 in Burgos, Spain, the Company has grown from a family-run mechanic shop into a multinational enterprise with approximately 20,000 employees across twenty-three countries and annual revenue of approximately €3.73 billion in 2025.[3]  This

---

[2]    Capitalized terms used but not otherwise defined in this Motion shall have the meanings ascribed to them in the Declaration of the Foreign Representative, the Declaration of the Foreign Counsel, the Recapitalisation Support Agreement, or the Spanish Restructuring Plan (each as defined herein).

[3]    *Antolin Closes 2025 with €4.7 Billion Order Intake and Consolidates Margin Improvement* (Apr. 29, 2026), https://www.antolin.com/en/antolin-closes-2025-eu47-billion-order-intake-and-consolidates-margin-improvement.

global presence has made it not only a significant participant in the global automotive supply chain, but also an important industrial employer in Spain.

2.     Despite the Company's historic success and global footprint, a convergence of macroeconomic and geopolitical headwinds affecting the automotive sector necessitated the commencement of the Spanish Proceeding and these chapter 15 cases to implement the Restructuring Transactions.  The COVID-19 pandemic temporarily disrupted vehicle production worldwide; the war in Ukraine caused significant supply chain disruption and increased raw material and energy costs; and, most recently, U.S. tariffs on vehicles and automotive components have placed additional pressure on European automotive suppliers, including the Company.  These external pressures combined with the Company's elevated leverage profile and substantial maturities approaching in 2027 and 2028, necessitated a comprehensive restructuring to preserve the Company as a going concern.

3.     To that end, over the course of the last few months, the Company, with the assistance of its advisors, Houlihan Lokey (Europe) GmbH, Gómez-Acebo & Pombo Abogados, S.L.P., and Kirkland & Ellis LLP, engaged in extensive negotiations with certain of the Company's lenders on the terms of a restructuring transaction.  These negotiations culminated in the terms of a restructuring plan (as amended, restated, or otherwise modified from time to time, the "Spanish Restructuring Plan"), attached hereto in English as **Exhibit E** and Spanish as **Exhibit F**, to implement a comprehensive restructuring transaction (the "Restructuring Transactions") under Spanish insolvency law, including by extending near-term maturities and providing the Company with up to €220 million of working capital. Notably, the Restructuring Transactions facilitate a capital structure solution while leaving trade creditors unimpaired and unaffected.  On July 10, 2026, the Debtors commenced the Spanish

3

Proceeding by filing a request to the Spanish Court for judicial homologation (the "Homologation Application") of the Spanish Restructuring Plan, which was officially accepted by the Spanish Court on July 17, 2026 (the "Homologation Acceptance"). The Spanish Court is expected to homologate (*i.e.*, approve and confirm) the Spanish Restructuring Plan in late September or October 2026 at the earliest in light of the upcoming summer holiday in Spain.

4. The Foreign Representative commenced these chapter 15 cases on July 20, 2026 (the "Petition Date"), to facilitate the ongoing administration of the Spanish Proceeding, protect the Debtors' assets in the United States and, ultimately (once the Spanish Court approves the Spanish Restructuring Plan), enforce the terms of the Spanish Restructuring Plan on any U.S. affected creditors. This Verified Petition also details the proposed noticing procedures for subsequent hearings.

5. Separately, given the summer holiday in Spain and threats from certain bondholders, as detailed further in and pursuant to the Provisional Relief Motion,[4] the Foreign Representative is also seeking provisional relief to stay the commencement of or continuation of any actions or proceedings concerning the Debtors or their assets, rights, obligations, or liabilities in the United States.

6. Recognition of the Spanish Proceeding as a foreign main proceeding is mandatory, as the requirements for recognition under section 1517 of the Bankruptcy Code are satisfied. Namely, (a) the Spanish Proceeding is pending in Spain, where the Debtors have their center of main interests, (b) the Foreign Representative, as Grupo Antolin's chief executive officer, is a "person" under section 101(41) of the Bankruptcy Code, and (c) this Verified

---

[4] "Provisional Relief Motion" means the *Motion for Provisional Relief Pursuant to Section 1519 of the Bankruptcy Code*, filed contemporaneously herewith.

Petition satisfies the requirements of section 1515 of the Bankruptcy Code, as it is accompanied by acceptable evidence of the existence of the Spanish Proceeding and the appointment of the Foreign Representative in the Declaration of the Foreign Representative.

7.    For the reasons set forth herein, the Foreign Representative submits that the relief requested in the Verified Petition is necessary and appropriate for the benefit of the Debtors, their creditors, and other parties in interest.  The U.S. Bankruptcy Court should approve the Verified Petition.

## Relief Requested

8.    The Foreign Representative seeks entry of an order, substantially in the form attached hereto as **Exhibit B** (the "Order"):

a.    granting the Verified Petition, recognizing the Spanish Proceeding as a "foreign main proceeding" pursuant to section 1517 of the Bankruptcy Code for each of the Debtors, and finding that the Verified Petition meets the requirements of section 1515 of the Bankruptcy Code;

b.    finding that the Foreign Representative is a duly appointed "foreign representative" of each of the Debtors within the meaning of section 101(24) of the Bankruptcy Code and is authorized to act on behalf of each Debtor;

c.    subject to the Spanish Court's entry of the Homologation Order (as defined herein) approving the Spanish Restructuring Plan, giving full force and effect to the Homologation Order, the Spanish Restructuring Plan, the Restructuring Transactions thereunder, and any Transaction Documents related thereto, pursuant to sections 105(a), 1504, 1507, 1510, 1515, 1517, 1520, 1521, 1525, and 1527 of the Bankruptcy Code, subject to the notice and objection procedures (the "Notice and Objection Procedures"), the notice of the Homologation Order (the "Homologation Order Notice") and the objection procedures (the "Objection Procedures Notice"), as set forth herein;

d.    approving and establishing the Notice and Objection Procedures for enforcement in the United States of the Homologation Order;

5

    e.      approving the form of notice of the Homologation Order Notice and the Objection Procedures Notice, substantially in the forms attached hereto as **Exhibit C** and **Exhibit D**; and

    f.      granting such other relief as the U.S. Bankruptcy Court (as defined herein) deems just and proper.

### Jurisdiction and Venue

9.      The United States Bankruptcy Court for the Southern District of New York (the "U.S. Bankruptcy Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the Southern District of New York*, dated January 31, 2012.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  The Foreign Representative confirms her consent to the entry of a final order by the U.S. Bankruptcy Court in connection with this Verified Petition to the extent that it is later determined that the U.S. Bankruptcy Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

10.     Venue is proper pursuant to 28 U.S.C. § 1410(1) and (3).

11.     The bases for the relief requested herein are sections 105(a), 1504, 1507, 1509, 1515, 1516, 1517, 1518, 1520, 1521, and 1522 of the Bankruptcy Code, rules 1007(a)(4), 1015(b), 2002(l), 2002(m), 2002(p), 2002(q), 2015(e), 9007, and 9008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and 9013-1(a) of the Local Bankruptcy Rules for the Southern District of New York (the "Local Rules").

**Background**

I.      **Grupo Antolin's Business Operations.**

A.      **Business Overview.**

12.     Over the last seventy-five years, family-owned Grupo Antolin has evolved from a neighborhood auto repair shop into an industry leading Tier 1 supplier of automotive interior solutions, supplying leading OEMs across the automotive sector, including many of the world's largest automobile manufacturers, such as Ford Motor Company, General Motors, Hyundai Motor Company, Volkswagen Group, Renault-Nissan, and Stellantis, just to name a few. Founded in 1950 in Burgos, Spain by Mr. Avelino Antolín López and his sons, Avelino and José, Grupo Antolin was originally a neighborhood mechanic shop in the business of repairing vehicles and agricultural machinery.  The family's invention of the rubber-metal steering joint, an innovation that solved important safety problems in the steering of vehicles, catapulted the Company's industrial growth.

13.     As of the Petition Date, Grupo Antolin operates in twenty-three countries with 111 production plants and "just-in-time" delivery centers, twenty-five technical-commercial offices, and approximately 20,000 employees worldwide.  As described further below, in the United States, Grupo Antolin operates ten production plants, one technical-commercial office, and employs nearly 2,100 people across the country.  The Company supplies more than 110 automotive brands and approximately twenty OEMs, with its components appearing in more than 500 vehicle models globally, including nine of the ten best-selling vehicles worldwide.

14.     Grupo Antolin operates primarily through three business units: (a) doors, integrated products, instrument panels, central consoles, and coatings, which business unit focuses on the manufacture of those vehicle components; (b) headliners, which business unit

7

focuses on the manufacture of components for vehicle roofs; and (c) electronic systems, which business unit includes lighting technologies, overhead consoles, smart surfaces, human-machine interface systems, and sun visors, reflecting Grupo Antolin's continued focus on higher-value technological and electronic solutions for automotive interiors.

15.    Grupo Antolin's operations depend critically on "just-in-time" delivery to OEM assembly lines, uninterrupted supplier relationships, continuous access to working capital facilities, and the maintenance of OEM confidence in the Company's ability to perform under long-term supply contracts.    Any disruption to production, working capital, or supplier or customer relationships could result in cascading harm to the Company's revenue, customer retention, competitive position, and, ultimately, its restructuring efforts and viability to operate as a going concern.

16.    Grupo Antolin's business is guided by a culture of family spirit, responsibility and sustainability, evolution and innovation, and talent and commitment—values that inform the Company's long-term approach to customers, employees, suppliers, and other stakeholders. Innovation, in particular, has remained central to Grupo Antolin's strategy, including through its development of advanced technological solutions designed to anticipate customer needs and contribute to the transformation of mobility.    For example, in 2023, Grupo Antolin launched Genius, an artificial intelligence project aimed at developing systems that recognize drivers' emotional and cognitive states so that the vehicle interior can automatically adapt to their needs. As part of the Genius project, Grupo Antolin partnered with psychologists, neurologists, other specialists, and several leading Spanish institutions.    Grupo Antolin's longstanding commitment to innovation and international growth has been recognized through numerous awards and distinctions, including the Prince Felipe Award for Internationalization and the Castilla y León

8

Prize for Scientific and Technical Research and Innovation.  Grupo Antolin is a trusted innovator in automotive interiors, known for its evolving roster of technical and customized interior solutions and international best practices.  Grupo Antolin had 311 products in development as of December 2025.

17.     For the year ended December 31, 2025, Grupo Antolin generated approximately €3.73 billion in sales and approximately €296.2 million in EBITDA, reflecting an EBITDA margin of approximately 9.0 percent.

18.     Although the Company remains a global automotive interiors supplier with substantial geographic, product, and customer diversification, its business has been affected by industry-wide headwinds, including weaker demand in various markets, production volatility, foreign exchange headwinds, tariff-related uncertainty, military conflicts and attendant commodity price increases, regulatory changes, and a slower-than-expected transition to electric vehicles.  As a result, Grupo Antolin's 2025 sales declined by approximately 11.1 percent as compared to 2024.   In response, the Company has continued to focus on cost control, working-capital management, capital expenditure optimization, and other measures designed to preserve liquidity and strengthen its balance sheet.

**B.     Centralized Business Model**

19.     Grupo Antolin operates internationally through an integrated business model centralized in Burgos, Spain.  The Company's subsidiaries are organized into three distinct functional categories:   (a) production plants, which are dedicated to the manufacture of components and associated logistics operations; (b) technical-commercial offices ("OTCs"), which provide commercial, technical, innovation, and corporate support services; and (c) Grupo Antolin-Ingenieria, S.A.U. ("Antolin Ingenieria"), which has entered into a framework

agreement with lead Debtor Grupo Antolin-Irausa S.A.U. ("Antolin-Irausa") for research, development, and innovation projects ("R&D&I") on behalf of the Company. Both the production plants and the OTCs operate under the direction and supervision of the employees and senior management of lead Debtor Grupo Antolin-Irausa or, with regard to R&D&I, Antolin-Ingenieria.

20. The Debtors' centralized operations are supported by a formal contractual framework under which strategic, commercial, and operational decision-making authority is coordinated through Antolin-Irausa. For example, Antolin-Irausa's relationships with each production plant is governed by a contract known as a Principal Master Agreement ("PMA") under which Antolin-Irausa acts as the principal and the plants focus primarily on productive functions and logistics activities under the direction and supervision of Antolin-Irausa. Separately,
Antolin-Irausa's and Antolin Ingenieria's relationships with each OTC are governed by a suite of service agreements (the "OTC Agreements"), under which the OTCs assist in implementing the business strategy designed by Antolin-Irausa and Antolin-Ingenieria from Burgos, Spain. Under the PMAs and OTC Agreements, subsidiaries coordinate with Antolin-Irausa before negotiating or entering into contracts with OEM customers.

21. The governing bodies of the Debtors' subsidiaries are composed primarily of individuals of Spanish nationality and residence. The chief executive officer of Antolin-Irausa holds each the position of director and or usually has been granted joint powers of attorney in nearly all the Company's non-Spanish subsidiaries, ensuring continuity across the corporate enterprise.

22.     Moreover, all of the Company's key intangible assets, including patents, trademarks, customer portfolios, manufacturing know-how, and logistics management systems, are owned by Antolin-Irausa in Burgos, Spain.  Antolin-Irausa's subsidiaries use these assets only under a non-exclusive license in connection with fulfilling their production obligations. Antolin-Irausa also maintains a centralized treasury and cash-management system through cash-pooling arrangements, and contracts for group-wide functions like insurance on behalf of all subsidiaries.  The Spanish Tax Administration has officially recognized this centralized model through an Advance Pricing Agreement entered into with Antolin-Irausa.

### C.     Connections to the United States.

23.     Grupo Antolin maintains operations in the United States.  As of the Petition Date, the Company operates ten production plants and one technical-commercial office in the United States, employing nearly 2,100 people across the country.  In the United States, approximately one out of every three cars on the road incorporates Grupo Antolin components.  For the year ended December 31, 2025, Grupo Antolin generated approximately €1.24 billion in sales in North America, representing approximately 33.4 percent of the Company's total consolidated sales.

24.     Seven of the Debtors are entities registered under the laws of various states throughout the United States.  In addition, the Debtors hold material assets and owe obligations to parties that are located in or connected to the United States.  Importantly, the Existing Notes—representing approximately €630.3 million of the Debtors' funded indebtedness—are governed by the laws of the state of New York and were issued pursuant to indentures containing New York forum selection clauses.

11

25.     The Company's U.S. operations are integral to its global "just-in-time" supply model, serving major OEM customers, including Ford Motor Company, General Motors, and Stellantis at their North American assembly facilities.  Grupo Antolin's U.S. production plants manufacture headliners, door panels, lighting technologies, and other interior components for delivery directly to OEM assembly lines across North America.  Any disruption to the Company's U.S. operations—including through enforcement actions by individual creditors—could cascade throughout Grupo Antolin's integrated production network and undermine the orderly restructuring that the Spanish Proceeding is designed to facilitate.

## II.      Prepetition Corporate and Capital Structure.

26.     The Debtors are private entities organized under the laws of various jurisdictions, including the laws of the United States and the laws of Spain, and are part of Grupo Antolin's integrated corporate structure, which is headed operationally by Debtor Antolin-Irausa.  As of December 31, 2025, Debtor Antolin-Irausa's share capital comprised 8,023,241 registered shares, all of a single class and series, with a par value of €4.67 each, fully subscribed and paid up.  As of December 31, 2025, all of Antolin-Irausa's shares were held by Grupo Antolin Holdco, S.A. ("HoldCo"), and all such shares carried the same voting and dividend rights.  A simplified chart depicting the Debtors' organizational structure is attached hereto as **Exhibit A**.

### A.      Affected Debt.

27.     As of the Petition Date, the Debtors are borrowers, issuers, and/or guarantors of approximately €1.25 billion of Affected Debt (as defined herein), excluding the Intragroup Loans (as defined herein).  The Spanish Restructuring Plan affects the Existing Notes, the Existing Syndicated Facilities Agreement, the Existing ICO Facilities Agreement, the Existing EIB Financing Agreements, the Ancillary Guarantee Facilities, the Existing Guarantee Lines, and the

Intragroup Loans (each as defined herein and, collectively, the "Affected Debt" and the creditors party thereto, the "Affected Creditors").  The Debtors' Affected Debt is summarized in the table below and described in further detail immediately following.[5]

| Facility | Maturity | Interest Rate | Approx. Amount Outstanding |
|---|---|---|---|
| **2028 Notes** | April 30, 2028 | 3.50% | €380.3 million |
| **2030 Notes** | January 30, 2030 | 10.375% | €250.0 million |
| **Term Loan** | June 30, 2029[6] | EURIBOR + 2.5% to 4.0% | €243.4 million |
| **RCF** | June 30, 2029[7] | EURIBOR + 2.5% to 4.0% | €162.2 million |
| **Existing ICO Facilities Agreement** | August 4, 2032[8] | EURIBOR + 3.00% | €150.0 million |
| **EIB Financing Agreement I** <br> **EIB Financing Agreement II** | May 31, 2028[9] <br> July 31, 2028[10] | 2.945% <br> 2.945% | €45.2 million |
| **Ancillary Guarantee Facilities** | Varies | Varies | €5.8 million |
| **Existing Guarantee Lines** | Varies | Varies | €13.8 million |
| *Total Affected Debt*[11] | | | *€1,250.7 million* |

a.    **Existing Notes.**

28.    Grupo Antolin's capital structure includes two series of senior secured notes issued by Debtor Antolin-Irausa:  (a) the 2028 Notes and (b) the 2030 Notes (each as defined and

---

[5]   The summaries provided herein are qualified in their entirety by the provisions of the relevant credit documents.

[6]   The Term Loan is subject to a springing maturity to October 29, 2027 if the 2028 Notes are not refinanced in full on or prior to October 29, 2027.

[7]   The RCF is subject to a springing maturity to October 29, 2027 if the 2028 Notes are not refinanced in full on or prior to October 29, 2027.

[8]   The Existing ICO Facilities Agreement provides for a springing maturity to October 29, 2027 if the 2028 Notes are not refinanced in full on or prior to October 29, 2027, or July 31, 2029, if the 2030 Notes are not refinanced in full on or prior to July 31, 2029.

[9]   The EIB Financing Agreement I is subject to a springing maturity pursuant to which EIB may cancel the credit and demand prepayment of all amounts outstanding thereunder if the 2028 Notes are not refinanced in full on or prior to October 29, 2027.

[10]   The EIB Financing Agreement II is subject to a springing maturity pursuant to which EIB may cancel the credit and demand prepayment of all amounts outstanding thereunder if the 2028 Notes are not refinanced in full on or prior to October 29, 2027.

[11]   This figure excludes Intragroup Loans, which are also part of the Affected Debt.

further described below). The Existing Notes are governed by New York law and share, on a *pari passu* basis, with the Debtors' obligations under the Existing Syndicated Facilities Agreement, the Existing EIB Financing Agreements, and the Existing ICO Facilities Agreement pursuant to the Intercreditor Agreement (as defined herein), and are secured by a Spanish law pledge granted by non-Debtor HoldCo over 100 percent of the issued share capital of Debtor Antolin-Irausa (the "Share Pledge"). The Existing Notes are otherwise unsecured. The Existing Notes are part of the Affected Debt and are treated as a separate class under the Spanish Restructuring Plan.

(i)     **2028 Notes.**

29.     On June 29, 2021, Debtor Antolin-Irausa issued €390 million aggregate principal amount of 3.50 percent senior secured notes due April 30, 2028 ("2028 Notes"), pursuant to an indenture, dated as of June 29, 2021, by and among Antolin-Irausa, as issuer, Deutsche Trustee Company Limited (the "Notes Trustee"), as trustee, Deutsche Bank AG, London Branch (the "Agent"), as security agent, paying agent, and transfer agent, Deutsche Bank Luxembourg S.A. (the "Registrar"), as registrar, and the guarantors party thereto (as amended, supplemented, or otherwise modified from time to time, the "2028 Notes Indenture"). The 2028 Notes are traded on the Luxembourg Stock Exchange's Euro MTF market. In June and July 2022, Grupo Antolin redeemed and canceled €9.7 million aggregate principal amount of the 2028 Notes. As of June 30, 2026, €380.3 million aggregate principal amount of the 2028 Notes remained outstanding. The 2028 Notes mature on April 30, 2028.

(ii)     **2030 Notes.**

30.     On July 31, 2024, Debtor Antolin-Irausa issued €250 million aggregate principal amount of 10.375 percent senior secured notes due January 30, 2030 (the "2030 Notes" and,

14

together with the 2028 Notes, the "Existing Notes"), pursuant to an indenture, dated as of July 31, 2024, by and among Antolin-Irausa, as issuer, the Notes Trustee, as trustee, the Agent, as security agent, paying agent, and transfer agent, the Registrar, as registrar, and the guarantors party thereto (as amended, supplemented, or otherwise modified from time to time, the "2030 Notes Indenture" and, together with the 2028 Notes Indenture, the "Notes Indentures"). The 2030 Notes are traded on the Luxembourg Stock Exchange's Euro MTF market. As of June 30, 2026, €250 million aggregate principal amount of the 2030 Notes remained outstanding. The 2030 Notes mature on January 30, 2030.

b.    **Existing Syndicated Facilities Agreement.**

31.    On March 13, 2014, Debtor Antolin-Irausa, as borrower, certain Debtors, as guarantors, the Agent, as agent and security agent, certain arrangers, and the lenders party thereto from time to time, entered into a senior facilities agreement governed by English law (as amended and restated from time to time, including as amended and restated on July 19, 2024, the "Existing Syndicated Facilities Agreement"). The Existing Syndicated Facilities Agreement provides for, among other things, a euro-denominated term loan facility (the "Term Loan"), a multi-currency revolving credit facility (the "RCF"), and ancillary guarantee facilities (the "Ancillary Guarantee Facilities").

32.    As of June 30, 2026, approximately €243.4 million was outstanding under the Term Loan. The Term Loan bears interest at EURIBOR plus an applicable margin of between 2.50 percent to 4.00 percent, subject to the terms of the Existing Syndicated Facilities Agreement. As of June 30, 2026, approximately €162.2 million was outstanding under the RCF. The RCF bears interest at EURIBOR plus an applicable margin of between 2.50 percent to 4.00 percent, subject to the terms of the Existing Syndicated Facilities Agreement. Both the

15

Term Loan and the RCF mature on June 30, 2029, subject to a springing maturity that would accelerate the maturity for each to October 29, 2027, if the 2028 Notes are not refinanced in full on or prior to October 29, 2027. As of June 30, 2026, approximately €5.8 million was outstanding under the Ancillary Guarantee Facilities.

33.    In addition to the obligations under the Existing Syndicated Facilities Agreement being guaranteed by certain Debtors, subject to applicable limitations, the lenders under the Existing Syndicated Facilities Agreement also share, on a *pari passu* basis with the Debtors' obligations under the Existing Notes, the Existing EIB Financing Agreements, and the Existing ICO Facilities Agreement pursuant to the Intercreditor Agreement (as defined herein), in the Share Pledge. The debt arising under the Existing Syndicated Facilities Agreement is part of the Affected Debt in the Spanish Restructuring Plan.

c.    **Existing ICO Facilities Agreement.**

34.    On August 4, 2025, Debtors Antolin-Irausa, Grupo Antolin-Aragusa, S.A.U., Grupo Antolin-Eurotrim, S.A.U., Antolin-Ingenieria, Grupo Antolin-Plasbur, S.A.U., and Grupo Antolin-RyA, S.A.U., as borrowers, certain Debtors, as guarantors, Banco Bilbao Vizcaya Argentaria, S.A. ("BBVA"), as agent, Deutsche Bank AG, London Branch, as security agent, and the lenders party thereto from time to time, entered into a syndicated financing agreement governed by Spanish law (the "Existing ICO Facilities Agreement").

35.    The Existing ICO Facilities Agreement provided €150 million of financing and was fully drawn as of June 30, 2026. The Existing ICO Facilities Agreement bears interest at EURIBOR plus a 3.00 percent margin and is backed by a Spanish government guarantee covering 75 percent of the amount thereof pursuant to the guarantee line made available under Royal Decree-Law 4/2025, of April 8, on Urgent Measures to Address the Tariff Threat and

16

Revitalize Trade. The Existing ICO Facilities Agreement matures on August 4, 2032, subject to a springing maturity to (a) October 29, 2027, if the 2028 Notes are not refinanced in full on or prior to October 9, 2027, or (b) July 31, 2029, if the 2030 Notes are not refinanced in full on or prior to July 31, 2029.

36.     In addition to the obligations under the Existing ICO Facilities Agreement being guaranteed by certain Debtors, subject to applicable limitations, the lenders under the Existing ICO Facilities Agreement also share, on a *pari passu* basis with the Debtors' obligations under the Existing Notes, the Existing Syndicated Facilities Agreement, and the Existing EIB Financing Agreements pursuant to the Intercreditor Agreement (as defined herein), in the Share Pledge. The debt arising under the Existing ICO Facilities Agreement is part of the Affected Debt in the Spanish Restructuring Plan.

d.     **Existing EIB Financing Agreements.**

37.     On June 12, 2018, Debtor Antolin-Irausa, as borrower, certain Debtors, as guarantors, and the European Investment Bank ("EIB"), as lender, entered into a finance contract entitled "Antolin Car Interiors RDI" in an original principal amount of €100 million (the "EIB Financing Agreement I"). The proceeds of EIB Financing Agreement I were used to finance Grupo Antolin's "Antolin Car Interiors RDI" project, which supported Grupo Antolin's R&D&I strategy for vehicle-interior solutions. The EIB Financing Agreement I matures on May 31, 2028, subject to a springing maturity pursuant to which EIB may cancel the credit and demand prepayment of all amounts outstanding thereunder if the 2028 Notes are not refinanced in full on or prior to October 29, 2027.

38.     On December 23, 2020, Debtor Antolin-Irausa, as borrower, certain Debtors, as guarantors, and EIB, as lender, entered into an additional finance contract entitled "Antolin Car

17

Interiors RDI B" in an original principal amount of €40 million (the "EIB Financing Agreement II" and, together with EIB Financing Agreement I, the "Existing EIB Financing Agreements" and, together with the Existing Syndicated Facilities Agreement and Existing ICO Facilities Agreement, the "Bank Debt"). The EIB Financing Agreement II matures on July 31, 2028, subject to a springing maturity pursuant to which EIB may cancel the credit and demand prepayment of all amounts outstanding thereunder if the 2028 Notes are not refinanced in full on or prior to October 29, 2027.

39. As of June 30, 2026, approximately €45.2 million remained outstanding under the Existing EIB Financing Agreements.

40. In addition to the obligations under the Existing EIB Financing Agreements being guaranteed by certain Debtors, subject to applicable limitations, the EIB also shares, on a *pari passu* basis with the Debtors' obligations under the Existing Notes, the Existing Syndicated Facilities Agreement, and the Existing ICO Facilities Agreement pursuant to the Intercreditor Agreement (as defined herein), in the Share Pledge. The debt arising under the Existing EIB Financing Agreements is part of the Affected Debt in the Spanish Restructuring Plan.

e. **Existing Guarantee Lines.**

41. The Affected Debt also includes certain guarantee lines, surety bonds, and related arrangements entered into between Debtor Antolin-Irausa, BBVA, BBVA New York Branch, HSBC Continental Europe, and Atradius Crédito y Caución, S.A. de Seguros y Reaseguros (collectively, the "Existing Guarantee Lines"). As of June 30, 2026, approximately €13.8 million was outstanding under the Existing Guarantee Lines (excluding the Ancillary Guarantee Facilities). The Ancillary Guarantee Facilities are treated as part of the Existing Guarantee Lines for purposes of the Spanish Restructuring Plan and treatment thereunder.

f.      **Intragroup Loans.**

42.   Certain Debtors are parties to intragroup loan agreements (the "Intragroup Loans"), which are also part of the Affected Debt.

g.      **Intercreditor Agreement.**

43.   On March 21, 2014, Debtor Antolin-Irausa, Deutsche Trustee Company Limited, as senior secured notes trustee, and the Agent, as security agent, entered into an intercreditor agreement (as amended, supplemented, or otherwise modified from time to time, the "Intercreditor Agreement"), which governs the relative rights of holders of the Affected Debt, as well as the ranking and enforcement of related security and guarantees.  Specifically, pursuant to the Intercreditor Agreement, the obligations under the Existing Notes, the Existing Syndicated Facilities Agreement, the Existing ICO Facilities Agreement, and the Existing EIB Financing Agreements are ranked on a *pari passu* basis.

## III.   Events Leading to Chapter 15 Filing.

44.   Grupo Antolin's current financial position results from a combination of strategic expansion, industry disruption, and macroeconomic pressures facing the global automotive sector.  In 2015, Grupo Antolín acquired Magna Interiors for approximately $525 million, which included thirty-six manufacturing facilities and approximately 12,000 employees, making the Company one of the largest automotive interior suppliers in the world.  While the acquisition substantially expanded the Company's global production platform and customer base, it also significantly increased Grupo Antolin's funded indebtedness.

45.   Beginning in 2020, the COVID-19 pandemic caused widespread production shutdowns, supply chain disruption, and demand volatility across the automotive sector.  These effects were compounded by the disruption to energy markets and raw material costs following

19

the Russia-Ukraine conflict beginning in 2022, which increased production costs across European manufacturing operations. Grupo Antolin experienced margin pressure from rising input costs that could not be fully recovered through customer pricing adjustments in the short term.

46. More recently, military conflict in the Middle East and tariff-related uncertainty, particularly affecting North American operations, have created additional planning challenges. Foreign exchange headwinds, weaker demand in key Asian markets, and a slower-than-anticipated transition to electric vehicles have further affected revenue expectations. The combined effect of these pressures resulted in a sales decline of approximately 11.1 percent in 2025 as compared to the year prior.

47. Critically, the Company faces a concentration of near-term maturities across its capital structure. The Group's Existing Syndicated Factoring Facility,[12] which is essential for day-to-day working capital management, matures on January 23, 2027, and has historically been extended on a short-term, uncommitted basis. The Existing Syndicated Facilities Agreement and the Existing ICO Facilities Agreement include springing maturity provisions that would accelerate maturities to October 29, 2027, if the 2028 Notes are not refinanced by that date. In addition, the 2028 Notes mature on April 30, 2028, and the Existing EIB Financing Agreements mature in May 2028 and June 2028.

48. Several ratings agencies have reflected these pressures in recent downgrades announced. In late June 2026, S&P Global Ratings downgraded Grupo Antolin to CCC- with a negative outlook, and Moody's Ratings ("Moody's") downgraded the corporate family rating to

---

[12] "Existing Syndicated Factoring Facility" means the syndicated factoring facility provided pursuant to that certain receivables servicing agreement dated January 23, 2025, between Antolin-Irausa, as seller and collection agent, BBVA, CaixaBank, and HSBC Factoring (France), as buyers, and BBVA, as agent bank.

Caa2, the probability of default rating to Caa3-PD, and the Existing Notes ratings to Caa3. Moody's cited weak liquidity, high leverage of 9.4 times adjusted debt-to-EBITDA as of March 2026, negative free cash flow, and reliance on uncommitted and short-term factoring arrangements.[13]

49.     Notwithstanding these challenges, the Company maintains a meaningful business outlook supported by its brand recognition and global reach.  The Company's order book exceeds €13 billion through 2029, and adjusted EBITDA margins have improved from approximately 7 percent in fiscal year 2023 to approximately 9 percent in fiscal year 2025, reflecting ongoing cost management and productivity improvements.  The Company's diversified global footprint across twenty-three countries and relationships with substantially all major OEMs provide resilience against concentration risk.  Nevertheless, the Company's operational strength cannot overcome the unsustainability of its current capital structure absent the proposed Restructuring Transactions, which are designed to address the following imperatives.

50.     *First*, the Company must avoid a disorderly acceleration or enforcement by any creditor group that could trigger cross-defaults across the capital structure and lead to cascading insolvency to the detriment of parties in interest.  The existing debt documents contain cross-default and cross-acceleration provisions that could convert a single event of default into a system-wide liquidity crisis for the entire Company.  *Second*, the Company must maintain supplier and customer confidence to preserve its "just-in-time" production capabilities.  Grupo Antolin's operations depend on continuous access to raw materials and components from a

---

[13]     *See Grupo Antolin Downgraded To 'CCC-' On Proposed Debt Restructuring; Outlook Negative*, S&P Global Ratings (June 25, 2026); *Moody's Ratings downgrades Grupo Antolin's CFR to Caa2 and instrument ratings on existing senior secured notes to Caa3; outlook remains negative*, Moody's Ratings (June 26, 2026).

global supplier base, and on maintaining the confidence of OEM customers that the Company will continue to perform under its supply contracts. Any signal of financial instability could result in suppliers demanding cash-on-delivery terms or customers redirecting production to alternative suppliers, either of which would accelerate a decline in the Company's competitive position. ***Third***, the Company must preserve its working capital position and replace or bridge its existing uncommitted factoring facility with longer-term committed working capital financing. The Existing Syndicated Factoring Facility matures on January 23, 2027, and the Company has historically depended on annual extensions of this facility to fund day-to-day operations. The absence of committed, longer-term working capital financing represents a material vulnerability to the Company's viability as a going concern that these Restructuring Transactions are designed to address. ***Finally***, the Restructuring Transactions must be coordinated across multiple jurisdictions and among numerous obligor and guarantor entities to avoid fragmentation of proceedings and ensure that all affected financial instruments are addressed consistently across the globe.

**IV.     The Restructuring Transactions and the Spanish Proceeding.**

     **A.     Overview of Spanish Pre-Insolvency Restructuring Proceeding.**

51.     As more fully set forth in the Declaration of the Foreign Counsel, filed contemporaneously herewith, Spanish law provides for court-supervised, pre-insolvency restructuring proceedings under Royal Legislative Decree 1/2020, of May 5, approving the consolidated text of the Insolvency Law (as amended, restated, and/or replaced, the "Insolvency Law") established by Law 16/2022, of September 5, amending the consolidated text of the Insolvency Law, approved by Royal Legislative Decree 1/2020, of May 5, for the implementation of Directive (EU) 2019/1023 of the European Parliament and of the Council of

June 20, 2019, on frameworks for preventive restructuring, discharge of debts and disqualifications, and measures to increase the efficiency of restructuring, insolvency, and debt discharge proceedings, and amending Directive (EU) 2017/1132 of the European Parliament and of the Council on certain aspects of company law.

52.    Spanish restructuring proceedings are governed by the Insolvency Law.  In 2022, the Insolvency Law introduced a new tool, referred to as a restructuring plan, which can amend or modify a company's capital structure (including debt and equity) to assure the company's viability for the medium and short term.  Specifically, a restructuring plan can affect or modify the composition, terms and conditions, or structure of a debtor's assets, liabilities, and/or equity, including sales of assets, business units, or the company as a whole, as well as affect operational changes.  A restructuring plan can affect nearly all claims of a debtor, other than tort claims, claims of employees, or certain specific financial guarantees.  Claims resulting from public laws can be affected by the restructuring plan but are significantly restricted.

53.    A debtor is eligible to file a request for homologation (*i.e.*, court approval) of a restructuring plan if the debtor is facing:  (1) current insolvency; (2) imminent insolvency, whereby a debtor expects it will not be able to meet its payment obligations as they come due within three months; or (3) probable insolvency, whereby a debtor expects it will not be able to meet its payment obligations as they come due within two years.  The Debtors fall within prong (3) of the grounds for eligibility set out above, meaning that they anticipate being unable to regularly meet their payment obligations as they come due within the next two years.

54.    The court-supervised process for approval of a restructuring plan, referred to as "homologation," among other things, prevents future claw-backs of the restructuring plan transactions, allows the effects of the restructuring plan to be extended to non-consenting

23

creditors, and protects interim and new financing.  Accordingly, debtors routinely seek court approval to ensure finality of the restructuring transactions contemplated by the restructuring plan and enforceability against all affected creditors.

55.    In order to be eligible for homologation, the restructuring plan has to be approved in one of these three ways:  (1) the plan received unanimous approval from all classes; (2) the plan is approved by a majority of classes, including at least one class of creditors with special or ordinary privilege[14]; or (3) at least one class that is reasonably expected to receive a recovery under the restructuring plan (based on a valuation of the debtor company as a going concern) approves the plan.  A class accepts a restructuring plan if creditors holding more than two-thirds of unsecured claims, by monetary value, or more than three-fourths of secured claims, by monetary value, vote in favor of the plan.  Where a plan affects claims governed by a syndication agreement, the statutory majority applies to the syndicate unless the agreement establishes a lower majority threshold to approve the relevant effects and, if the applicable majority votes in favor, all syndicated claims are deemed to have accepted a plan.

56.    Once the homologation request is filed, the Spanish Court can accept the request for processing, upon which the related order is published in the Public Insolvency Register. Upon acceptance of the homologation request for processing, an automatic stay under Spanish law occurs, which prohibits any creditors from initiating or continuing judicial or extrajudicial enforcement actions and acceleration of obligations against the Debtors' assets until a final decision on homologation is made.

---

[14]    Under Insolvency Law, special privilege claims are secured by relevant assets and paid from the sale of those assets, and ordinary privilege claims are unsecured claims that have payment priority over general insolvency claims.

57.     During the homologation process, a debtor's board of directors and management continue to run the company.   Separately, the debtor or creditors representing more than 50 percent of claims affected by the proposed restructuring plan may request the court to appoint a restructuring expert.   In cases where at least one class of creditors does not consent to the restructuring plan, a restructuring expert must be appointed.   The restructuring expert assists in connection with the restructuring plan by, among other things, issuing any reports or certificates that are required in connection with the homologation process.

B.      **Pre-Filing Creditor Negotiations and the Recapitalisation Support Agreement.**

58.     On April 28, 2026, the Debtors requested the appointment of Lexaudit Concursal, S.L.P., as restructuring expert (the "Restructuring Expert").   The Spanish Court issued an order approving the appointment of the Restructuring Expert on May 14, 2026.[15]

59.     As a result of extensive negotiations, on June 23, 2026, the Debtors, HoldCo, GLAS Specialist Services Limited, and the Original RSA Supporting Creditors[16] holding more than two-thirds of the debt under the Existing Syndicated Facilities executed the Recapitalisation Support Agreement and, on June 24, 2026, the Debtors and a sufficient majority of the Affected Creditors entered into the Spanish Restructuring Plan.   Pursuant to the Recapitalisation Support Agreement, the Original RSA Supporting Creditors committed to, among other things, support and vote in favor of the Spanish Restructuring Plan, and the Debtors agreed to, among other

---

[15]    The May 14, 2026, order was amended at the request of the Debtors by a rectification order dated June 1, 2026, for the purpose of expressly confirming that the appointment of the Restructuring Expert was made for all of the Debtors.

[16]    The Original RSA Supporting Creditors are comprised of: (1) Banco Santander, S.A.; (2) Banco De Sabadell, S.A.; (3) CaixaBank, S.A.; (4) BBVA; and (5) Bankinter, S.A.

things, take the necessary measures to implement the Restructuring Transactions. The Recapitalisation Support Agreement establishes a binding framework for the implementation of the Restructuring Transactions, including creditor forbearance, support commitments, and the mechanics for consummation.

60.     Specifically, during the Support Period, the RSA Supporting Creditors agree to not take actions that would disrupt the implementation of the Restructuring Transactions, including exercising any rights or remedies they may have under the Affected Debt documents or at law as a result of any events of default, among other things, relating to the Spanish Proceeding or the implementation of the Restructuring Transactions, and to support waivers needed to avoid any relevant defaults or interruptions to the implementation of the Restructuring Transactions.

61.     After the entry into the Recapitalisation Support Agreement, an accession period was provided for certain Affected Creditors to freely accede to the Recapitalisation Support Agreement and/or express their support for the Spanish Restructuring Plan by July 22, 2026 (subject to extension at the request of the Debtors). Supporting noteholders under the Existing Notes who acceded to the Recapitalisation Support Agreement by July 8, 2026, will receive a lock-up fee of 0.50 percent of the aggregate principal amount of their Existing Notes if the Restructuring Transactions become effective (subject to certain other conditions set out in the Recapitalisation Support Agreement).

62.     On July 10, 2026, the Spanish Restructuring Plan was amended for certain technical amendments and certain additional Affected Creditors acceded to the Spanish Restructuring Plan. The Spanish Restructuring Plan was formalized as a public instrument on July 10, 2026, by deed granted before the Notary Public of Madrid, Mr. Francisco Miras Ortiz, acting in substitution for and on the protocol of Mr. Andrés Domínguez Nafría, as required by

article 634 of the Insolvency Law. The Restructuring Expert issued the requisite certification of majorities confirming that the Spanish Restructuring Plan has been approved by the requisite majorities of Affected Creditors in accordance with the voting thresholds prescribed by the Insolvency Law.

### C. The Debtors' Spanish Restructuring Plan.

63. The Spanish Restructuring Plan provides the framework for a comprehensive restructuring of the Debtors' Affected Debt by extending maturities, modifying applicable debt terms, securing committed working capital financing, and preserving Grupo Antolin's business as a going concern.

64. The framework of the Spanish Restructuring Plan contemplates, among others, the following principal transactions:

a. **Default treatment of Affected Debt.** Affected Creditors that do not elect an Alternative Treatment will generally receive an extension of the final maturity of their Affected Debt to December 31, 2035, with full repayment of principal at maturity and without any principal write-off. The Default Treatment of the Bank Debt, the Existing Notes, and the Existing Guarantee Lines also contemplate a 6.97 percent annual interest rate, payable semi-annually, and the benefit of the Existing Security and Guarantees, New ICA Second-Ranking Security Interests, Third-Ranking Pledge over Accounts, and New ICA Guarantees.

b. **Alternative treatment of Affected Debt.** Certain Affected Creditors may elect alternative treatments that provide shorter maturities, enhanced security, and payment priority under the Amended Intercreditor Agreement.

(i) *Bank Debt.* Affected Creditors under the Bank Debt that elect the Alternative Treatment of the Bank Debt will commit to subscribe their pro rata share of the New Working Capital Financing Agreement and receive, among other things, an extension of final maturity to August 4, 2032, with a springing maturity to June 30, 2030, in the event that, on or before such date, the New B Notes have not been redeemed, repaid, or refinanced or the Debtors have not demonstrated binding commitments for their refinancing. The Alternative Treatment of the Bank Debt also provides for scheduled amortization of outstanding principal

(excluding the RCF), an interest rate of EURIBOR *plus* 2.50 percent (with a margin adjustment subject to a leverage ratio), and the benefit of the Existing Security and Guarantees, New ICA First-Ranking Security Interests, Second-Ranking Pledge over Accounts, and New ICA Guarantees, and a senior payment right of up to €435 million over claims subject to the Default Treatments.

(ii) *Existing Notes*. Affected Creditors under the Existing Notes that elect the Alternative Treatment of the Existing Notes will receive, among other things, a 32.5 percent discount to the nominal principal amount of the Existing Notes, an extension of final maturity to December 31, 2030, a thirty-month non-call period (unless the make-whole premium is paid), and an 8.28 percent annual coupon, subject to an automatic step-up of 2.00 percentage points per annum on each anniversary date commencing on June 30, 2027. The Alternative Treatment of the Existing Notes also provides for the benefit of the Existing Security and Guarantees, New ICA First-Ranking Security Interests, Second-Ranking Pledge over Accounts, and New ICA Guarantees, and a senior payment of up to €435 million right over claims subject to the Default Treatments.

(iii) *Existing Guarantee Lines*. Affected Creditors under the Existing Guarantee Lines that elect the Alternative Treatment of the Existing Guarantee Lines will receive an extension of maturity to August 4, 2032, with a springing maturity to June 30, 2030, on the same terms as the Alternative Treatment of the Bank Debt, an availability period running until six months prior to maturity, and the benefit of the Existing Security and Guarantees, New ICA First-Ranking Security Interests, Second-Ranking Pledge over Accounts, and New ICA Guarantees, and a senior payment right over claims subject to the Default Treatments.

c. **New working capital financing agreement.** The Spanish Restructuring Plan provides for a new Working Capital Financing Agreement, structured as a multi-product facility comprising non-recourse factoring and a revolving credit line with a bonding ancillary facility, in a maximum aggregate amount of up to €220 million with maturity on August 4, 2032, subject to a springing maturity to June 30, 2030, on the same terms as the Alternative Treatment of the Bank Debt. The Working Capital Financing Agreement will be provided by the Affected Creditors under the Bank Debt that elect the Alternative Treatment of the Bank Debt, in proportion to their participation in the Bank Debt. BBVA has assumed a backstop commitment of the Working Capital Financing Agreement from the first euro exceeding €15 million up to €205 million, which was conditioned on Affected Creditors representing at least 65 percent of the Bank Debt

electing the Alternative Treatment.   The Working Capital Financing Agreement ranks first in priority in the payment waterfall in respect of the obligations with recourse to the Company.

d.   **Implementation through amended instruments and new notes.**   The Bank Debt will be amended on a non-extinguishing basis through amended and restated documentation, resulting in the New Syndicated Facilities Agreement, the Amended ICO Facilities Agreement, and the New EIB Financing Agreement.   The Existing Notes will be exchanged for New Notes, with Affected Creditors receiving either New A Notes or New B Notes depending on whether they receive the Default Treatment or Alternative Treatment, respectively.   The Existing Guarantee Lines will be amended on a non-extinguishing basis, with affected claims treated as Contingent Guarantee Claims or New Guarantee Lines, as applicable.   The Intragroup Loans will be extended to January 1, 2036, with all interest capitalized, and subordinated to the remainder of the Affected Debt.

e.   **Security and intercreditor agreements.**   The Spanish Restructuring Plan contemplates the ratification and amendment of the Existing Security and Guarantees, the granting of the New ICA First-Ranking and Second-Ranking Security Interests, the New ICA Guarantees, and the Pledges over Accounts, and an amended Intercreditor Agreement, which will provide, among other things, that in respect of enforcement recoveries from the Existing Security and Guarantees (other than the Share Pledge), the New ICA Guarantees, and the New ICA Security Interests, proceeds are applied first to obligations under the Working Capital Financing Agreement and the Extensions of the Existing Syndicated Factoring (in each case, with respect to obligations with recourse to Grupo Antolin), second to Affected Claims of Affected Creditors electing Alternative Treatments up to a maximum of €435 million, and third to the remaining Affected Claims on a pro rata and *pari passu* basis.   In respect of enforcement recoveries from the Share Pledge, the existing *pari passu* payment priority waterfall is preserved, amended solely to reflect the post-Restructuring Transaction instruments.

f.   **Interest accruing and payable.**   The Spanish Restructuring Plan provides that interest and fees accruing under the Affected Agreements, other than the Intragroup Loans, will continue to accrue and be payable in accordance with the terms of the applicable Affected Debt agreements until the Effective Date.   If the Effective Date does not coincide with an ordinary interest or fee payment date, an extraordinary interest and fee settlement will be made on the Closing Date for the period between the last ordinary settlement date and the Effective Date, without any turnover or repayment obligation under the Intercreditor Agreement or any Affected Agreement applying to such payments.   From the Effective Date, interest and fees on

the Affected Debt will accrue in accordance with the applicable Restructuring Documents.

65. The Spanish Restructuring Plan does not affect all liabilities of Grupo Antolin. Commercial, labor, and public creditors, as well as any creditors holding debt outside the perimeter of the Affected Debt, are not affected by the Spanish Restructuring Plan and are expected to continue to be paid in the ordinary course and in accordance with their existing terms. The Spanish Restructuring Plan also does not provide for operational restructuring measures, does not affect public-law claims, and does not affect shareholder rights in their capacity as such.

66. Following homologation, and once the applicable conditions precedent have been satisfied, the Debtors and their stakeholders will proceed to consummate the Restructuring Transactions in accordance with the Spanish Restructuring Plan and the related Transaction Documents.

**D.     The Debtors' Spanish Proceeding.**

67. Following the signing and formalization of the amended Spanish Restructuring Plan, on July 10, 2026, the Debtors filed the Homologation Application. The Spanish Court was deemed to have jurisdiction over the Spanish Proceeding with respect to the Debtors.

68. On July 20, 2026, the Debtors were notified with a resolution of the Spanish Court issued on July 17, 2026, accepting the Homologation Application for processing, and the related order is expected to be published in the Public Insolvency Register sometime thereafter. The Spanish Court may issue an order granting or denying the homologation of the Spanish Restructuring Plan (the "Homologation Order") within approximately fifteen business days of publication of the order admitting the Homologation Application for processing in the Public Insolvency Register, although homologation is expected to occur in September or October 2026

in light of the Spanish judicial holidays during the month of August.  If the Spanish Court is satisfied that the Spanish Restructuring Plan meets the applicable requirements of the Insolvency Law, the Spanish Court will homologate the Spanish Restructuring Plan and the effects thereof will become effective immediately, including the extension of the plan's terms to non-participating affected creditors, the protection of the Restructuring Transactions and new financing against claw-back actions, and the extension of the Spanish Restructuring Plan's effects to the Share Pledge.  After the Homologation Order is entered, Affected Creditors that did not vote in favor of the Spanish Restructuring Plan may challenge the homologation within fifteen business days of publication of the Homologation Order in the Public Insolvency Register, on grounds prescribed by articles 654 and 655 of the Insolvency Law.  Once homologated, the Debtors and their stakeholders will proceed to consummate the Restructuring Transactions in accordance with the Spanish Restructuring Plan and the related Transaction Documents.  Recognition of the Spanish Restructuring Plan under chapter 15 of the Bankruptcy Code is a condition precedent to the effectiveness of the Spanish Restructuring Plan.

### **Basis for Relief**

69.     The U.S. Bankruptcy Court should grant the Verified Petition and recognize (a) the Spanish Proceeding as a "foreign main proceeding" (as such term is defined in section 1502(4) of the Bankruptcy Code) for each of the Debtors, and (b) Cristina Blanco Santo Tomás, Grupo Antolin's chief executive officer and duly authorized foreign representative of each Debtor, as the "foreign representative" (as such term is defined in section 101(24) of the Bankruptcy Code).  The requirements for recognition under section 1517 of the Bankruptcy Code are satisfied here as (a) the Spanish Proceeding is a foreign main proceeding within the meaning of section 1502 of the Bankruptcy Code, (b) the Foreign Representative applying for recognition

31

is a person or body, and (c) the Verified Petition satisfies the requirements of section 1515 of the Bankruptcy Code. *See* 11 U.S.C. § 1517(a). For these reasons, and the reasons set forth herein, the U.S. Bankruptcy Court should grant the Verified Petition and enter the Order.

## I. The Debtors Are Eligible for Chapter 15 Relief.

70. The Debtors are eligible to be debtors in a chapter 15 case. For the purposes of chapter 15 of the Bankruptcy Code, a "debtor" means an entity that is the subject of a foreign proceeding. *See* 11 U.S.C. § 1502(1); *see also* 11 U.S.C. § 101(15), (41) (defining "entity" and "person"). Each of the Debtors is also a debtor in the Spanish Proceeding.

71. The Debtors must also meet the general eligibility requirements under section 109(a) of the Bankruptcy Code, which courts in the Second Circuit apply to chapter 15 debtors. *See Drawbridge Special Opportunities Fund LP v. Barnet (In re Barnet)*, 737 F.3d 238, 251 (2d Cir. 2013) (finding that section 109(a) of the Bankruptcy Code applies to the debtor in a foreign main proceeding under chapter 15 of the Bankruptcy Code); *but see In re Bemarmara Consulting A.S.*, Case No. 13-13037-KG (Bankr. D. Del. Dec. 17, 2013) (holding that section 109 property requirements do not apply to chapter 15 debtors). Section 109(a) of the Bankruptcy Code provides that "[n]otwithstanding any other provision of this section, only a person that resides or has a domicile, a place of business, or property in the United States, or a municipality, may be a debtor under this title." 11 U.S.C. § 109(a). Here the Debtors have property in the U.S., including operations, assets, and employees, cash held in U.S. accounts (including retainers), and U.S.-based contractual rights.

72. Section 109(a) of the Bankruptcy Code does not require a specific quantum of property in the United States, nor does it indicate when or for how long such property must have a U.S. situs. *See, e.g.*, *In re Berau Cap. Res. Pte Ltd.*, 540 B.R. 80, 82 (Bankr. S.D.N.Y. 2015).

Decisions applying section 109(a) of the Bankruptcy Code to foreign debtors find that a nominal amount of property in the United States suffices to satisfy the section 109 requirement. *See, e.g.*, *GMAM Inv. Funds Tr. I v. Globo Comunicacoes e Participacoes S.A. (In re Globo Comunicacoes e Participacoes S.A.)*, 317 B.R. 235, 249 (S.D.N.Y. 2004) ("For a foreign corporation to qualify as a debtor under Section 109, courts have required only nominal amounts of property to be located in the United States, and have noted that there is 'virtually no formal barrier' to having federal courts adjudicate foreign debtors' bankruptcy proceedings.") (quoting *In re Aerovias Nacionales de Colom. S.A. (In re Avianca)*, 303 B.R. 1, 9 (Bankr. S.D.N.Y. 2003)); *In re Paper I Partners, L.P.*, 283 B.R. 661, 674 (Bankr. S.D.N.Y. 2002) ("[T]here is no statutory requirement as to the property's minimum value."). Effectively, if a debtor has any property in the United States, section 109(a) of the Bankruptcy Code is satisfied.

73. A debtor's contractual rights, including rights pursuant to debt that is governed by New York law and contains a New York forum selection clause, constitute property of the debtor in New York for purposes of section 109(a) of the Bankruptcy Code. *See, e.g.*, *In re Olinda Star Ltd.*, 614 B.R. at 40; *In re Serviços de Petróleo Constellation S.A.*, 600 B.R. 237, 269 (Bankr. S.D.N.Y. 2019); *In re Avanti Commc'ns Grp. PLC*, 582 B.R. 603, 612–13 (Bankr. S.D.N.Y. 2018); *In re Suntech Power Holdings Co.*, 520 B.R. 399, 412–13 (Bankr. S.D.N.Y. 2014).

74. Moreover, a retainer held in a client trust fund is a sufficient independent basis to establish property in the United States for purposes of section 109(a). *See, e.g.*, *NFE Global Holdings*, Mem. Op. at 43 (finding that debtors obligated on New York law governed debt formed an independent basis for satisfaction of section 109(a) of the Bankruptcy Code); *In re U.S. Steel Canada Inc.*, 571 B.R. 600, 610 (Bankr. S.D.N.Y. 2017) (same).

75.     As stated above, the Debtors satisfy the eligibility requirement of section 109(a) of the Bankruptcy Code as they have both property and U.S. bank accounts, including ten production plants, one technical-commercial office, and thirty-nine U.S. bank accounts, including a professional services retainer, in the United States.  Further, the Debtors are obligors on the Existing Notes, each of which are governed by New York law.  Section 12.07 of both the 2028 Notes Indenture and 2030 Notes Indenture provides that the indenture, the notes, and the note guarantees are governed by and construed in accordance with the laws of the State of New York.  *See* § 12.07, 2028 Notes Indenture; § 12.07, 2030 Notes Indenture.  Finally, the Debtors have a retainer with their claims and noticing agent that is held in a bank account located in New York.

76.     The U.S. assets, the New York law-governed indebtedness, and the retainer held in a New York bank account are each independent bases for jurisdiction and satisfy the "property" requirement of section 109(a) of the Bankruptcy Code.  *See Cell C Proprietary Ltd.*, 571 B.R. at 551.  Accordingly, the Debtors meet the general eligibility requirements of section 109(a) of the Bankruptcy Code.

## II.     The Requirements of Section 1517(a) of the Bankruptcy Code Are Satisfied.

77.     Section 1517(a) of the Bankruptcy Code provides that, after notice and hearing, a court shall enter an order recognizing a foreign proceeding as a foreign main or foreign nonmain proceeding if (a) such foreign proceeding is a foreign main or foreign nonmain proceeding within the meaning of section 1502 of the Bankruptcy Code, (b) the foreign representative applying for recognition is a person or body, and (c) the petition meets the requirements of section 1515 of the Bankruptcy Code.  *See* 11 U.S.C. § 1517(a).  Recognition is mandatory if all three requirements of section 1517(a) of the Bankruptcy Code are met.  *See, e.g., In re Comair*

*Ltd.*, No. 21-10298 (JLG), 2023 LX 87110, at \*40 (Bankr. S.D.N.Y. Feb. 12, 2023) ("[S]ubject to the public policy exception under section 1506, recognition of a foreign proceeding is 'mandatory' where the requirements of section 1517(a) are met."); *Constellation,* 600 B.R. at 269 ("Therefore, recognition of the foreign proceeding is statutorily mandated if the three requirements of section 1517(a) are met and no exception applies."); *In re Oi Brasil Holdings Coöperatief U.A.*, 578 B.R. 169, 194 (Bankr. S.D.N.Y. 2017) ("Recognition is mandatory if all three requirements of Section 1517(a) are met."). As explained below, the Spanish Proceeding, the Foreign Representative, and the Verified Petition each satisfy the foregoing requirements and, therefore, the Spanish Proceeding should be recognized as a foreign main proceeding of the Debtors.

### A.      The Spanish Proceedings Is a Foreign Proceeding.

78.      Section 101(23) of the Bankruptcy Code requires that a "foreign proceeding" must be (a) either judicial or administrative; (b) collective in nature; (c) in a foreign country that is authorized or conducted under a law related to insolvency or the adjustment of debts; (d) in which the debtor's assets and affairs are subject to the control or supervision of a foreign court; and (e) for the purpose of reorganization or liquidation. *See* 11 U.S.C. § 101(23); *see also In re Ashapura Minechem Ltd.*, 480 B.R. 129, 136 (S.D.N.Y. 2012) (citing *In re Betcorp Ltd.*, 400 B.R. 266, 277 (Bankr. D. Nev. 2009)); *In re ABC Learning Ctrs. Ltd.*, 728 F.3d 301, 308 (3d Cir. 2013) (listing the seven factors); *In re Oversight & Control Comm'n of Avánzit, S.A.*, 385 B.R. 525, 533 (Bankr. S.D.N.Y. 2008) (discussing factors). As described below, the Spanish Proceeding satisfy such requirements and therefore qualify as a "foreign proceeding" for purposes of section 101(23) of the Bankruptcy Code.

35

79.    *First*, the Spanish Proceeding is commenced pursuant to a law relating to insolvency and are judicial in character.  Namely, the Spanish Proceeding is commenced pursuant to the Insolvency Law, a Spanish law that governs insolvency restructuring proceedings and provides for the adjustment and restructuring of a company's financial obligations through a restructuring plan.  Such proceedings are judicial in character whenever a court "exercises its supervisory powers."  *In re ABC Learning Ctrs. Ltd.*, 445 B.R. 318, 328 (Bankr. D. Del. 2010).  Here, the Spanish Proceeding is pending before the Spanish Court, which appointed the Restructuring Expert who assisted the Debtors and their creditors in the preparation of the Spanish Restructuring Plan.  In addition, the Spanish Court will determine whether the statutory requirements for homologation of the Spanish Restructuring Plan have been satisfied, including the requirements relating to class approval, treatment of affected creditors, protection of new financing and implementation acts, and extension of the Spanish Restructuring Plan's effects to certain creditors and security interests.  Accordingly, the Spanish Proceeding is pending pursuant to law relating to insolvency and are judicial in character.

80.    *Second*, the Spanish Proceeding is collective in nature in that all affected creditors are allowed to participate.  In *Betcorp*, for instance, the bankruptcy court discussed the contrasts between a true collective proceeding, where such proceeding "considers the rights and obligations of all creditors" and a non-collective proceeding, such as a "receivership remedy instigated at the request, and for the benefit, of a single secured creditor." *Betcorp*, 400 B.R. at 281; *see also In re Poymanov*, 571 B.R. 24, 33 (Bankr. S.D.N.Y. 2017) ("A proceeding is collective if it considers the rights and obligations of all of a debtor's creditors, rather than a single creditor.").  The Spanish Proceeding considers the rights and obligations of all affected creditors collectively, rather than merely providing a forum for resolution of a two-party dispute.

Affected Creditors that did not vote in favor of the Spanish Restructuring Plan have fifteen business days following publication of the homologation order in the Public Insolvency Register to challenge the homologation.

81. *Third*, the Spanish Proceeding subjects the Debtors' assets and affairs to the supervision of the Spanish Court for the duration of the proceeding. The Spanish Court has jurisdiction over the Homologation Application and must determine whether the Spanish Restructuring Plan satisfies the requirements for homologation under the Insolvency Law. A restructuring plan can be homologated in one of three ways: (a) the plan received unanimous approval from all classes; (b) the plan is accepted by a majority of classes, including at least one class of creditors with special or ordinary privilege; or (c) at least one class that will receive a recovery under the restructuring plan, based on a valuation of the debtor company as a going concern, approves the plan. Upon admission of the Homologation Application, the Spanish Court may impose measures to prevent individual enforcement actions, including prohibiting the commencement of judicial or extrajudicial enforcement actions against the Debtors' assets and suspending enforcement actions already commenced until a decision on homologation is taken.

82. *Finally*, the objective of the Spanish Proceeding is the reorganization of the Debtors. The principal objective of the Spanish Proceeding is to facilitate the reorganization of a business through homologation of the Spanish Restructuring Plan. The Spanish Proceeding allow the Debtors' business operations to continue, employees to be maintained, and liabilities to be restructured. The Spanish Restructuring Plan provides for a comprehensive financial restructuring of the Debtors' Affected Debt and is intended to ensure the viability of Grupo Antolin in the short and medium term. The Spanish Restructuring Plan contemplates, among other things, extending debt maturities, modifying applicable debt terms, and preserving the

Debtors' business operations. Therefore, the Debtors have commenced the Spanish Proceeding for the purpose of reorganization, as required by section 101(23) of the Bankruptcy Code. *Cf. Avánzit*, 385 B.R. at 533–34 (recognizing a "financial restructuring" as a "reorganization" for purposes of the sections 101(23) and 1517 analysis, especially where debts will be repaid through the plan at issue).

83. The Spanish Proceeding satisfies the criteria required under section 101(23) of the Bankruptcy Code and, accordingly, the Spanish Proceeding are foreign proceeding entitled to recognition under chapter 15 of the Bankruptcy Code.

**B.    The Spanish Proceeding Is a Foreign Main Proceeding.**

84. The Spanish Proceeding should be recognized as a "foreign main proceeding" as defined in section 1502(4) of the Bankruptcy Code. A foreign proceeding must be recognized as a "foreign main proceeding" if it is pending in the country where the debtor has its center of main interests. *See* 11 U.S.C. § 1517(b). The term "center of main interests" is not defined in the Bankruptcy Code but has been equated to a debtor's principal place of business. *See In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd.*, 374 B.R. 122, 129 (Bankr. S.D.N.Y. 2007), *aff'd*, 389 B.R. 325 (S.D.N.Y. 2008) (citing *In re Tri-Continental Exchange Ltd.*, 349 B.R. 627, 633–34 (E.D. Calif. 2006)).

85. Courts have identified certain factors that are relevant in determining a debtor's center of main interest ("COMI"), including: (a) the location of the debtor's headquarters; (b) the location of those persons or entities that actually manage the debtor; (c) the location of the debtor's primary assets; and (d) the location of the majority of the debtor's creditors or of a majority of the creditors who would be affected by the case. *See In re SPhinX, Ltd.*, 351 B.R. 103, 117 (Bankr. S.D.N.Y. 2006); *see also Morning Mist Holdings Ltd. v. Krys*, 714 F.3d 127,

n.10 (2d Cir. 2013) ("[A] court may certainly consider a debtor's 'nerve center,' including from where the debtor's activities are directed and controlled, in determining a debtor's COMI."). In the absence of evidence to the contrary, a debtor's registered office is presumed to be the debtor's COMI. *See* 11 U.S.C. § 1516(c); *see also In re InterCement Brasil S.A.*, 688 B.R. 802, 821 (Bankr. S.D.N.Y. 2025) (holding that the debtor's registered office is its COMI because no evidence contradicted that presumption); *Suntech*, 520 B.R. at 416 (finding the debtor's presumptive COMI to be its registered office); *In re Fairfield Sentry Ltd.*, 714 F.3d 127, 137 (2d Cir. 2013) (stating that in the absence of contrary evidence the location of a debtor's registered office is presumed to be its COMI) (internal citations omitted).

86.     Here, under all the relevant criteria, Spain is the Debtors' COMI. As set forth in the Declaration of the Foreign Representative:

a.  ***The operating parent's registered office and headquarters are in Spain.*** Debtor Antolin-Irausa, Grupo Antolin's operating parent, is a Spanish company with its registered office and headquarters in Burgos, Spain;

b.  ***The Spanish Debtor subsidiaries' registered offices are in Spain.*** The Spanish Debtor subsidiaries also have their registered offices in Burgos, Spain;

c.  ***The Company operates an integrated and centralized business model.*** Grupo Antolin operates through an integrated and centralized business model under which the Debtors and other subsidiaries operate under the direction and supervision of Antolin-Irausa and, with respect to research, development, and innovation matters, Antolin Ingenieria, each of which is based in Burgos, Spain;

d.  ***The subsidiaries coordinate with Antolin-Irausa under a formal contractual framework.*** PMAs and OTC agreements explicitly vest all strategic, commercial, and operational decision-making in Antolin-Irausa in Burgos, Spain. Subsidiaries coordinate with Antolin-Irausa before negotiating or entering into contracts with OEM customers;

e.  ***Decision-making is centralized in Spain.*** All of the Debtors are directed by, and key decision-making is made from, the Company's headquarters in Burgos, Spain;

39

f. ***Key functions are directed from Spain.*** Although certain Debtors are incorporated or organized outside Spain, including in the United States, their strategic, operational, financial, and management decisions are directed from Burgos, Spain;

g. ***The governing bodies of the subsidiaries are directed from Spain.*** The governing bodies of the Debtors' subsidiaries are composed primarily of Spanish residents, and the chief executive officer of Antolin-Irausa holds director-level positions and/or joint powers of attorney in non-Spanish subsidiaries, ensuring effective management direction resides in Burgos, Spain;

h. ***The Company's intellectual property and intangible assets are owned by Antolin-Irausa in Spain.*** All key intangible assets, including patents, trademarks, customer portfolios, manufacturing know-how, and logistics systems, are owned by Antolin-Irausa in Burgos, Spain, and subsidiaries use them only under limited license;

i. ***Business units are managed from Spain.*** Grupo Antolin's business units are managed from Burgos, Spain, with business-unit leadership reporting to senior management based in Burgos, Spain;

j. ***Centralized treasury and cash management functions are run out of Spain.*** Grupo Antolin maintains a centralized treasury and cash-management system through Antolin-Irausa in Burgos, Spain, including cash-pooling arrangements and centralized contracting for group-wide functions like insurance; and

k. ***The Spanish Tax Administration has officially recognized the Company's centralization in Spain.*** The Spanish Tax Administration has recognized Grupo Antolin's centralized industrial and commercial management model, including the centralization of production and commercial decision-making in Burgos, Spain.

87. Courts have found COMI in other chapter 15 cases that had far fewer connections than those present here. *See, e.g.*, *In re Mega Newco Ltd.*, No. 24-12031 (MEW), 2025 WL 601463, at *2–4 (recognizing an English scheme proceeding as a "foreign main proceeding" where the debtor subsidiary was incorporated in England shortly before commencing the chapter 15 case, and its parent had no registered office, business operations, or facilities in the United Kingdom (citation omitted)); *In re Sunac China Holdings Ltd.*, 656 B.R. 715, 719

40

(Bankr. S.D.N.Y. 2024) (finding Hong Kong to be the debtors' COMI despite the debtors' limited physical presence there because Hong Kong has been the primary locus of the debtors' business activities and decision-making); *Suntech*, 520 B.R. at 416–17 (overruling objection and holding that COMI of Cayman Islands exempted company was in the Cayman Islands even though COMI had been transferred to the Cayman Islands only months prior to the commencement of the schemes); *In re Gandi Innovations Holdings, LLC*, No. 09-51782-C, 2009 WL 2916908, at *2 (Bankr. W.D. Tex. June 5, 2009) (finding Canada to be debtor's COMI despite mixed facts; for example, senior management was located in Ontario, but assets, employees, and operations were both in Texas and Ontario); *In re Ernst & Young, Inc.*, 383 B.R. 773, 780–81 (Bankr. D. Colo. 2008) (finding COMI in Canada notwithstanding the fact that two of the factors—the location of the debtors' creditors and applicable law—yielded inconclusive and possibly contrary results).

88.     Moreover, courts have found that U.S.-incorporated or U.S.-registered entities may have their COMI located in a foreign jurisdiction where, as here, the relevant COMI factors demonstrate that the entity's operations and decision-making are centralized abroad.  *See, e.g.*, *In re Giftcraft*, No. 25-11030 (MG), 2025 WL 1583480, at *2 (Bankr. S.D.N.Y. June 4, 2025) (granting provisional relief after finding that the U.S. debtors' COMI was likely Canada); *In re Iovate Health Scis. Int'l Inc.*, 673 B.R. 516, 533 (Bankr. S.D.N.Y. Sept. 12, 2025) (finding that COMI for a Delaware LLC with its registered office in Delaware was likely Canada).  Here, the seven U.S. Debtors are in the same position.  Although organized under the laws of various U.S. states, their strategic, operational, financial, and management decisions are coordinated from Burgos, Spain.

89.     In sum, the operations and services of the Debtors are highly interdependent and effectively form a single, integrated economic unit where the Company's operations, finances, and management are directed from Spain.  *See, e.g.*, *Constellation*, 600 B.R. 237 at 288 (location of staff in charge of operations and management relevant factor for COMI analysis); *In re OAS S.A.*, 533 B.R. 83, 101-12 (Bankr. S.D.N.Y. 2015) (location of group operations and of parent entity led to finding of COMI in the jurisdiction of the group, not that of the individual debtor's registered office).  For the reasons set forth above, the COMI for each Debtor is in Spain, and the Spanish Proceeding should be recognized as the foreign main proceeding for each Debtor pursuant to section 1517(b)(1) of the Bankruptcy Code.

**C.     In the Alternative, the Spanish Proceeding Is a Foreign Nonmain Proceeding.**

90.     While the Spanish Proceeding satisfies the standards to be deemed a foreign main proceeding under the Bankruptcy Code, if this U.S. Bankruptcy Court concludes that the Spanish Proceeding is not a "foreign main proceeding," the Spanish Proceeding should be recognized as a "foreign nonmain proceeding" under section 1502(5) of the Bankruptcy Code.

91.     A "foreign nonmain proceeding" is defined as "a foreign proceeding, other than a foreign main proceeding, pending in a country where the debtor has an establishment." *See* 11 U.S.C. § 1502(5); *see also* 11 U.S.C. § 1517(b)(2) (providing that an order of recognition as a "foreign nonmain proceeding" shall be entered "if the debtor has an establishment within the meaning of section 1502 in the foreign country where the proceeding is pending").  An establishment is "any place of operations where the debtor carries out a nontransitory economic activity."  11 U.S.C. § 1502(2).  "Nontransitory economic activity" is not defined in the Bankruptcy Code but has been referred to as "a local place of business."  *See In re Creative Fin. Ltd.*, 543 B.R. 498, 520 (Bankr. S.D.N.Y 2016) (holding that in order to have an establishment in

42

a country a debtor must "conduct business in that country"); *see also In re Ran*, 607 F.3d 1017, 1027 (5th Cir. 2010) (holding that the definition of establishment requires "a place from which economic activities are exercised on the market (*i.e.*, externally), whether the said activities are commercial, industrial or professional") (citation omitted); *Bear Stearns*, 374 B.R. at 131 (holding that the requirements of a "place of operations" from which "economic activity" is conducted require a seat for local business activity that has a local effect on the markets); *In re British Am. Ins. Co.*, 425 B.R. 884, 915 (Bankr. S.D. Fla. 2010) (holding same). As with determining a debtor's COMI, courts determine whether a debtor has an establishment in a country as of the time of the filing of the chapter 15 petition. *See Lavie v. Ran*, 406 B.R. 277, 284–85 (S.D. Tex. 2009).

92. As described above, the Debtors maintain substantial operations and management functions in Spain. Antolin-Irausa, Grupo Antolin's operating parent, is headquartered in Burgos, Spain, and the Spanish Debtor subsidiaries have their registered offices and COMI in Burgos, Spain. Although certain Debtors are organized outside Spain, their strategic, operational, financial, treasury, and management decisions are directed from Burgos, Spain through Grupo Antolin's integrated and centralized business model. Given the material and substantive activities conducted by the Debtors in Spain, and the Debtors' centralized management and corporate functions in Burgos, Spain, the Debtors demonstrably have a local and non-transitory place of business, and hence, an establishment, in Spain.

**D.      The Chapter 15 Cases Have Been Commenced by a Duly Authorized Foreign Representative.**

93.     Section 1517 of the Bankruptcy Code provides that a "foreign representative" shall apply for recognition of the foreign proceeding.  Section 101(24) of the Bankruptcy Code defines "foreign representative":

> The term "foreign representative" means a person or body, including a person or body appointed on an interim basis, authorized in a foreign proceeding to administer the reorganization or the liquidation of the debtor's assets or affairs or to act as a representative of such foreign proceeding.

11 U.S.C. § 101(24).

94.     The Debtors' governing bodies have authorized the commencement of the Spanish Proceeding, the implementation of the Spanish Restructuring Plan and related Restructuring Transactions, and the commencement of these chapter 15 cases.  The Debtors' governing bodies also authorized the Foreign Representative to act as foreign representative of the Debtors and to seek recognition of the Spanish Proceeding and related relief under chapter 15 of the Bankruptcy Code.  Courts have held that a governing body of an entity may authorize a person to act as that entity's foreign representative in a chapter 15 proceeding.  *See Cell C Proprietary Ltd.*, 571 B.R. at 553 (recognizing that "section 101(24) does not require that a foreign representative be judicially appointed" and "that a board of directors may authorize a person to act as the corporation's foreign representative in a chapter 15 proceeding"); *see also In re OAS S.A.*, 533 B.R. 83, 98 (Bankr. S.D.N.Y. 2015) (holding that individual appointed by board qualified as a "foreign representative"); *In re Compañia Mexicana de Aviación, S.A. de C.V.*, No. 10-14182 (MG), 2010 WL 10063842 at *2 (Bankr. S.D.N.Y. Nov. 8, 2010) (same).   The Foreign Representative is a "person" under section 101(41) of the Bankruptcy Code.  Accordingly, the requirements of section 101(24) of the Bankruptcy Code

have been met and that the Foreign Representative is the Debtors' "foreign representative" as

defined therein.

**E.     The Verified Petition Satisfies the Requirements of Section 1515 of the Bankruptcy Code.**

95.     Pursuant to section 1515(b) of the Bankruptcy Code, a petition for recognition

must be accompanied by one of the following:

   a.     a certified copy of the decision commencing such foreign proceeding and appointing the foreign representative;

   b.     a certificate from the foreign court affirming the existence of such foreign proceeding and of the appointment of the foreign representative; or

   c.     in the absence of evidence referred to in paragraphs (1) and (2), any other evidence acceptable to the court of the existence of such foreign proceeding and of the appointment of the foreign representative.

96.     The Declaration of the Foreign Representative describes the existence of the

Spanish Proceeding and the Debtors' authorization of the Foreign Representative to act as the

"foreign representative" of the Debtors in these chapter 15 cases, satisfying section 1515(b)(3) of

the Bankruptcy Code.  *See Cell C Proprietary Ltd.*, 571 B.R. at 553; *ABC Learning Ctrs.*,

445 B.R. at 334 (holding that declaration of petitioner "is acceptable evidence under

§ 1515(b)(3) of the existence of the foreign proceeding and the appointment of the foreign

representatives"). Therefore, the Verified Petition meets the requirements of section 1515 of the

Bankruptcy Code in satisfaction of the third requirement under section 1517(a) of the

Bankruptcy Code.

97.     Because the Verified Petition satisfies section 1517 of the Bankruptcy Code, the

U.S. Bankruptcy Court must recognize the Spanish Proceeding in these chapter 15 cases. *See,*

*e.g.*, *Comair*, 2023 LX 87110, at *40 ("[S]ubject to the public policy exception under section

1506, recognition of a foreign proceeding is 'mandatory' where the requirements of section 1517(a) are met."); *Constellation*, 600 B.R. at 269 ("Therefore, recognition of the foreign proceeding is statutorily mandated if the three requirements of section 1517(a) are met and no exception applies."); *Oi Brasil*, 578 B.R. at 194 (Bankr. S.D.N.Y. 2017) ("Recognition is mandatory if all three requirements of Section 1517(a) are met."); *see also* 8 Collier on Bankruptcy ¶ 1515.02 (16th 2026) ("This structure makes the recognition procedure largely objective and not discretionary[.]").

## III.  Recognition of the Spanish Proceeding Is Not Contrary to U.S. Public Policy.

98.     A court may deny a request for any chapter 15 relief that would be "manifestly contrary to the public policy of the United States."  11 U.S.C. § 1506.  Courts that have addressed the "public policy exception" in section 1506 of the Bankruptcy Code have noted that the exception is narrow, its application restricted to the most fundamental policies of the U.S., and a foreign judgment should generally be accorded comity if the foreign jurisdiction's proceedings meet fundamental standards of fairness.  *See Collins v. Oilsands Quest Inc.*, 484 B.R. 593, 597 (Bankr. S.D.N.Y. 2012); *see also In re Metcalfe & Mansfield Alternative Invs.*, 421 B.R. 685, 697 (Bankr. S.D.N.Y. 2010) (holding that a court is not required to make an independent determination about the propriety of the acts of a foreign court, but only whether their procedures meet U.S. standards of fundamental fairness).  The relief granted in a foreign proceeding and the relief available in a U.S. proceeding need not be identical.  Courts have even gone so far as to hold that even the absence of a jury trial (a right embodied in the U.S. Constitution) in a foreign proceeding would not justify the court's refusal to recognize the foreign proceeding pursuant to the public policy exception.  *See In re Ephedra Products Liab. Litig.*, 349 B.R. 333, 335–36 (Bankr. S.D.N.Y. 2006).

99.     Here, the Verified Petition seeks recognition of the Spanish Proceeding as a foreign main proceeding and recognition of the Foreign Representative as fulfilling the requirements of section 101(24) of the Bankruptcy Code.  Because Congress enacted chapter 15 specifically to provide for this type of compulsory recognition relief, the granting of such relief is not manifestly contrary to United States public policy.  *See* 11 U.S.C. § 1501(a) (explaining that the purpose of chapter 15 is to provide effective mechanisms for dealing with cases of cross-border insolvency with the objectives of, among other things, cooperation between courts of the United States and foreign countries involved in cross-border insolvency cases, greater legal certainty for trade and investment, fair and efficient administration of cross-border insolvencies that protects the interests of all creditors and other interested entities, and protection and maximization of the value of the debtor's assets); *see also In re Vitro S.A.B. de C.V.*, 701 F.3d 1031, 1053 (5th Cir. 2012) ("Given Chapter 15's heavy emphasis on comity, it is not necessary, nor to be expected, that the relief requested by a foreign representative be identical to, or available under, United States law.").

100.     Moreover, recognition promotes the very objectives that Congress sought to advance through chapter 15, including international cooperation and comity among courts, protection and maximization of the value of the Debtors' assets, and facilitation of the rescue of financially troubled businesses.  *See* 11 U.S.C. §§ 1501(a), 1525(a), 1527; *see also In re Crédito Real. S.A.B. de C.V., SOFOM, E.N.R.*, 677 B.R. 192, 205 (D. Del. 2026) ("Section 1506's public policy exception provides a narrow remedy for genuine threats to core U.S. constitutional or statutory rights, as opposed to mere discrepancies between domestic and foreign law.").  Indeed, denying recognition would be contrary to United States public policy because it would frustrate the congressionally mandated framework for cross-border cooperation and deprive the Debtors

and their stakeholders of the protections that chapter 15 was designed to provide. The Spanish Proceeding affords the Affected Creditors a full and fair opportunity to participate therein, consistent with U.S. standards of fundamental fairness, and any party that seeks to object to this U.S. Bankruptcy Court's enforcement of the Spanish Restructuring Plan will have the right to do so pursuant to the Notice and Objection Procedures.

## IV. Enforcement of the Spanish Restructuring Plan Is Necessary and Appropriate.

### A. The Enforcement Order Is Appropriate Relief Under Sections 105(a) and 1521(a)(7) of the Bankruptcy Code.

101. If the Spanish Proceeding is recognized under section 1517 of the Bankruptcy Code as a foreign main proceeding or a foreign nonmain proceeding, enforcement of the Spanish Restructuring Plan is appropriate under sections 105(a) and 1521 of the Bankruptcy Code. Section 105(a) of the Bankruptcy Code empowers the U.S. Bankruptcy Court to "issue any order, process, or judgment that is necessary and appropriate to carry out the provisions of" the Bankruptcy Code. 11 U.S.C. § 105(a). Additionally, section 1521(a)(7) of the Bankruptcy Code authorizes the U.S. Bankruptcy Court to grant "any appropriate relief" that is "necessary to effectuate the purpose of [chapter 15] and to protect the assets of the debtor or the interests of the creditors." 11 U.S.C. § 1521(a)(7); *see, e.g.*, *In re Avanti*, 582 B.R. at 612 ("The discretion that is granted is 'exceedingly broad,' since a court may grant 'any appropriate relief' that would further the purposes of chapter 15 and protect the debtor's assets and the interests of creditors.") (citation omitted). For example, appropriate relief under section 1521(a) of the Bankruptcy Code includes enforcing a foreign confirmation order. *See In re Rede Energia S.A.*, 515 B.R. 69, 93 (Bankr. S.D.N.Y. 2014).

102. Recognition and enforcement of the Homologation Order, the Spanish Restructuring Plan, the Restructuring Transactions thereunder, and the Transaction Documents

48

related thereto is "appropriate relief" under section 1521(a)(7) of the Bankruptcy Code because the relief is necessary to ensure that the Restructuring Transactions can be implemented without disruption or adverse actions being brought in the United States. *See, e.g.*, *In re Garcia Avila*, 296 B.R. 95, 114 (Bankr. S.D.N.Y. 2003) ("[I]rreparable harm is present when the failure to enjoin local actions will disrupt the orderly reconciliation of claims and the fair distribution of assets in a single, centralized forum[.]") (citation omitted). Furthermore, allowing creditors to re-litigate issues resolved under the Spanish Restructuring Plan would threaten the success of the Spanish Proceeding and cause "irreparable harm" to the Debtors. The relief requested herein is narrowly tailored to effectuate the purpose of chapter 15 of the Bankruptcy Code, as the Enforcement Order is limited to recognition and enforcement of the Homologation Order, the Spanish Restructuring Plan, the Restructuring Transactions thereunder, and the Transaction Documents related thereto, subject to the Notice and Objection Procedures and the Spanish Court's entry of the Homologation Order. The Enforcement Order will therefore ensure that the relief requested herein is coextensive with, and does not exceed, the relief approved in the Spanish Proceeding for which recognition as a foreign main proceeding is sought.

**B.     The Enforcement Order Provides the Foreign Representative with Additional Assistance Pursuant to Section 1507 of the Bankruptcy Code.**

103.    Moreover, the U.S. Bankruptcy Court may also provide "additional assistance" to foreign representatives under the Bankruptcy Code or under the other laws of the United States, provided that such assistance is "consistent with the principles of comity" and cooperation with foreign courts and not manifestly contrary to public policy. 11 U.S.C. § 1507; *see, e.g.*, *In re PT Bakrie Telecom Tbk*, 628 B.R. 859, 878 (Bankr. S.D.N.Y. 2021) ("In sum, federal courts assessing whether to extend comity look to (1) whether the foreign proceeding abided by fundamental standards of procedural fairness; (2) whether the foreign proceeding violated the

49

laws or public policy of the United States; and (3) whether the foreign judgment was affected by fraud."); *In re Oi S.A.*, 587 B.R. 253, 264 (Bankr. S.D.N.Y. 2018) ("Federal courts generally extend comity whenever the foreign court had proper jurisdiction and enforcement does not prejudice the rights of United States citizens or violate domestic public policy."); *see also, e.g.*, *In re Metcalfe & Mansfield Alt. Invs.*, 421 B.R. at 696; *In re Atlas Shipping A/S*, 404 B.R. 726, 738 (Bankr. S.D.N.Y. 2009) (noting that post-recognition relief is "largely discretionary and turns on subjective factors that embody principles of comity" (quoting *In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd.*, 389 B.R. 325, 333 (S.D.N.Y. 2008))). Enforcement of the Homologation Order, the Spanish Restructuring Plan, the Restructuring Transactions thereunder, and the Transaction Documents related thereto is consistent with the goals of international cooperation and assistance to foreign courts embodied in chapter 15 and is necessary to promote comity and to the implementation of the Restructuring Transactions.

104. In addition, section 1507(b) of the Bankruptcy Code directs the U.S. Bankruptcy Court to consider several specific factors in determining whether to grant additional assistance, including (i) protection of the interests of U.S. creditors, (ii) prevention of preferential or fraudulent transfers of the Debtors' property, (iii) whether the treatment of creditors under the foreign proceeding is substantially in accordance with the treatment such creditors would receive under U.S. law, (iv) whether a class of creditors has voted to accept the foreign plan, and (v) the Debtors' ability to pay their debts as they come due following confirmation. *See* 11 U.S.C. §1507(b); *In re Vitro*, 701 F.3d at 1065-67. Each of these factors weigh decisively in favor of granting additional assistance here.

105.     *First*, the interests of U.S. creditors are fully protected because any U.S.-based holders of Affected Debt receive the same treatment under the Spanish Restructuring Plan as similarly situated creditors elsewhere, and all parties in interest—wherever located—will have a full and fair opportunity to raise any objection to the Spanish Restructuring Plan through the Notice and Objection Procedures before the U.S. Bankruptcy Court.  *Second*, the Spanish Restructuring Plan and the Restructuring Transactions do not affect any preferential or fraudulent disposition of the Debtors' property, and the Restructuring Transactions were negotiated at arm's length among the Debtors and their key stakeholders and designed to maximize the value available for distribution to all creditors.  *Third*, the treatment of creditors under the Spanish Restructuring Plan is substantially in accordance with U.S. law because distributions respect the relative priority of claims in a manner consistent with the distribution scheme under title 11 of the United States Code.  *Fourth*, the Spanish Restructuring Plan is supported by a sufficient majority of the class of holders of the Affected Debt entitled to vote, with the Ad Hoc Group representing the only creditor constituency of which the Foreign Representative is aware that opposes the Restructuring Transactions.  *Fifth*, the Restructuring Transactions are designed to provide the Debtors with a sustainable capital structure going forward, such that the Debtors will be able to satisfy their post-emergence obligations as they come due.  Because each of these factors is satisfied, granting additional assistance here is consistent with the principles of comity.

**C.     The Enforcement Order Is Not Manifestly Contrary to Public Policy under Section 1506 of the Bankruptcy Code.**

106.     The Restructuring Transactions also are not "manifestly contrary to public" policy under section 1506 of the Bankruptcy Code—a statutory provision that is narrowly construed by courts.  *See* 11 U.S.C. 1506; *see also In re Crédito Real*, 677 B.R. at 205 ("Section 1506's public policy exception provides a narrow remedy for genuine threats to core U.S. constitutional or

statutory rights, as opposed to mere discrepancies between domestic and foreign law. The public policy exception applies only when actions offend 'the most fundamental policies of the United States' and is 'invoked only "under exceptional circumstances concerning matters of fundamental importance for the [United States]."') (citation omitted); *In re Fairfield Sentry Ltd.*, 714 F.3d at 139 (finding that manifestly contrary to public policy means the exception should be interpreted restrictively and used "only 'under exceptional circumstances concerning matters of fundamental importance for the enacting State.'") (citation omitted); *In re Sino-Forest Corp.*, 501 B.R. 655, 665 (Bankr. S.D.N.Y. 2013); *In re Metcalfe & Mansfield Alt. Inv.*, 421 B.R. 685, 697 (Bankr. S.D.N.Y. 2010); *In re Vitro*, 701 F.3d at 1069; *In re Servicos de Petroleo Constellation S.A.*, 600 B.R. 237, 252 n.20 (Bankr. S.D.N.Y. 2019) (rejecting a public policy objection premised on differences between Brazilian and U.S. insolvency procedure). Nor is the public policy exception implicated merely because a minority creditor constituency, such as the Ad Hoc Group, opposes the Restructuring Transactions—the exception is reserved for exceptional circumstances threatening fundamental U.S. policy, not for garden-variety disputes among creditors regarding the merits of a foreign restructuring. *See In re Sino-Forest Corp*, 501 B.R. at 665. Notably, mere differences between the procedural mechanics of the Insolvency Law and a plenary chapter 11 case do not, standing alone, implicate the public policy exception. *See In re Rede Energia S.A.*, 515 B.R. at 104-05 ("This Court will not decline to extend comity and grant additional relief simply because Brazilian bankruptcy law is not identical to U.S. bankruptcy law."); *Allstate Life Ins. Co. v. Linter Group Ltd.*, 944 F.2d 996, 999-1000 (2d Cir. 1993) ("[T]here is no requirement that Australian liquidation proceedings be identical to United States bankruptcy proceedings. . . . The fact that the Australian procedure differs slightly from

52

the United States' stay procedure is irrelevant, especially where, as here, there is no indication that appellants would be prejudiced if they were required to maintain their actions in Australia.").

107. Here, the Spanish Court will conduct a fair and judicious process with respect to the substance of the Spanish Restructuring Plan pursuant to the Insolvency Law. The Spanish Court is expected to adjudicate the merits of the Spanish Restructuring Plan prior to the Foreign Representative's dissemination and publication of the Homologation Order Notice, and any party in interest can raise issues with its contents before the U.S. Bankruptcy Court should any remain upon entry of the Homologation Order. The Spanish Restructuring Plan is also supported by a sufficient majority of holders of the Affected Debt, and the Ad Hoc Group is the only creditor constituency that the Foreign Representative is aware of that opposes the Restructuring Transactions. The Debtors will demonstrate why the Restructuring Transactions comply with Spanish law in the Spanish Proceeding following a fair process where all affected parties will have an opportunity to be heard. The U.S. Bankruptcy Court should therefore enter the Enforcement Order following the Spanish Court's entry of the Homologation Order, subject the Notice and Objection Procedures, as set forth herein.

## V. The Interests of Creditors and Other Interested Entities, Including the Debtor, Are Sufficiently Protected in Accordance with Section 1522 of the Bankruptcy Code.

108. Relief under section 1521 of the Bankruptcy Code will be granted "only if the interests of the creditors and other interested entities, including the debtor, are sufficiently protected." 11 U.S.C. § 1522(a). The interests of creditors and other interested entities, including the Debtors, are sufficiently protected by the relief requested herein. *First*, the relief requested in this Verified Petition with respect to the Homologation Order and the Spanish Restructuring Plan is limited to the establishment of the Notice and Objection Procedures, through which the Homologation Order and the Spanish Restructuring Plan will be given full

force and effect in the United States following entry of the Enforcement Order.  The entry of this Order establishes an orderly framework that preserves all parties' ability to be heard before the Enforcement Order is entered.  All creditors and parties in interest will have a full and fair opportunity to raise objections both in the Spanish Proceeding and in the United States.  Accordingly, no party's rights are prejudiced by entry of this Order.  ***Second***, the relief requested herein is in the best interests of the Debtors.  Section 1522(a) of the Bankruptcy Code explicitly identifies the debtor as one of the parties whose interests must be sufficiently protected.  Here, the establishment of the Notice and Objection Procedures at this stage, rather than waiting until after the Homologation Order is entered, serves the Debtors' interest in an efficient and timely implementation of the Restructuring Transactions.  Given the anticipated timeline of the Spanish Proceeding, with homologation expected in September or October 2026, establishing the Notice and Objection Procedures now ensures that the Restructuring Transactions can be consummated without unnecessary delay once the Homologation Order is entered.  This approach preserves the Debtors' resources, maintains creditor and stakeholder confidence in the restructuring timeline, and avoids the potential for disruption that could result from a gap between homologation in Spain and enforcement in the United States.  ***Third***, the Affected Creditors are sufficiently protected.  The Affected Creditors who support the Spanish Restructuring Plan, which represent the requisite majorities necessary for homologation, have already signed the Recapitalisation Support Agreement and/or the Spanish Restructuring Plan, thereby affirmatively consenting to the Restructuring Transactions.  Any Affected Creditor that did not support the Spanish Restructuring Plan retains the right to challenge the homologation in the Spanish Proceeding and, following entry of the Homologation Order, to object to enforcement in the United States pursuant to the Notice and Objection Procedures.  ***Fourth***, the Notice and Objection Procedures

also promote judicial economy and the efficient administration of these chapter 15 cases because approval of the contents of the Spanish Restructuring Plan are expected to be fully adjudicated in the Spanish Court prior to the Enforcement Order being entered. Accordingly, the balance of interests weighs in favor of granting the relief requested, and the interests of all creditors and other interested entities, including the Debtors, are sufficiently protected within the meaning of section 1522(a) of the Bankruptcy Code.

**VI.     The Notice and Objections Procedures Should Be Approved Pursuant to Sections 105(a), 1507, 1521(a)(7) of the Bankruptcy Code.**

109.    The Foreign Representative requests that the U.S. Bankruptcy Court approve the Notice and Objection Procedures to establish an orderly framework by which, after the Homologation Order is entered by the Spanish Court, parties in interest will receive notice and may raise objections with the U.S. Bankruptcy Court before the Homologation Order and the Spanish Restructuring Plan are given full force and effect in the United States pursuant to sections 105(a), 1507, and 1521(a) of the Bankruptcy Code. The Foreign Representative requests, through this Verified Petition, that the U.S. Bankruptcy Court approve procedures for and objections to, and ultimately give full force and effect to, the Homologation Order, the Spanish Restructuring Plan, and the Restructuring Transactions thereunder, upon entry of the Homologation Order by the Spanish Court and subject to the Notice and Objection Procedures.

110.    The establishment of the Notice and Objection Procedures at this stage is warranted because of the anticipated timeline of the Spanish Proceeding. Homologation of the Spanish Restructuring Plan is expected to occur in September or October 2026, due to the Spanish court closures during the month of August. Upon the resumption of judicial activity in September, the Debtors anticipate that the Spanish Court will enter the Homologation Order. Establishing the Notice and Objection Procedures both preserves resources of the Debtors and

ensures that, once the Homologation Order is entered, the Foreign Representative can promptly notify parties in interest and that any objections can be raised and resolved in an efficient and orderly manner, without unnecessary delay to the implementation of the Restructuring Transactions.

111.   Notably, unlike the notice and hearing requirement for recognition under section 1517 of the Bankruptcy Code, section 1521(a) does not impose a statutory hearing requirement as a precondition to granting relief.   Accordingly, the Notice and Objection Procedures appropriately provide that, if no timely objection is filed, the Spanish Restructuring Plan shall be given full force and effect without further hearing or order of the U.S. Bankruptcy Court.   The Notice and Objection Procedures have been drafted in accordance with Bankruptcy Rules 2002(1), 2002(m), 2002(p), and 2002(q), and the U.S. Bankruptcy Court may determine the form and manner of such notice pursuant to Bankruptcy Rule 9008.

112.   Specifically, the Notice and Objection Procedures contemplate that, within five (5) business days after the entry of the Homologation Order by the Spanish Court, the Foreign Representative will file the Homologation Order Notice on the docket of these chapter 15 cases and cause the Homologation Order Notice, substantially in the form attached hereto as **Exhibit C**, to be served by electronic mail to the extent email addresses are available and otherwise by overnight mail (for international addresses) or United States mail, first-class postage prepaid, upon  (a) the Debtors; (b) all persons or bodies authorized to administer foreign proceedings of the Debtors; (c) all parties to litigation pending in the United States in which a Debtor is a party at the time of the filing of the chapter 15 petitions; (d) all known creditors affected under the Spanish Restructuring Plan; (e) material unsecured creditors within the territorial jurisdiction of the United States; (f) the United States Trustee for the Southern District

of New York (the "U.S. Trustee"); (g) the United States Attorney for the Southern District of New York; (h) GLAS Specialist Services Limited, the information agent for the Debtors; (i) the Restructuring Expert; (j) D. Miguel Ángel Esteban, in his capacity as Spanish court agent; and (k) any party that has requested notice pursuant to Bankruptcy Rule 2002 (collectively, the "Notice Parties"). To ensure parties are aware of the objection procedures prior to the Spanish Court's entry of the Homologation Order, the Foreign Representative will also cause the Objection Procedures Notice, substantially in the form attached hereto as **Exhibit D**, to be served by electronic mail to the extent email addresses are available and otherwise by overnight mail (for international addresses) or United States mail, first-class postage prepaid, upon the Notice Parties (as defined in the Scheduling Motion) within five (5) business days after entry of the Order. The Homologation Order Notice will include the proposed form of order, substantially in the form attached to the Homologation Order Notice as Exhibit 1, recognizing and enforcing the Homologation Order, the Spanish Restructuring Plan, the Restructuring Transactions, and the Transaction Documents related thereto within the territorial jurisdiction of the United States (the "Enforcement Order") and instructions for all parties to access copies of the Homologation Order and all documents filed in these chapter 15 cases from the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/Antolin.

113. To provide additional notice, within five (5) business days of entry of the Homologation Order by the Spanish Court (or as soon as practicable thereafter), the Foreign Representative will publish the Homologation Order Notice (modified as necessary and appropriate for publication purposes) in the *Financial Times*. Bankruptcy Rule 2002(l) permits the U.S. Bankruptcy Court to "order notice by publication if it finds that notice by mail is

impracticable or that it is desirable to supplement the notice." Fed. R. Bankr. P. 2002(l); *see also* Fed. R. Bankr. P. 9008 (providing that the U.S. Bankruptcy Court shall determine the form and manner of publication notice). Publication notice is appropriate here because the Debtors' operations span multiple jurisdictions and certain creditors or parties in interest may not be known to the Debtors or may not be on the existing service list. *See, e.g.*, *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 317 (1950) ("Those beneficiaries represented by appellant whose interests or whereabouts could not with due diligence be ascertained come clearly within this category. As to them the statutory notice [by publication] is sufficient.").

114. The Notice and Objection Procedures and the Homologation Order Notice provide that any party in interest that intends to object to this U.S. Bankruptcy Court's enforcement of the Spanish Restructuring Plan, the Restructuring Transactions thereunder, and any Transaction Documents related thereto within the territorial jurisdiction of the United States must file and serve a written objection (an "Objection") by 4:00 p.m. (prevailing Eastern Time) on the date that is fourteen calendar days after the Homologation Order Notice is filed with the U.S. Bankruptcy Court (the "Objection Deadline") so that it is ***actually received*** by (a) the U.S. Bankruptcy Court, (b) the Debtors, Grupo Antolin-Irausa S.A.U., C/Vitoria número 307 / Burgos / 09007 / Spain; (c) counsel to the Foreign Representative, (i) Kirkland & Ellis LLP, 333 West Wolf Point Plaza, Chicago, Illinois 60654, Attn.: Chad J. Husnick, P.C. (chusnick@kirkland.com) and (ii) Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022, Attn.: Margaret Reiney (margaret.reiney@kirkland.com) and Jimmy Ryan (jimmy.ryan@kirkland.com); (d) counsel to the Original Participating Creditors, Allen Overy Shearman Sterling US LLP, 599 Lexington Avenue, New York, New York, 10022, Attn. Fredric Sosnick (fsosnick@aoshearman.com) and Mira J. Soldon (mira.soldon@aoshearman.com); and

(e) the Office of the United States Trustee – Manhattan Office, Alexander Hamilton Custom House, One Bowling Green, Room 534, New York, New York, 10004, Attn.:  Daniel Rudewicz (daniel.rudewicz@usdoj.gov) (collectively,  the "Objection Notice Parties") on or before the Objection Deadline.

115.   If no timely Objection is filed and served in accordance with the Notice and Objection Procedures, or such Objection is withdrawn or resolved upon agreement of the Foreign Representative and the objecting party, the Foreign Representative shall file the Enforcement Order under a certificate of counsel.   Upon the U.S. Bankruptcy Court's entry of the Enforcement Order, the Homologation Order, the Spanish Restructuring Plan, the Restructuring Transactions thereunder, and any Transaction Documents related thereto shall be granted full force and effect in the United States, in accordance with section 1521(a) of the Bankruptcy Code. If a timely Objection is filed and not resolved upon agreement of the Foreign Representative and the objecting party or withdrawn within five (5) business days of such filing, the Foreign Representative will request a hearing before this U.S. Bankruptcy Court to resolve such Objection.

116.   These procedures are consistent with the requirements of due process and provide all parties in interest with adequate notice and a meaningful opportunity to be heard before the Spanish Restructuring Plan takes effect in the United States. *See, e.g.*, *Mullane*, 339 U.S. at 314 ("An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.").

## VII.   In Satisfaction of Section 1518, the Foreign Representative Will Promptly Inform the U.S. Bankruptcy Court of Material Changes in the Spanish Proceeding.

117.    Further, the Foreign Representative acknowledges her ongoing obligation under section 1518 of the Bankruptcy Code to "promptly" inform this U.S. Bankruptcy Court of "any substantial change in the status of [the Spanish Proceeding] or the status of the foreign representative's appointment" and of "any other change in the [Spanish Proceeding] that the court may find relevant."  11 U.S.C. § 1518(a).  The Foreign Representative will comply with Bankruptcy Rule 2015(e), which requires the filing of a notice of any such substantial change within fourteen (14) days after the foreign representative becomes aware of such change. Substantial changes requiring notice under section 1518 of the Bankruptcy Code may include, among other things, the entry of the Homologation Order by the Spanish Court approving the Spanish Restructuring Plan, any extension of the Spanish Proceeding by the Spanish Court, any substitution of the Foreign Representative, and any other material developments in the Spanish Proceeding.  This affirmative reporting obligation shall continue for as long as these chapter 15 cases remain pending.

### Conclusion

118.    For the reasons set forth herein, this Verified Petition satisfies the requirements of sections 1515 and 1517(a) of the Bankruptcy Code for the recognition of the Foreign Representative as the Debtors' "foreign representative" and the Spanish Proceeding as the Debtors' "foreign main proceeding," or, in the alternative, the Debtors' "foreign nonmain proceeding;" and establishes Notice and Objection Procedures for the future effectiveness of the Spanish Restructuring Plan in the United States.  Accordingly, the Foreign Representative requests entry of an order, substantially in the form attached hereto, granting the relief requested herein.

**No Prior Request**

119.    No previous request for the relief requested herein has been made by the Foreign

Representative to this U.S. Bankruptcy Court or any other court.

**Motion Practice**

120.    This Verified Petition includes citations to the applicable rules and statutory

authorities upon which the relief requested herein is predicated and a discussion of their

application to this Verified Petition.  Accordingly, the Debtors submit that this Verified Petition

satisfies Local Rule 9013-1(a).

**Notice**

121.    The Foreign Representative will provide notice of this Motion to:  (a) the Debtors;

(b) all persons or bodies authorized to administer foreign proceedings of the Debtors; (c) all

parties to litigation pending in the United States in which a Debtor is a party at the time of the

filing of the chapter 15 petitions; (d) all known creditors affected under the Spanish

Restructuring Plan; (e) the U.S. Trustee; (f) the United States Attorney for the Southern District

of New York; (g) GLAS Specialist Services Limited, the information agent for the Debtors;

(h) the Restructuring Expert; (i) D. Miguel Ángel Esteban, in his capacity as Spanish court agent;

and (j) any party that has requested notice pursuant to Bankruptcy Rule 2002.  In light of the

nature of the relief requested, the Foreign Representative submits that no further notice is

required.

WHEREFORE, the Foreign Representative respectfully requests that the U.S. Bankruptcy Court enter an order, substantially in the form attached hereto as **Exhibit B**, granting the relief requested in this Motion and granting such other and further relief as is appropriate under the circumstances.

| | |
|---|---|
| New York, New York<br>Dated:  July 20, 2026 | */s/ Chad J. Husnick, P.C.*<br>Chad J. Husnick, P.C.<br>**KIRKLAND & ELLIS LLP**<br>**KIRKLAND & ELLIS INTERNATIONAL LLP**<br>333 West Wolf Point Plaza<br>Chicago, Illinois 60654<br>Telephone:    (312) 862-2000<br>Facsimile:    (312) 862-2200<br><br>- and -<br><br>Margaret Reiney<br>Jimmy Ryan<br>**KIRKLAND & ELLIS LLP**<br>**KIRKLAND & ELLIS INTERNATIONAL LLP**<br>601 Lexington Avenue<br>New York, New York 10022<br>Telephone:    (212) 446-4800<br>Facsimile:    (212) 446-4900<br><br>*Counsel to the Foreign Representative* |

## VERIFICATION OF PETITION

I, Cristina Blanco Santo Tomás, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury under the laws of the United States of America as follows:

I am the authorized foreign representative for the Debtors. As such, I have full authority to verify the foregoing Verified Petition on behalf of the Debtors.

I have read the foregoing Verified Petition, and I am informed and believe that the factual allegations contained therein are true and accurate to the best of my knowledge, information, and belief.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: July 20, 2026

*/s/ Cristina Blanco Santo Tomás*
By: Cristina Blanco Santo Tomás
Chief Executive Officer
Grupo Antolin-Irausa, S.A.U.

**Exhibit A**

**Organizational Structure**



**Exhibit B**

**Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 15 |
| | ) | |
| GRUPO ANTOLIN-IRAUSA, S.A.U.,[1] | ) | Case No. 26-11679 (___) |
| | ) | |
| Debtors in a Foreign Proceeding. | ) | (Joint Administration Requested) |
| | ) | |

**ORDER GRANTING PETITION FOR (I) RECOGNITION AS FOREIGN**
**MAIN PROCEEDING, (II) RECOGNITION OF FOREIGN REPRESENTATIVE,**
**AND (III) RELATED RELIEF UNDER CHAPTER 15 OF THE BANKRUPTCY CODE**

Upon consideration of the *Verified Petition for (I) Recognition of Foreign Main Proceeding, (II) Recognition of Foreign Representative, and (III) Related Relief Under Chapter 15 of the Bankruptcy Code* (together with the form petition filed concurrently therewith, the "Verified Petition"),[2] filed by the Foreign Representative as the "foreign representative" of the above-captioned debtors (the "Debtors") for entry of an order (this "Order"): (a) granting the Verified Petition and recognizing the Spanish Proceeding as a "foreign main proceeding," as defined in section 1502(4) of the Bankruptcy Code or, in the alternative, as a "foreign non-main proceeding"; (b) finding that the Foreign Representative is a duly authorized "foreign representative" of the Debtors within the meaning of section 101(24) of the Bankruptcy Code; (c) finding that the Verified Petition meets the requirements of section 1515 of the Bankruptcy Code; (d) approving and establishing the Notice and Objection Procedures for enforcement of any order issued by the Spanish Court, including any Homologation Order approving the Spanish

---

[1]   A complete list of each of the Debtors in these chapter 15 cases may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/Antolin. The location of Debtor Grupo Antolin-Irausa, S.A.U.'s corporate headquarters and the Debtors' service address in these chapter 15 cases is C/Vitoria número 307 / Burgos / 09007 / Spain.

[2]   Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Verified Petition.

Restructuring Plan; (e) approving the form of the Homologation Order Notice and the Objection Procedures Notice; and (f) granting such other relief as this U.S. Bankruptcy Court deems just and proper; and upon the Declaration of the Foreign Representative; and upon the Declaration of the Foreign Counsel; and this U.S. Bankruptcy Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the Southern District of New York*, dated January 31, 2012; and this U.S. Bankruptcy Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b); and this U.S. Bankruptcy Court having found that it may enter this Order consistent with Article III of the United States Constitution; and this U.S. Bankruptcy Court having found that venue of this proceeding and the Verified Petition in this district is proper pursuant to 28 U.S.C. § 1410(1) and (3); and this U.S. Bankruptcy Court having found that the relief requested in the Verified Petition is in the best interests of the Debtors, their creditors, and other parties in interest; and this U.S. Bankruptcy Court having found that adequate and sufficient notice of the filing of the Verified Petition has been given by the Foreign Representative; and this U.S. Bankruptcy Court having found that the Debtors' notice of the Verified Petition and opportunity for a hearing on the Verified Petition were appropriate under the circumstances and that no other notice need be provided; and this U.S. Bankruptcy Court having reviewed the Verified Petition and having heard the statements in support of the relief requested therein at a hearing before this U.S. Bankruptcy Court (the "Hearing"), and this U.S. Bankruptcy Court having determined that the legal and factual bases set forth in the Verified Petition and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before this U.S. Bankruptcy Court; and after due deliberation and sufficient cause appearing therefor, it is **HEREBY FOUND AND DETERMINED THAT**:

2

a.      The findings and conclusions set forth herein constitute this U.S. Bankruptcy Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such.

b.      These chapter 15 cases were properly commenced pursuant to sections 1504, 1509, and 1515 of the Bankruptcy Code.

c.      Each of the Debtors satisfies the eligibility requirements of section 109(a) of the Bankruptcy Code.

d.      The Foreign Representative is a "person" pursuant to section 101(41) of the Bankruptcy Code and is the duly appointed "foreign representative" of the Debtors as such term is defined in section 101(24) of the Bankruptcy Code.  The Foreign Representative has satisfied the requirements of section 1515 of the Bankruptcy Code and Bankruptcy Rule 1007(a)(4).

e.      The Spanish Proceeding is a "foreign proceeding" within the meaning of section 101(23) of the Bankruptcy Code.

f.      The Spanish Proceeding are pending in Spain, where the Debtors have their "center of its main interests" as referred to in section 1517(b)(1) of the Bankruptcy Code.  Accordingly, the Spanish Proceeding is a "foreign main proceeding" pursuant to section 1502(4) of the Bankruptcy Code and are entitled to recognition as a foreign main proceeding pursuant to section 1517(b)(1) of the Bankruptcy Code.

g.      The Foreign Representative is entitled to all relief available and provided pursuant to sections 1507, 1520, and 1521 of the Bankruptcy Code, because such protections are necessary to effectuate the purposes of chapter 15 of the Bankruptcy Code and to protect the assets of the Debtors and the interests of the Debtors' creditors.

3

h.        The relief granted hereby is necessary to effectuate the purposes and objectives of chapter 15 and to protect the Debtors and their interests and is consistent with the laws of the United States, international comity, public policy, and the policies of the Bankruptcy Code.

i.        The Notice and Objection Procedures, the Homologation Order Notice, substantially in the form attached to the Verified Petition as **Exhibit C**, and the Objection Procedures Notice, substantially in the form attached to the Verified Petition as **Exhibit D**, provide adequate and sufficient notice of this U.S. Bankruptcy Court's enforcement of the Homologation Order, the Spanish Restructuring Plan, the Restructuring Transactions thereunder, and any Transaction Documents related thereto in the United States upon the Spanish Court's entry of the Homologation Order.

**BASED ON THE FOREGOING FINDINGS OF FACT AND AFTER DUE DELIBERATION AND SUFFICIENT CAUSE APPEARING THEREFORE, IT IS HEREBY ORDERED THAT**:

1.        The Verified Petition and the relief requested therein is GRANTED as set forth herein.

2.        Any objections to the entry of this Order, to the extent not withdrawn or settled, are overruled with prejudice.

3.        The Spanish Proceeding is recognized as a foreign main proceeding as to each of the Debtors pursuant to section 1517 of the Bankruptcy Code, and the Debtors and the Foreign Representative are entitled to all the effects of recognition as set forth in sections 1520 and 1521 of the Bankruptcy Code, including, without limitation, the application of the protection afforded by the automatic stay under section 362 of the Bankruptcy Code to the Debtors and to the Debtors' property that is within the territorial jurisdiction of the United States.

4.      Upon entry of this Order, the Spanish Proceeding and all prior orders of the Spanish

Court shall be, and hereby are, granted comity and are given full force and effect in the United

States and, pursuant to section 1520 of the Bankruptcy Code, among other things:

a.      section 362 of the Bankruptcy Code shall apply with respect to the Debtors and the Debtors' property that is within the territorial jurisdiction of the United States.   For the avoidance of doubt and without limiting the generality of the foregoing, this Order shall impose a stay within the territorial jurisdiction of the United States against any financial creditor of the Debtors of:

(i)      the commencement or continuation, including the issuance or employment of process of, any judicial, administrative or any other action or proceeding involving or against the Debtors or their assets or proceeds thereof, or to recover a claim or enforce any judicial, quasi-judicial, regulatory, administrative or other judgment, assessment, order, lien, arbitration award, or otherwise against the Debtors or their assets or proceeds thereof, or to exercise any control over the Debtors' assets located in the United States except as authorized by the Debtors in writing;

(ii)     the creation, perfection, seizure, attachment, enforcement, execution of liens or judgments, or otherwise against the Debtors' property in the United States or from transferring, encumbering or otherwise disposing of or interfering with the Debtors' assets or agreements in the United States without the express consent of the Foreign Representative;

(iii)    any act or attempt to collect, assess, or recover a claim against the Debtors that arose before the commencement of the Debtors' chapter 15 case, including any act to exercise or purport to exercise any control over any of the Debtors through proxy, governance, or other similar rights, without the express written consent of the Foreign Representative; and

(iv)    the setoff of any debt owing to the Debtors that arose before the commencement of the Debtors' chapter 15 cases against any claim of the Debtors.

b.      section 365(e) of the Bankruptcy Code shall apply with respect to the Debtors and the property of the Debtors that is within the territorial jurisdiction of the United States.

5

5.      The Foreign Representative and the Debtors shall be entitled to the full protections and rights enumerated under section 1521(a)(4) and (5) of the Bankruptcy Code and, accordingly, the Foreign Representative:

a.      is entrusted with the administration or realization of all of the Debtors' assets and affairs in the United States; and

b.      has the right and power to examine witnesses, take evidence, or deliver information concerning the Debtors' assets, affairs, rights, obligations, or liabilities.

6.      The Foreign Representative is hereby established as the foreign representative of the Debtors within the meaning of section 101(24) of the Bankruptcy Code, is authorized to act on behalf of the Debtors in these chapter 15 cases, and is established as the exclusive representative of the Debtors in the United States, with full authority to administer the Debtors' assets and affairs in the United States.

7.      The Foreign Representative, the Debtors, and their respective agents are authorized to serve or provide any notices required under the Bankruptcy Rules or Local Rules of this U.S. Bankruptcy Court.

8.      No action taken by the Foreign Representative, the Debtors, or their respective successors, agents, representatives, advisors, or counsel in preparing, disseminating, applying for, implementing, or otherwise acting in furtherance of or in connection with the Spanish Proceeding, this Order, these chapter 15 cases, any adversary proceeding herein, or contested matters in connection herewith, will be deemed to constitute a waiver of any immunity or rights afforded the Foreign Representative, including, without limitation, pursuant to sections 306 and 1510 of the Bankruptcy Code.

9.      All parties who believe they have a claim against any of the Debtors that is affected by the Spanish Restructuring Plan are obligated to file such claim in, and only in, the Spanish

6

Proceeding; *provided*, *however*, that such obligation to file such claim in, and only in, the Spanish Proceeding, shall not limit relief that may otherwise be sought by parties under chapter 15 of the Bankruptcy Code in this U.S. Bankruptcy Court.

10.     The Homologation Order Notice, substantially in the form attached to the Verified Petition as **Exhibit C**, including the proposed form of the Enforcement Order attached to the Homologation Order Notice as Exhibit 1, and the Objection Procedures Notice, substantially in the form attached to the Verified Petition as **Exhibit D**, are hereby approved.

11.     The Notice and Objection Procedures are hereby approved and established as follows: (a) within five (5) business days following entry of this Order, the Foreign Representative shall cause the Objection Procedures Notice to be served by electronic mail to the extent email addresses are available and otherwise by overnight mail (for international addresses) or United States mail, first-class postage prepaid, upon the Notice Parties; (b) within five (5) business days following the entry of the Homologation Order by the Spanish Court, the Foreign Representative shall file the Homologation Order Notice on the docket of these chapter 15 cases, and cause the Homologation Order Notice to be (i) served by electronic mail to the extent email addresses are available and otherwise by overnight mail (for international addresses) or United States mail, first-class postage prepaid, upon the Notice Parties and (ii) published (as modified as necessary and appropriate for publication purposes) in the *Financial Times*; and (c) any party in interest that objects to the Homologation Order, the Spanish Restructuring Plan, the Restructuring Transactions thereunder, or any Transaction Documents related thereto must file and serve a written objection no later than 4:00 p.m. (prevailing Eastern Time) on the day that is fourteen (14) calendar days after the Homologation Notice is filed with the U.S. Bankruptcy Court (the "Objection Deadline") so that such objection is *actually received* by the Objection Notice Parties by the Objection

7

Deadline. Any such objection must be: (i) in writing; (ii) state with specificity the legal and factual bases for such objection; (iii) be filed with the U.S. Bankruptcy Court; and (iv) be served upon the Objection Notice Parties.

12. If no timely objection is filed and served in accordance with the Notice and Objection Procedures, or such Objection is withdrawn or resolved upon agreement of the Foreign Representative and the objecting party, subject to the entry of the Homologation Order by the Spanish Court, the Foreign Representative shall file the Enforcement Order, substantially in the form attached to the Homologation Order Notice as Exhibit 1, under certificate of counsel, pursuant to which the Spanish Restructuring Plan, the Restructuring Transactions thereunder, and any Transaction Documents related thereto shall be recognized, granted comity, and given full force and effect in the United States and shall be binding and enforceable, in accordance with their terms, pursuant to sections 105(a), 1507, and 1521 of the Bankruptcy Code; *provided*, *however*, if such a timely objection is filed in accordance with the Notice and Objection Procedures and not resolved upon agreement of the Foreign Representative and the objecting party or withdrawn within five (5) business days of such filing, the Foreign Representative shall request a hearing before this U.S. Bankruptcy Court to resolve such objection.

13. The Foreign Representative and the Debtors are authorized to take any and all actions deemed necessary or appropriate to effectuate the Spanish Restructuring Plan and the Restructuring Transactions, in each case in accordance with their terms, in each case, subject to the Notice and Objection Procedures and entry of the Homologation Order by the Spanish Court.

14. Nothing herein shall enjoin, impair, or otherwise supplement or modify in any manner the rights of any party granted under the Spanish Restructuring Plan, and nothing herein shall modify the right of the Spanish Court to hear and determine any suit, action, or proceeding

8

and to settle any dispute which may arise out of the Spanish Restructuring Plan, or out of any action to be taken or omitted to be taken under the Spanish Restructuring Plan or in connection with the administration of the Spanish Restructuring Plan.

15. For avoidance of doubt, nothing in this Order is intended or should be construed to (a) prevent any entity from filing any claims against the Debtors in the Spanish Proceeding; (b) prevent parties from seeking relief in the Spanish Proceeding or seeking relief from this U.S. Bankruptcy Court in these chapter 15 cases, including seeking to modify or terminate relief granted by this Order pursuant to section 1522(c) of the Bankruptcy Code; or (c) effectuate a waiver of the rights, remedies, and defenses of any parties in the Spanish Proceeding.

16. This U.S. Bankruptcy Court shall retain jurisdiction with respect to the enforcement, amendment, or modification of this Order, any requests for additional relief or any adversary proceeding brought in and through these chapter 15 cases, and any request by an entity for relief from the provisions of this Order, for cause shown, that is properly commenced and within the jurisdiction of this U.S. Bankruptcy Court.

17. This Order is without prejudice to the Foreign Representative requesting any additional relief in these chapter 15 cases, including seeking recognition and enforcement by this U.S. Bankruptcy Court of any further orders issued by the Spanish Court in the Spanish Proceeding.

18. This Order applies to all parties in interest in these chapter 15 cases and all of their agents, employees, and representatives, and all those who act in concert with them who receive notice of this Order.

9

19.     Notwithstanding any provision of the Bankruptcy Code or any Bankruptcy Rule to the contrary, the terms and conditions of this Order are immediately effective and enforceable upon its entry.

20.     The Foreign Representative, its agents, including the claims and noticing agent, and the Debtors are authorized to take all actions necessary to effectuate the relief granted pursuant to this Order.

21.     Notice of the Verified Petition as provided therein shall be deemed good and sufficient notice of such Verified Petition, and the requirements of the Bankruptcy Rules and the Local Rules are satisfied by such notice.

22.     This U.S. Bankruptcy Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and/or enforcement of this Order.


New York, New York
Dated: _____, 2026

_____
UNITED STATES BANKRUPTCY JUDGE

## Exhibit C

**Homologation Order Notice**

Chad J. Husnick, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
333 West Wolf Point Plaza
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200

Margaret Reiney
Jimmy Ryan
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900

*Counsel to the Foreign Representative*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 15 |
| GRUPO ANTOLIN-IRAUSA, S.A.U.,[1] | Case No. 26-11679 (____) |
| Debtors in a Foreign Proceeding. | (Jointly Administered) |

## NOTICE OF ENTRY OF SPANISH HOMOLOGATION ORDER

**PLEASE TAKE NOTICE** that on July 20, 2026, the Foreign Representative,[2] in her capacity as the authorized representative of the Debtors regarding the Spanish Proceeding currently pending before the Spanish Court, filed the Verified Petition pursuant to 11 U.S.C. §§ 1504, 1515, and 1517 with the U.S. Bankruptcy Court.

On [●], 2026, the U.S. Bankruptcy Court entered the Recognition Order which, among other things, recognized the Spanish Proceeding of the Debtors as a foreign main proceeding and granted certain related relief, including approval of the Notice and Objection Procedures for the enforcement of any order issued by the Spanish Court, including the Homologation Order, within the territorial jurisdiction of the United States.

On [●], 2026, the Foreign Representative filed and served the Objection Procedures Notice, which provided notice of the Recognition Order and the Notice and Objection Procedures approved therein.

---

[1]   A complete list of each of the Debtors in these chapter 15 cases may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/Antolin. The location of Debtor Grupo Antolin-Irausa, S.A.U.'s corporate headquarters and the Debtors' service address in these chapter 15 cases is C/Vitoria número 307 / Burgos / 09007 / Spain.

[2]   Capitalized terms used but not otherwise defined herein have the meanings ascribed to such terms in the Verified Petition or the Recognition Order, as applicable.

On [●], 2026, the Spanish Court entered the Homologation Order, approving the Spanish Restructuring Plan, the Restructuring Transactions, and the Transaction Documents related thereto.

In accordance with the Recognition Order, the Foreign Representative hereby files this Homologation Order Notice to inform parties in interest of the entry of the Homologation Order by the Spanish Court, and the Notice and Objection Procedures in connection with the U.S. Bankruptcy Court's recognition and enforcement of the Homologation Order, the Spanish Restructuring Plan, the Restructuring Transactions thereunder, or any Transaction Documents related thereto within the territorial jurisdiction of the United States.

Any party in interest that seeks to object to the U.S. Bankruptcy Court's recognition and enforcement in the United States of the Homologation Order, the Spanish Restructuring Plan, the Restructuring Transactions thereunder, or any Transaction Documents related thereto must file and serve a written objection no later than 4:00 p.m. (prevailing Eastern Time) on [●], 2026 (the "Objection Deadline").  Any such objection must  (i) be in writing; (ii) state with specificity the legal and factual bases for such objection; (iii) be filed with the U.S. Bankruptcy Court; and (iv) be served upon the following parties:  (a) the Debtors, Grupo Antolin-Irausa S.A.U., C/Vitoria número 307 / Burgos / 09007 / Spain; (b) counsel to the Foreign Representative, (i) Kirkland & Ellis LLP, 333 West Wolf Point Plaza, Chicago, Illinois 60654, Attn.:  Chad J. Husnick, P.C. (chusnick@kirkland.com) and (ii) Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022, Attn.: Margaret Reiney (margaret.reiney@kirkland.com) and Jimmy Ryan (jimmy.ryan@kirkland.com); (c) counsel to the Original Participating Creditors, Allen Overy Shearman Sterling US LLP, 599 Lexington Avenue, New York, New York 10022, Attn.:  Fredric Sosnick (fsosnick@aoshearman.com) and Mira J. Soldon (mira.soldon@aoshearman.com); and (d) the Office of the United States Trustee – Manhattan Office, Alexander Hamilton Custom House, One Bowling Green, Room 534, New York, New York 10004, Attn.: Daniel Rudewicz (daniel.rudewicz@usdoj.gov), so that it is actually received on or before the Objection Deadline.

If no timely objection is filed and served in accordance with the foregoing procedures, or such Objection is withdrawn or resolved upon agreement of the Foreign Representative and the objecting party, then the Foreign Representative shall file the Enforcement Order, substantially in form the attached hereto as **Exhibit 1**, under certificate of counsel.  If the U.S. Bankruptcy Court enters the Enforcement Order, then the Homologation Order, the Spanish Restructuring Plan, the Restructuring Transactions thereunder, and any Transaction Documents related thereto will be recognized, granted comity, and given full force and effect within the United States, and will be binding and enforceable in accordance with their terms, pursuant to sections 105(a), 1507, and 1521 of the Bankruptcy Code.  If a timely objection is filed and served in accordance with the foregoing procedures, and not resolved upon agreement of the Foreign Representative and the objecting party or withdrawn within five (5) business days of such filing, the Foreign Representative will request a hearing before the U.S. Bankruptcy Court to resolve such objection.

The Spanish Homologation Order, Recognition Order, and copies of all documents filed in these chapter 15 cases are available free of charge by visiting https://restructuring.ra.kroll.com/Antolin, by calling the Debtors' restructuring hotline at (844) 408-2047 (Domestic) or +1 (332) 219-0122 (International), or by email at

2

AntolinInfo@ra.kroll.com.  You may also obtain copies of any pleadings or papers filed in these chapter 15 cases for a fee via PACER at:  https://ecf.nysb.uscourts.gov.

The Spanish Restructuring Plan contains other provisions that may affect your rights.  You are encouraged to review the Spanish Restructuring Plan in its entirety.

[*Remainder of page intentionally left blank.*]

New York, New York
Dated:  [●], 2026

*/s/ DRAFT*

Chad J. Husnick, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
333 West Wolf Point Plaza
Chicago, Illinois 60654
Telephone:   (312) 862-2000
Facsimile:   (312) 862-2200

- and -

Margaret Reiney
Jimmy Ryan
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:   (212) 446-4800
Facsimile:   (212) 446-4900

*Counsel to the Foreign Representative*

## Exhibit 1

**Proposed Enforcement Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) Chapter 15 |
| | ) |
| GRUPO ANTOLIN-IRAUSA, S.A.U.,[1] | ) Case No. 26-11679 (___) |
| | ) |
| Debtors in a Foreign Proceeding. | ) (Joint Administration Requested) |
| | ) |

**ORDER GRANTING (I) RECOGNITION
AND ENFORCEMENT OF THE HOMOLOGATION ORDER,
SPANISH RESTRUCTURING PLAN, RESTRUCTURING TRANSACTIONS
THEREUNDER, AND TRANSACTION DOCUMENTS RELATED THERETO,
WITHIN THE TERRITORIAL JURISDICITON OF THE UNITED STATES AND
(II) RELATED RELIEF UNDER CHAPTER 15 OF THE BANKRUPTCY CODE**

Upon consideration of the Verified Petition,[2] filed by the Foreign Representative as the "foreign representative" of the above-captioned debtors (the "Debtors") for entry of an order (this "Order"):  (a) granting full force and effect and comity to the Homologation Order, the Spanish Restructuring Plan, the Restructuring Transactions thereunder, and the Transaction Documents related thereto and (b) granting such other relief as this U.S. Bankruptcy Court deems just and proper; and this U.S. Bankruptcy Court having entered the *Order Granting Petition for (I) Recognition as Foreign Main Proceeding, (II) Recognition of Foreign Representative, and (III) Related Relief Under Chapter 15 of the Bankruptcy Code* (the "Recognition Order"); and upon the Declaration of the Foreign Representative; and upon the Declaration of the Foreign Counsel; and this U.S. Bankruptcy Court having jurisdiction over this matter pursuant to 28 U.S.C.

---

[1]  A complete list of each of the Debtors in these chapter 15 cases may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/Antolin.  The location of Debtor Grupo Antolin-Irausa, S.A.U.'s corporate headquarters and the Debtors' service address in these chapter 15 cases is C/Vitoria número 307 / Burgos / 09007 / Spain.

[2]  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Verified Petition.

§§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the Southern District of New York*, dated January 31, 2012; and this U.S. Bankruptcy Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b); and this U.S. Bankruptcy Court having found that it may enter this Order consistent with Article III of the United States Constitution; and this U.S. Bankruptcy Court having found that venue of this proceeding and the Verified Petition in this district is proper pursuant to 28 U.S.C. § 1410(1) and (3); and this U.S. Bankruptcy Court having found that the relief requested in the Verified Petition and the entry of this Order is in the best interests of the Debtors, their creditors, and other parties in interest; and this U.S. Bankruptcy Court having found that adequate and sufficient notice of the filing of the Verified Petition and the entry of this Order has been given by the Foreign Representative; and this U.S. Bankruptcy Court having found that the Debtors' notice of the Verified Petition and the entry of this Order and opportunity for a hearing (if any) on the Verified Petition and the entry of this Order were appropriate under the circumstances and that no other notice need be provided; and this U.S. Bankruptcy Court having reviewed the Verified Petition and having heard the statements in support of the relief requested therein at a hearing (if any) before this U.S. Bankruptcy Court (the "Hearing"), and this U.S. Bankruptcy Court having determined that the legal and factual bases set forth in the Verified Petition and at the Hearing (if any) establish just cause for the relief granted herein; and upon all of the proceedings had before this U.S. Bankruptcy Court; and after due deliberation and sufficient cause appearing therefor, it is **HEREBY FOUND AND DETERMINED THAT**:

a.      The findings and conclusions set forth herein constitute this U.S. Bankruptcy Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent any of the following findings

of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

b. The Debtors have property and property rights in the United States, and therefore, the Debtors are eligible to be debtors in a chapter 15 case pursuant to sections 109 and 1501 of the Bankruptcy Code.

c. This Order constitutes a final order within the meaning of 28 U.S.C. § 158(a). Notwithstanding any Bankruptcy Rule to the contrary, this U.S. Bankruptcy Court expressly finds that there is no just reason for delay in the implementation of this Order and waives any applicable stay.

d. The Foreign Representative and the Debtors, as applicable, are entitled to this U.S. Bankruptcy Court's cooperation under section 1525(a) of the Bankruptcy Code in implementing the Spanish Restructuring Plan in the form of relief granted by this Order on the terms provided herein. The terms of the Spanish Restructuring Plan and the process for solicitation of votes on and confirmation of the Spanish Restructuring Plan, in each case before the Spanish Court, provided creditors and other parties in interest with appropriate due process and were not manifestly contrary to U.S. public policy.

e. The Homologation Order (and any related orders issued by the Spanish Court during the pendency of the Spanish Proceeding), the Spanish Restructuring Plan, the Restructuring Transactions thereunder, and the Transaction Documents related thereto, are entitled to recognition and enforcement by this U.S. Bankruptcy Court pursuant to sections 105(a), 1507, and 1521 of the Bankruptcy Code.

f. The relief granted herein is necessary to effectuate the purposes and objectives of chapter 15 and to protect the Debtors and their interests, and is consistent with the laws of the

3

United States, international comity, public policy, and the policies of the Bankruptcy Code. Absent the relief granted herein, the Spanish Proceeding and the efforts of the Debtors, their creditors, and other parties in interest to consummate the Spanish Restructuring Plan could be impeded or harmed by the actions of certain creditors and/or other persons, a result that would be inconsistent with the purposes of chapter 15 of the Bankruptcy Code as set forth in, *inter alia*, section 1501(a) of the Bankruptcy Code. The relief granted herein (i) is within this U.S. Bankruptcy Court's jurisdiction, (ii) is essential to the success of the Spanish Proceeding and the Spanish Restructuring Plan, (iii) is an integral element of the Spanish Proceeding and the Spanish Restructuring Plan, (iv) confers material benefits on, and is in the best interests of, the Debtors and their stakeholders, and (v) is critical to the overall objectives of the Debtors' restructuring efforts.

g. The relief sought through the Verified Petition and granted herein will not cause undue hardship or inconvenience to any party in interest and, to the extent that any hardship or inconvenience may result to any such parties, it is outweighed by the benefits of the relief requested to the Debtors, their creditors, and other parties in interest.

h. As evidenced by the affidavits or certificates of service and publication notice filed with this U.S. Bankruptcy Court, proper, sufficient, and timely notice of the Verified Petition, the Homologation Order Notice, the Objection Procedures Notice, the Hearing (if any), and all deadlines related thereto, have been provided in accordance with sections of the Bankruptcy Code, Bankruptcy Rules, and the Local Rules, in compliance with the Recognition Order, to all interested persons and entities entitled to received notice in accordance with the Recognition Order, the Bankruptcy Code, and the Bankruptcy Rules. The notices and the notice provided thereunder was good, sufficient, and appropriate under the circumstances, and no further or other notice of entry of this Order or the Hearing is or shall be required.

i.       The interests of creditors and other interested entities, including the Debtors, are

sufficiently protected within the meaning of section 1522(a) of the Bankruptcy Code.

j.       As evidenced by the affidavits or certificates of service and publication notice filed

with this U.S. Bankruptcy Court, the Homologation Order Notice, the Objection Procedures

Notice, and publication of the Homologation Order Notice are sufficient and adequate notice of

change of status concerning any substantial change in the status of the Spanish Proceeding in

satisfaction of section 1518 of the Bankruptcy Code and no other such notice need be provided.

**BASED ON THE FOREGOING FINDINGS OF FACT AND AFTER DUE DELIBERATION AND SUFFICIENT CAUSE APPEARING THEREFOR, IT IS HEREBY ORDERED THAT:**

1.       The Verified Petition and the relief requested therein is GRANTED as set forth

herein.

2.       Any objections to the entry of this Order, to the extent not withdrawn or settled, are

overruled with prejudice.

3.       The Homologation Order, the Spanish Restructuring Plan, the Restructuring

Transactions thereunder, and any Transaction Documents related thereto shall be and hereby are

recognized, granted comity, and given full force and effect within the territorial jurisdiction of the

United States, effective *nunc pro tunc* to the date of entry of the Homologation Order by the

Spanish Court, and are binding and enforceable, in accordance with their terms, on all creditors,

shareholders, and any other holders of claims or interests in the Debtors, and any of their successors

or assigns, and all persons having notice of the Verified Petition, pursuant to sections 105(a), 1507,

1509, and 1521 of the Bankruptcy Code.

4.       All persons and entities, including all creditors, shareholders, and any other holders

of claims or interests in the Debtors, their agents, attorneys, successors, and assigns, are

permanently enjoined from (i) commencing, continuing, or taking any action or asserting any claim

5

that is in contravention to, inconsistent with, would interfere with, or impede the administration, implementation, and/or consummation of the Spanish Restructuring Plan, the Homologation Order, or the terms of this Order, and (ii) commencing, continuing, or taking any action, including, without limitation, commencing or continuing any action or legal proceeding (including, without limitation, bringing suit in any court, arbitration, mediation, or any judicial or quasi-judicial, administrative or regulatory action, proceeding, or process whatsoever), whether directly or by way of counterclaim, and from seeking discovery of any nature related to the foregoing, and from seizing, attaching, obtaining possession of, exercising control over, and/or enforcing or executing liens or judgments, to recover or offset any debt or claims that are extinguished, novated, canceled, discharged, restructured, or released under the Spanish Restructuring Plan, the Homologation Order, or, as a result of the Spanish Proceeding, against the Debtors or the Debtors' property located within the territorial jurisdiction of the United States; *provided*, *however*, that the foregoing shall not enjoin or otherwise prevent the applicable parties from enforcing or pursuing rights and remedies under the Spanish Restructuring Plan, the Transaction Documents, or the Homologation Order.  No action may be taken within the territorial jurisdiction of the United States to confirm or enforce any award or judgment that would otherwise be in violation of this Order without first obtaining leave of this U.S. Bankruptcy Court.

5.      The Foreign Representative and the Debtors are authorized to take any and all actions deemed necessary or appropriate to effectuate the Spanish Restructuring Plan and the Restructuring Transactions within the territorial jurisdiction of the United States, in each case in accordance with their terms.

6.      Nothing herein shall enjoin, impair, or otherwise supplement or modify in any manner the rights of any party granted under the Spanish Restructuring Plan, and nothing herein

6

shall modify the right of the Spanish Court to hear and determine any suit, action, or proceeding and to settle any dispute that may arise out of the Spanish Restructuring Plan, or out of any action to be taken or omitted to be taken under the Spanish Restructuring Plan or in connection with the administration of the Spanish Restructuring Plan.

7. For avoidance of doubt, nothing in this Order is intended or should be construed to (i) prevent any entity from filing any claims against the Debtors in the Spanish Proceeding, (ii) prevent parties from seeking relief in the Spanish Proceeding or seeking relief from this U.S. Bankruptcy Court in these chapter 15 cases, including seeking to modify or terminate relief granted by this Order pursuant to section 1522(c) of the Bankruptcy Code, or (iii) effectuate a waiver of the rights, remedies, and defenses of any parties in the Spanish Proceeding.

8. This U.S. Bankruptcy Court shall retain jurisdiction with respect to the enforcement, amendment, or modification of this Order, any requests for additional relief or any adversary proceeding brought in and through these chapter 15 cases, and any request by an entity for relief from the provisions of this Order, for cause shown, that is properly commenced and within the jurisdiction of this U.S. Bankruptcy Court; *provided*, *however*, in no event shall this Order prevent the implementation of any amendments or modification to the Spanish Restructuring Plan or the Homologation Order that may be agreed upon by and among the Debtors and the applicable creditors and approved by the Spanish Court (or as otherwise permitted under applicable law).

9. This Order is without prejudice to the Foreign Representative requesting any additional relief in these chapter 15 cases, including seeking recognition and enforcement by this U.S. Bankruptcy Court of any further orders issued by the Spanish Court in the Spanish Proceeding.

10.     This Order applies to all parties in interest in these chapter 15 cases and all of their agents, employees, representatives, and all those who act in concert with them.

11.     No action taken by the Foreign Representative, the Debtors, or their respective successors, agents, representatives, advisors, or counsel in preparing, disseminating, applying for, implementing, or otherwise acting in furtherance of or in connection with the Spanish Proceeding, this Order, these chapter 15 cases, any adversary proceeding herein, or contested matters in connection herewith, will be deemed to constitute a waiver of any immunity or rights afforded the Foreign Representative, including, without limitation, pursuant to sections 306 and 1510 of the Bankruptcy Code.

12.     Notwithstanding any provision of the Bankruptcy Code or Bankruptcy Rule to the contrary, the terms and conditions of this Order are immediately effective and enforceable upon its entry.

13.     The Foreign Representative, its agents, including the claims and noticing agent, and the Debtors are authorized to take all actions necessary to effectuate the relief granted pursuant to this Order.

14.     Notice of the Verified Petition as provided therein shall be deemed good and sufficient notice of such Verified Petition, and the requirements of the Bankruptcy Rules and the Local Rules are satisfied by such notice.

15.     This U.S. Bankruptcy Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and/or enforcement of this Order.

New York, New York
Dated: _____, 2026

_____
UNITED STATES BANKRUPTCY JUDGE

8

**<u>Exhibit D</u>**

**Objection Procedures Notice**

Chad J. Husnick, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
333 West Wolf Point Plaza
Chicago, Illinois 60654
Telephone:   (312) 862-2000
Facsimile:   (312) 862-2200

Margaret Reiney
Jimmy Ryan
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:   (212) 446-4800
Facsimile:   (212) 446-4900

*Counsel to the Foreign Representative*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re: | ) Chapter 15 |
| | ) |
| GRUPO ANTOLIN-IRAUSA, S.A.U.,[1] | ) Case No. 26-11697 (____) |
| | ) |
| Debtors in a Foreign Proceeding. | ) (Jointly Administered) |
| | ) |

**NOTICE OF ENTRY OF RECOGNITION ORDER**

**PLEASE TAKE NOTICE** that on July 20, 2026, the Foreign Representative,[2] in her capacity as the authorized representative of the Debtors regarding the Spanish Proceeding currently pending before the Spanish Court, filed the Verified Petition pursuant to 11 U.S.C. §§ 1504, 1515, and 1517 with the U.S. Bankruptcy Court.

On [●], 2026, the U.S. Bankruptcy Court entered the Recognition Order which, among other things, recognized the Spanish Proceeding of the Debtors as a foreign main proceeding and granted certain related relief, including approval of the Notice and Objection Procedures for the enforcement of any order issued by the Spanish Court, including the Homologation Order, within the territorial jurisdiction of the United States.

The Debtors' request for judicial homologation of the Spanish Restructuring Plan is currently pending before the Spanish Court. Subject to and upon entry of the Homologation Order, the U.S. Bankruptcy Court may recognize, enforce, and give effect to the Homologation Order, the Spanish Restructuring Plan, the Restructuring Transactions, and the Transaction Documents related thereto within the territorial jurisdiction of the United States in accordance with the Notice and Objection Procedures.

---

[1]   A complete list of each of the Debtors in these chapter 15 cases may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/Antolin. The location of Debtor Grupo Antolin-Irausa, S.A.U.'s corporate headquarters and the Debtors' service address in these chapter 15 cases is C/Vitoria número 307 / Burgos / 09007 / Spain.

[2]   Capitalized terms used but not otherwise defined herein have the meanings ascribed to such terms in the Verified Petition or the Recognition Order, as applicable.

In accordance with the Recognition Order, the Foreign Representative hereby files this notice to inform parties in interest of the Notice and Objection Procedures that will apply once the Spanish Court enters the Homologation Order.

Pursuant to the Notice and Objection Procedures set forth in the Recognition Order, within five (5) business days following entry of the Homologation Order by the Spanish Court, the Foreign Representative will file the Homologation Order Notice to inform parties in interest of the entry of the Homologation Order by the Spanish Court and the Notice and Objection Procedures in connection with the U.S. Bankruptcy Court's recognition and enforcement of the Homologation Order, the Spanish Restructuring Plan, the Restructuring Transactions thereunder, or any Transaction Documents related thereto within the territorial jurisdiction of the United States.

Any party in interest that seeks to object to the U.S. Bankruptcy Court's recognition and enforcement within the territorial jurisdiction of the United States of the Homologation Order, the Spanish Restructuring Plan, the Restructuring Transactions thereunder, or any Transaction Documents related thereto must file and serve a written objection by the date specified on the Homologation Order Notice (the "Objection Deadline").  Any such objection must  (i) be in writing; (ii) state with specificity the legal and factual bases for such objection; (iii) be filed with the U.S. Bankruptcy Court; and (iv) be served upon the following parties:  (a) the Debtors, Grupo Antolin-Irausa S.A.U., C/Vitoria número 307 / Burgos / 09007 / Spain; (b) counsel to the Foreign Representative, (i) Kirkland & Ellis LLP, 333 West Wolf Point Plaza, Chicago, Illinois 60654, Attn.:  Chad J. Husnick, P.C. (chusnick@kirkland.com)  and  (ii) Kirkland &  Ellis LLP, 601 Lexington  Avenue,  New  York,  New  York  10022,  Attn.: Margaret  Reiney (margaret.reiney@kirkland.com) and Jimmy Ryan (jimmy.ryan@kirkland.com); (c) counsel to the Original Participating Creditors, Allen Overy Shearman Sterling US LLP, 599 Lexington Avenue, New York, New York 10022, Attn.: Fredric Sosnick (fsosnick@aoshearman.com) and Mira J. Soldon (mira.soldon@aoshearman.com); and (d) the Office of the United States Trustee – Manhattan Office, Alexander Hamilton Custom House, One Bowling Green, Room 534, New York, New York 10004, Attn.: Daniel Rudewicz (daniel.rudewicz@usdoj.gov), so that it is actually received on or before the Objection Deadline.

If no timely objection is filed and served in accordance with the foregoing procedures, or such Objection is withdrawn or resolved upon agreement of the Foreign Representative and the objecting party, the Foreign Representative shall file the Enforcement Order, substantially in the form attached to the Homologation Order Notice as Exhibit 1, under certificate of counsel, pursuant to which the Homologation Order, the Spanish Restructuring Plan, the Restructuring Transactions thereunder, and any Transaction Documents related thereto will be recognized, granted comity, and given full force and effect within the territorial jurisdiction of the United States, and will be binding and enforceable in accordance with their terms, pursuant to sections 105(a), 1507, and 1521 of the Bankruptcy Code.  If a timely objection is filed and served in accordance with the foregoing procedures, and not resolved upon agreement of the Foreign Representative and the objecting party or withdrawn within five (5) business days of such filing, the Foreign Representative will request a hearing before the U.S. Bankruptcy Court to resolve such objection.

Upon entry of the Homologation Order by the Spanish Court and subject to the Notice and Objection Procedures described above, the Spanish Restructuring Plan and its provisions will be

binding on the Debtors, each holder of an affected claim or an interest under the Spanish Restructuring Plan, and each such holder's respective successors and assigns, whether or not such holder voted in favor of, accepted, acceded to, signed or otherwise supported the Spanish Restructuring Plan, and whether or not the class in which such holder was included voted to approve the Spanish Restructuring Plan.

The Recognition Order and copies of all documents filed in these chapter 15 cases are available free of charge by visiting https://restructuring.ra.kroll.com/Antolin, by calling the Debtors' restructuring hotline at (844) 408-2047 (Domestic) or +1 (332) 219-0122 (International), or by email at AntolinInfo@ra.kroll.com. You may also obtain copies of any pleadings or papers filed in these chapter 15 cases for a fee via PACER at: https://ecf.nysb.uscourts.gov.

The Spanish Restructuring Plan contains other provisions that may affect your rights. You are encouraged to review the Spanish Restructuring Plan in its entirety.

[*Remainder of page intentionally left blank.*]

New York, New York
Dated: [●], 2026

*/s/ DRAFT*
Chad J. Husnick, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
333 West Wolf Point Plaza
Chicago, Illinois 60654
Telephone:   (312) 862-2000
Facsimile:   (312) 862-2200

- and -

Margaret Reiney
Jimmy Ryan
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:   (212) 446-4800
Facsimile:   (212) 446-4900

*Counsel to the Foreign Representative*

**<u>Exhibit E</u>**

**Spanish Restructuring Plan (English)**

  

**TRADUX USA Corp**
**Certified & Professional Translation Services**
405 Lexington Avenue, Floor 9
(Chrysler Building) NEW YORK, NY 10174
+ 1 650 546-5512
www.traduxusa.com
info@traduxusa.com

# Certification of Translation Accuracy

Translation of
**Deed of Restatement and Execution into a Public Instrument of a Joint Restructuring Plan**
from **Spanish** to **English**

As an authorized representative of TRADUX USA Corp, a professional translation services agency, I hereby certify that the above-mentioned document has been translated by an experienced, qualified, and certified professional translator, fluent in the above-mentioned language pair and that, in my best judgment, the translated text accurately and faithfully reflects the content, meaning, and style of the original document and constitutes in every respect a complete and accurate translation of the original document.  This document has not been translated for a family member, friend, or business associate.

This is to certify the correctness of the translation only. I do not make any claims or guarantees about the authenticity or content of the original document. Further, TRADUX USA Corp assumes no liability for the way in which the translation is used by the customer or any third party, including end-users of the translation.

A copy of the translation is attached to this certification.





Mariagiovanna Oricchio - CEO of TRADUX USA Corp
Order date: July 12, 2026

TRADUX USA Corp
405 Lexington Avenue, Floor 9
New York City 10174
United States
 + 1 650 546-5512

**TRADUX USA Corp**
**108 West 13th Street,**
**Wilmington, DE 19801**



| | |
|---|---|
| | **ANDRES DOMINGUEZ NAFRIA**<br>*Notary Public*<br>88 Lagasca Street, 8th Floor<br>Tel.: (91) 577 47 87 — Fax: (91) 577 82 31<br>28001 MADRID<br>andresdominguez@notariado.org |

**THIS IS A SIMPLE COPY**

**DEED OF CONSOLIDATION AND FORMALIZATION AS A PUBLIC INSTRUMENT OF A JOINT RESTRUCTURING PLAN.**

NUMBER: FOUR THOUSAND TWO HUNDRED AND EIGHTY-ONE.

In Madrid, on the tenth day of July, two thousand and twenty-six.

Before me, FRANCISCO MIRAS ORTIZ, **acting as substitute due to the temporary unavailability of my colleague MR ANDRÉS DOMÍNGUEZ NAFRÍA**, a Notary Public belonging to the Notarial Association of this Capital and practising therein,

**APPEAR:**

On behalf of GRUPO ANTOLÍN-IRAUSA, S.A.U. AND CERTAIN COMPANIES OF THE GROUP:

**MS MARÍA CRISTINA BLANCO SANTO TOMÁS**, a Spanish national, of legal age, whose address for these purposes is Calle Vitoria 307, 09007 Burgos, Burgos, holder of valid Spanish National Identity/Tax Identification Number 13158416-R.

On behalf of GRUPO ANTOLÍN-HOLDCO, S.A.:

**MR. ERNESTO ANTOLÍN CALZADA**, of legal age,

1





a Spanish national, whose business address is Calle Vitoria 307, 09007 Burgos, Burgos, holder of valid Spanish National Identity/Tax Identification Number 71303230-X; and

**MS EMMA FIDELA ANTOLÍN GRANET**, of legal age, whose address for these purposes is Calle Vitoria 307, 09007 Burgos, Burgos, holder of valid Spanish National Identity/Tax Identification Number **13153972-L**.

On behalf of BANCO BILBAO VIZCAYA ARGENTARIA, S.A. AND BANCO BILBAO VIZCAYA ARGENTARIA, S.A., NEW YORK BRANCH:

**MS MARÍA LUZ BARROSO GARCÍA** and **MR ÁLVARO SANTOS ANGARITA**, both of legal age and Spanish nationals, whose address for these purposes is Plaza de San Nicolás 4, Bilbao, respectively holding Spanish National Identity/Tax Identification Number 51109036-T and passport number **PE108920**, each valid and in force.

On behalf of BANCO SABADELL, S.A.:

**MR JUAN JOSÉ VILLAR CRUZ** and **MR JAVIER VICENTE LEÓN**, both of legal age, whose address for these purposes is Plaça de Sant Roc 20, Sabadell, holders of valid Spanish National Identity/Tax Identification Numbers **51897628-Z** and **02891028-C**, respectively.

On behalf of BANCO SANTANDER, S.A.:

**MR LUCAS MARTÍN GÓMEZ** and **MR FERNANDO DE LA HAZA DE LARA**, both of legal age,







[Seal: Mr Andrés Domínguez Nafría – Notary Public of Madrid]

mp: DON ANDRÉS DOMINGUEZ NAFRÍA — NOTARY PUBLIC IN MADRID
HING BEFORE FAITH 25 MAY 1862]

whose address for these purposes is Paseo de Pereda 9–12, Santander, holders of valid Spanish National Identity/Tax Identification Numbers 53615211-A and 50888463-C, respectively.

On behalf of CAIXABANK, S.A.:

**MR FELIPE PLAZA SOTO and MR EDUARDO OCEJO LARRABEITI,** both of legal age, whose business address is Calle Pintor Sorolla 2–4, Valencia, holders of valid Spanish National Identity Numbers 52881521-J and 16048179-K, respectively.

On behalf of BANKINTER, S.A.:

**MR JORGE CUESTA MARCOS and MR PAULO JAIME MONTEIRO**, both of legal age, of Spanish and Portuguese nationality, respectively, whose address for the purposes of executing this instrument is Paseo de la Castellana 29, Madrid; the former holding Spanish National Identity/Tax Identification Number 09797899-Z, and the latter holding Portuguese passport number CD632312 and Spanish Foreign National Identity Number Y-6275252-A.

On behalf of HSBC CONTINENTAL EUROPE:

**MR JUAN FRANCISCO AMORAGA**

3





**CHEREGUINI** and **MR SEBASTIÁN LEÓN MORENO**, both of legal age and Spanish nationals, whose address for these purposes is Plaza Pablo Ruiz Picasso 32, Madrid, holders of Spanish National Identity/Tax Identification Numbers **23055933-C** and **77362814-Z**, respectively.

On behalf of HSBC CONTINENTAL EUROPE, SUCURSAL EN ESPAÑA:

**MR JUAN FRANCISCO AMORAGA CHEREGUINI**, of legal age, a Spanish national, whose address for these purposes is Plaza Pablo Ruiz Picasso 32, Madrid, holder of Spanish National Identity/Tax Identification Number **23055933-C**, valid and produced to me for inspection.

On behalf of GLAS SPECIALIST SERVICES LIMITED:

**MR CRISTÓBAL MONTOJO ARTEAGA**, of legal age, a Spanish national, whose address for these purposes is Calle Núñez de Balboa 33, 4th Floor Left, 28001 Madrid, holder of valid Spanish National Identity and Tax Identification Number 70880233-Y.

**THEY ACT IN THE FOLLOWING CAPACITIES:**

**1. MS MARÍA CRISTINA BLANCO SANTO TOMÁS**, for and on behalf of:

A. In her capacity as Managing Director of the company named **GRUPO ANTOLÍN-IRAUSA, S.A.U.** ("**Antolín Irausa**"), incorporated under the name of


CERTIFIED TRANSLATION





[Seal: Mr Andrés Domínguez Nafría – Notary Public of Madrid]

GRUPO ANTOLÍN, S.A., incorporated by virtue of a deed executed before the Notary Public of Burgos, Mr José María Gómez-Oliveros Sánchez de Rivera, on 5 November 1987, under number 1,635 of his General Notarial Records, for an indefinite term, with registered office at Calle Vitoria, 307, 09007 Burgos. Registered with the Commercial Registry of this province in Volume 182, Book 102, Section 3 of Companies, folio 133, file number 1,960, first entry. Tax Identification Number (N.I.F.): A09092305. ------------

-------------------------------------------------------------------------------------------

--------------------------

His authority to execute this instrument derives from the aforementioned office, to which he was appointed by virtue of a deed executed before the Notary Public of Burgos, Mr José María Gómez-Oliveros Sánchez de Rivera, on 17 October 2023, under notarial record number 3,785, 153rd entry.---

He assures me that the powers under which he acts remain fully valid and in force and that the legal capacity of the company he represents has not changed. ----------------------------------------------------------------------

I, the Notary Public, have had before me an authorised copy of the aforementioned deed, which I return to the appearing party, and I deem the powers conferred therein sufficient for these purposes. --------------------------

------------------------------------------





<u>DECLARATION OF BENEFICIAL OWNERSHIP</u>. — For the purpose of complying with the obligation to identify the beneficial owner imposed by Law 10/2010 of 28 April, I, the Notary Public, have consulted the Beneficial Ownership Database (BDTR), created pursuant to the Resolution of the General Council of Notaries dated 24 March 2012 (Official State Gazette of 28 April 2012), the result of which is consistent with the statements made by the representative. ------------------------------------------------------------------------- --------------------------------------------------------------

**B-.** In her capacity as Chief Executive Officer of the company named **GRUPO ANTOLIN-ARAGUSA, S.A.U.** ("Antolín Aragusa"), with registered office in Burgos, Parque Empresarial Monte La Abadesa. Incorporated for an indefinite term under the corporate name "ARA GUARNECIDOS, S.A." by virtue of a deed executed on 17 March 1978 before the Notary Public of Madrid, Mr Juan-Manuel de la Puente Menéndez, under notarial record number 738. Its Articles of Association were adapted to the legislation governing public limited companies by virtue of a deed executed before the Notary Public of Burgos, Mr José María Gómez-Oliveros Sánchez de Rivera, on 24 September 1992, under notarial record number 2,025. Its corporate name was changed to its current name by virtue of a deed executed before the same Notary Public on 22 January 1999, under notarial record number 120. Registered with the Commercial Registry of Burgos, in


CERTIFIED TRANSLATION





[Seal: Mr Andrés Domínguez Nafría – Notary Public of Madrid]

Volume 117, Book 54 of Section 3 of the Companies Register, folio 60, file 544, first entry. --------------------------------

Tax Identification Number (N.I.F.): A-09019191. ---------------------------------

Her authority to execute this instrument derives from the aforementioned office, to which she was appointed by virtue of a deed executed before the Notary Public of Burgos, Mr Daniel González del Álamo, on 27 June 2025, under notarial record number 1,333, which gave rise to the 94th entry in the file opened in the name of the company. ---------------------------------

She assures me that the powers under which she acts remain fully valid and in force and that the legal capacity of the company she represents has not changed. ---------------------------------

I, the Notary Public, have had before me an authorised copy of the aforementioned deed, which I return to the appearing party, and I deem the powers conferred therein sufficient for these purposes. ---------------------------------------

DECLARATION OF BENEFICIAL OWNERSHIP. — For the purpose of complying with the obligation to identify the beneficial owner imposed by Law 10/2010 of 28 April, I, the Notary Public, have consulted the Beneficial Ownership Database (BDTR), created pursuant to the Resolution of the General Council of





Notaries dated 24 March 2012 (Official State Gazette of 28 April 2012), the result of which is consistent with the statements made by the representative.

-----------------------------------------------------------------------------------------------------------------------------------------

**C-.** In her capacity as Chief Executive Officer of the company named **GRUPO ANTOLIN EUROTRIM, S.A.U.** ("**Antolín Eurotrim**"), with registered office at Calle Vitoria, 309, Burgos.

Initially incorporated for a term expiring on 31 December 2020, under the corporate name "PIANFEI-SOLANO, S.A.", by virtue of a deed executed in Lerma on 12 September 1979 before the Notary Public Mr Luis Sanz Rodero, under notarial record number 1,251.

Registered with the Commercial Registry of Burgos in Volume 122, Section 3, Book 58, folio 55, file number 620, first entry.

Its Articles of Association were adapted to the Public Limited Companies Act by virtue of a deed executed before the Notary Public of Burgos, Mr José María Gómez-Oliveros Sánchez de Rivera, on 24 September 1992, under notarial record number 2,026.

Registered with the Commercial Registry of Burgos in Volume 272, Book 63, folio 183, Section GE, file BU-2194, 10th entry.

Its corporate name was changed to its current name by virtue of another deed executed before Mr José María Gómez-Oliveros Sánchez de Rivera on 15 July 1999, under notarial record number 2,319.

Registered with the Commercial Registry of Burgos in Volume 272, Book 63, folio 189,







[Seal: Mr Andrés Domínguez Nafría – Notary Public of Madrid]

ction 8, file BU-2194, 25th entry.

Its term was changed to an indefinite term by virtue of a deed executed before the Notary Public, Mr José María Gómez-Oliveros Sánchez de Rivera, on 27 July 2017, under notarial record number 2,362.

Registered with the Commercial Registry in Volume 624, Book 415, folio 15, Section 8, file BU-2194, 60th entry.

Tax Identification Number (N.I.F.): A09021759.

Her authority to execute this instrument derives from the aforementioned office, to which she was appointed by virtue of a deed executed before the Notary Public of Burgos, Mr Daniel González del Álamo, on 27 June 2025, under notarial record number 1,334, which gave rise to the 81st entry in the file opened in the name of the company.

She assures me that the powers under which she acts remain fully valid and in force and that the legal capacity of the company she represents has not changed.

I, the Notary Public, have had before me an authorised copy of the aforementioned deed, which I return to the appearing party, and I deem the powers conferred therein sufficient for these purposes.



CERTIFIED TRANSLATION



USA CORP

<u>DECLARATION OF BENEFICIAL OWNERSHIP</u>. — For the purpose of complying with the obligation to identify the beneficial owner imposed by Law 10/2010 of 28 April, I, the Notary Public, have consulted the Beneficial Ownership Database (BDTR), created pursuant to the Resolution of the General Council of Notaries dated 24 March 2012 (Official State Gazette of 28 April 2012), the result of which is consistent with the statements made by the representative.

D-. In her capacity as Chief Executive Officer of the company named **GRUPO ANTOLIN INGENIERÍA, S.A.U. ("Antolín Ingeniería"),** with registered office at Calle Vitoria, 307, Burgos.

Incorporated for an indefinite term under the corporate name "IRAUSA INGENIERÍA, S.A." by virtue of a deed executed before the Notary Public of Burgos, Mr José María Gómez-Oliveros Sánchez de Rivera, on 24 December 1993, under notarial record number 2,355.

Registered with the Commercial Registry of Burgos in Volume 312, Book 103, folio 13, Section 8, file BU-3606, first entry.

Its corporate name was changed to its current name by virtue of a deed executed before the Notary Public of Burgos, Mr José María Gómez-Oliveros Sánchez de Rivera, on 22 January 1999, under notarial record number 126.

Registered with the Commercial Registry in Volume 339, Book 130, folio 207, Section 8, file BU-3606, 15th entry.


**CERTIFIED TRANSLATION**





[Seal: Mr Andrés Domínguez Nafría – Notary Public of Madrid]

Tax Identification Number (N.I.F.): A-09276528.

Her authority to execute this instrument derives from the aforementioned office, to which she was appointed by virtue of a deed executed before the Notary Public of Burgos, Mr José María Gómez-Oliveros Sánchez de Rivera, on 17 October 2023, under notarial record number 3,787, which gave rise to the 101st entry in the file opened in the name of the company.

She assures me that the powers under which she acts remain fully valid and in force and that the legal capacity of the company she represents has not changed.

I, the Notary Public, have had before me an authorised copy of the aforementioned deed, which I return to the appearing party, and I deem the powers conferred therein sufficient for these purposes.

DECLARATION OF BENEFICIAL OWNERSHIP. — For the purpose of complying with the obligation to identify the beneficial owner imposed by Law 10/2010 of 28 April, I, the Notary Public, have consulted the Beneficial Ownership Database (BDTR), created pursuant to the Resolution of the General Council of Notaries dated 24 March 2012 (Official State Gazette of 28 April 2012), the result of which is consistent with the statements made by

11





the representative.

E-. In her capacity as Chief Executive Officer of the company named **GRUPO ANTOLIN PLASBUR, S.A.U.** ("**Antolín Plasbur**"), with registered office at Calle Condado de Treviño, 21 (Villalonquéjar Industrial Estate), Burgos.

Incorporated for an indefinite term under the corporate name "IRAPLAST, S.A." by virtue of a deed executed on 6 May 1992 before Mr Julián Sastre Martín, formerly a Notary Public of Burgos, under notarial record number 1,110.

Registered with the Commercial Registry of Burgos in Volume 256, Book 47, folio 15, Section GE, file BU-1603, first entry.

Its corporate name was changed to its current name by virtue of a deed executed in Burgos before the Notary Public, Mr José María Gómez-Oliveros Sánchez de Rivera, on 22 January 1999, under notarial record number 124.

Registered with the Commercial Registry of Burgos in Volume 339, Book 130, folio 32, Section 8, file BU-1603, 11th entry.

Tax Identification Number (N.I.F.): A09256975.

Her authority to execute this instrument derives from the aforementioned office, to which she was appointed by virtue of a deed executed before the Notary Public of Burgos, Mr Daniel González del Álamo, on 27 June 2025, under notarial record number 1,336, which gave rise to the 62nd entry in the file opened in the name of the company.


CERTIFIED TRANSLATION





[Seal: Mr Andrés Domínguez Nafría – Notary Public of Madrid]

She assures me that the powers under which she acts remain fully valid and in force and that the legal capacity of the company she represents has not changed.

I, the Notary Public, have had before me an authorised copy of the aforementioned deed, which I return to the appearing party, and I deem the powers conferred therein sufficient for these purposes.

DECLARATION OF BENEFICIAL OWNERSHIP. — For the purpose of complying with the obligation to identify the beneficial owner imposed by Law 10/2010 of 28 April, I, the Notary Public, have consulted the Beneficial Ownership Database (BDTR), created pursuant to the Resolution of the General Council of Notaries dated 24 March 2012 (Official State Gazette of 28 April 2012), the result of which is consistent with the statements made by the representative.

F-. In her capacity as Chief Executive Officer of the company named **GRUPO ANTOLIN RYA, S.A.U. ("Antolín RyA")**, with registered office at Calle Vitoria, 307, Burgos.

Incorporated for an indefinite term under the corporate name
REVESTIMIENTOS Y ASIENTOS, S.A., by virtue of a deed executed in
Burgos before the Notary Public, Mr José





María Gómez-Oliveros Sánchez de Rivera, on 19 February 1987, under notarial record number 259.

Registered with the Commercial Registry of Burgos in Volume 176, Book 97 of Section 3 of Companies, folio 146, file number 1,837, first entry.

Its Articles of Association were amended by virtue of a deed executed before the Notary Public of Burgos, Mr José María Gómez-Oliveros Sánchez de Rivera, on 24 September 1992, under notarial record number 2,029.

Registered with the Commercial Registry of Burgos in Volume 272, Book 63 of the GE Section of Companies, folio 152, file number 2,188, 12th entry.

Its corporate name was changed to its current name, GRUPO ANTOLÍN-RYA, S.A., by virtue of a deed executed before the Notary Public of Burgos, Mr José María Gómez-Oliveros Sánchez de Rivera, on 22 January 1999, under notarial record number 119.

Registered with the Commercial Registry of Burgos in Volume 272, Book 63 of Section 8, folio 159, file number 2,188, 27th entry.

Tax Identification Number (N.I.F.): A-09075680.

Her authority to execute this instrument derives from the aforementioned office, to which she was appointed by virtue of a deed executed before the Notary Public of Burgos, Mr Daniel González del Álamo, on 27 June 2025, under notarial record number 1,337, which gave rise to the 78th entry in the file opened in the name of the company.







[Seal: Mr Andrés Domínguez Nafría – Notary Public of Madrid]

She assures me that the powers under which she acts remain fully valid and in force and that the legal capacity of the company she represents has not changed.

I, the Notary Public, have had before me an authorised copy of the aforementioned deed, which I return to the appearing party, and I deem the powers conferred therein sufficient for these purposes.

DECLARATION OF BENEFICIAL OWNERSHIP. — For the purpose of complying with the obligation to identify the beneficial owner imposed by Law 10/2010 of 28 April, I, the Notary Public, have consulted the Beneficial Ownership Database (BDTR), created pursuant to the Resolution of the General Council of Notaries dated 24 March 2012 (Official State Gazette of 28 April 2012), the result of which is consistent with the statements made by the representative.

G-. In her capacity as Chief Executive Officer of the company named **GRUPO ANTOLIN-AUTOTRIM, S.A.U.**, with registered office at Calle Vitoria, 307, Burgos, incorporated for an indefinite term under the corporate name AUTOTRIM, S.A., by virtue of a deed executed before the Notary Public of Burgos, Mr José María Gómez-Oliveros Sánchez de Rivera, on


CERTIFIED TRANSLATION


USA CORP

15 January 1988, under notarial record number 21.

Registered with the Provincial Commercial Registry of Burgos in Volume 184, Book 104 of Section 3, folio 111, file 2,044, first entry; its Articles of Association were adapted to the Public Limited Companies Act by virtue of a deed executed before the same Notary Public on 24 September 1992, under notarial record number 2,033.

Its corporate name was changed to its current name by virtue of a deed executed before the Notary Public of Burgos, Mr José María Gómez-Oliveros Sánchez de Rivera, on 22 January 1999, under notarial record number 125.

Registered with the Commercial Registry of Burgos in Volume 272, Book 63, folio 136, Section 8, file BU-2184, 25th entry.

Tax Identification Number (N.I.F.): A09097080.

Her authority to execute this instrument derives from the aforementioned office, to which she was appointed by virtue of a deed executed before the Notary Public of Burgos, Mr Daniel González del Álamo, on 27 June 2025, under notarial record number 1,332, which gave rise to the 79th entry in the file opened in the name of the company.

She assures me that the powers under which she acts remain fully valid and in force and that the legal capacity of the company she represents has not changed.

I, the Notary Public, have had before me an authorised copy of the aforementioned deed, which I return to the appearing party, and I deem






[Seal: Mr Andrés Domínguez Nafría – Notary Public of Madrid]

sufficient for these purposes.--------------------------------------------------

<u>DECLARATION OF BENEFICIAL OWNERSHIP.</u>— For the purpose of complying with the obligation to identify the beneficial owner imposed by Law 10/2010 of 28 April, I, the Notary Public, have consulted the Beneficial Ownership Database (BDTR), created pursuant to the Resolution of the General Council of Notaries dated 24 March 2012 (Official State Gazette of 28 April 2012), the result of which is consistent with the statements made by the representative.--------------------------------------------------

H.- In her capacity as Chief Executive Officer of the company named **GRUPO ANTOLIN-GLASS, S.A.U.**, with registered office at Calle Vitoria, 309, Burgos. Incorporated for an indefinite term under the corporate name "PIANFEI-GLASS, S.A." by virtue of a deed executed in Burgos on 3 November 1986 before the Notary Public, Mr José-María Martín Álvarez, under notarial record number 2,009. Registered with the Commercial Registry of Burgos in Volume 172 of Section 3 of Companies, Book 94, folio 149, file number 1,709, first entry. Its Articles of Association were adapted to the legislation governing public limited companies by virtue of a deed executed

before the Notary Public of Burgos, Mr José María Gómez-Oliveros Sánchez de Rivera, on 24 September 1992, under notarial record number 2,016. Its corporate name was changed to its current name by virtue of a deed executed before the Notary Public of Burgos, Mr José María Gómez-Oliveros Sánchez de Rivera, on 19 December 2000, under notarial record number 3,511. Registered with the Commercial Registry of Burgos in Volume 273, Book 64,

17


CERTIFIED TRANSLATION



folio 37, Section 8, file BU-2216, 18th entry. Tax Identification Number (N.I.F.): A09063611. -------------------------------------------------

Her authority to execute this instrument derives from the aforementioned office, to which she was appointed by virtue of a deed executed before the Notary Public of Burgos, Mr Daniel González del Álamo, on 27 June 2025, under notarial record number 1,335, which gave rise to the 58th entry in the file opened in the name of the company.-------------------------------------------------

She assures me that the powers under which she acts remain fully valid and in force and that the legal capacity of the company she represents has not changed.-------------------------------------------------

I, the Notary Public, have had before me an authorised copy of the aforementioned deed, which I return to the appearing party, and I deem the powers conferred therein sufficient for these purposes.------------------------------
---------------------

DECLARATION OF BENEFICIAL OWNERSHIP.— For the purpose of complying with the obligation to identify the beneficial owner imposed by Law 10/2010 of 28 April, I, the Notary Public,







[Seal: Mr Andrés Domínguez Nafría – Notary Public of Madrid]

have consulted the Beneficial Ownership Database (BDTR), created pursuant to the Resolution of the General Council of Notaries dated 24 March 2012 (Official State Gazette of 28 April 2012), the result of which is consistent with the statements made by the representative.----------------------------------------------

I-. In her capacity as Managing Director of the company named GRUPO **ANTOLÍN LUSITÂNIA, COMPONENTES AUTOMÓVEL, UNIPESSOAL, LDA. ("Antolín Lusitania")**, with registered office at Zona Industrial Polo Dois, District of Viana do Castelo, Municipality of Vila Nova de Cerveira, Civil Parish of Campos e Vila Meã, 4920-012 CAMPOS VNC (Portugal), registered with the Commercial Registry of Vila Nova de Cerveira under legal entity number 502227958 and Spanish non-resident Tax Identification Number N0405449J. -------------

Her authority to execute this instrument derives from the aforementioned office, the continued validity of which she evidences to me by means of a certificate issued by the Civil/Land/Commercial Registry Office of Vila Nova de Cerveira (Conservatória do Registo Civil/Predial/Comercial de Vila Nova de Cerveira), which she produces to me and which I return to her, and from which her powers for this

CERTIFIED TRANSLATION




execution.-------------------------------------------------

The appearing party assures me that she continues to hold the aforementioned office and that the powers conferred upon her remain fully valid and in force. ----------

I, the Notary Public, hereby state that, in my opinion, the representative powers evidenced are sufficient for the execution of this instrument.----------------------------------------------

DECLARATION OF BENEFICIAL OWNERSHIP.— For the purpose of complying with the obligation to identify the beneficial owner imposed by Law 10/2010 of 28 April, I, the Notary Public, have consulted the Beneficial Ownership Database (BDTR), created pursuant to the Resolution of the General Council of Notaries dated 24 March 2012 (Official State Gazette of 28 April 2012), the result of which is consistent with the statements made by the representative.----------------------------------------------------

J-. In her capacity as Executive Director of the company named **GRUPO ANTOLIN BRATISLAVA, S.R.O.**, incorporated by means of the deed of incorporation recorded under notarial record No. Nz 117/01 on 24 April 2001 before the Notary Public JUDr. Magdalena Cizova. With registered office at Opletalova 73, 841 07 Bratislava, Slovak Republic. Company Identification Number (IČO): 35811650; Spanish non-resident Tax Identification Number: N0407135C. --------------------------------------------------

Her authority to execute this instrument derives from the aforementioned







[Seal: Mr Andrés Domínguez Nafría – Notary Public of Madrid]

office, the continued validity of which she evidences to me by means of a certificate issued by the Commercial Register of Bratislava (Slovak Republic), which she produces to me and which I return to her, and from which her powers for the execution of this instrument are evidenced. ------------------------ -------------------------

The appearing party assures me that she continues to hold the aforementioned office and that the powers conferred upon her remain fully valid and in force. -- -----------

I, the Notary Public, hereby state that, in my opinion, the representative powers evidenced are sufficient for the execution of this instrument.---------------------- ---------------------------

DECLARATION OF BENEFICIAL OWNERSHIP.— For the purpose of complying with the obligation to identify the beneficial owner imposed by Law 10/2010 of 28 April, I, the Notary Public, have consulted the Beneficial Ownership Database (BDTR), created pursuant to the Resolution of the General Council of Notaries dated 24 March 2012 (Official State Gazette of 28 April 2012), the result of which is consistent with the statements made by the representative.---------------------------------------------------

K-. In her capacity as Executive Director and legal representative of the company named **GRUPO ANTOLIN OSTRAVA,**





**S.R.O.**, with registered office at Na Rovince 912, Hrabová, 720 00 Ostrava (Czech Republic), Company Identification Number 275 34 596, registered with the Commercial Register maintained by the Regional Court in Ostrava, Section C, entry number 33224; Spanish non-resident Tax Identification Number N0407142I. --------------------------------------------------

Her authority to execute this instrument derives from the aforementioned office, the continued validity of which she evidences to me by means of a certificate issued by the Commercial Register of Ostrava (Czech Republic), which she produces to me and which I return to her, and from which her powers for the execution of this instrument are evidenced.-------------------------

--------------------------

The appearing party assures me that she continues to hold the aforementioned office and that the powers conferred upon her remain fully valid and in force. --

-----------

I, the Notary Public, hereby state that, in my opinion, the representative powers evidenced are sufficient for the execution of this instrument.----------------------

---------------------------

DECLARATION OF BENEFICIAL OWNERSHIP.— For the purpose of complying with the obligation to identify the beneficial owner imposed by Law 10/2010 of 28 April, I, the Notary Public, have consulted the Beneficial Ownership Database (BDTR), created pursuant to the Resolution of the General Council of Notaries dated 24 March 2012 (Official State Gazette of 28 April 2012), the result of which is consistent with the statements made by







[Seal: Mr Andrés Domínguez Nafría – Notary Public of Madrid]

the representative.---------------------------------------------------

L-. In her capacity as Executive Director of the company named **GRUPO ANTOLIN TURNOV, S.R.O.**, with registered office at Prumyslová 3000, 511 01 Turnov, Czech Republic, Tax Identification Number CZ26702436, registered with the Commercial Register maintained by the Regional Court in Hradec Králové, Section C, entry number 20006, and Company Identification Number 267 02 426; Spanish non-resident Tax Identification Number N0611285H. --------------------------------------------------

Her authority to execute this instrument derives from the aforementioned office, the continued validity of which she evidences to me by means of an extract from the Commercial Register of Hradec Králové (Czech Republic), which she produces to me and which I return to her, and from which her powers for the execution of this instrument are evidenced.------------------------
-------------------------

The appearing party assures me that she continues to hold the aforementioned office and that the powers conferred upon her remain fully valid and in force. --
-----------

I, the Notary Public, hereby state that, in my opinion, the representative powers evidenced are sufficient for the execution of this instrument.-----------------------
---------------------------



CERTIFIED TRANSLATION



USA CORP

<u>DECLARATION OF BENEFICIAL OWNERSHIP</u>.— For the purpose of complying with the obligation to identify the beneficial owner imposed by Law 10/2010 of 28 April, I, the Notary Public, have consulted the Beneficial Ownership Database (BDTR), created pursuant to the Resolution of the General Council of Notaries dated 24 March 2012 (Official State Gazette of 28 April 2012), the result of which is consistent with the statements made by the representative.----------------------------------------------------

M-. In her capacity as Executive Director of the company named **ANTOLIN LIBAN S.R.O.**, with registered office at Komenskeho 30, Postal Code 507 23, Liban (Czech Republic), Company Identification Number 03561453, registered with the Commercial Register of Prague, Section C, file No. 232999; Spanish non-resident Tax Identification Number N0405441G. -------------------------------------------------

Her authority to execute this instrument derives from the aforementioned office, the continued validity of which she evidences to me by means of an extract from the Commercial Register of Hradec Králové (Czech Republic), which she produces to me and which I return to her, and from which her powers for the execution of this instrument are evidenced.----------------------------------------------

The appearing party assures me that she continues to hold the aforementioned office and that the powers conferred upon her remain fully valid and in force. -------------

I, the Notary Public, hereby state that, in my opinion, the representative powers evidenced are sufficient for the



CERTIFIED
TRANSLATION


USA CORP



[Seal: Mr Andrés Domínguez Nafría – Notary Public of Madrid]

...tion of this instrument.--------------------------------------------------

DECLARATION OF BENEFICIAL OWNERSHIP.— For the purpose of complying with the obligation to identify the beneficial owner imposed by Law 10/2010 of 28 April, I, the Notary Public, have consulted the Beneficial Ownership Database (BDTR), created pursuant to the Resolution of the General Council of Notaries dated 24 March 2012 (Official State Gazette of 28 April 2012), the result of which is consistent with the statements made by the representative.-----------------------------------------------------

N-. In her capacity as Chairwoman of the Board of Directors of the company named **GRUPO ANTOLIN BOHEMIA, A.S.**, with registered office at Prumyslova zona Server, Svároska 696, 463 03 Stráz nad Nisou, Czech Republic, Tax Identification Number CZ60192925, registered with the Commercial Register maintained by the Regional Court in Usti nad Labem, Section B, No. 620; Spanish non-resident Tax Identification Number N0407143G. -----------------------------------------------------

Her authority to execute this instrument derives from the aforementioned office, the continued validity of which she evidences to me by means of a certificate issued by the Commercial Register of Usti nad Labem (Czech Republic),

25



CERTIFIED TRANSLATION



which she produces to me and which I return to her, and from which her powers for the execution of this instrument are evidenced. -------------------------------------------

The appearing party assures me that she continues to hold the aforementioned office and that the powers conferred upon her remain fully valid and in force. -------------

I, the Notary Public, hereby state that, in my opinion, the representative powers evidenced are sufficient for the execution of this instrument.-------------------------------------------

DECLARATION OF BENEFICIAL OWNERSHIP.— For the purpose of complying with the obligation to identify the beneficial owner imposed by Law 10/2010 of 28 April, I, the Notary Public, have consulted the Beneficial Ownership Database (BDTR), created pursuant to the Resolution of the General Council of Notaries dated 24 March 2012 (Official State Gazette of 28 April 2012), the result of which is consistent with the statements made by the representative.-------------------------------------------

O-. In her capacity as joint and several director of the company named **"GRUPO ANTOLÍN SIBIU, S.R.L."**, with registered office at Europa Unita St., No. 7, Sibiu, Sibiu County (Romania), Tax Identification Number RO 22946116, registered with the Commercial Register under number J2008000486327; Spanish non-resident Tax Identification Number N0329720G. ---

Her authority to execute this instrument derives from the aforementioned office, the continued validity of which she evidences to me by means of a certificate issued by the


CERTIFIED TRANSLATION





[Seal: Mr Andrés Domínguez Nafría – Notary Public of Madrid]

Romanian Commercial Register (National Trade Register), which she produces to me and which I return to her, and from which her powers for the execution of this instrument are evidenced. --------------------------------------------------

The appearing party assures me that she continues to hold the aforementioned office and that the powers conferred upon her remain fully valid and in force. -- -----------

I, the Notary Public, hereby state that, in my opinion, the representative powers evidenced are sufficient for the execution of this instrument.---------------------- ---------------------------

DECLARATION OF BENEFICIAL OWNERSHIP.— For the purpose of complying with the obligation to identify the beneficial owner imposed by Law 10/2010 of 28 April, I, the Notary Public, have consulted the Beneficial Ownership Database (BDTR), created pursuant to the Resolution of the General Council of Notaries dated 24 March 2012 (Official State Gazette of 28 April 2012), the result of which is consistent with the statements made by the representative.-------------------------------------------------

P-. In her capacity as Chairwoman of the Board of Directors of the company named **ANTOLIN SILESIA SP ZOO**, a company duly incorporated under the laws of

27



CERTIFIED TRANSLATION



USA CORP

Poland, with registered office at WROCtAWSKA, No. 82, 57-100 Strzelin, Silesia (Poland), Statistical Number (REGON): 020075399, KRS: 0000236792, Tax Identification Number (NIP): 8982065139, and Spanish non-resident Tax Identification Number N0405304G.

Her authority to execute this instrument derives from the aforementioned office, the continued validity of which she evidences to me by means of a certificate issued by the Polish National Court Register, which she produces to me and which I return to her, and from which her powers for the execution of this instrument are evidenced.

The appearing party assures me that she continues to hold the aforementioned office and that the powers conferred upon her remain fully valid and in force.

I, the Notary Public, hereby state that, in my opinion, the representative powers evidenced are sufficient for the execution of this instrument.

DECLARATION OF BENEFICIAL OWNERSHIP.— For the purpose of complying with the obligation to identify the beneficial owner imposed by Law 10/2010 of 28 April, I, the Notary Public, have consulted the Beneficial Ownership Database (BDTR), created pursuant to the Resolution of the General Council of Notaries dated 24 March 2012 (Official State Gazette of 28 April 2012), the result of which is consistent with the statements made by the representative.

Q-. In her capacity as Geschäftsführer (Managing Director) of the


CERTIFIED TRANSLATION





[Seal: Mr Andrés Domínguez Nafría – Notary Public of Madrid]

company named **GRUPO ANTOLIN BAMBERG GmbH & Co. KG**, with registered office at Kronacherstraße 70–80, D-96052 Bamberg, Tax Identification Number DE 132277887, registered with the Commercial Register of the Local Court of Bamberg under number HRA 8480, and Spanish non-resident Tax Identification Number N0405434B.

Her authority to execute this instrument derives from the aforementioned office, the continued validity of which she evidences to me by means of a certificate issued by the Commercial Register of Bamberg, which she produces to me and which I return to her.

The appearing party assures me that she continues to hold the aforementioned office and that the powers conferred upon her remain fully valid and in force.

I, the Notary Public, hereby state that, in my opinion, the representative powers evidenced are sufficient for the execution of this instrument.

DECLARATION OF BENEFICIAL OWNERSHIP.— For the purpose of complying with the obligation to identify the beneficial owner imposed by Law 10/2010 of 28 April, I, the Notary Public, have consulted the Beneficial Ownership Database (BDTR), created pursuant to the Resolution of the General Council of Notaries dated 24 March 2012 (Official State Gazette of 28 April 2012), the result of which is consistent with the statements made by the representative.



CERTIFIED TRANSLATION



tradux
U S A  C O R P

R-. In her capacity as **Geschäftsführer (Managing Director)** and legal representative of the company named **ANTOLIN DEUTSCHLAND GmbH**, with registered office at Am Ziegelwerk 1, D-85391 Allershausen, Tax Identification Number DE-192564301, registered with the Commercial Register of the Local Court of Munich under number HRB 235486. The appearing party assures me that she continues to hold the aforementioned office and that the powers conferred upon her remain fully valid and in force; Spanish non-resident Tax Identification Number N0407141A.------------------------------
-------------------

Her authority to execute this instrument derives from the aforementioned office, the continued validity of which she evidences to me by means of a certificate issued by the Commercial Register of Munich, which she produces to me and which I return to her. -

The appearing party assures me that she continues to hold the aforementioned office and that the powers conferred upon her remain fully valid and in force. --
-----------

I, the Notary Public, hereby state that, in my opinion, the representative powers evidenced are sufficient for the execution of this instrument.-----------------------
---------------------------

DECLARATION OF BENEFICIAL OWNERSHIP**.**— For the purpose of complying with the obligation to identify the beneficial owner


CERTIFIED TRANSLATION





[Seal: Mr Andrés Domínguez Nafría – Notary Public of Madrid]

sed by Law 10/2010 of 28 April, I, the Notary Public, have consulted the Beneficial Ownership Database (BDTR), created pursuant to the Resolution of the General Council of Notaries dated 24 March 2012 (Official State Gazette of 28 April 2012), the result of which is consistent with the statements made by the representative.---------------------------------------------------

S-. In her capacity as Geschäftsführer (Managing Director) and legal representative of the company named **GRUPO ANTOLIN LOGISTIK DEUTSCHLAND GMBH**, with registered office at Am Coloneum 4, D-50829 Cologne, Germany, Tax Identification Number DE-195635583, registered with the Commercial Register of the Local Court of Cologne under number HRB 62880; Spanish non-resident Tax Identification Number N0407139E.

Her authority to execute this instrument derives from the aforementioned office, the continued validity of which she evidences to me by means of a certificate issued by the Commercial Register of Cologne, which she produces to me and which I return to her. -

The appearing party assures me that she continues to hold the aforementioned office and that the powers conferred upon her remain fully valid and in force. -- -----------



CERTIFIED TRANSLATION



I, the Notary Public, hereby state that, in my opinion, the representative powers evidenced are sufficient for the execution of this instrument.----------------------------------------------

DECLARATION OF BENEFICIAL OWNERSHIP.— For the purpose of complying with the obligation to identify the beneficial owner imposed by Law 10/2010 of 28 April, I, the Notary Public, have consulted the Beneficial Ownership Database (BDTR), created pursuant to the Resolution of the General Council of Notaries dated 24 March 2012 (Official State Gazette of 28 April 2012), the result of which is consistent with the statements made by the representative.---------------------------------------------------

T-. In her capacity as Geschäftsführer (Managing Director) and legal representative of the company named **ANTOLIN STRAUBING GMBH**, with registered office at Stettiner Str. 7, D-94315 Straubing, Germany, Tax Identification Number DE 812311435, registered with the Commercial Register of the Local Court of Straubing under number HRB 10424; Spanish non-resident Tax Identification Number N0407137I. ---------------------------------------------------

Her authority to execute this instrument derives from the aforementioned office, the continued validity of which she evidences to me by means of a certificate issued by the Commercial Register of Straubing, which she produces to me and which I return to her.

The appearing party assures me that she continues to hold the aforementioned office and that the powers


CERTIFIED
TRANSLATION





[Seal: Mr Andrés Domínguez Nafría – Notary Public of Madrid]

conferred upon her remain fully valid and in force. -------------

I, the Notary Public, hereby state that, in my opinion, the representative powers evidenced are sufficient for the execution of this instrument.----------------------

----------------------------

DECLARATION OF BENEFICIAL OWNERSHIP.— For the purpose of complying with the obligation to identify the beneficial owner imposed by Law 10/2010 of 28 April, I, the Notary Public, have consulted the Beneficial Ownership Database (BDTR), created pursuant to the Resolution of the General Council of Notaries dated 24 March 2012 (Official State Gazette of 28 April 2012), the result of which is consistent with the statements made by the representative.---------------------------------------------------

U-. In her capacity as Executive Director of the company named **GRUPO ANTOLIN LEAMINGTON LIMITED** (formerly **GRUPO ANTOLIN KENT LIMITED**), with registered office at Tachbrook Park Drive, Leamington Spa, Warwick, CV34 6RH, Warwickshire (United Kingdom), Tax Identification Number GB710134103, registered with the local Companies Register under number 3477767; Spanish non-resident Tax Identification Number N0404953B. ---------------------------------------------------


CERTIFIED TRANSLATION



Her authority to execute this instrument derives from the aforementioned office, the continued validity of which she evidences to me by means of a certificate issued by Companies House, which she produces to me and which I return to her, and from which her powers for the execution of this instrument are evidenced.--------------------------------------------------

The appearing party assures me that she continues to hold the aforementioned office and that the powers conferred upon her remain fully valid and in force. --------------

I, the Notary Public, hereby state that, in my opinion, the representative powers evidenced are sufficient for the execution of this instrument.----------------------------------------------

As supplementary evidence of her authority, she produces to me a special power of attorney granted by Ms María Cristina Blanco Santo Tomás, in her capacity as Director of the Company, in Madrid on 17 June 2026, notarised on 18 June 2026 by Mr Edward Gardiner, a Notary Public authorised to act throughout England and Wales, drawn up in parallel columns in Spanish and English and legalised by means of an Apostille dated 18 June 2026, the original of which she produces to me at this time and which I return to her.------------------

I, the Notary Public, hereby state the following in relation to the aforementioned supplementary evidence of authority, in compliance with the provisions of Article 36 of the Mortgage Regulations: ------------------------------------------------


CERTIFIED TRANSLATION





[Seal: Mr Andrés Domínguez Nafría – Notary Public of Madrid]

(i) That the represented entity has been validly and lawfully incorporated under the laws of England and Wales.

(ii) That the grantor of the aforementioned power of attorney was duly identified by the Notary Public of the aforementioned country of origin.

(iii) That the said Notary Public duly assessed the sufficiency of the grantor's powers, recording in the power of attorney her legal competence and capacity for the said power of attorney to have full force and effect.

(iv) That the formalities and solemnities required in the country of origin for the granting of the power of attorney have been duly observed.

DECLARATION OF BENEFICIAL OWNERSHIP.— For the purpose of complying with the obligation to identify the beneficial owner imposed by Law 10/2010 of 28 April, I, the Notary Public, have consulted the Beneficial Ownership Database (BDTR), created pursuant to the Resolution of the General Council of Notaries dated 24 March 2012 (Official State Gazette of 28 April 2012), the result of which is consistent with the statements made by the representative.



CERTIFIED TRANSLATION



Tradux USA CORP

V-. In her capacity as Executive Director of the company named **ANTOLIN INTERIORS UK LIMITED**, with registered office at Merse Road, North Moons Moat, Redditch, B98 9HL, United Kingdom, Tax Identification Number GB683819882, registered with the local Companies Register under number 01676532; Spanish non-resident Tax Identification Number N0407133H.------- ------------------------------------------

Her authority to execute this instrument derives from the aforementioned office, the continued validity of which she evidences to me by means of a certificate issued by Companies House, which she produces to me and which I return to her, and from which her powers for the execution of this instrument are evidenced.-------------------------------------------------

The appearing party assures me that she continues to hold the aforementioned office and that the powers conferred upon her remain fully valid and in force. -- ----------

I, the Notary Public, hereby state that, in my opinion, the representative powers evidenced are sufficient for the execution of this instrument. ---------------------- --------------------------

As supplementary evidence of her authority, she produces to me a special power of attorney granted by Ms María Cristina Blanco Santo Tomás, in her capacity as Director of the Company, in Madrid on 17 June 2026, notarised on 18 June 2026 by Mr Edward Gardiner, a Notary Public authorised to act throughout England and Wales,





[Seal: Mr Andrés Domínguez Nafría – Notary Public of Madrid]

drawn up in parallel columns in Spanish and English and legalised by means of an Apostille dated 18 June 2026, the original of which she produces to me at this time and which I return to her.

I, the Notary Public, hereby state the following in relation to the aforementioned supplementary evidence of authority, in compliance with the provisions of Article 36 of the Mortgage Regulations:

(i) That the represented entity has been validly and lawfully incorporated under the laws of England and Wales.

(ii) That the grantor of the aforementioned power of attorney was duly identified by the Notary Public of the aforementioned country of origin.

(iii) That the said Notary Public duly assessed the sufficiency of the grantor's powers, recording in the power of attorney her legal competence and capacity for the said power of attorney to have full force and effect.

(iv) That the formalities and solemnities required in the country of origin for the granting of the power of attorney have been duly observed.

DECLARATION OF BENEFICIAL OWNERSHIP.— For the





purpose of complying with the obligation to identify the beneficial owner imposed by Law 10/2010 of 28 April, I, the Notary Public, have consulted the Beneficial Ownership Database (BDTR), created pursuant to the Resolution of the General Council of Notaries dated 24 March 2012 (Official State Gazette of 28 April 2012), the result of which is consistent with the statements made by the representative.

W-. In her capacity as attorney-in-fact and legal representative of the company named **ANTOLIN INTERIORS MÉXICO, SOCIEDAD ANÓNIMA DE CAPITAL VARIABLE**, incorporated before Ms María Elena Guadalupe Orozco Aguirre, Notary Public in charge of Notarial Office No. 52 of the city of Saltillo, State of Coahuila, on 30 September 2004, under number 301. Registered with the Public Registry of Property and Commerce of Coahuila, Saltillo Office, under Commercial File number 25.806 2. With registered office in the City of Silao, State of Guanajuato (United Mexican States). Tax Identification Number IAI0409305B8; Spanish non-resident Tax Identification Number N0405467B.

Her authority to execute this instrument derives from her aforementioned capacity, the continued validity of which she evidences to me by means of a certificate issued by the Public Registry of Commerce of Mexico City, which she produces to me and which I return to her, and from which her powers to







[Seal: Mr Andrés Domínguez Nafría – Notary Public of Madrid]

execute this instrument are evidenced. ------------------------------------------------

The appearing party assures me that she continues to act in the aforementioned capacity and that the powers conferred upon her remain fully valid and in force. ------------

I, the Notary Public, hereby state that, in my opinion, the representative powers evidenced are sufficient for the execution of this instrument. ----------------------

--------------------------

DECLARATION OF BENEFICIAL OWNERSHIP.— For the purpose of complying with the obligation to identify the beneficial owner imposed by Law 10/2010 of 28 April, I, the Notary Public, have consulted the Beneficial Ownership Database (BDTR), created pursuant to the Resolution of the General Council of Notaries dated 24 March 2012 (Official State Gazette of 28 April 2012), the result of which is consistent with the statements made by the representative. ----------------------------------------------

X-. In her capacity as attorney-in-fact and legal representative of the company named **GRUPO ANTOLIN SILAO, SOCIEDAD ANÓNIMA DE CAPITAL VARIABLE**, incorporated for a term of 99 years under the corporate name "IRAUSA MEXICANA" before Mr


CERTIFIED TRANSLATION



Francisco Javier Arce Gargollo, Notary Public in charge of Notarial Office No. 74 of the Federal District of Mexico City, on 18 March 1994, under instrument number 66,150. Its corporate name was changed by instrument number 21,971, executed on 9 February 1999 before Mr José María Morera González, Notary Public in charge of Notarial Office No. 102 of Mexico City. Registered with the Public Registry of Commerce of Mexico City under Commercial File number 189,000. With registered office in Silao, State of Guanajuato (United Mexican States). Tax Identification Number GAS-940318-6J1; Spanish non-resident Tax Identification Number N0405430J. ------------------------------------------------

Her authority to execute this instrument derives from her aforementioned capacity, the continued validity of which she evidences to me by means of a certificate issued by the Public Registry of Commerce of Mexico City, which she produces to me and which I return to her, and from which her powers for the execution of this instrument are evidenced. ------------------------------------------------

The appearing party assures me that she continues to act in the aforementioned capacity and that the powers conferred upon her remain fully valid and in force. ------------

I, the Notary Public, hereby state that, in my opinion, the representative powers evidenced are sufficient for the execution of this instrument. -----------------------------------------------

<u>DECLARATION OF BENEFICIAL OWNERSHIP</u>.— For the







[Seal: Mr Andrés Domínguez Nafría – Notary Public of Madrid]

purpose of complying with the obligation to identify the beneficial owner imposed by Law 10/2010 of 28 April, I, the Notary Public, have consulted the Beneficial Ownership Database (BDTR), created pursuant to the Resolution of the General Council of Notaries dated 24 March 2012 (Official State Gazette of 28 April 2012), the result of which is consistent with the statements made by the representative. -------------------------------------------------

Y-. In her capacity as attorney-in-fact and legal representative of the company named **GRUPO ANTOLIN SALTILLO, SOCIEDAD DE RESPONSABILIDAD LIMITADA DE CAPITAL VARIABLE**, incorporated before Mr Guillermo Oliver Bucio, Notary Public in charge of Notarial Office No. 246 of Mexico City, on 11 December 2007, under instrument number 25,074. Registered with the Public Registry of Commerce of Mexico City under Commercial File number 376,013. With registered office in Silao, State of Guanajuato (United Mexican States). Tax Identification Number GAS-071211-2S0; Spanish non-resident Tax Identification Number N0405496A. -------------------------------------------------

Her authority to execute this instrument derives from her aforementioned capacity,



CERTIFIED TRANSLATION



Tradux
U S A   C O R P

the continued validity of which she evidences to me by means of a certificate issued by the Public Registry of Commerce of Mexico City, which she produces to me and which I return to her, and from which her powers for the execution of this instrument are evidenced. ------------------------------------------------

The appearing party assures me that she continues to act in the aforementioned capacity and that the powers conferred upon her remain fully valid and in force. ------------

I, the Notary Public, hereby state that, in my opinion, the representative powers evidenced are sufficient for the execution of this instrument. ------------------------------------------------

DECLARATION OF BENEFICIAL OWNERSHIP.— For the purpose of complying with the obligation to identify the beneficial owner imposed by Law 10/2010 of 28 April, I, the Notary Public, have consulted the Beneficial Ownership Database (BDTR), created pursuant to the Resolution of the General Council of Notaries dated 24 March 2012 (Official State Gazette of 28 April 2012), the result of which is consistent with the statements made by the representative. ------------------------------------------------

Z-. In her capacity as attorney-in-fact and legal representative of the company named **GRUPO ANTOLIN TLAXCALA, SOCIEDAD DE RESPONSABILIDAD LIMITADA DE CAPITAL VARIABLE**, incorporated for a term of 99 years under the corporate name "Grupo Antolin Puebla" before Mr Luis Ángel Alfonso Chico González,


CERTIFIED TRANSLATION





[Seal: Mr Andrés Domínguez Nafría – Notary Public of Madrid]

Notary Public in charge of Notarial Office No. 5 of the city of León, State of Guanajuato, on 13 August 2014. Tax Identification Number GAP140813N38. With registered office at Virgen de la Caridad, no number, Lot 19, Vesta Park Tlaxcala, 90500 Huamantla. Its corporate name was changed to its current name before Mr Luis Ángel Alfonso Chico González, Notary Public in charge of Notarial Office No. 5 of the city of León, State of Guanajuato, on 29 September 2014. Registered with the Commercial Registry of Cholula, State of Puebla, under Commercial File number 40663; Spanish non-resident Tax Identification Number N0405486B.--------------------------------------------------

Her authority to execute this instrument derives from her aforementioned capacity, the continued validity of which she evidences to me by means of a certificate issued by the Public Registry of Commerce of Mexico City, which she produces to me and which I return to her, and from which her powers for the execution of this instrument are evidenced. -------------------------------------------------

The appearing party assures me that she continues to act in the aforementioned capacity and that the powers conferred upon her remain fully valid and in force. ------------

I, the Notary Public, hereby state that, in my opinion, the



CERTIFIED TRANSLATION



USA CORP

representative powers evidenced are sufficient for the execution of this instrument. --------------------------------------------------

DECLARATION OF BENEFICIAL OWNERSHIP.— For the purpose of complying with the obligation to identify the beneficial owner imposed by Law 10/2010 of 28 April, I, the Notary Public, have consulted the Beneficial Ownership Database (BDTR), created pursuant to the Resolution of the General Council of Notaries dated 24 March 2012 (Official State Gazette of 28 April 2012), the result of which is consistent with the statements made by the representative.---------------------------------------------------

AA-. In her capacity as Executive Director and legal representative of the company named **GRUPO ANTOLIN NORTH AMERICA, INC.**, an entity duly incorporated under the laws of the State of Michigan, with registered office at 3410 Belle Chase Way, Suite 600, Lansing, Michigan 48911, United States of America, Department of Licensing and Regulatory Affairs identification number 800517119 and Federal Employer Identification Number (EIN) 383096385; Spanish non-resident Tax Identification Number N0405409D.---------------------------------------------------

Her authority to execute this instrument derives from the aforementioned office, the continued validity of which she evidences to me by means of a certificate issued by the Department of Licensing and Regulatory Affairs of Lansing, Michigan, which she produces to me and which I return to her, and from which her powers for the execution of this instrument are evidenced. ----- ----------------------------------------------







[Seal: Mr Andrés Domínguez Nafría – Notary Public of Madrid]

The appearing party assures me that she continues to hold the aforementioned office and that the powers conferred upon her remain fully valid and in force. -- ----------

I, the Notary Public, hereby state that, in my opinion, the representative powers evidenced are sufficient for the execution of this instrument. ---------------------- -----------------------------

As supplementary evidence of her authority, she produces to me a special power of attorney granted pursuant to the Unanimous Written Consent of the Board of Directors of the Company dated 17 June 2026, whereby power of attorney was granted in favour of Ms María Cristina Blanco Santo Tomás, notarised on 22 June 2026 by Mr Samuel Chabbott, a Notary Public of the State of New York, drawn up in the English language and legalised by means of an Apostille issued in the City of New York on 23 June 2026 under number NYC-2937140, the original of which she produces to me at this time and which I return to her.------------------

I, the Notary Public, hereby state the following in relation to the aforementioned supplementary evidence of authority

in compliance with the provisions of Article 36 of the Mortgage Regulations: -- --------------------------------------------------



CERTIFIED TRANSLATION



USA CORP

(i) That the represented entity has been validly and lawfully incorporated under the laws of the State of Michigan, United States of America. --------------------- -----------------------------

(ii) That the grantors of the aforementioned power of attorney were duly identified by the Notary Public of the aforementioned country of origin. -------- --------------------------------------------

(iii) That the said Notary Public duly assessed the sufficiency of the grantors' powers, recording in the power of attorney their legal competence and capacity for the said power of attorney to have full force and effect. ---

(iv) That the formalities and solemnities required in the country of origin for the granting of the power of attorney have been duly observed. ------------------- --------------------------------

DECLARATION OF BENEFICIAL OWNERSHIP.— For the purpose of complying with the obligation to identify the beneficial owner imposed by Law 10/2010 of 28 April, I, the Notary Public, have consulted the Beneficial Ownership Database (BDTR), created pursuant to the Resolution of the General Council of Notaries dated 24 March 2012 (Official State Gazette of 28 April 2012), the result of which is consistent with the statements made by the representative.---------------------------------------------------

BB-. In her capacity as Executive Director and legal representative of







[Seal: Mr Andrés Domínguez Nafría – Notary Public of Madrid]

the company named **ANTOLIN ALABAMA LLC**, an entity duly incorporated under the laws of the State of Michigan, with registered office at 3410 Belle Chase Way, Suite 600, Lansing, MI 48911, Michigan, United States of America, Department of Licensing and Regulatory Affairs identification number 802121790; Spanish non-resident Tax Identification Number N0404938C. ----------

Her authority to execute this instrument derives from the aforementioned office, the continued validity of which she evidences to me by means of a certificate issued by the Department of Licensing and Regulatory Affairs of Lansing, Michigan, which she produces to me and which I return to her, and from which her powers for the execution of this instrument are evidenced. ----------------------------------------------------

The appearing party assures me that she continues to hold the aforementioned office and that the powers conferred upon her remain fully valid and in force. -- ----------

I, the Notary Public, hereby state that, in my opinion, the representative powers evidenced are sufficient for the execution of this instrument. ----------------------------------------------------

As supplementary evidence of her authority, she produces to me a special power of attorney granted pursuant to a unanimous resolution



CERTIFIED TRANSLATION



U S A   C O R P

by the unanimous written consent of the Board of Managers of the Company dated 17 June 2026, whereby power of attorney was granted in favour of Ms María Cristina Blanco Santo Tomás, notarised on 22 June 2026 by Mr Samuel Chabbott, a Notary Public of the State of New York, drawn up in the English language and legalised by means of an Apostille issued in the City of New York on 23 June 2026 under number NYC-2937141, the original of which she produces to me at this time and which I return to her.------------------

I, the Notary Public, hereby state the following in relation to the aforementioned supplementary evidence of authority, in compliance with the provisions of Article 36 of the Mortgage Regulations: -----------------------------
----------------------

(i) That the represented entity has been validly and lawfully incorporated under the laws of the State of Michigan, United States of America. ----------------------
-----------------------------

(ii) That the grantors of the aforementioned power of attorney were duly identified by the Notary Public of the aforementioned country of origin. --------
--------------------------------------------

(iii) That the said Notary Public duly assessed the sufficiency of the grantors' powers, recording in the power of attorney their legal competence and capacity for the said power of attorney to have full force and effect. ---







[Seal: Mr Andrés Domínguez Nafría – Notary Public of Madrid]

(iv) Que se han observado las formas y solemnidades requeridas en el país de origen para el acto de apoderamiento. --------------------------------------------------

DECLARACIÓN DE TITULARIDAD REAL.- Con el objeto de cumplir con la obligación de identificación del titular real que impone la Ley 10/2010, de 28 de abril, yo el Notario, he consultado la Base de Datos de Titularidad Real (BDTR) creada por Acuerdo del Consejo General del Notariado, de 24 de marzo de 2012, (BOE 28 de abril de 2012), cuyo resultado es coincidente con lo manifestado por el representante.--------------------------------------------------

CC-. Como Directora Ejecutiva y representante legal de la Sociedad denominada **ANTOLIN INTERIORS USA, INC.**, entidad debidamente constituida conforme a las leyes del estado de Delaware, domiciliada en 3410 Belle Chase Way STE600, Lansing-Mi-48911, Michigan, Estados Unidos de América, número de identificación del "Department of Licensing and Regulatory Affairs" 801040546, número del Delaware Secretary of State / Division of Corporations 3414386 y número fiscal (EIN)





522330192; Spanish non-resident Tax Identification Number N0404942E. -----
-----

Her authority to execute this instrument derives from the aforementioned office, the continued validity of which she evidences to me by means of a certificate issued by the Department of Licensing and Regulatory Affairs of Lansing, Michigan, which she produces to me and which I return to her, and from which her powers for the execution of this instrument are evidenced. -----
-----------------------------------------------

The appearing party assures me that she continues to hold the aforementioned office and that the powers conferred upon her remain fully valid and in force. --
----------

I, the Notary Public, hereby state that, in my opinion, the representative powers evidenced are sufficient for the execution of this instrument. ----------------------
-----------------------------

As supplementary evidence of her authority, she produces to me a special power of attorney granted pursuant to the unanimous Written Consent of the Board of Directors of the Company dated 17 June 2026, whereby power of attorney was granted in favour of Ms María Cristina Blanco Santo Tomás, notarised on 2 July 2026 by Mr Samuel C. Chabot, a Notary Public of the State of New York, drawn up in the English language and legalised by means of an Apostille issued in the City of New York on 2 July 2026 under number NYC-2947517, the original of which she produces to me at this time and which I return to her.







[Seal: Mr Andrés Domínguez Nafría – Notary Public of Madrid]

I, the Notary Public, hereby state the following in relation to the aforementioned supplementary evidence of authority, in compliance with the provisions of Article 36 of the Mortgage Regulations: ------------------------------ ----------------------

(i) That the represented entity has been validly and lawfully incorporated under the laws of the State of Delaware, United States of America. ---------------------- ------------------------------

(ii) That the grantors of the aforementioned power of attorney were duly identified by the Notary Public of the aforementioned country of origin. -------- --------------------------------------------

(iii) That the said Notary Public duly assessed the sufficiency of the grantors' powers, recording in the power of attorney their legal competence and capacity for the said power of attorney to have full force and effect. ---

(iv) That the formalities and solemnities required in the country of origin for the granting of the power of attorney have been duly observed. ------------------- --------------------------------

DECLARATION OF BENEFICIAL OWNERSHIP.— For the purpose of complying with the obligation to identify the beneficial owner imposed by Law 10/2010 of 28 April, I, the





Notary Public, have consulted the Beneficial Ownership Database (BDTR), created pursuant to the Resolution of the General Council of Notaries dated 24 March 2012 (Official State Gazette of 28 April 2012), the result of which is consistent with the statements made by the representative.--------------------------------------------------

DD-. In her capacity as Executive Director and legal representative of the company named **ANTOLIN SHELBY INC.**, an entity duly incorporated under the laws of the State of Michigan, with registered office at 3410 Belle Chase Way, Suite 600, Lansing, MI 48911, Michigan, United States of America, Department of Licensing and Regulatory Affairs identification number 801987446 and Federal Employer Identification Number (EIN) 814622094; Spanish non-resident Tax Identification Number N0404939A. --------------------------------------------------

Her authority to execute this instrument derives from the aforementioned office, the continued validity of which she evidences to me by means of a certificate issued by the Department of Licensing and Regulatory Affairs of Lansing, Michigan, which she produces to me and which I return to her, and from which her powers for the execution of this instrument are evidenced. --------------------------------------------------

The appearing party assures me that she continues to hold the aforementioned office and that the powers conferred upon her remain fully valid and in force. ------------

I, the Notary Public, hereby state that, in my opinion, the representative powers evidenced are sufficient for the execution of this instrument.







[Seal: Mr Andrés Domínguez Nafría – Notary Public of Madrid]

As supplementary evidence of her authority, she produces to me a special power of attorney granted pursuant to the unanimous Written Consent of the Board of Directors of the Company dated 17 June 2026, whereby power of attorney was granted in favour of Ms María Cristina Blanco Santo Tomás, notarised on 22 June 2026 by Mr Samuel Chabbott, a Notary Public of the State of New York, drawn up in the English language and legalised by means of an Apostille issued in the City of New York on 23 June 2026 under number NYC-2937142, the original of which she produces to me at this time and which I return to her.------------------

I, the Notary Public, hereby state the following in relation to the aforementioned supplementary evidence of authority, in compliance with the provisions of Article 36 of the Mortgage Regulations: ------------------------------

----------------------

(i) That the represented entity has been validly and lawfully incorporated under the laws of the State of Michigan, United States of America. ----------------------

-----------------------------



CERTIFIED TRANSLATION



USA CORP

(ii) That the grantors of the aforementioned power of attorney were duly identified by the Notary Public of the aforementioned country of origin. -------- ---------------------------------------

(iii) That the said Notary Public duly assessed the sufficiency of the grantors' powers, recording in the power of attorney their legal competence and capacity for the said power of attorney to have full force and effect. ---

(iv) That the formalities and solemnities required in the country of origin for the granting of the power of attorney have been duly observed. ------------------- --------------------------------

DECLARATION OF BENEFICIAL OWNERSHIP.— For the purpose of complying with the obligation to identify the beneficial owner imposed by Law 10/2010 of 28 April, I, the Notary Public, have consulted the Beneficial Ownership Database (BDTR), created pursuant to the Resolution of the General Council of Notaries dated 24 March 2012 (Official State Gazette of 28 April 2012), the result of which is consistent with the statements made by the representative.---------------------------------------------------

EE-. In her capacity as Executive Director and legal representative of the company named **GRUPO ANTOLIN MISSOURI, LLC**, an entity duly incorporated under the laws of the State of Michigan, with registered office at 3410 Belle Chase Way, Suite 600, Lansing, MI 48911, Michigan, United States of America, Department of Licensing and Regulatory Affairs identification number







[Seal: Mr Andrés Domínguez Nafría – Notary Public of Madrid]

801701255 and Federal Employer Identification Number (EIN) 462491062; Spanish non-resident Tax Identification Number N0404941G. -------------------- -------------------------------

Her authority to execute this instrument derives from the aforementioned office, the continued validity of which she evidences to me by means of a certificate issued by the Department of Licensing and Regulatory Affairs of Lansing, Michigan, which she produces to me and which I return to her, and from which her powers for the execution of this instrument are evidenced. ----- ----------------------------------------------

The appearing party assures me that she continues to hold the aforementioned office and that the powers conferred upon her remain fully valid and in force. -- ----------

I, the Notary Public, hereby state that, in my opinion, the representative powers evidenced are sufficient for the execution of this instrument. ---------------------- ----------------------------

As supplementary evidence of her authority, she produces to me a special power of attorney granted pursuant to the unanimous Written Consent of the Board of Managers of the Company dated 17 June 2026, whereby power of attorney was granted in favour of Ms María Cristina Blanco Santo Tomás, notarised by Mr

55



CERTIFIED TRANSLATION



USA CORP

Samuel Chabbott, a Notary Public of the State of New York, on 2 July 2026, drawn up in the English language and legalised by means of an Apostille issued in the City of New York on 2 July 2026 under number NYC-2947516, the original of which she produces to me at this time and which I return to her.------------------

I, the Notary Public, hereby state the following in relation to the aforementioned supplementary evidence of authority, in compliance with the provisions of Article 36 of the Mortgage Regulations: -----------------------------------------------------

(i) That the represented entity has been validly and lawfully incorporated under the laws of the State of Michigan, United States of America. -----------------------------------------------------

(ii) That the grantors of the aforementioned power of attorney were duly identified by the Notary Public of the aforementioned country of origin. -----------------------------------------------------

(iii) That the said Notary Public duly assessed the sufficiency of the grantors' powers, recording in the power of attorney their legal competence and capacity for the said power of attorney to have full force and effect. ---

(iv) That the formalities and solemnities required in the country of origin for the granting of the power of attorney have been duly observed. -----------------------------------------------------

DECLARATION OF BENEFICIAL OWNERSHIP.— For the







[Seal: Mr Andrés Domínguez Nafría – Notary Public of Madrid]

purpose of complying with the obligation to identify the beneficial owner imposed by Law 10/2010 of 28 April, I, the Notary Public, have consulted the Beneficial Ownership Database (BDTR), created pursuant to the Resolution of the General Council of Notaries dated 24 March 2012 (Official State Gazette of 28 April 2012), the result of which is consistent with the statements made by the representative.----------------------------------------------------

FF-. In her capacity as Executive Director and legal representative of the company named **GRUPO ANTOLIN KENTUCKY, INC.**, an entity duly incorporated under the laws of the State of Michigan, with registered office at 3410 Belle Chase Way, Suite 600, Lansing, MI 48911, Michigan, United States of America, Department of Licensing and Regulatory Affairs identification number 800019559 and Federal Employer Identification Number (EIN) 383906655; Spanish non-resident Tax Identification Number N0405410B. -----
------------------------------------------------

Her authority to execute this instrument derives from the aforementioned office, the continued validity of which she evidences to me by means of a certificate issued by the Department of Licensing and Regulatory Affairs of Lansing, Michigan, which she produces to me and which I return to her, and from which her

57



CERTIFIED
TRANSLATION



powers for the execution of this instrument are evidenced. ------------------------
--------------------------

The appearing party assures me that she continues to hold the aforementioned office and that the powers conferred upon her remain fully valid and in force. ----------

I, the Notary Public, hereby state that, in my opinion, the representative powers evidenced are sufficient for the execution of this instrument. ----------------------
-----------------------------

As supplementary evidence of her authority, she produces to me a special power of attorney granted pursuant to the Written Consent of the Board of Directors of the Company, unanimously adopted on 17 June 2026, whereby power of attorney was granted in favor of Ms. María Cristina Blanco Santo Tomás, notarized on 22 June 2026 by Mr. Samuel Chabbott, a Notary Public of the State of New York, drawn up in the English language and legalized by means of an Apostille issued in the City of New York on 23 June 2026 under number NYC-2937143, the original of which she produces to me at this time and which I return to her.------------------

I, the Notary Public, hereby state the following in relation to the aforementioned supplementary evidence of authority, in compliance with the provisions of Article 36 of the Mortgage Regulations: ------------------------------
----------------------

(i) That the represented entity has been validly and lawfully







[Seal: Mr Andrés Domínguez Nafría – Notary Public of Madrid]

incorporated under the laws of the State of Michigan, United States of America. ---------------------------------------------------

(ii) That the grantors of the aforementioned power of attorney were duly identified by the Notary Public of the aforementioned country of origin. ----------------------------------------------

(iii) That the said Notary Public duly assessed the sufficiency of the grantors' powers, recording in the power of attorney their legal competence and capacity for the said power of attorney to have full force and effect. ---

(iv) That the formalities and solemnities required in the country of origin for the granting of the power of attorney have been duly observed. -----------------------------------------------

DECLARATION OF BENEFICIAL OWNERSHIP.— For the purpose of complying with the obligation to identify the beneficial owner imposed by Law 10/2010 of 28 April, I, the Notary Public, have consulted the Beneficial Ownership Database (BDTR), created pursuant to the Resolution of the General Council of Notaries dated 24 March 2012 (Official State Gazette of 28 April 2012), the result of which is consistent with the statements made by the representative.-----------------------------------------------------





GG-. In her capacity as Executive Director and legal representative of the company named **GRUPO ANTOLIN MICHIGAN, INC.**, an entity duly incorporated under the laws of the State of Michigan, with registered office at 3410 Belle Chase Way, Suite 600, Lansing, MI 48911, Michigan, United States of America, Department of Licensing and Regulatory Affairs identification number 800616630; Spanish non-resident Tax Identification Number N0405411J.

Her authority to execute this instrument derives from the aforementioned office, the continued validity of which she evidences to me by means of a certificate issued by the Department of Licensing and Regulatory Affairs of Lansing, Michigan, which she produces to me and which I return to her, and from which her powers for the execution of this instrument are evidenced. ----- ------------------------------------

The appearing party assures me that she continues to hold the aforementioned office and that the powers conferred upon her remain fully valid and in force. -- -----------

I, the Notary Public, hereby state that, in my opinion, the representative powers evidenced are sufficient for the execution of this instrument. --------------------- ------------------------------

As supplementary evidence of her authority, she produces to me a special power of attorney granted pursuant to the unanimous Written Consent of the Board of Directors of the Company dated 17 June 2026, whereby power of attorney was granted in favour of Ms María


CERTIFIED
TRANSLATION


USA CORP

[Seal: Mr Andrés
Domínguez Nafría –
Notary Public of
Madrid]

Cristina Blanco Santo Tomás, notarised on 22 June 2026 by Mr Samuel Chabbott, a Notary Public of the State of New York, drawn up in the English language and legalised by means of an Apostille issued in the City of New York on 23 June 2026 under number NYC-2937144, the original of which she produces to me at this time and which I return to her. ------------------------------- --------------------

I, the Notary Public, hereby state the following in relation to the aforementioned supplementary evidence of authority, in compliance with the provisions of Article 36 of the Mortgage Regulations: ----------------------------- ---------------------

(i) That the represented entity has been validly and lawfully incorporated under the laws of the State of Michigan, United States of America. ---------------------- ----------------------------

(ii) That the grantors of the aforementioned power of attorney were duly identified by the Notary Public of the aforementioned country of origin. -------- --------------------------------------------

(iii) That the said Notary Public duly assessed the sufficiency of the grantors' powers, recording in the power of attorney their legal competence and capacity





for the said power of attorney to have full force and effect. ---

(iv) That the formalities and solemnities required in the country of origin for the granting of the power of attorney have been duly observed. ------------------- --------------------------------

DECLARATION OF BENEFICIAL OWNERSHIP.— For the purpose of complying with the obligation to identify the beneficial owner imposed by Law 10/2010 of 28 April, I, the Notary Public, have consulted the Beneficial Ownership Database (BDTR), created pursuant to the Resolution of the General Council of Notaries dated 24 March 2012 (Official State Gazette of 28 April 2012), the result of which is consistent with the statements made by the representative. --------------------------------------------------

HH-. In her capacity as Executive Director and legal representative of the company named GRUPO ANTOLÍN SOUTH AFRICA (PTY) LTD, with registered office at Nelson Mandela Bay Logistics Park, Algoa Road, Jagvlakte, Uitenhage Industries, Eastern Cape, South Africa, registered with the Companies and Intellectual Property Commission (CIPC), South Africa — Companies and Close Corporations, under number 1996/014003/07; Spanish non-resident Tax Identification Number N0405412H. ------------------------------- --------------------

Her authority to execute this instrument derives from the aforementioned office, the continued validity of which she evidences to me by means of a certificate issued by the Commissioner of Companies & Intellectual Property







[Seal: Mr Andrés Domínguez Nafría – Notary Public of Madrid]

Commission, which she produces to me and which I return to her, and from which her powers for the execution of this instrument are evidenced. ------------ ----------------------------------------

II-. In her capacity as Executive Director and legal representative of the company named **GRUPO ANTOLIN UK LIMITED**, with registered office at Merse Road, North Moons Moat, Redditch, B98 9HL, United Kingdom, Tax Identification Number GB545826912, registered with the local Companies Register under number 2319953; Spanish non-resident Tax Identification Number N0407133H. ---------------------------------------------------

Her authority to execute this instrument derives from the aforementioned office, the continued validity of which she evidences to me by means of a certificate issued by Companies House, which she produces to me and which I return to her, and from which her powers for the execution of this instrument are evidenced. --------------------------------------------------

The appearing party assures me that she continues to hold the aforementioned office and that the powers conferred upon her remain fully valid and in force. -- -----------

I, the Notary Public, hereby state that, in my opinion, the representative powers evidenced are sufficient for the execution of this instrument. ---------------------- -------------------------------

As supplementary evidence of her authority, she



CERTIFIED TRANSLATION



Tradux
USA CORP

produces to me a special power of attorney granted by Ms María Cristina Blanco Santo Tomás, in her capacity as Director of the Company, in Madrid on 17 June 2026, notarised on 18 June 2026 by Mr Edward Gardiner, a Notary Public authorised to act throughout England and Wales, drawn up in parallel columns in Spanish and English and legalised by means of an Apostille dated 18 June 2026, the original of which she produces to me at this time and which I return to her.

I, the Notary Public, hereby state the following in relation to the aforementioned supplementary evidence of authority, in compliance with the provisions of Article 36 of the Mortgage Regulations: ------------------------------ ---------------------

(i) That the represented entity has been validly and lawfully incorporated under the laws of England and Wales.

(ii) That the grantor of the aforementioned power of attorney was duly identified by the Notary Public of the aforementioned country of origin.

(iii) That the said Notary Public duly assessed the sufficiency of the grantor's powers, recording in the power of attorney her legal competence and capacity for the said power of attorney to have full force and effect.

(iv) That the formalities and solemnities required in the country of origin for the granting of the


CERTIFIED TRANSLATION





[Seal: Mr Andrés Domínguez Nafría – Notary Public of Madrid]

power of attorney have been duly observed. -----------------------------------------
--------

DECLARATION  OF  BENEFICIAL  OWNERSHIP.— For  the  purpose  of complying with the obligation to identify the beneficial owner imposed by Law 10/2010 of 28 April, I, the Notary Public, have consulted the Beneficial Ownership Database (BDTR), created pursuant to the Resolution of the General Council of Notaries dated 24 March 2012 (Official State Gazette of 28 April 2012), the result of which is consistent with the statements made by the representative. ----------------------------------------------------

JJ-. In her capacity as attorney-in-fact and legal representative of the company named **GRUPO ANTOLIN CUAUTITLAN, SOCIEDAD DE RESPONSABILIDAD LIMITADA DE CAPITAL VARIABLE**, incorporated before Mr Luis Ángel Alfonso Chico González, Notary Public in charge of Notarial Office No. 5 of the city of León, State of Guanajuato, on 8 October 2018, under instrument number 16,661. Registered with the Public Registry of Commerce of Mexico City under Commercial File number N-2018091763. With registered office in Silao, State of Guanajuato (United Mexican States). ----------------------------------------------------





Her authority to execute this instrument derives from her aforementioned capacity, the continued validity of which she evidences to me by means of a certificate issued by the Public Registry of Commerce of Mexico City, which she produces to me and which I return to her, and from which her powers for the execution of this instrument are evidenced. -------------------------------------------------

The appearing party assures me that she continues to act in the aforementioned capacity and that the powers conferred upon her remain fully valid and in force. -------------

I, the Notary Public, hereby state that, in my opinion, the representative powers evidenced are sufficient for the execution of this instrument. -----------------------------------------------------

DECLARATION OF BENEFICIAL OWNERSHIP.— For the purpose of complying with the obligation to identify the beneficial owner imposed by Law 10/2010 of 28 April, I, the Notary Public, have consulted the Beneficial Ownership Database (BDTR), created pursuant to the Resolution of the General Council of Notaries dated 24 March 2012 (Official State Gazette of 28 April 2012), the result of which is consistent with the statements made by the representative. --------------------------------------------------

KK-. In her capacity as Chairwoman of the Board of Directors of the Company and legal representative of the company named **"GRUPO ANTOLIN ITALIA S.R.L."**, a company subject to the direction and coordination of its sole shareholder, "GRUPO ANTOLIN IRAUSA S.A.", with registered office


CERTIFIED TRANSLATION





[Seal: Mr Andrés Domínguez Nafría – Notary Public of Madrid]

at Strada Statale 6, Via Breccelle, no street number, Località Cerreto, Calvi Risorta, with a fully paid-up share capital of EUR 500,000, VAT number, Tax Code and registration number with the Commercial Registry of Caserta 07606870967, and REA number CE-299591; Spanish non-resident Tax Identification Number N0407725A. -------------------------------------------------

The appearing party assures me that she continues to hold the aforementioned office and that the powers conferred upon her remain fully valid and in force. -- -----------

I, the Notary Public, hereby state that, in my opinion, the representative powers evidenced are sufficient for the execution of this instrument. ---------------------- ------------------------------

DECLARATION OF BENEFICIAL OWNERSHIP.— For the purpose of complying with the obligation to identify the beneficial owner imposed by Law 10/2010 of 28 April, I, the Notary Public, have consulted the Beneficial Ownership Database (BDTR), created pursuant to the Resolution of the General Council of Notaries dated 24 March 2012 (Official State Gazette of 28 April 2012), the result of which is consistent with the statements made by the representative. ---------------------------------------------------





UU-. **"GRUPO ANTOLIN BESANÇON"**, a simplified joint-stock company (single-shareholder company), a company of French nationality, duly incorporated and validly existing under the laws of France, with registered office at 8 Rue Gérard Mantion, 25000 Besançon, and registered with the Besançon Trade and Companies Register (France) under RCS number 328 358 734; Spanish non-resident Tax Identification Number N0407723F.---

Her authority to execute this instrument derives from her appointment as the natural-person representative of the President, the company **GRUPO ANTOLIN–IRAUSA, S.A. (Single-Member Company)**, incorporated under the corporate name GRUPO ANTOLÍN, S.A. by virtue of a deed executed before Mr José María Gómez-Oliveros Sánchez de Rivera on 5 November 1987, under notarial record number 1,635, for an indefinite term, with registered office at Carretera Madrid-Irún, Km 244.8, Burgos. Its Articles of Association were adapted to the legislation governing public limited companies by virtue of a deed executed before the same Notary Public on 24 September 1992, under notarial record number 2,018, and its corporate name was changed to its current name by virtue of the deed of Merger by Absorption executed before Mr José María Gómez-Oliveros Sánchez de Rivera on 2 November 1993, under notarial record number 1,894. Registered with the Commercial Registry of Burgos in Volume 182, Book 102 of the



CERTIFIED TRANSLATION





[Seal: Mr Andrés Domínguez Nafría – Notary Public of Madrid]

Section 3 of Companies, folio 133, file number 1,960, first entry, as evidenced to me by a Kbis extract issued by the Besançon Trade and Companies Register, drawn up in French, a language with which I am sufficiently familiar for the relevant purposes, duly apostilled and translated, which she produces to me and which I return to her. --------------------------------------------------

The appearing party assures me that she continues to hold the aforementioned office and that the powers conferred upon her remain fully valid and in force. -- -----------

I, the Notary Public, hereby state that, in my opinion, the representative powers evidenced are sufficient for the execution of this instrument. ---------------------- ------------------------------

DECLARATION OF BENEFICIAL OWNERSHIP.— For the purpose of complying with the obligation to identify the beneficial owner imposed by Law 10/2010 of 28 April, I, the Notary Public, have consulted the Beneficial Ownership Database (BDTR), created pursuant to the Resolution of the General Council of Notaries dated 24 March 2012 (Official State Gazette of 28 April 2012), the result of which is consistent with the statements made by the representative. ---------------------------------------------------





VV-. In her capacity as Manager of the company named **"ANTOLIN TANGER"**, a company duly incorporated and validly existing under the laws of Morocco, with registered office at ZONE FRANCHE D'EXPORTATION, ILOT No. 22 B ET 21, Tangier, and registered with the Commercial Register of Tangier under number 24899; Spanish non-resident Tax Identification Number N0407727G. ----

Her authority to execute this instrument derives from the aforementioned office, the continued validity of which she evidences to me by means of a certificate issued by the Commercial Register of Tangier, which she produces to me and which I return to her, and from which her powers for the execution of this instrument are evidenced. -----

The appearing party assures me that she continues to hold the aforementioned office and that the powers conferred upon her remain fully valid and in force. -- -----------

I, the Notary Public, hereby state that, in my opinion, the representative powers evidenced are sufficient for the execution of this instrument. ---------------------- ------------------------------

DECLARATION OF BENEFICIAL OWNERSHIP.— For the purpose of complying with the obligation to identify the beneficial owner imposed by Law 10/2010 of 28 April, I, the Notary Public, have consulted the Beneficial Ownership Database (BDTR), created pursuant to the Resolution of the General Council of Notaries dated 24 March 2012 (Official State Gazette of 28 April 2012), the result of which is consistent with the statements made by the representative. ---------------------------------------------------


CERTIFIED TRANSLATION





[Seal: Mr Andrés Domínguez Nafría – Notary Public of Madrid]

WW-. In her capacity as attorney-in-fact of TRIMTEC LTDA., a company duly incorporated under the laws of Brazil, with registered office at Av. Henri Nestlé 2600, Caçapava, registered with the Commercial Registry of the State of São Paulo (JUCESP) under NIRE number 35213220309 and CNPJ number 00.783.986/0001-13. ------

The Company does not have a Spanish Tax Identification Number (N.I.F.); accordingly, I give the appropriate warning regarding the need to obtain one, and the appearing party authorises me to incorporate it into this instrument by means of a notarial memorandum. -------------------------------------------------

Her authority to execute this instrument derives from the special power of attorney, which she declares to remain valid and in force, granted to her by Mr Gerson Vialta Silva and Mr Paulo de Nardi, in their capacity as Directors, in Caçapava, Brazil, on 22 June 2026, before Mr Lucas Silva Fernandes, Notary Public, the original of which she produces to me at this time, drawn up in parallel columns in English and Spanish and legalised by means of an Apostille on 22 June 2026.-------------------------------------------------

I, the Notary Public, hereby state the following in relation to the representation of this Company, in compliance with the provisions of Article 36 of the





Mortgage Regulations:-------------------------------------------------

(i) That the represented entity is validly and legally constituted under the laws of Brazil.

(ii) That the grantor of said power of attorney has been duly identified by the Notary Public of the aforementioned country of origin.

(iii) That said Notary Public has duly assessed the sufficiency of the grantor's powers, stating in said power of attorney their aptitude and legal capacity for the aforementioned power to be fully effective.

(iv) That the forms and formalities required in the country of origin for the granting of power of attorney have been observed.

The appearing lady assures me that she continues to hold her aforementioned position, and that the powers conferred upon her remain fully valid.

I, the Notary Public, hereby certify that in my judgment the accredited representative powers are sufficient for this granting. ----------------------------------------------

DECLARATION OF BENEFICIAL OWNERSHIP.- In order to comply with the obligation to identify the beneficial owner imposed by Law 10/2010 of April 28, I, the Notary Public, have obtained a statement from the company representative regarding said beneficial ownership, the result of which is recorded in a deed authorized by me today in a single act.







[Seal: Mr Andrés Domínguez Nafría – Notary Public of Madrid]

XX-. In her capacity as attorney-in-fact of **INTERTRIM LTDA.**, a company duly incorporated under the laws of Brazil, with registered office at Av. Henri Nestlé 3000, Caçapava, registered with the Commercial Registry of the State of São Paulo (JUCESP) under NIRE number 35213485892 and CNPJ number 01.105.075/0001-08. -------------------------------------------------

The Company does not have a Spanish Tax Identification Number (N.I.F.); accordingly, I give the appropriate warning regarding the need to obtain one, and the appearing party authorises me to incorporate it into this instrument by means of a notarial memorandum. -------------------------------------------------

Her authority to execute this instrument derives from the special power of attorney, which she declares to remain valid and in force, granted to her by Mr Gerson Vialta Silva and Mr Paulo de Nardi, in their capacity as Directors, in Caçapava, Brazil, on 22 June 2026, before Mr Lucas Silva Fernandes, Notary Public, the original of which she produces to me at this time, drawn up in parallel columns in English and Spanish and legalised by means of an Apostille on 22 June 2026.-------------------------------------------------

I, the Notary Public, hereby state, in relation to the representation of the





Company, the following, in compliance with the provisions of Article 36 of the Mortgage Regulations: ---------------------------------------------------

(i) That the represented entity has been validly and lawfully incorporated under the laws of Brazil. -------------------------------------------------

(ii) That the grantor of the aforementioned power of attorney was duly identified by the Notary Public of the aforementioned country of origin. --------------------------------------------------

(iii) That the said Notary Public duly assessed the sufficiency of the grantor's powers, recording in the power of attorney the grantor's legal competence and capacity for the said power of attorney to have full force and effect. --

(iv) That the formalities and solemnities required in the country of origin for the granting of the power of attorney have been duly observed. --------------------------------------------

The appearing party assures me that she continues to act in the aforementioned capacity and that the powers conferred upon her remain fully valid and in force. -------------

I, the Notary Public, hereby state that, in my opinion, the representative powers evidenced are sufficient for the execution of this instrument. ------------------------------------------------

DECLARATION OF BENEFICIAL OWNERSHIP.— For the purpose of complying with the obligation to identify the beneficial owner imposed by Law 10/2010 of 28 April, I,







[Seal: Mr Andrés Domínguez Nafría – Notary Public of Madrid]

the Notary Public, have obtained from the company representative a declaration regarding such beneficial ownership, the outcome of which is recorded in a notarial deed executed before me today as part of the same notarial act. ---------------------------------------------------

**2.- MR ERNESTO ANTOLÍN CALZADA and MS EMMA FIDELA ANTOLÍN GRANET**, acting on behalf of **"GRUPO ANTOLÍN HOLDCO, S.A."**, with registered office at Calle Vitoria 307, Burgos. Incorporated for an indefinite term by virtue of a deed executed in Burgos on 19 February 2014 before the Notary Public, Mr José María Gómez-Oliveros Sánchez de Rivera, under notarial record number 286. Registered with the Commercial Registry of Burgos in Volume 676, Book 467, folio 33, file BU-15343, first entry. -------------------------------------------------

Tax Identification Number (N.I.F.): A09553702. -------------------------------------------------

They state that the corporate purpose of the company consists of: "1. The subscription, acquisition, administration, management, holding, enjoyment and disposal, under any title whatsoever, of equity interests, shares, rights, options, futures and bonds of commercial companies, whether listed or unlisted. 2. The provision of advisory services and technical assistance, financial and management services relating to those companies in which it has invested or may invest by virtue of rights to participate in the share capital or equity of such companies. 3. The provision of assistance or support services to companies or undertakings in which it holds an interest or which form part of its group of companies, including the granting of participating or non-participating loans to such companies, as well as the provision of any guarantees or sureties that may be appropriate. -------------------------------------------------

In their capacity as the natural-person representatives appointed by the joint managing directors, namely the companies **CANEA, S.L.**, a company of

75





Spanish nationality, with registered office at Calle Aparicio y Ruiz, 3, 4th floor, right-hand side, Burgos, registered with the Commercial Registry of Burgos in Volume 301, Book 89, file BU-3258, and holding Tax Identification Number B09271156, and **INJAT, S.L.**, a company of Spanish nationality, with registered office at Plaza Santa María, No. 2, 10C, Burgos, registered with the Commercial Registry of Burgos in Volume 787, Book 578, folio 49, file BU-18681, and holding Tax Identification Number B16766354. -----------------------
----------------------------

**CANEA, S.L.** and **INJAT, S.L.** were appointed joint managing directors of **"GRUPO ANTOLÍN HOLDCO, S.A."** by virtue of deeds executed before the Notary Public of







[Seal: Mr Andrés Domínguez Nafría – Notary Public of Madrid]

Burgos, Mr José María Gómez-Oliveros Sánchez de Rivera, on 14 July 2020 and 29 September 2021, under notarial record numbers 1,572 and 3,702, respectively. -------------

**MR ERNESTO ANTOLÍN CALZADA** was appointed as the natural-person representative for the performance of the aforementioned office by virtue of a deed executed before the Notary Public of Burgos, Mr Daniel González del Álamo, on 26 February 2026, under notarial record number 432. ----------------- -

AND **MS EMMA FIDELA ANTOLÍN GRANET** was appointed pursuant to a resolution of the Board of Directors adopted at its meeting held on 25 September 2023, as evidenced to me by a certificate issued by the Secretary of the Board of Directors, Mr Alberto Guerra San José, with the approval of the Chairwoman, Ms Emma Fidela Antolín Granet herself, whose signatures have been duly notarised and whose appointments are recorded in the file opened in the name of the company. --------------------------

The appearing parties assure me that they continue to hold the aforementioned offices and that the powers conferred upon them remain fully valid and in force. -------



CERTIFIED TRANSLATION



tradux USA CORP

I, the Notary Public, hereby state that, in my opinion, the representative powers evidenced are sufficient for the execution of this instrument. ---------------------- ------------------------------

<u>DECLARATION OF BENEFICIAL OWNERSHIP</u>**.**— For the purpose of complying with the obligation to identify the beneficial owner imposed by Law 10/2010 of 28 April, I, the Notary Public, have consulted the Beneficial Ownership Database (BDTR), created pursuant to the Resolution of the General Council of Notaries dated 24 March 2012 (Official State Gazette of 28 April 2012), the result of which is consistent with the statements made by the representative. ---------------------------------------------------

**3-. MS MARÍA LUZ BARROSO GARCÍA** and **MR ÁLVARO SANTOS ANGARITA**, acting in the name and on behalf of **BANCO BILBAO VIZCAYA ARGENTARIA, S.A. ("BBVA")**, and also acting on behalf of **BANCO BILBAO VIZCAYA ARGENTARIA, S.A., NEW YORK BRANCH ("BBVA USA")**. The former has its registered office at Plaza de San Nicolás 4, Bilbao, and holds Tax Identification Number A-48265169. It adopted the corporate name Banco Bilbao Vizcaya, S.A. by virtue of the deed of merger of the banks "Banco de Bilbao, S.A." and "Banco de Vizcaya, S.A.", executed before the Notary Public of Bilbao, Mr José-María Arriola Arana, on 1 October 1988, under number 4,350 of his notarial records; it adapted its


CERTIFIED TRANSLATION





[Seal: Mr Andrés Domínguez Nafría – Notary Public of Madrid]

Articles of Association to the Public Limited Companies Act by virtue of a deed executed before the aforementioned Notary Public, Mr Arriola, on 22 March 1990, under number 808 of his notarial records; registered with the Commercial Registry of Biscay in Volume 2,227, folio 49, Section 8, file BI-17A, 156th entry; its former corporate name was changed to its current name as a result of the merger of "Banco Bilbao Vizcaya, S.A." and "Argentaria, Caja Postal, Banco Hipotecario, S.A.", whereby the former company absorbed the latter, pursuant to a deed executed in Bilbao before the Notary Public, Mr José-María Arriola Arana, on 25 January 2000, under number 149 of his notarial records, registered with the Commercial Registry of Biscay in Volume 3,858, folio 1, Section 8, file B-17-A, 1,035th entry. ----------------------------------------------------

Their authority to execute this instrument derives from the following: ----------------------

– As regards Ms **Barroso García**, by virtue of the power of attorney, which she declares to remain valid and in force, granted to her by means of a deed executed in Madrid on 20 May 2016 before the Notary Public, Mr Juan José de Palacio Rodríguez, under number 1,285 of his notarial records, which gave rise to the registration 3,448th entry in the company's file at the Commercial Registry, an authorised copy of which I have before me. ------------------------------

– As regards Mr **Santos Angarita**, by virtue of the power of attorney, which he declares to remain valid and in force, granted to him by means of a deed executed in Madrid on 29 February 2024 before the Notary Public, Mr Rodrigo Tena Arregui, under notarial record number 407, which gave rise to the 4,658th entry in the company's file at the Commercial Registry, an

79


CERTIFIED TRANSLATION



authorised copy of which I have before me. ----------------------------------------
------------------

The aforementioned attorneys-in-fact assure me that the powers under which they act remain fully valid and in force and that the legal capacity of the company they represent has not changed. ----------

DECLARATION OF BENEFICIAL OWNERSHIP: I, the Notary Public, expressly state that the exemptions from the obligation to identify the beneficial owner apply to the participating Company, pursuant to Article 9 of Law 10/2010 of 28 April, Article 15(a) of Royal Decree 304/2014 of 5 May, approving the Regulations implementing the aforementioned Law, and Section 3.6 (**IV. INTERNAL CONTROL MEASURES**) of the Procedures Manual for the Prevention of Money Laundering and Terrorist Financing. --------------

Furthermore, I, the Notary Public, hereby state that I have consulted the Beneficial Ownership Database (BDTR)







[Seal: Mr Andrés Domínguez Nafría – Notary Public of Madrid]

created pursuant to the Resolution of the General Council of Notaries dated 24 March 2012 (Official State Gazette of 28 April 2012), in which the following is stated verbatim: "The legal entity in respect of which beneficial ownership information is requested is recorded in the databases of the General Council of Notaries as an entity eligible for the application of simplified due diligence measures (Article 15 of Royal Decree 304/2014 of 5 May). Accordingly, as provided for in Article 17 of the said Royal Decree, and depending on the level of risk, one or more of the measures set out in paragraph 1, subparagraphs (a) to (d), may apply. Specifically, this legal entity falls within 'paragraph (c)' of Article 15 of Royal Decree 304/2014 as a Financial Institution." ----------------------

4.- **MR JUAN JOSÉ VILLAR CRUZ** and **MR JAVIER VICENTE LEÓN**, acting in the name and on behalf of **"BANCO DE SABADELL, S.A."** (**"Banco Sabadell"**), with registered office at Plaça de Sant Roc, No. 20, Sabadell; incorporated for an indefinite term by virtue of a deed executed before the Notary Public, Mr Antonio Capdevila, on 31 December 1881; its Articles of Association having been adapted to Royal Legislative Decree 154/1989 of 22 December, by which the Consolidated Text of the Public



CERTIFIED TRANSLATION



Limited Companies Act was approved, and consolidated by virtue of a deed executed before the Notary Public of Sabadell, Mr Máximo Catalán Pardo, on 26 April 1990; its registered office was subsequently changed by virtue of a deed executed before the Notary Public of Sabadell, Mr Javier Micó Giner, on 28 February 2007. Registered with the Commercial Registry of Alicante in Volume 4,070, folio 1, Section 8, file 156980. Tax Identification Number (N.I.F.): A-08000143. ----------------------

The Bank is a credit institution subject to the supervision of the Bank of Spain and registered in the Special Administrative Register under number 0081. The registered office of the Bank of Spain is located at Calle Alcalá 48, 28014 Madrid. Its website address is www.bde.es.

Banco Sabadell, S.A. absorbed the entity SABADELL SOLBANK, S.A. in its entirety by virtue of a deed executed before the Notary Public of Sabadell, Mr Javier Micó Giner, on 11 March 2014, under notarial record number 2,891, which gave rise to the 1,848th entry in the company's file. ----------------------

Their authority to execute this instrument derives from the following: ----------- -----------

–   As regards **Mr Villar Cruz**, by virtue of the power of attorney, which he declares to remain valid and in force, granted to him by means of a deed executed in Barcelona on 24 April 2008 before the Notary Public, Mr Miguel Álvarez y Ángel, under notarial record number 1,199, which was registered with the Commercial Registry







[Seal: Mr Andrés Domínguez Nafría – Notary Public of Madrid]

of Alicante, an authorised copy of which I have before me. -------

–   As regards **Mr Vicente León**, by virtue of the power of attorney, which he declares to remain valid and in force, granted to him by means of a deed executed in Barcelona on 26 March 2013 before the Notary Public, Mr Jesús Benavides Lima, under notarial record number 432, which was registered with the Commercial Registry of Barcelona, an authorised copy of which I have before me. -----

DECLARATION OF BENEFICIAL OWNERSHIP: I, the Notary Public, expressly state that the exemptions from the obligation to identify the beneficial owner apply to the participating Company, pursuant to Article 9 of Law 10/2010 of 28 April, Article 15(a) of Royal Decree 304/2014 of 5 May, approving the Regulations implementing the aforementioned Law, and Section 3.6 (IV. INTERNAL CONTROL MEASURES) of the Procedures Manual for the Prevention of Money Laundering and Terrorist Financing. -------------

Furthermore, I, the Notary Public, hereby state that I have consulted the Beneficial Ownership Database (BDTR), created pursuant to the Resolution of the General Council of Notaries dated 24 March 2012 (Official State Gazette

83


CERTIFIED TRANSLATION


traddux
USA CORP

of 28 April 2012), in which the following is stated verbatim: "The legal entity in respect of which beneficial ownership information is requested is recorded in the databases of the General Council of Notaries as an entity eligible for the application of simplified due diligence measures (Article 15 of Royal Decree 304/2014 of 5 May). Accordingly, as provided for in Article 17 of the said Royal Decree, and depending on the level of risk, one or more of the measures set out in paragraph 1, subparagraphs (a) to (d), may apply. Specifically, this legal entity falls within 'paragraph (c)' of Article 15 of Royal Decree 304/2014 as a Financial Institution." ----------------------

5.- **MR LUCAS MARTÍN GÓMEZ** and **MR FERNANDO DE LA HAZA DE LARA**, acting in the name and on behalf of **BANCO SANTANDER, S.A.** (hereinafter, "**Banco Santander**"), in their capacity as attorneys-in-fact, with registered office at Paseo de Pereda, Nos. 9 to 12, Santander, registered with the Commercial Registry under file number S-1960 and holding Tax Identification Number A-39000013. ----------

Its corporate purpose consists, in summary, of the activities inherent to banking and financial institutions.

Their authority derives from the following: ---------------------------------

a) As regards Mr **Martín Gómez**, by virtue of the power of attorney formalised by means of the public deed executed on 25 November 2021 before the Notary Public of Madrid, Mr Juan


CERTIFIED TRANSLATION





[Seal: Mr Andrés Domínguez Nafría – Notary Public of Madrid]

de Dios Valencia García, under notarial record number 3,327. -----------------
-----------------------------

b) As regards Mr **De la Haza de Lara**, by virtue of the public deed executed on 9 July 2013 before the Notary Public of Madrid, Mr Juan de Dios Valencia García, under notarial record number 1,152. ----------------------------

They produce to me authorised copies of the aforementioned public deeds, bearing a note of registration with the Commercial Registry. In my opinion, it follows therefrom that they have sufficient authority to execute this public deed and, in particular, to discharge mortgages. -------------

They declare that the powers under which they act remain valid and in force and that the legal capacity and circumstances of the company on whose behalf they act remain unchanged. --------

DECLARATION OF BENEFICIAL OWNERSHIP**:** I, the Notary Public, expressly state that the exemptions from the obligation to identify the beneficial owner apply to the participating Company, pursuant to Article 9 of Law 10/2010 of 28 April and Article 15(c) of Royal Decree 304/2014 of 5 May, approving the Regulations implementing the aforementioned Law, and Section 3.6 (IV. INTERNAL CONTROL MEASURES) of the Procedures Manual for the Prevention of Money Laundering and Terrorist Financing. ------
-------


CERTIFIED TRANSLATION



Furthermore, I, the Notary Public, hereby state that I have consulted the Beneficial Ownership Database (BDTR), created pursuant to the Resolution of the General Council of Notaries dated 24 March 2012 (Official State Gazette of 28 April 2012), in which the following is stated verbatim: "The legal entity in respect of which beneficial ownership information is requested is recorded in the databases of the General Council of Notaries as an entity eligible for the application of simplified due diligence measures (Article 15 of Royal Decree 304/2014 of 5 May). Accordingly, as provided for in Article 17 of the said Royal Decree, and depending on the level of risk, one or more of the measures set out in paragraph 1, subparagraphs (a) to (d), may apply. Specifically, this legal entity falls within 'paragraph (c)' of Article 15 of Royal Decree 304/2014 as a Financial Institution." ----------------------

6.- **MR FELIPE PLAZA SOTO** and **MR EDUARDO OCEJO LARRABEITI**, acting as joint attorneys-in-fact in the name and on behalf of the commercial company **CAIXABANK, S.A.** ("**CaixaBank**"), with registered office at Calle Pintor Sorolla 2–4, Valencia, registered with the Commercial Registry of Valencia in Volume 10,370, folio 1, file V-







[Seal: Mr Andrés Domínguez Nafría – Notary Public of Madrid]

178351; incorporated for an indefinite term under the corporate name "Grupo de Servicios, S.A." by virtue of a deed executed before the Notary Public of Barcelona, Mr Eduardo Blat Gimeno, on 12 December 1980; its corporate name was subsequently changed several times, and it adopted the name "Criteria CaixaCorp, S.A.", immediately preceding its current name, by virtue of a deed executed before the Notary Public of Barcelona, Mr Tomás Giménez Duart, under number 3,511 of his notarial records. It is registered with the Commercial Registry of Barcelona under file B-41232. ----------------------------------------

Their authority to execute this instrument derives from the following: ----------------------

-. As regards Mr **Plaza Soto**, he exercises the powers conferred upon him by virtue of a deed of power of attorney executed in Barcelona before the Notary Public, Ms María Dolores Giménez Arbona, on 3 November 2022, under notarial record number 2,601, which gave rise to the 783rd entry in the aforementioned file opened in the name of the Company at the Commercial Registry.

-. As regards Mr **Ocejo Larrabeiti**, he exercises the powers conferred upon him by virtue of a deed of power of attorney executed in Barcelona before the



CERTIFIED TRANSLATION



USA CORP

Notary Public, Ms María Dolores Gimenez Arbona, el día 29 de mayo de 2023, número 1087 de protocolo, que causó la inscripción 906ª en la referida hoja abierta a la Sociedad en el Registro Mercantil. ----------

DECLARACIÓN DE TITULARIDAD REAL: Yo, el Notario, hago constar expresamente que son de aplicación a la Sociedad interviniente, las excepciones a la obligación de identificación del titular real, de conformidad con lo establecido en el artículo 9 de la Ley 10/2010, de 28 de abril, artículo 15. a) del Real Decreto 304/2014, de 5 de mayo, por el que se aprueba el Reglamento de dicha Ley, y apartado 3.6 (IV. MEDIDAS DE CONTROL INTERNO) del Manual de Procedimiento de Prevención del Blanqueo de Capitales y de la Financiación del Terrorismo. -------------

Asimismo, yo el Notario, hago constar que he consultado la Base de Datos de Titularidad Real (BDTR) creada por Acuerdo del Consejo General del Notariado, de 24 de marzo de 2012, (BOE 28 de abril de 2012), en la cual consta literalmente: "La persona jurídica de cuya titularidad real se solicita información consta en las bases de datos del CGN como entidad susceptible de aplicación de medidas simplificadas de diligencia debida (art. 15 del RD 304/2014, de 5 de mayo). Por ello, tal y como establece el artículo 17 de dicho RD, y en función del riesgo, podrían ser aplicables una o varias de las medidas contenidas en el


CERTIFIED TRANSLATION





[Seal: Mr Andrés Domínguez Nafría – Notary Public of Madrid]

paragraph 1, subparagraphs (a) to (d). Specifically, this legal entity falls within "paragraph (c)" of Article 15 of Royal Decree 304/2014 as a Financial Institution." ----------------------

7.- MR **JORGE CUESTA MARCOS** and **MR PAULO JAIME MONTEIRO**, acting in the name and on behalf of the credit institution **BANKINTER, S.A.** ("**Bankinter**"), incorporated for an indefinite term, with registered office at Paseo de la Castellana, No. 29, Madrid; incorporated under the corporate name "Banco Intercontinental Español, S.A." (Bankinter), as an Industrial and Business Bank subject to the Decree-Law of 29 November 1962, by virtue of a deed executed in Madrid on 4 June 1965 before the then Notary Public of Madrid, Mr Alejandro Bérgamo Llabrés. Its former corporate name was expanded by virtue of a deed executed before Mr Manuel de la Cámara Álvarez, also formerly a Notary Public of Madrid, on 5 September 1980, under number 2,518 of his notarial records. Registered with the Commercial Registry of Madrid in General Volume 1,758, Volume 1,259 of Section 3 of the Companies Register, folio 220, file 9,643, first entry. ----------





Its Articles of Association were adapted to the Public Limited Companies Act by virtue of a deed executed in Madrid on 24 July 1990 before the Notary Public, Mr Agustín Sánchez Jara, under number 2,052 of his notarial records, whereby it adopted the new corporate name BANKINTER, SOCIEDAD ANÓNIMA. It is currently governed by its consolidated Articles of Association, as set out in a deed executed before the aforementioned Notary Public, Mr Sánchez Jara, on 28 September 1990, under number 2,556 of his notarial records, which gave rise to the 1,692nd entry in the file opened in the name of the Company at the aforementioned Commercial Registry. Its Articles of Association were subsequently amended again by virtue of a deed executed in Madrid on 26 October 1992 before the Notary Public, Mr Agustín Sánchez Jara, under number 3,425 of his notarial records, duly registered with the aforementioned Commercial Registry under file M-7766. Tax Identification Number: A-28157360. ----------------------------------------

Their authority to execute this instrument derives from the following: ----------------------

– As regards Mr **Cuesta Marcos**, by virtue of the power of attorney, which he declares to remain valid and in force, granted to him by means of a deed executed in Madrid on 3 February 2022 before the Notary Public, Mr Jesús María Ortega Fernández, under number 296 of his notarial records, which gave rise to the 9,343rd entry in the company's file at the Commercial Registry, an authorised copy of which I have before me. ---------------------------------------







[Seal: Mr Andrés Domínguez Nafría – Notary Public of Madrid]

– As regards Mr **Monteiro**, by virtue of the power of attorney, which he declares to remain valid and in force, granted to him by means of a deed executed in Madrid on 3 February 2022 before the Notary Public, Mr Jesús María Ortega Fernández, under number 302 of his notarial records, which gave rise to the 9,418th entry in the company's file at the Commercial Registry, an authorised copy of which I have before me. -------------

DECLARATION OF BENEFICIAL OWNERSHIP: I, the Notary Public, expressly state that the exemptions from the obligation to identify the beneficial owner apply to the participating Company, pursuant to Article 9 of Law 10/2010 of 28 April, Article 15(a) of Royal Decree 304/2014 of 5 May, approving the Regulations implementing the aforementioned Law, and Section 3.6 (IV. INTERNAL CONTROL MEASURES) of the Procedures Manual for the Prevention of Money Laundering and Terrorist Financing. -------------

Furthermore, I, the Notary Public, hereby state that I have consulted the Beneficial Ownership Database (BDTR), created pursuant to the Resolution of



CERTIFIED
TRANSLATION



USA CORP

the General Council of Notaries, dated 24 de marzo de 2012, (BOE 28 de abril de 2012), en la cual consta literalmente: "La persona jurídica de cuya titularidad real se solicita información consta en las bases de datos del CGN como entidad susceptible de aplicación de medidas simplificadas de diligencia debida (art. 15 del RD 304/2014, de 5 de mayo). Por ello, tal y como establece el artículo 17 de dicho RD, y en función del riesgo, podrían ser aplicables una o varias de las medidas contenidas en el número 1 (letras a-d). En concreto esta persona jurídica está contemplada en el "Apartado c" del artículo 15 del RD 304/2014 como Entidad Financiera". ----------------------

8-. **MR JUAN FRANCISCO AMORAGA CHEREGUINI and MR SEBASTIÁN LEÓN MORENO**, as joint attorneys, in the name and on behalf of **HSBC Continental Europe ("HSBC")**, a French public limited company, with registered office at 38, Avenue Kléber, 75116 – Paris, France, and registered in the Paris Trade and Companies Register under number 775 670 284 RCS. It has been assigned the N.I.F. number **N0014939C**. --------------------
------------------------

Its purpose is the development in Spain of the activities of its parent company, which are essentially those of financial entities. -------------------

Its powers include: -----------------------------------







[Seal: Mr Andrés Domínguez Nafría – Notary Public of Madrid]

As regards **Mr Chereguini Amoraga**, by virtue of the power of attorney granted in his favour by means of the public deed executed on 27 July 2022 before the Notary Public of Madrid, Mr Antonio-Luis Reina Gutiérrez, under notarial record number 7,048. ---------------------------------------------

**As regards Mr León Moreno**, by virtue of the power of attorney granted in his favour by means of the public deed executed on 22 June 2023 before the Notary Public of Madrid, Mr Antonio-Luis Reina Gutiérrez, under notarial record number 5,839.

**DECLARATION OF BENEFICIAL OWNERSHIP:** I, the Notary Public, expressly state that the exemptions from the obligation to identify the beneficial owner apply to the participating Company, pursuant to Article 9 of Law 10/2010 of 28 April, Article 15(d) of Royal Decree 304/2014 of 5 May, approving the Regulations implementing the aforementioned Law, and Section 3.6 (IV. INTERNAL CONTROL MEASURES) of the Procedures Manual for the Prevention of Money Laundering and Terrorist Financing. -------------

Furthermore, I, the Notary Public, hereby state that I have



CERTIFIED TRANSLATION



Itradux
U S A   C O R P

consulted the Beneficial Ownership Database (BDTR), created pursuant to the Resolution of the General Council of Notaries dated 24 March 2012 (Official State Gazette of 28 April 2012), in which the following is stated verbatim: "The legal entity in respect of which beneficial ownership information has been requested is recorded in the databases of the General Council of Notaries as an entity eligible for the application of simplified due diligence measures (Article 15 of Royal Decree 304/2014 of 5 May). Accordingly, as provided for in Article 17 of the said Royal Decree and depending on the level of risk, one or more of the measures set out in paragraph 1, subparagraphs (a) to (d), may apply.". --

**9-. MR JUAN FRANCISCO AMORAGA CHEREGUINI**, acting as attorney-in-fact of **"HSBC CONTINENTAL EUROPE, SUCURSAL EN ESPAÑA"**, with registered office at Plaza Pablo Ruiz Picasso No. 1, Torre Picasso, 32nd Floor, Madrid, incorporated by virtue of a deed executed before the Notary Public of Madrid, Mr Antonio Luis Reina Gutiérrez, on 2 October 2018, under notarial record number 8,427, and registered with the Commercial Registry of this Province in General Volume 38,314 of Section 8 of the Companies Register, folio 1, file number M-681702, first entry. --------------------

It has been assigned Tax Identification Number (N.I.F.) W2502598B. --------

His authority to execute this instrument derives from the power of attorney granted in his favour by means of the public deed executed



CERTIFIED
TRANSLATION





[Seal: Mr Andrés Domínguez Nafría – Notary Public of Madrid]

on 20 January 2022 before the Notary Public of Madrid, Mr Antonio-Luis Reina Gutiérrez, under notarial record number 426. ---------------------
-------------------------

**DECLARATION OF BENEFICIAL OWNERSHIP:** I, the Notary Public, expressly state that the exemptions from the obligation to identify the beneficial owner apply to the participating Company, pursuant to Article 9 of Law 10/2010 of 28 April, Article 15(d) of Royal Decree 304/2014 of 5 May, approving the Regulations implementing the aforementioned Law, and Section 3.6 (IV. INTERNAL CONTROL MEASURES) of the Procedures Manual for the Prevention of Money Laundering and Terrorist Financing. -------------

Furthermore, I, the Notary Public, hereby state that I have consulted the Beneficial Ownership Database (BDTR), created pursuant to the Resolution of the General Council of Notaries dated 24 March 2012 (Official State Gazette of 28 April 2012), in which the following is stated verbatim: "The legal entity



CERTIFIED TRANSLATION



tradux
U S A   C O R P

in respect of which beneficial ownership information has been requested is recorded in the databases of the General Council of Notaries as an entity eligible for the application of simplified due diligence measures (Article 15 of Royal Decree 304/2014 of 5 May). Accordingly, as provided for in Article 17 of the said Royal Decree and depending on the level of risk, one or more of the measures set out in paragraph 1, subparagraphs (a) to (d), may apply.". --

10.- **MR CRISTÓBAL MONTOJO ARTEAGA**, acting as attorney-in-fact of **GLAS SPECIALIST SERVICES LIMITED** (the **"Restructuring Agent"**), a company with registered office at 10 Old Bailey, 2nd Floor, London, EC4M 7NG Ludgate, England, holding Tax Identification Number N6061001A and registered with the Companies Register of England and Wales under number 784614. ----------------------------------------

His authority to execute this instrument derives from the special power of attorney, which he declares to remain valid and in force, granted to him by Mr Brian Jonathan Carne, in his capacity as legal representative, in London on 1 July 2025 before Ms Eleonora Andrea Ceolin, Notary Public, the original of which he produces to me at this time, drawn up in parallel columns in English and Spanish and legalised by means of an Apostille on 2 July 2025. ----------------------------------------------

I, the Notary Public, hereby state the following in relation to the representation of this Company, in compliance with the provisions of Article 36 of the Mortgage Regulations: ----------------------


CERTIFIED TRANSLATION





[Seal: Mr Andrés Domínguez Nafría – Notary Public of Madrid]

(i) That the represented entity has been validly and lawfully incorporated under the laws of England and Wales. ------

(ii) That the grantor of the aforementioned power of attorney was duly identified by the Notary Public of the aforementioned country of origin. -------- ---------------------------------------

(iii) That the said Notary Public duly assessed the sufficiency of the grantor's powers, recording in the power of attorney the grantor's legal competence and capacity for the said power of attorney to have full force and effect. --

(iv) That the formalities and solemnities required in the country of origin for the granting of the power of attorney have been duly observed. ------------------- ---------------------------

DECLARATION OF BENEFICIAL OWNERSHIP.— For the purpose of complying with the obligation to identify the beneficial owner imposed by Law 10/2010 of 28 April, I, the Notary Public, have obtained from the company's representative a declaration regarding such beneficial ownership, the outcome of which is recorded in a notarial deed executed before the Notary Public of Madrid, Mr José-Miguel García Lombardía, on 17 February 2026, under notarial record number 920, stating that there has been no change to its

97


CERTIFIED TRANSLATION


USA CORP

content. ---------------------------------------------

Hereinafter, the entities referred to in Sections 1.A. to 1.JJ., both inclusive, whether in their capacity as principal debtor or guarantor of the Affected Debt, shall be referred to collectively as the **"Restructured Companies"** and each of them individually as a **"Restructured Company."** ----------------------------------

Hereinafter, the entities referred to in Sections 1.KK. to 2, both inclusive, whether in their capacity as principal debtor or guarantor of the Affected Debt, shall be referred to collectively as the **"Additional Guarantors"** and each of them individually as an **"Additional Guarantor."**

Hereinafter, the entities referred to in Sections (3) to (9) above, both inclusive, shall be referred to collectively as the **"Original Participating Creditors."** ---------------------------------------------

Hereinafter, the Restructured Companies, the Additional Guarantors, the Original Participating Creditors and the Restructuring Agent shall be referred to collectively as the **"Parties."** -------------

The persons appearing on behalf of each of the Parties, their respective representative powers and the particulars of each of the Parties for identification purposes of







[Seal: Mr Andrés Domínguez Nafría – Notary Public of Madrid]

the same are set out in the record of appearance to be attached to this Plan. ---------------------------------------------

I consider the appearing parties, in the capacities in which they act and under my responsibility, to have sufficient representative powers to execute this **DEED OF CONSOLIDATION AND FORMALISATION AS A PUBLIC INSTRUMENT OF A JOINT RESTRUCTURING PLAN** (Article 583 of the Consolidated Text of the Insolvency Act), and to have the legal capacity required for such purpose, and, accordingly, ---------------------- -------------------------

---------------------- **STATE AS FOLLOWS:** ----------------------

**I.-** That, on 24 June 2026, a joint restructuring plan relating to the Restructured Companies was executed, which was formalised as a public instrument on that same date by virtue of a deed executed before the undersigned Notary Public under notarial record number 3,847 (the **"Original Restructuring Plan"**). ------------------

**II.-** That the parties signing the Restructuring Plan identified a formal and inadvertent omission and decided to remedy it by executing a consolidated text. -------------





**III.-** That, in view of the foregoing, the Parties appearing in this deed have today executed a private document, together with its annexes, entitled **"JOINT RESTRUCTURING PLAN"**, on the terms and subject to the covenants and conditions set out therein, a copy of which they deliver to me for incorporation into my notarial records, hereinafter referred to as the **"Restructuring Plan"**, and of whose terms and conditions I take full cognisance and record. -------------

**IV.-** That the Parties intend to formalise the said Restructuring Plan as a public instrument so that it may produce the appropriate legal effects, particularly its submission to Law 1/2000 of 7 January on Civil Procedure (hereinafter, the **"LEC"**) and Royal Legislative Decree 1/2020 of 5 May, approving the Consolidated Text of the Insolvency Act, as amended from time to time and, in particular, by virtue of Law 16/2022 of 5 September (hereinafter, the **"TRLC"**); and, in the capacities in which they act, they execute this deed subject to the following: ---------------------------------------------

---------------- **PROVISIONS:** ----------------

**FIRST. Prevailing effect of the Restructuring Plan.** The Parties hereby agree that the terms and conditions set forth in the Plan







[Seal: Mr Andrés Domínguez Nafría – Notary Public of Madrid]

of the Original Restructuring Plan shall henceforth be governed in their entirety by the Restructuring Plan forming part of this deed, without interruption and by way of amendment rather than extinguishment, and compliance with the Conditions Precedent referred to in Provision Six below must be evidenced in accordance with the Restructuring Plan. ----------------

**SECOND. Formalisation as a public instrument:** The Restructuring Plan delivered to me, executed by the Parties on this same date, is hereby formalised as a public instrument. It is drawn up on plain paper and shall form an integral part of this deed and be reproduced in its copies and certified copies. Its contents are deemed fully reproduced herein in order to avoid unnecessary repetition, and I refer to it in all respects. The Restructuring Plan has been incorporated into the original of this deed, and the Parties accept, approve and ratify each and every one of the agreements, terms and conditions set out therein and in its annexes, undertaking to comply with them strictly. ----------------------------------

**THIRD. Ratification:** The Parties, in the capacities in which they act,



CERTIFIED TRANSLATION



USA CORP

in the capacities in which they act, hereby ratify the Restructuring Plan in full and in all its terms. The Restructuring Plan, as thus ratified and formalised as a public instrument, shall constitute an enforceable instrument for all purposes provided for in the LEC and in the other applicable legal provisions. ---------------------------------

**FOURTH. Definitions:** The Parties expressly state that all terms defined in this deed shall have the meanings assigned to them in the Restructuring Plan. ---------------------------------

**FIFTH. Instrument:** The Restructuring Plan, as thus ratified and formalised as a public instrument, shall constitute a public instrument for the purposes of compliance with Article 634 of the TRLC and for all purposes provided for in Articles 517.2.4, 572 and related provisions of Law 1/2000 of 7 January on Civil Procedure; furthermore, it shall produce the effects provided for in Articles 1,216 et seq., 1,924.3 and 1,929 of the Civil Code and in the other applicable legal provisions and, consequently, the obligations arising from its contents shall be enforceable. ---------------------- ------------

**SIXTH. Conditions Precedent.** The Restructuring Plan formalised as a public instrument contains two conditions precedent: -------------------------- -------

(i) a condition precedent for the entry into force


CERTIFIED TRANSLATION





[Seal: Mr Andrés Domínguez Nafría – Notary Public of Madrid]

referred to in Clause 11 thereof (the **"Condition Precedent to Entry into Force"**); and ------------------

(ii) a condition precedent to effectiveness referred to in Clause 12 thereof (the **"Condition Precedent to Effectiveness"**); ---------------------

the contents of which are deemed fully reproduced herein in order to avoid unnecessary repetition. -------

In accordance with the provisions of the Restructuring Plan, the Parties expressly instruct and authorise the undersigned Notary Public to issue such notarial memoranda as may be necessary in connection with this deed in order to record fulfilment of the Condition Precedent to Entry into Force and the Condition Precedent to Effectiveness. ------------------------------------- ----------

**SEVENTH.- Instructions to the Notary Public.** Pursuant to Clause 11 of the Restructuring Plan, the Parties request the Notary Public, once he has received the Majority Certificates and, where applicable, the Expert Valuation Report (as those terms are defined in the Restructuring Plan), to incorporate the said Majority Certificates and, where applicable, the Expert Valuation Report into this Deed by means of a notarial memorandum. ------- ---------------------


CERTIFIED TRANSLATION


USA CORP

Likewise, pursuant to Clause 12 of the Restructuring Plan, the Parties request the Notary Public, once fulfilment of the Condition Precedent to Effectiveness has been evidenced to him in accordance with the terms of the Restructuring Plan, to record such fulfilment by means of the appropriate notarial memorandum appended to this Deed. -------------

The requests are hereby accepted. ----------------------

**EIGHTH.- Accession.** ----------------------------------------

The Parties request the Notary Public to incorporate into this deed the deeds of accession to the Restructuring Plan, in accordance with Clause 7 (*Accession of Affected Creditors during the Accession Period*) of the Restructuring Plan. ----------------------

The request is hereby accepted. ----------------------

**NINTH. Costs:** This public deed shall be deemed an instrument without stated value pursuant to Article 634.2 of the TRLC. All fees, costs and taxes arising from the agreement hereby formalised as a public instrument, as well as those arising from this deed, shall be paid by **GRUPO ANTOLÍN– IRAUSA, S.A.** ----------------------------


CERTIFIED TRANSLATION



[Seal: Mr Andrés Domínguez Nafría – Notary Public of Madrid]

**TENTH.- Copies:** Any of the Parties may request the authorising Notary Public directly to issue authorised copies of this deed. The cost of the first authorised copies shall be borne by **GRUPO ANTOLÍN–IRAUSA, S.A.**, and the cost of any second and subsequent copies shall be borne by the requesting Party. ----------------------------------------------

**ELEVENTH.- Governing law and jurisdiction:** This deed shall be governed by and construed in accordance with the general laws of Spain. The Parties irrevocably submit any claim arising from this deed to the jurisdiction of the Courts of the City of Burgos. --------------------------------------------

I, the Notary Public, hereby state, in compliance with Article 23 of the Notarial Act, that I have consulted the list of revoked tax identification numbers maintained by the STATE TAX ADMINISTRATION AGENCY, through the access facility provided in the Integrated Notarial Management System (SIGNO), and it appears that the companies represented herein do not appear on the said list; therefore, the execution of this deed may proceed. ----------------------------------

----------------- **EXECUTION:** -----------------

Having read this deed in accordance with the provisions of Article 193 of the Notarial Regulations, the appearing parties, to whom I gave the appropriate legal and tax reservations and warnings, as well as those relating to personal data protection legislation, accept and sign it. ----------------------

**Protection of personal data.** --------------

The appearing parties are informed of the following:

Their personal data shall be processed by this Notarial Office, such processing being necessary for compliance with the legal obligations arising from the exercise of the notarial public function, in accordance with the provisions of the legislation governing notarial practice, the prevention of money laundering, taxation and, where applicable, the substantive legislation applicable to the documented legal act or transaction. The provision of personal data is a legal requirement, and the executing party is obliged to provide such data and is informed that failure to do so would make it impossible to authorise or intervene in this public instrument. Their data shall be kept confidential. ----------------------

The purpose of processing the data is to comply with the





[Seal: Mr Andrés Domínguez Nafría – Notary Public of Madrid]

the applicable regulations governing the authorisation or intervention of this instrument, its invoicing, subsequent monitoring and the mandatory functions inherent in notarial practice. Such functions may involve automated decision-making authorised by law and carried out by Public Authorities and recipient entities authorised by law, including the creation of detailed profiles for the prevention and investigation of money laundering and terrorist financing by the competent authorities. ----------------------------------

The Notary Public shall disclose such data, where legally required, to Public Authorities, entities and persons designated by law and, where applicable, to the Notary Public who succeeds or replaces the current Notary Public at this Notarial Office. ----------------------------------------------

The data provided shall be retained for the number of years necessary to comply with the legal obligations of the Notary Public or of any person who replaces or succeeds him. -------------

They may exercise their rights of access, rectification, erasure, restriction of processing, data portability and objection to processing by sending a written request by post to the authorising Notary Public. They also have the right to lodge a complaint with a supervisory authority. ----------------------------------

The data shall be processed and protected in accordance with notarial legislation, Organic Law 3/2018 of 5 December on the Protection of Personal Data and the Guarantee of Digital Rights—or any law replacing it—and its implementing regulations, as well as Regulation (EU) 2016/679 of the European Parliament and of the Council of 27 April 2016 on the protection of natural persons with regard to the processing of personal data and on the free movement of such data, repealing Directive 95/46/EC. ----------------------------------------------

107





I invite the appearing parties to read this deed themselves and, once they have done so, I, the Notary Public, read it aloud, having communicated the contents of the instrument to the extent necessary for them to understand fully its scope and effects, taking into account their circumstances. I, the Notary Public, hereby certify that, after the reading, the appearing parties stated that they had been duly informed of the contents of the instrument, had freely consented thereto, and approved and signed it. --------------------- ------------------------

Having identified the appearing parties by means of their







[Seal: Mr Andrés Domínguez Nafría – Notary Public of Madrid]

identity documents referred to above, bearing their photographs and signatures and issued by a public authority; that their consent was freely given; that the execution of this instrument complies with the law and with the duly informed wishes of the executing and appearing parties; and as to all the contents of this public instrument, drawn up on fifty-five sheets of State-stamped paper reserved exclusively for notarial documents, all of the same series and bearing the number of the present sheet and the following fifty-four consecutive numbers, the electronic version of which is incorporated, on the same date and under the same number, into the corresponding electronic notarial records, I, the Notary Public, hereby certify. -----------------------------------------------

The signatures of the appearing parties are affixed hereto. Signed: Francisco Miras Ortiz. Initialled and sealed. -----------------

**NOTARIAL MEMORANDUM.**— In Madrid, on 10 July 2026. --------- --------------------------------------

I, ANDRÉS DOMÍNGUEZ NAFRIA, Notary Public of Madrid, issue this memorandum to record that, on this date, the Condition Precedent to Entry into Force, on the terms set out in the foregoing deed, and the Majority Certificates and the Expert Valuation Report have been

incorporated herein, pursuant to Clause 11 of the Restructuring Plan. -----

------------------------------------------

And I, the Notary Public, hereby certify the contents of this notarial memorandum, which is drawn up on the present sheet of paper reserved exclusively for notarial documents. ----------------------------------

Signed: Andrés Domínguez Nafría. Initialled and sealed.

------------------------------------------------------------------------------

------------------------------------------------------------------------------

------------------------------------------------------------------------------

------------------------------------------------------------------------------

------------------------------------------------------------------------------

------------------------------------------------------------------------------

------------------------------------------------------------------------------

------------------------------------------------------------------------------

-----------------------------------------------------------------------------

------------ ATTACHED DOCUMENTS FOLLOW ------------





[Seal: Mr Andrés Domínguez Nafría – Notary Public of Madrid]

*Privileged and Confidential*

**JOINT RESTRUCTURING PLAN**

between

**GRUPO ANTOLÍN-IRAUSA, S.A.U.**

and

**CERTAIN GROUP COMPANIES**

as the **Restructured Companies**

**BANCO BILBAO VIZCAYA ARGENTARIA, S.A.**

**BANCO BILBAO VIZCAYA ARGENTARIA, S.A., NEW YORK BRANCH**

**BANCO DE SABADELL, S.A.**

**BANCO SANTANDER, S.A.**

**BANKINTER, S.A.**

**CAIXABANK, S.A.**

**HSBC CONTINENTAL EUROPE**

**HSBC CONTINENTAL EUROPE, SUCURSAL EN ESPAÑA**

as the **Original Participating Creditors**

**ANTOLIN TANGER S.A.R.L.**

**GRUPO ANTOLIN BESANÇON S.A.S.**

**TRIMTEC LTDA.**

**INTERTRIM LTDA.**

**GRUPO ANTOLÍN ITALIA, S.A.R.L.**

**GRUPO ANTOLÍN HOLDCO, S.A.**

as the **New ICA Guarantors**

and

**GLAS SPECIALIST SERVICES LIMITED**

as the **Restructuring Agent**

**10 July 2026**

**GA_P**

**Gómez-Acebo & Pombo**

111

CERTIFIED TRANSLATION




*Privileged and Confidential*

## TABLE OF CONTENTS

APPEARING PARTIES.................................................................... 5

RECITALS...................................................................................... 8

CLAUSES...................................................................................... 16

**DEFINITIONS AND INTERPRETATION**................................. 16

1.1. Defined terms........................................................................ 16

1.2. Interpretation......................................................................... 16

**PURPOSE AND NATURE OF THE RESTRUCTURING PLAN**.......... 17

2.1. Purpose.................................................................................. 17

2.2. Nature of the Restructuring Plan........................................... 18

2.3. Single agreement................................................................... 19

2.4. Restructuring phases.............................................................. 19

**FORMATION OF CLASSES**........................................................ 21

3.1. Preliminary consideration...................................................... 21

3.2. General criteria for the formation of classes........................... 21

3.3. Classes................................................................................... 22

3.4. Approval of the Restructuring. Majorities and syndication

agreement...................................................................................... 25

**COMPLIANCE WITH THE REQUIREMENTS OF THE RESTRUCTURING**

**PLAN**.............................................................................................. 26

4.1. Statutory content requirements............................................... 26

4.2. Notice of the Restructuring Plan............................................. 26

4.3. Formalisation in a public instrument....................................... 28

**TERMS AND TREATMENT OF THE RESTRUCTURING OF THE AFFECTED**

**DEBT**............................................................................................. 29

5.1. Terms of the Restructuring...................................................... 29

5.2. Treatment of the Affected Debt............................................... 29

5.3. Implementation of the Restructuring in respect of the Affected

Debt............................................................................................... 39

5.4. Security granted in connection with the Plan........................... 41

5.5. Novation of the Intercreditor Agreement................................. 45

5.6. Interest and fees accrued under the Affected Agreements......... 47

5.7. Claims arising from the Existing Guarantee Facilities.............. 49





[Seal: Mr Andrés Domínguez Nafría – Notary Public of Madrid]

*Privileged and Confidential*

6. **EXTENSIONS OF THE EXISTING SYNDICATED FACTORING FACILITY AND WORKING CAPITAL FINANCING AGREEMENT**................................................................. 49

    6.1. Maintenance and extensions of the Existing Syndicated Factoring Facility from 23 January 2027............................................................................................ 50

    6.2. Execution of the Working Capital Financing Agreement............................. 51

    6.3. Terms of the Working Capital Financing Agreement................................... 51

7. **ACCESSION OF AFFECTED CREDITORS DURING THE ACCESSION PERIOD**................................................................................................................. 56

8. **COURT APPROVAL AND EXTENSION OF EFFECTS**............................. 57

    8.1. Court Approval as an essential condition of the Restructuring.................... 57

    8.2. Application for Court Approval.................................................................... 58

    8.3. Compliance with the requirements for Court Approval................................ 60

    8.4. Extension of effects to Non-Participating Creditors..................................... 60

    8.5. Effects of Court Approval............................................................................ 61

9. **RECOGNITION PURSUANT TO CHAPTER 15 OF TITLE 11 OF THE UNITED STATES CODE**.......................................................................................... 61

10. **ASSIGNMENT**....................................................................................................... 61

    10.1. Assignment by the Affected Creditors........................................................ 61

    10.2. Assignment by the Restructured Companies.............................................. 62

11. **CONDITION PRECEDENT TO ENTRY INTO FORCE**............................... 62

12. **CONDITION PRECEDENT TO THE EFFECTIVE DATE**.......................... 64

13. **TERMINATION**.................................................................................................... 65

14. **REPRESENTATION OF THE PARTIES**......................................................... 67

    14.1. Representative of the Restructured Companies........................................... 67

    14.2. Restructuring Agent.................................................................................... 68

15. **COMMUNICATIONS AND NOTICES BETWEEN THE PARTIES**........... 75

16. **COSTS**................................................................................................................... 75

17. **PREVAILING EFFECT AND UNDERTAKING NOT TO AMEND**............. 76

18. **CONFIDENTIALITY AND PUBLICITY**........................................................ 76

19. **DATA PROTECTION**.......................................................................................... 79

20. **PRESERVATION OF THE AGREEMENT**...................................................... 80

21. **GOVERNING LAW**............................................................................................. 80

22. **JURISDICTION**................................................................................................... 80





*Privileged and Confidential*

**ANNEX I. DEFINITIONS**.................................................................. 92

**ANNEX II. AFFECTED DEBT**........................................................ 106

Annex II Part I — Bank Debt.............................................................. 106

Annex II Part II — Existing Notes....................................................... 142

Annex II Part III — Existing Guarantee Facilities................................ 152

Annex II Part IV — Intragroup Loans................................................. 161

**ANNEX III. UNAFFECTED DEBT**................................................ 177

**ANNEX IV. CLASSES OF EACH OF THE RESTRUCTURED COMPANIES**
........................................................................................................ 190

**ANNEX V. VIABILITY PLAN**........................................................ 192

**ANNEX VI. STATUTORY CONTENT REQUIREMENTS OF THE RESTRUCTURING**

**PLAN**............................................................................................. 194

Appendix I to Annex VI — Details of the Restructured Companies......... 202

Appendix II to Annex VI — Assets and Liabilities of the Restructured

Companies....................................................................................... 210

**ANNEX VII. RESTRUCTURING TERM SHEET**........................... 211

**ANNEX VIII. INVITATION**........................................................... 213

**ANNEX IX. ENTITY ELECTION FORM**....................................... 215

Appendix to Annex IX — Entity Election Form: Affected Debt............... 216

**ANNEX X. DEED OF ACCESSION**............................................... 218

**ANNEX XI. DETAILS FOR NOTICES**........................................... 221

[Seal: Mr Andrés Domínguez Nafría – Notary Public of Madrid]

*Privileged and Confidential*

### JOINT RESTRUCTURING PLAN

In Madrid, on 10 July 2026

With the participation of Mr Andrés Domínguez Nafría, Notary Public and member of the

Illustrious Notarial Association of Madrid (or whoever replaces him on the Signing Date).

### APPEARING PARTIES

On the one part,

(A) **GRUPO ANTOLÍN-IRAUSA, S.A.U. ("Antolín Irausa")**

(B) **GRUPO ANTOLÍN ARAGUSA, S.A.U. ("Antolín Aragusa")**

(C) **GRUPO ANTOLÍN EUROTRIM, S.A.U. ("Antolín Eurotrim")**

(D) **GRUPO ANTOLÍN INGENIERÍA, S.A.U. ("Antolín Ingeniería")**

(E) **GRUPO ANTOLÍN PLASBUR, S.A.U. ("Antolín Plasbur")**

(F) **GRUPO ANTOLÍN RYA, S.A.U. ("Antolín RyA")**

(G) **GRUPO ANTOLÍN-AUTOTRIM, S.A.U.**

(H) **GRUPO ANTOLÍN-GLASS, S.A.U.**

(I) **GRUPO ANTOLÍN LUSITÂNIA, COMPONENTES AUTOMÓVEL, UNIPESSOAL,**

**LDA. ("Antolín Lusitania")**

(J) **GRUPO ANTOLIN BRATISLAVA S.R.O.**

(K) **GRUPO ANTOLÍN OSTRAVA S.R.O.**

(L) **GRUPO ANTOLÍN TURNOV S.R.O.**

(M) **ANTOLIN LIBAN, S.R.O.**

(N) **GRUPO ANTOLÍN BOHEMIA, A.S.**

(O) **GRUPO ANTOLIN SIBIU SRL**

5





*Privileged and Confidential*

(P) **ANTOLIN SILESIA SP. Z O.O.**

(Q) **GRUPO ANTOLIN BAMBERG GMBH & CO.** KG

(R) **ANTOLIN DEUTSCHLAND GMBH**

(S) **GRUPO ANTOLIN LOGISTIK DEUTSCHLAND GMBH**

(T) **ANTOLIN STRAUBING GMBH**

(U) **ANTOLIN INTERIORS UK LIMITED**

(V) **GRUPO ANTOLIN LEAMINGTON LIMITED**

(W) **GRUPO ANTOLIN UK LIMITED**

(X) **ANTOLÍN INTERIORS MÉXICO, S.A.** DE C.V.

(Y) **GRUPO ANTOLÍN SILAO, S.A. DE C.V.**

(Z) **GRUPO ANTOLÍN SALTILLO, S. DE R.L. DE C.V.**

(AA) **GRUPO ANTOLÍN TLAXCALA, S. DE R.L. DE C.V.**

(BB) **GRUPO ANTOLÍN CUAUTITLÁN, S. DE R.L. DE C.V.**

(CC) **GRUPO ANTOLÍN NORTH AMERICA, INC.**

(DD) **ANTOLÍN ALABAMA, LLC**

(EE) **ANTOLIN INTERIORS USA, INC.**

(FF) **ANTOLÍN SHELBY, INC.**

(GG) **GRUPO ANTOLÍN MISSOURI, LLC**

(HH) **GRUPO ANTOLÍN KENTUCKY, INC.**

(II) **GRUPO ANTOLÍN MICHIGAN, INC.**

(JJ) **GRUPO ANTOLIN SOUTH AFRICA (PTY) LTD.**





[Seal: Mr Andrés Domínguez Nafría – Notary Public of Madrid]

*Privileged and Confidential*

For these purposes, Antolín Irausa enters into this Plan in its capacity as principal debtor under the Existing Notes, the Existing Syndicated Financing Agreement, the Existing EIB Financing Agreements and the Existing Guarantee Facilities, and as borrower and guarantor under the Existing ICO Financing Agreement.

Likewise, the entities referred to in paragraphs (A) to (F) above enter into this Plan in their capacity as borrowers under the Existing ICO Financing Agreement and, together with the entities referred to in paragraphs (G) to (J), as guarantors under the Existing Notes, the Existing Syndicated Financing Agreement, the Existing ICO Financing Agreement and the EIB Financing Agreements, as well as in their capacity as principal debtors under the respective Intragroup Loans in respect of which they hold such capacity.

Hereinafter, the entities referred to in paragraphs (A) to (J) above, both inclusive, whether in their capacity as principal debtor, borrower or guarantor of the Affected Debt, shall be referred to collectively as the **"Restructured Companies"** and each of them individually as a **"Restructured Company."**

On the other part,

(KK) **BANCO BILBAO VIZCAYA ARGENTARIA, S.A. ("BBVA")**

(LL) **BANCO BILBAO VIZCAYA ARGENTARIA, S.A., NEW YORK BRANCH ("BBVA USA")**

(MM) **BANCO DE SABADELL, S.A. ("Banco Sabadell")**

(NN) **BANCO SANTANDER, S.A. ("Banco Santander")**

(OO) **BANKINTER, S.A. ("Bankinter")**

(PP) **CAIXABANK, S.A. ("CaixaBank")**

(QQ) **HSBC CONTINENTAL EUROPE ("HSBC Europe")**

(RR) **HSBC CONTINENTAL EUROPE, SUCURSAL EN ESPAÑA ("HSBC Spain")**

Hereinafter, the entities referred to in paragraphs (KK) to (RR) above, both inclusive, shall be referred to collectively as the **"Original Participating Creditors."**

On the other part,

(SS) **GLAS SPECIALIST SERVICES LIMITED (the "Restructuring Agent").**


CERTIFIED TRANSLATION



*Privileged and Confidential*

Hereinafter, the Restructured Companies, the Original Participating Creditors and the Restructuring Agent shall be referred to collectively as the **"Parties."**

And, on the other part,

(TT) **GRUPO ANTOLÍN HOLDCO, S.A. ("Antolín HoldCo").**

(UU) **GRUPO ANTOLIN ITALIA S.R.L.**

(VV) **GRUPO ANTOLIN BESANÇON SAS**

(WW) **ANTOLIN TANGER SARL**

(XX) **TRIMTEC Ltda.**

(YY) **INTERTRIM Ltda.**

The entities referred to in paragraphs (TT) to (YY) above (the **"New ICA Guarantors"**) enter into this Plan for the purpose of undertaking to become first-demand personal guarantors by granting the New ICA Personal Guarantees on the terms set out in Clause 5.4.8 and, in the case of Antolín HoldCo, also for the purpose of acknowledging and consenting to the extension of the Plan to the Pledges over Antolín Irausa for the purposes of Article 652.2 of the Insolvency Act and in accordance with the terms set out in Clause 5.4.4 et seq.

The persons appearing on behalf of each of the Parties, their respective representative powers and the particulars of each of the Parties for identification purposes are set out in the record of appearance to be attached to this Plan.

## RECITALS

**I.** The Restructured Companies and the New ICA Guarantors are companies belonging to the same corporate group engaged in the development, design and manufacture of interior components for the automotive industry (the **"Group"**).

**II.** The Restructured Companies, as applicable, are parties to, inter alia, the debt instruments detailed below (collectively, the **"Affected Agreements"**), which constitute the scope of the debt affected by this Plan:

**(a)** the issuance by Antolín Irausa of senior secured notes governed by the laws of the State of New York, United States of America, with a final maturity date of 30 April 2028,


CERTIFIED TRANSLATION



[Seal: Mr Andrés Domínguez Nafría – Notary Public of Madrid]

*Privileged and Confidential*

governed by the indenture dated 29 June 2021 (as amended and supplemented from time to time, the **"2028 Notes Indenture"**) and formalised by means of the deed of issuance of notes executed on 23 July 2021 before the Notary Public of Burgos, Mr José María Gómez-Oliveros, under notarial record number 2,881 (the **"2028 Notes"**);

**(b)** the issuance by Antolín Irausa of senior secured notes governed by the laws of the State of New York, United States of America, with a final maturity date of 30 June 2030, governed by the indenture dated 31 July 2024 (as amended and supplemented from time to time, the **"2030 Notes Indenture"**) and formalised by means of the deed of issuance of notes executed on that same date before the Notary Public of Burgos, Mr José María Gómez-Oliveros, under notarial record number 3,132 (the **"2030 Notes"** and, together with the 2028 Notes, the **"Existing Notes"**);

**(c)** the senior facilities agreement governed by English law, originally entered into on 13 March 2014 by Antolín Irausa, as borrower, certain Group companies, as guarantors, Banco Bilbao Vizcaya Argentaria, S.A., Banco de Sabadell, S.A., Banco Santander, S.A., Bankinter, S.A., BNP Paribas S.A., Spanish Branch, CaixaBank, S.A. and Deutsche Bank AG, London Branch, as mandated lead arrangers, Banca March, S.A. and Banco Espírito Santo, S.A., Spanish Branch, as arrangers, Deutsche Bank AG, London Branch, as security agent, and the financial institutions holding the status of lenders from time to time, formalised as a public instrument by means of a deed executed on 2 April 2014 before the Notary Public of Burgos, Mr José María Gómez-Oliveros Sánchez de Rivera, under notarial record number 683 (as amended and restated from time to time and, in particular, as amended and restated on 19 July 2024, the **"Existing Syndicated Financing Agreement"**);

**(d)** the financing agreement governed by Spanish law and backed by a State guarantee under the guarantee facility granted to companies pursuant to Royal Decree-Law 4/2025 of 8 April on Urgent Measures in Response to the Tariff Threat and for Strengthening Trade, together with its implementing regulations (the **"ICO Tariff Guarantee"**), entered into on 4 August 2025 by Antolín Irausa, Antolín Aragusa, Antolín Eurotrim, Antolín Ingeniería, Antolín Plasbur and Antolín RyA, as borrowers, certain Group companies, as guarantors, Banco Bilbao Vizcaya Argentaria, S.A., as agent, Deutsche Bank AG, London Branch, as security agent, and Banco Bilbao Vizcaya Argentaria, S.A., Banco de Sabadell, S.A., Banco Santander, S.A., CaixaBank, S.A., HSBC Continental Europe, Spanish Branch, and Instituto de Crédito Oficial, E.P.E., as institutions

9



CERTIFIED TRANSLATION



*Privileged and Confidential*

financing parties, formalised as a public instrument by means of a deed executed on that same date before the Notary Public of Madrid, Mr Andrés Domínguez Nafría, under notarial record number 5,225 (as amended from time to time, the **"Existing ICO Financing Agreement"**);

**(e)** the finance contract entitled **"Antolín Car Interiors RDI"**, entered into on 12 June 2018 by Antolín Irausa, as borrower, certain Group companies, as guarantors, and the European Investment Bank (**"EIB"**), as lender, formalised as a public instrument by means of a deed executed on that same date before the Notary Public of Burgos, Mr José María Gómez-Oliveros Sánchez de Rivera, under notarial record number 1,806 (as amended from time to time, the **"EIB Financing Agreement I"**);

**(f)** the finance contract entitled **"Antolín Car Interiors RDI B"**, entered into on 23 December 2020 by Antolín Irausa, as borrower, certain Group companies, as guarantors, and the EIB, as lender, formalised as a public instrument by means of a deed executed on 9 July 2021 before the Notary Public of Burgos, Mr José María Gómez-Oliveros Sánchez de Rivera, under notarial record number 2,688 (as amended from time to time, the **"EIB Financing Agreement II"** and, together with EIB Financing Agreement I, the **"Existing EIB Financing Agreements"**);

**(g)** the guarantees issued under the guarantee and surety insurance facilities entered into between Antolín Irausa, on the one hand, and BBVA, BBVA USA, HSBC Europe and Atradius, on the other hand, as detailed in **Annex II, Part III**, which include, for the avoidance of doubt, the BBVA Guarantee Facility as an Ancillary Facility entered into pursuant to the Existing Syndicated Financing Agreement (the **"Existing Guarantee Facilities"**); and

**(h)** the intragroup loan agreements entered into among the Restructured Companies and detailed in **Annex II, Part IV** (the **"Intragroup Loans"**), together with the corresponding accrued and unpaid interest arising thereunder, as identified in that Annex.

The Restructured Companies referred to in paragraphs (B) to (JJ) of the Appearing Parties section are guarantors of the 2028 Notes, the 2030 Notes, the Existing Syndicated Financing Agreement, the Existing ICO Financing Agreement and the Existing EIB Financing Agreements. Those Restructured Companies are parties to this Plan for the purpose of restructuring their debt, as applicable, arising under the first-demand guarantee granted





[Seal: Mr Andrés Domínguez Nafría – Notary Public of Madrid]

*Privileged and Confidential*

under those Affected Agreements, with an express waiver of the benefits of excussion and any other defence.

As at the date of this Restructuring Plan, the amounts due under the Affected Agreements are those detailed in Annex II (the **"Affected Debt"**).

For the avoidance of doubt and in connection with Article 616 of the Insolvency Act, it is expressly recorded that the Affected Debt arises from the financial claims under the Affected Agreements (the **"Affected Claims"**).

**III.** Antolín Irausa, certain Group companies, Deutsche Bank AG, London Branch, Deutsche Trustee Company Limited and others entered into an intercreditor agreement governed by English law on 21 March 2014, which was formalised as a public instrument by means of a deed executed on 2 April 2014 before the Notary Public of Burgos, Mr José María Gómez-Oliveros, under notarial record number 684 (as amended from time to time, the **"Intercreditor Agreement"**). The Intercreditor Agreement provides, among other matters, for the *pari passu* ranking of the obligations due under the Existing Notes, the Existing Syndicated Financing Agreement, the Existing ICO Financing Agreement and the Existing EIB Financing Agreements.

**IV.** On 23 January 2025, Antolín Irausa, as seller and collection agent, BBVA, CaixaBank and HSBC Factoring (France), as purchasers, and BBVA, as agent bank, entered into a syndicated factoring agreement governed by general Spanish law, entitled the *Receivables Purchase and Servicing Agreement* (the **"Existing Syndicated Factoring Agreement"**). The Existing Syndicated Factoring Agreement provides for an annual availability period that is automatically renewable unless notice of non-renewal is given at least one month in advance.

**V.** The Group holds a leading position in the global market for interior components for the automotive industry, with a presence in numerous countries and a diversified portfolio of automotive manufacturers worldwide as customers. That leading position is the direct result of the strategic vision of the Antolín family, the founders and managers of the Group for more than seven decades, whose surname constitutes the name and corporate identity of the entire group of companies headed by Antolín Irausa. Under the family's leadership, the Group has pursued a sustained strategy of investment in technological innovation, internationalisation and product diversification, enabling it to consolidate its competitive position. Family management is a distinguishing feature and has provided the Group with institutional stability and a long-term strategic focus that are particularly valuable in an industry as competitive and cyclical as the automotive sector, allowing it to build solid relationships of trust with customers,

11


CERTIFIED TRANSLATION



*Privileged and Confidential*

employees and other stakeholders, which constitute an essential intangible asset for the Group's competitiveness.

**VI.** The importance of the Antolín family's involvement in the management and control of the Group is reflected in the change-of-control provisions linked to specific members of the Antolín family and included in the Affected Agreements and in many other commercial operating agreements entered into by the Group with third-party suppliers and customers.

**VII.** Notwithstanding and without prejudice to the foregoing, the automotive sector is experiencing a period of uncertainty unprecedented in recent decades, resulting from the convergence of multiple external factors that are severely affecting the automotive value chain and, in particular, the component manufacturing industry, the segment in which the Group operates. In particular, the tariff policy pursued by the United States of America has profoundly altered competitive conditions in the North American market. The announcement and progressive imposition of tariffs on imports of vehicles and automotive components not manufactured in the United States have had a direct impact on the global automotive industry as a whole and, especially, on European component suppliers with manufacturing operations in the United States, including the Group.

**VIII.** In addition to the sectoral and geopolitical factors mentioned above, the Group has faced difficulties arising from the integration of the interiors business of the Canadian multinational Magna International, known as **"Magna Interiors,"** the acquisition of which by the Group was partially financed under certain of the Affected Agreements, thereby significantly increasing the Group's leverage. The proper financial integration of this business was severely compromised by two consecutive exceptional crises: the COVID-19 pandemic in 2020, which temporarily brought global automotive production to a standstill, and the outbreak of the war in Ukraine in February 2022, which caused supply-chain disruption and a general increase in the cost of raw materials and energy. Although the Group has now succeeded in restoring its operating margins and has a sound business position, with a diversified customer portfolio and a strengthened competitive position, that recovery has occurred at a time when the Group's financial structure was constrained by its high level of leverage, further aggravated by the subsequent external crises, resulting in a financial burden that the Group expects will be difficult to sustain in the medium and long term under the current terms.

**IX.** In the circumstances described above and as a consequence thereof, in anticipation of a breach during financial year 2026 of certain financial ratios provided for in the Existing Syndicated Financing Agreement and the Existing ICO Financing Agreement,

12



CERTIFIED
TRANSLATION



[Seal: Mr Andrés Domínguez Nafría – Notary Public of Madrid]

*Privileged and Confidential*

the Group submitted the corresponding waiver requests in respect of those financial ratios, which were duly approved under each of the aforementioned debt instruments.

**X.** A significant portion of the Affected Debt contains a mechanism bringing forward its final maturity date to 29 October 2027 if the 2028 Notes have not been refinanced by that date. Furthermore, a significant concentration of maturities falls due during that financial year, making the early adoption of an orderly solution necessary, particularly in view of the current economic and geopolitical environment. In addition, the Existing Syndicated Factoring Agreement, which is a fundamental financing instrument for the Group's operations, matures on 23 January 2027. Consequently, the need to secure a long-term bank working-capital financing facility is an essential and critical matter for the Group's viability and has been one of the most important issues addressed in the negotiations.

**XI.** In view of what constitutes a likelihood-of-insolvency scenario, the Restructured Companies submitted to certain Affected Creditors a proposal for the potential restructuring of the Affected Debt, aimed at establishing a framework enabling the orderly repayment of that debt and safeguarding the Group's viability in the short and medium term. As of today, that proposal has been formally accepted by the Original Participating Creditors, without prejudice to the prior notice given to the remaining Affected Creditors on the terms described below. For this purpose, with the assistance of the Financial Adviser, the Group has prepared the viability plan attached hereto as Annex V (the **"Viability Plan"**). This Restructuring is based on the Viability Plan, which confirms that the Restructuring provides the Group with the operational and liquidity sustainability required to address the prevailing economic and geopolitical environment and will enable the Group to remain solvent in the short and medium term. Hereinafter, the term **"Restructuring"** shall refer to the process of restructuring the Affected Debt, with the scope and subject to the terms set out in this Restructuring Plan.

**XII.** The Restructured Companies have prepared a joint Viability Plan applicable to all of them, which in turn ensures the viability of each of them individually. This is due to the extensive level of the Group's operations and to its functioning and activities as a corporate group, the degree of operational, financial and managerial integration among the Restructured Companies being such that their cash flows, liquidity requirements and capacity to generate resources cannot reasonably be assessed in isolation, but only from a consolidated perspective.


CERTIFIED TRANSLATION



*Privileged and Confidential*

**XIII.** As a consequence of the foregoing, the Restructured Companies and the Original Participating Creditors have deemed the following actions essential to the successful completion of the Restructuring, on the terms set out herein:

**(a)** The appointment of Lexaudit Concursal, S.L.P. as Restructuring Expert before the Commercial Section of the Court of First Instance of Burgos, Courtroom No. 1, pursuant to Article 672.1.1º of the Insolvency Act, at the request of the Restructured Companies, in view of the possibility that a dissenting class might exist.

In this regard, on 14 May 2026, the Commercial Section of the Court of First Instance of Burgos, Courtroom No. 1, issued Order No. 89/2026 appointing Lexaudit Concursal, S.L.P. as Restructuring Expert. Likewise, on 1 June 2026, the Commercial Section of the Court of First Instance of Burgos, Courtroom No. 1, issued a rectification order confirming that the appointment of the Restructuring Expert applies both to Antolín Irausa and to the other Restructured Companies that applied for the appointment.

**(b)** Court Approval for the purpose of obtaining the protections and legal effects provided for in Articles 635 et seq. of the Insolvency Act, so that all Affected Creditors become fully bound by this Restructuring Plan, the actions contemplated herein are protected against any potential clawback actions, and the corresponding protections and priorities are afforded to interim financing or new financing, as applicable, the extensions of the Existing Syndicated Factoring Agreement and the Working Capital Financing Agreement.

**XIV.** Prior to the submission of this Restructuring Plan, and with the aim of reaching an agreement establishing the essential terms and conditions for the restructuring of the Group's debt and thereby ensuring the Group's stability and its short- and medium-term viability, the Restructured Companies and certain Original Participating Creditors, among others, entered into a restructuring support agreement entitled the **"Recapitalisation Support Agreement"** on 23 June 2026 (the **"Recapitalisation Support Agreement"** or **"RSA"**), pursuant to which the signatory parties undertook, among other matters, to vote in favour of and take such measures as might be necessary to implement the Restructuring, subject to the rights and obligations assumed thereunder.

**XV.** It is an essential condition for the Parties that: **(i)** the Restructuring be implemented in accordance with this Restructuring Plan and the regime provided for in Articles





[Seal: Mr Andrés Domínguez Nafría – Notary Public of Madrid]

*Privileged and Confidential*

Articles 614 et seq. of the Insolvency Act; **(ii)** it be granted Court Approval for the purposes of Articles 635 et seq. of the Insolvency Act, with the aim, among other matters, of extending its effects to any dissenting creditors holding Affected Debt; **(iii)** the payment priorities and protections provided for in the Insolvency Act be granted to the Working Capital Financing Extensions, the New Guarantee Facilities and the Pledges over Antolín Irausa, pursuant to Article 652.2 of the Insolvency Act; and **(v)** all actions contemplated in this Restructuring Plan be protected against any potential clawback actions pursuant to Articles 567 et seq. of the Insolvency Act, including the granting of all personal guarantees and security interests contemplated in this Plan.

**XVI.** The viability of the Restructuring Plan depends to a large extent on the availability of working-capital financing instruments suited to the Group's operational requirements. For these purposes, the Original Participating Creditors elect the Alternative Bank Debt Treatment and thereby assume a firm commitment to subscribe for a pro rata portion of the Working Capital Financing Agreement, which shall constitute new financing pursuant to Article 666 of the Insolvency Act. The Original Participating Creditors' election of the Alternative Treatment has enabled the minimum threshold of 65% of the Bank Debt required to activate BBVA's backstop mechanism to be reached, pursuant to which BBVA has undertaken an underwriting commitment in respect of the Working Capital Financing Agreement contemplated in this Plan. Reaching this minimum subscription level, together with the activation of the aforementioned backstop mechanism, constituted an essential condition for the Restructured Companies to be able formally to launch this Restructuring Plan, thereby ensuring the full availability of the Working Capital Financing Agreement.

**XVII.** The United States of America is a significant jurisdiction in terms of the Group's assets and revenues. Furthermore, the Existing Notes are governed by the laws of the State of New York, United States of America. Accordingly, in parallel with the process of submitting the Restructuring Plan, the Restructured Companies intend to file petitions in the United States seeking recognition of the proceedings as a *foreign main proceeding* pursuant to Chapter 15 of Title 11 of the United States Code. The Restructured Companies intend to make such filings and submit the relevant petition under Chapter 15 of the United States Code as soon as reasonably practicable following the filing of the Application for Court Approval.





*Privileged and Confidential*

**XVIII.** In view of the foregoing, and subject to the terms and conditions set out in the clauses below, the Parties have agreed to enter into this restructuring plan pursuant to Book Two of the Insolvency Act (the **"Restructuring Plan,"** the **"Plan"** or the **"Agreement"**), which shall be governed by the following:

CLAUSES

**1. DEFINITIONS AND INTERPRETATION**

**1.1. Defined Terms**

**1.1.1.** Capitalised terms and expressions that are neither proper nouns nor appear at the beginning of a sentence shall have the meanings assigned to them in Annex I.

**1.2. Interpretation**

**1.2.1.** Defined terms used in the singular shall have the same meaning when used in the plural, and vice versa.

**1.2.2.** Unless expressly provided otherwise, all references to clauses, paragraphs, sections and annexes shall be construed as references to the corresponding clauses, paragraphs, sections and annexes of this Plan.

**1.2.3.** Unless expressly provided otherwise, all references in this Plan to legal provisions, irrespective of their rank, shall be construed as references to such provisions as amended and in force from time to time and, should they be repealed, to the provisions repealing or replacing them in the regulation of the relevant matter.

**1.2.4.** The Annexes form an integral part of this Restructuring Plan for all purposes. Any reference to this Restructuring Plan shall be construed as a reference to this Plan together with all its Annexes. Likewise, any reference to any Restructuring Document shall be construed as a reference to that Restructuring Document together with all its corresponding Annexes.

**1.2.5.** Any interval or period of time defined by reference to a specific number of days before or after an event shall be calculated without including the date on which that event occurs within such interval or period.

**1.2.6.** This Plan has been drafted as a result of the negotiations and joint efforts of the Parties and does not correspond to any standard form prepared in advance by any of them, its clauses reflecting the Parties' true intentions. Accordingly, the following rules of interpretation set out in Article 1,288 of the Civil Code are declared inapplicable





[Seal: Mr Andrés
Domínguez Nafría –
Notary Public of
Madrid]

*Privileged and Confidential*

and any other special rule or principle under consumer and user protection legislation.

**1.2.7.** The Parties agree that, to the extent that the provisions of this Plan or the corresponding Restructuring Documents contain terms or matters that are not regulated, are open to ambiguous interpretation or give rise to gaps, recourse shall be had, insofar as reasonably applicable, to the provisions and interpretative criteria contained in this Plan.

## 2. PURPOSE AND NATURE OF THE RESTRUCTURING PLAN

### 2.1. Purpose

**2.1.1.** The purpose of this document is to establish the contractual framework and procedure through which the Restructuring of the entire Affected Debt is to be implemented by amending certain terms of the Affected Claims, in order to ensure the short- and medium-term viability of the Restructured Companies. It also establishes certain terms that shall apply generally to the Affected Debt and the Restructuring, with the aim of providing stability to the Group during the processing of the Application for Court Approval and following the Closing Date, including, without limitation, the conditions under which the Restructuring shall, where applicable, be extended to the Non-Participating Creditors.

**2.1.2.** This Restructuring Plan has been approved by the relevant management or governing body of each of the Restructured Companies and is structured in accordance with Article 633 of the Insolvency Act.

**2.1.3.** Once the Restructuring Plan has been approved by the Court and in implementation of its provisions, the Restructuring shall entail, among other matters, the execution of the following transactions or, where applicable, the taking of the following actions for the purpose of implementing the Restructuring:

**(i)** the amendment, by way of a non-extinguishing novation, of the terms of the Bank Debt and the claims arising from the Existing Guarantee Facilities, in accordance with the treatments assigned to the relevant class;

**(ii)** the exchange of the Existing Notes for the New Notes in accordance with the Indentures and on the terms of the Consent Solicitation;

17





*Privileged and Confidential*

**(iii)** the extensions of the Existing Syndicated Factoring Agreement and the execution of a new working-capital financing agreement on the terms described in Clause 6 (the **"Working Capital Financing Agreement"**);

**(iv)** the amendment and ratification of the Existing Security, as well as the granting of the New ICA Security Interests, the New ICA Personal Guarantees and the Account Pledges; and

**(v)** the amendment of the Intercreditor Agreement on the terms described in Clause 5.5.

**2.2. Nature of the Restructuring Plan**

**2.2.1.** The Parties state that they intend this Restructuring Plan to constitute a restructuring plan for the purposes of Articles 614 et seq. of the Insolvency Act, eligible for Court Approval for the purposes of Articles 635 et seq. of the Insolvency Act and protected against clawback actions for the purposes of Article 667 of the Insolvency Act.

**2.2.2.** The Restructuring Plan is supported by and consistent with the Viability Plan and, pursuant to Articles 614 et seq. of the Insolvency Act, the Restructuring shall result, among other matters, in:

**(i)** compliance with the recommendations incorporated into the Restructuring Directive and the Insolvency Act concerning the early commencement of restructuring processes through **"early-warning"** mechanisms;

**(ii)** safeguarding the business of the Restructured Companies in the short and medium term and thereby avoiding potential insolvency proceedings;

**(iii)** preserving the employment and business activities of the Restructured Companies on their current terms;

**(iv)** adjusting the maturities of the Affected Debt in accordance with the Viability Plan;

**(v)** obtaining new financing through the Working Capital Financing Agreement and, on an interim basis until that agreement enters into force and becomes fully available, through the extensions of the Existing Syndicated Factoring Agreement, in each case subject to the conditions set out in this Plan;

**(vi)** ensuring the orderly repayment of the Affected Debt;





[Seal: Mr Andrés Domínguez Nafría – Notary Public of Madrid]

*Privileged and Confidential*

**(vii)** preserving the current capital structure; and

**(viii)** ensuring the viability of the Group.

**2.2.3.** The Parties acknowledge and agree that compliance with the requirements laid down in the aforementioned provisions of the Insolvency Act constitutes an essential element of the Participating Creditors' consent, without which they would not have agreed to participate in the Restructuring or consented to enter into this Plan. Furthermore, this Plan is entered into on the basis that all Affected Creditors shall be subject to the Restructuring, whether by voluntarily entering into this Plan or through the compulsory extension of its effects as a result of Court Approval.

**2.2.4.** This Restructuring Plan constitutes a joint restructuring plan of the Restructured Companies pursuant to Article 642.2 of the Insolvency Act.

**2.3. Single Agreement**

**2.3.1.** The Parties hereby record that, in implementation of the agreements reached, they enter into this Restructuring Plan.

**2.3.2.** All the Restructuring Documents and the Restructuring Term Sheet shall be deemed an integral part of this Restructuring Plan and, irrespective of whether they are documented by means of separate agreements or of the dates on which they are entered into, shall for all purposes be construed as constituting a single agreement pursuant to which the Restructuring is implemented.

**2.4. Restructuring Phases**

**2.4.1.** In view of the large number of parties affected by the Restructuring, the Parties agree that the Restructuring shall be implemented in the following phases:

**(i) <u>Execution of the Recapitalisation Support Agreement</u>:** The execution of the Recapitalisation Support Agreement on 23 June 2026 by, among others, the Restructured Companies, Antolín HoldCo and certain Original Participating Creditors, in accordance with Recital XIV.

**(ii) <u>Delivery of the Invitation and Accession Period</u>:** Prior to the execution of this Plan, an accession period has been made available until 22 July 2026, which may be extended at the request of Antolín Irausa by giving notice to the Restructuring Agent for such purpose (the **"Accession Period"**), on the terms and subject to the conditions set out in Clause 4.2 below.

19


CERTIFIED TRANSLATION



*Privileged and Confidential*

**(iii)** <u>Execution of the Plan</u>: At any time following the commencement of the Accession Period, this Plan shall be executed by the Restructured Companies, the Original Participating Creditors and the Restructuring Agent. Any other Affected Creditors wishing to express their support for the Plan shall accede thereto, whether appearing in their own name or through the Restructuring Agent, in accordance with Clause 7.

**(iv)** <u>Entry into Force of the Plan</u>: On the Entry into Force Date, satisfaction of the Condition Precedent to Entry into Force shall be evidenced by delivery of the corresponding Majority Certificates by the Restructuring Expert, as described in Clause 11.

**(v)** <u>Filing of the Application for Court Approval</u>: The Restructured Companies shall file the Application for Court Approval of the Restructuring Plan with the Competent Court in accordance with Clause 8.2.1.

**(vi)** <u>Election Period</u>: The Affected Creditors may elect between the Treatments applicable to them in accordance with Clause 5.2.8 for a period of at least twenty (20) Business Days commencing on 2 July 2026 or, in the case of the Existing Notes, commencing on the date on which the Restructuring Agent sends the Consent Solicitation. In both cases, this is without prejudice to Antolín Irausa's right to extend either period by giving notice to the Restructuring Agent for such purpose, provided that the Bank Debt Election Period may in no event be extended beyond 31 August 2026 (the **"Election Period"**).

**(vii)** <u>Effective Date of the Plan</u>: The Effective Date shall occur once satisfaction of the Condition Precedent to Effectiveness has been evidenced in accordance with Clause 12.

**(viii)** <u>Closing of the Restructuring</u>: Following the Effective Date, provided that the Election Period has ended, Antolín Irausa shall determine a Closing Date for the execution and formalisation of the remaining Restructuring Documents and of any other documents and agreements required to implement the Plan with effect from the Effective Date, including, without limitation, the issuance by the Group's Legal Adviser of the relevant legal opinions as to capacity and by the Participating Creditors' Legal Adviser of legal opinions as to validity and enforceability, in each case in form and substance satisfactory to the Original Participating Creditors. The Closing Date shall in no event fall later than three months after the Effective Date, without prejudice to any extension agreed between the Restructured Companies, acting through Antolín Irausa, and the Majority Participating Creditors.





[Seal: Mr Andrés Domínguez Nafría – Notary Public of Madrid]

*Privileged and Confidential*

**3. FORMATION OF CLASSES**

**3.1. Preliminary Considerations**

**3.1.1.** The Affected Creditors comprise all holders of the Affected Debt, which constitutes the scope of this Plan.

**3.1.2.** The Restructuring Plan does not affect trade creditors, creditors holding public-law claims or certain contingent debt that is fully secured by entirely liquid assets, as further explained below. Accordingly, such claims fall outside the scope of the Affected Debt pursuant to paragraph 8 of **Annex VI.**

**3.1.3.** The Affected Debt does not constitute public-law claims for the purposes of Article 624 bis of the Insolvency Act.

**3.2. General Criteria for the Formation of Classes**

**3.2.1.** Pursuant to Article 622 of the Insolvency Act, the holders of the Affected Debt shall vote in classes in respect of each Restructured Company.

**3.2.2.** The Restructured Companies and the Participating Creditors consider that the formation of the Classes contemplated in Clause 3.2.1 constitutes the most objective criterion, having regard to the nature of the Affected Claims, namely those included within the scope of the Plan. This is because the formation of classes must be based on the existence of a common interest and, pursuant to Article 623 of the Insolvency Act, claims of the same ranking, as determined by the order of payment in insolvency proceedings, are deemed to share a common interest. Nevertheless, claims of the same insolvency ranking may be separated into different classes where sufficient grounds exist to justify such separation.

**3.2.3.** Accordingly, insolvency ranking constitutes one of the primary criteria for the formation of the Classes under this Plan. Therefore, in respect of each Restructured Company and provided that claims of the relevant classes exist, a distinction shall be drawn between ordinary insolvency claims, comprising the Existing Notes, the Bank Debt and claims arising from the Existing Guarantee Facilities, and subordinated insolvency claims arising from the Intragroup Loans and from any rights of reimbursement, repayment, recourse, indemnification or subrogation that are subordinated pursuant to this Plan.

21





*Privileged and Confidential*

**3.2.4.** The ordinary insolvency claims, comprising the Existing Notes, the Bank Debt and the Existing Guarantee Facilities, are in turn divided into three separate classes of claims for the following reasons:

**(i)** The different alternative treatments offered to each of the Classes, namely the Bank Debt, the Existing Guarantee Facilities and the Existing Notes, in accordance with Clauses 5.2.4, 5.2.5 and 5.2.6 below, arise from the need to afford equal-ranking treatment to all ordinary classes. In this regard, obtaining a working-capital financing instrument from those institutions forming part of the Group's banking pool is essential to the Group's viability, having regard to business and operational criteria and to the availability of the relevant product.

**(ii)** The different nature of the Bank Debt instruments as compared with the Existing Notes: the former are private financing agreements subject to transfer restrictions, whereas the latter are securities admitted to trading on a regulated market and subject to capital-markets legislation. This distinction makes it appropriate to establish differentiated treatments and tailored solutions under this Restructuring Plan, taking into account the particular features of each category of instrument.

**(iii)** The need to amend certain undertakings and financial ratios contained only in certain bank financing instruments—namely, the Existing Syndicated Financing Agreement, the Existing ICO Financing Agreement and the Existing EIB Financing Agreements—in order to safeguard the short- and medium-term viability of the Restructured Companies, unlike the Existing Notes, which do not contain such undertakings or financial ratios.

**(iv)** The contingent nature of the claims arising from the guarantees issued under the Existing Guarantee Facilities.

**3.3. Classes**

Having regard to Clause 3.2 above and pursuant to Article 622 of the Insolvency Act, the Affected Creditors holding Affected Claims shall be grouped into the following classes:


CERTIFIED TRANSLATION



[Seal: Mr Andrés Domínguez Nafría – Notary Public of Madrid]

*Privileged and Confidential*

### 3.3.1. Classes of Antolín Irausa

**(i) Bank Debt Class**

**(a)** Comprising those Affected Claims arising under the Existing Syndicated Financing Agreement, including, for the avoidance of doubt, the amount drawn under the RCF as at the Signing Date, but excluding any Affected Claims constituting Existing Guarantee Facilities; the Existing ICO Financing Agreement; and the Existing EIB Financing Agreements, in respect of which Antolín Irausa is the principal debtor, borrower or personal guarantor.

**(b)** The Affected Debt corresponding to this Class is described in **Annex II, Part I**.

**(ii) Notes Class**

**(a)** Comprising those Affected Claims arising from the 2028 Notes and the 2030 Notes, in respect of which Antolín Irausa is the issuer and principal debtor.

**(b)** The Affected Debt corresponding to this Class is described in **Annex II, Part II**.

**(iii) Guarantee Facilities Class**

**(a)** Comprising those Affected Claims arising under the Existing Guarantee Facilities that are not secured by security interests and in respect of which Antolín Irausa is the principal guaranteed party.

**(b)** The Affected Debt corresponding to this Class is described in **Annex II, Part III.**

**(iv) Subordinated Debt Class**

**(a)** Comprising: **(i)** the Affected Claims arising under the Intragroup Loans in respect of which Antolín Irausa is the principal debtor; **(ii)** the accrued and unpaid interest arising under such Intragroup Loans in respect of which Antolín Irausa is the principal debtor; and, where applicable, any rights of recourse, reimbursement, recovery, indemnification or subrogation against Antolín Irausa that are subordinated pursuant to this Plan.





*Privileged and Confidential*

**(b)** The Affected Debt corresponding to this Class is described in **Annex II, Part IV.**

### 3.3.2. Classes of the Remaining Restructured Companies

Without prejudice to the provisions of this Clause 3.3.2, **Annex IV** contains details of the Classes of Affected Claims in respect of each Restructured Company other than Antolín Irausa. For the avoidance of doubt, Grupo Antolin South Africa (PTY) Ltd. does not have a Subordinated Debt Class, as it has no Affected Claims arising under Intragroup Loans.

**(i) Bank Debt Class**

**(a)** Comprising those Affected Claims arising under the Existing Syndicated Financing Agreement, including, for the avoidance of doubt, the RCF, but excluding any Affected Claims constituting Existing Guarantee Facilities; the Existing ICO Financing Agreement; and the Existing EIB Financing Agreements, in respect of which the relevant Restructured Company other than Antolín Irausa is the principal debtor, borrower and/or personal guarantor, as applicable.

**(b)** The Affected Debt corresponding to this Class is described in **Annex II, Part I**.

**(ii) Notes Class**

**(a)** Comprising those Affected Claims arising from the 2028 Notes and the 2030 Notes, in respect of which the relevant Restructured Company other than Antolín Irausa is a personal guarantor.

**(b)** The Affected Debt corresponding to this Class is described in **Annex II, Part II**.

**(iii) Guarantee Facilities Class**

**(a)** Comprising those Affected Claims arising under the Existing Guarantee Facilities that are not secured by security interests and in respect of which the relevant Restructured Company other than Antolín Irausa is a personal guarantor.

**(b)** The Affected Debt corresponding to this Class is described in **Annex II, Part III**.





[Seal: Mr Andrés Domínguez Nafría – Notary Public of Madrid]

*Privileged and Confidential*

**(iv) Subordinated Debt Class**

**(a)** Comprising: **(i)** the Affected Claims arising under the Intragroup Loans in respect of which the relevant Restructured Company other than Antolín Irausa is the principal debtor; **(ii)** the accrued and unpaid interest arising under those Intragroup Loans in respect of which each relevant Restructured Company is the principal debtor; and, where applicable, any rights of recourse, reimbursement, recovery, indemnification or subrogation against that Restructured Company that are subordinated pursuant to this Plan.

**(b)** The Affected Debt corresponding to this Class is described in **Annex II, Part IV.**

**3.4. Approval of the Restructuring. Majorities and Syndication Arrangements**

**3.4.1. <u>Syndication Arrangements</u>**

**(i)** Pursuant to Article 630.1 of the Insolvency Act, since the Restructuring Plan affects claims subject to syndication arrangements, as is the case, respectively, with the 2028 Notes, the 2030 Notes, the Existing Syndicated Financing Agreement and the Existing ICO Financing Agreement—collectively, the **"Syndicated Instruments"** and each individually a **"Syndicated Instrument"**—the majorities provided for in Article 629 of the Insolvency Act shall apply separately to each Syndicated Instrument, unless the syndication arrangements governing the relevant instrument provide for a lower majority for the approval of such effects.

**(ii)** The Syndicated Instruments do not provide for majorities lower than those established in Article 629 of the Insolvency Act. Accordingly, since they constitute unsecured Affected Claims, the threshold of more than two thirds of the amount of the liabilities corresponding to each Syndicated Instrument must be met in order for the Plan to be deemed approved in respect of each such instrument.

**(iii)** Where the required majority of the relevant Affected Creditors votes in favour in respect of each Syndicated Instrument, all Affected Creditors bound by the relevant syndication arrangements—namely, respectively, the 2028 Notes, the 2030 Notes, the Existing Syndicated Financing Agreement and the Existing ICO Financing Agreement—shall be deemed to have accepted the Restructuring Plan, pursuant to Article 630.2 of the Insolvency Act.

25





*Privileged and Confidential*

**(iv)** Accordingly, the favourable vote of the Affected Creditors holding amounts representing more than two thirds of each Syndicated Instrument shall constitute the favourable vote of 100% of the Affected Creditors under the respective Syndicated Instruments.

### 3.4.2. Majorities

**(i)** For the purposes of complying with Article 634.1 of the Insolvency Act, prior to the filing of the Application for Court Approval, the Restructuring Expert shall issue the Majority Certificate confirming that the majorities described in Articles 638 or 639 of the Insolvency Act, as applicable, have been obtained, taking into account all Participating Creditors.

**(ii)** Pursuant to Clause 11, the Restructured Companies undertake to deliver a copy of the Majority Certificate to the Notary Public as soon as they receive it from the Restructuring Expert. The Parties hereby instruct the Notary Public, who accepts such instructions, to incorporate a copy of the Majority Certificate into this Plan by means of a notarial memorandum, for the purposes of complying with Article 634.1 of the Insolvency Act.

**(iii)** Once the majorities have been confirmed by the Majority Certificate issued by the Restructuring Expert, the Entry into Force Date shall be deemed to have occurred.

### 4. COMPLIANCE WITH THE REQUIREMENTS OF THE RESTRUCTURING PLAN

#### 4.1. Statutory Content Requirements

**4.1.1.** For the purposes of evidencing compliance with the statutory content requirements applicable to the Restructuring Plan, **Annex VI** includes the particulars expressly required under Article 633 of the Insolvency Act.

#### 4.2. Notice of the Restructuring Plan

**4.2.1.** For the purpose of complying with the notice requirements provided for in Article 627 of the Insolvency Act, the Restructured Companies state that the Restructuring Plan has been notified to all Affected Creditors as set out below.

**4.2.2.** The Restructured Companies, acting through the Restructuring Agent, have sent the invitation, a copy of which is attached to this Plan as **Annex VIII** (the **"Invitation"**), together with the execution version of the Restructuring Plan, for the purposes of





[Seal: Mr Andrés Domínguez Nafría – Notary Public of Madrid]

*Privileged and Confidential*

Articles 627 and 628 of the Insolvency Act, to invite each Affected Creditor, as applicable, to accede to the Recapitalisation Support Agreement and/or express its support for this Restructuring Plan, as follows:

**(i)** in the case of the Bank Debt and the Existing Guarantee Facilities, by notifying the Affected Creditors holding the Bank Debt and the Existing Guarantee Facilities in accordance with the notification mechanisms provided for in the relevant Affected Agreements;

**(ii)** in the case of the Existing Notes, by sending the Invitation to the Affected Creditors holding the Existing Notes through Euroclear Bank SA/NV (**Euroclear**) and Clearstream Banking S.A. (**Clearstream**) and in accordance with the rules of Euronext; and

**(iii)** the Invitation has been published on the Group's website (Spanish:

http://antolin.com/es/inversores/comunicados-2026; English:

https://www.antolin.com/en/inversores/publications-2026) and on the website established by the

Restructuring Agent in connection with the Restructuring (https://glas-

agency.appiancloud.com/suite/sites/GRUPO-ANTOLIN-IRAUSA-SAU).

**4.2.3.** The Restructured Companies have sent the execution version of the Restructuring Plan to the Affected Creditors holding Subordinated Debt in accordance with Article 627 of the Insolvency Act.

**4.2.4.** During the Accession Period, the Invitation provides the opportunity to:

**(i)** accede freely to the Recapitalisation Support Agreement, without requiring the consent or agreement of any party to the RSA, and undertake to accede to this Plan when required to do so in accordance with the Recapitalisation Support Agreement; and/or

**(ii)** vote in favour of or against, and, where applicable, freely accede to the Plan and the other relevant Restructuring Documents, as follows:

**(a)** the Affected Creditors holding Bank Debt and claims under the Existing Guarantee Facilities may vote in favour or against and, where they vote in favour, accede to the Plan by executing a deed of accession in accordance with Clause 7 below;

27





*Privileged and Confidential*

**(b)** the Affected Creditors holding Existing Notes that qualify as Eligible Noteholders may vote in favour of or against the Plan and, where they vote in favour, irrevocably instruct the Restructuring Agent to execute the Plan in their name and on their behalf, in accordance with Clause 7 below;

**(c)** the Affected Creditors holding Existing Notes that do not qualify as Eligible Noteholders may vote against the Plan.

**4.3. Formalisation in a Public Instrument**

For the purpose of complying with Article 634 of the Insolvency Act, this Restructuring Plan is formalised as a public instrument on this date by the Restructured Companies, the Original Participating Creditors, the New ICA Guarantors and the Restructuring Agent, acting in its own name and on behalf of the Participating Creditors that have not appeared in their own name, by means of a deed of formalisation as a public instrument executed before Mr Andrés Domínguez Nafría, Notary Public and member of the Illustrious Notarial Association of Madrid, or whoever replaces him on the Signing Date, so that it is formally recorded in a Spanish public instrument.

The Parties and the New ICA Guarantors instruct the Notary Public before whom this Restructuring Plan is formalised as a public instrument, or whoever replaces him on the Signing Date, who accepts such instructions, to notify the Restructuring Expert as soon as possible by email from any of the following addresses: andresdominguez@notariado.org; lruiz@notarialagasca88.com; or any other address using the domain "@notarialagasca88.com", copying the email addresses of the Group's Legal Adviser (mlamo@ga-p.com; rlopez@ga-p.com; ffoix@ga-p.com; ldelclaux@ga-p.com; and projectaxle@ga-p.com) and the Original Participating Creditors' Legal Adviser (javier.castresana@aoshearman.com; and oscar.guinea@aoshearman.com), at the following addresses of the Restructuring Expert: jmaymi@lexaudit.com; vfernandez@lexaudit.com; danielarteta@lexaudit.com; aardura@lexaudit.com; and jvilella@lexaudit.com, informing them of the formalisation of this Restructuring Plan in terms substantially similar to the following:

"I, [Andrés Domínguez Nafría], Notary Public and member of the Illustrious Notarial Association of Madrid, hereby confirm that, on this date, the deed of formalisation as a public instrument of the Restructuring Plan has been executed before me by Grupo Antolín-Irausa, S.A.U., certain companies of its group, as Restructured Companies and New Guarantors, as applicable, Banco Bilbao Vizcaya Argentaria, S.A., Banco Bilbao Vizcaya Argentaria, S.A., New York Branch, Banco de Sabadell, S.A., Banco Santander, S.A., Bankinter, S.A., CaixaBank, S.A., HSBC Continental Europe and HSBC Continental Europe, Spanish Branch, as

28





[Seal: Mr Andrés Domínguez Nafría – Notary Public of Madrid]

*Privileged and Confidential*

original Participating Creditors, and GLAS Specialist Services Limited, as Restructuring Agent, [as well as the immediately subsequent accession of [•] as an Acceding Creditor to the said Restructuring Plan], without any additional accessions having occurred on this date or any vote against the Restructuring Plan having been notified. I hereby notify you of the foregoing for the purpose of taking such actions as may be necessary to satisfy the Condition Precedent to Entry into Force and for any other purposes contemplated in the Restructuring Plan itself."

## 5. TERMS AND TREATMENT OF THE RESTRUCTURING OF THE AFFECTED DEBT

### 5.1. Terms of the Restructuring

The Parties attach to this Restructuring Plan as **Annex VII** the term sheet (the **"Restructuring Term Sheet"**), which sets out the principal terms and conditions of the Restructuring and the terms on which the Affected Agreements shall be affected as a consequence thereof, including: **(i)** a summary of the Restructuring and the Affected Debt; **(ii)** the general terms of the Restructuring, including the treatment of each category of Affected Debt; and **(iii)** the documentary terms governing the Affected Debt following the Restructuring, including, among other matters, the terms of the Working Capital Financing Agreement, the amendments to the various Affected Agreements relating to the Bank Debt and the Existing Guarantee Facilities, the New Notes issuance documents, the New ICA Security Interests, the New ICA Personal Guarantees, the Account Pledges and the amendment of the Intercreditor Agreement.

### 5.2. Treatment of the Affected Debt

The fundamental premise of the Restructuring contemplated in this Plan is the extension of the final maturity of the Affected Debt, which shall, by default, be extended until 31 December 2035, without applying any write-off and with the financial terms of the debt being adjusted accordingly.

With regard to the Bank Debt Class, since it is essential for the Group to have committed and available new working-capital financing facilities in order to ensure its viability in accordance with the Viability Plan, all Affected Creditors holding Bank Debt have been offered the option of subscribing for such new financing through the Working Capital Financing Agreement in exchange for a shorter extension of their debt until 4 August 2032, new senior-ranking security and a priority right of payment arising from the Restructuring of the Affected Debt of the Restructured Companies acting as guarantors. Accordingly, all the

29





*Privileged and Confidential*

Affected Creditors holding Bank Debt may, should they so wish, obtain the same treatment if they undertake to enter into the Working Capital Financing Agreement.

In order to provide equivalent treatment to the Affected Creditors holding the Existing Notes and claims under the Existing Guarantee Facilities, they are offered the possibility of electing an alternative treatment involving an extension until 31 December 2030 and 4 August 2032, respectively, together with the same enhancement of their security and priority of payment, on terms financially equivalent to those applicable to the Bank Debt.

Accordingly, the treatments offered to the Affected Creditors in the different Classes having the same insolvency ranking are equivalent to one another, thereby ensuring equal treatment in accordance with the Insolvency Act.

**5.2.1.** Default Bank Debt Treatment

The treatment that shall apply by default to each Affected Creditor holding Bank Debt (the **"Default Bank Debt Treatment"**) shall have the following characteristics:

**(i)** extension at par, without any discount, of the final maturity date to 31 December 2035;

**(ii)** repayment of the principal in full on the maturity date (*bullet*);

**(iii)** with respect to the Affected Claims arising from amounts outstanding under the RCF, such amounts shall be converted into term loans;

**(iv)** an annual interest rate of 6.97%, payable in semi-annual interest periods on 30 June and 31 December of each year, with the first interest period running from the Effective Date to 31 December 2026 or, if the Closing Date has not occurred, to 30 June 2027;

**(v)** amendment of certain financial ratios applicable to the relevant Bank Debt in order to align them with the Viability Plan;

**(vi)** security comprising the Existing Security, the New Second-Ranking ICA Security Interests, the Third-Ranking Account Pledge and the New ICA Personal Guarantees, without prejudice to the amendment of the payment waterfall under the Intercreditor Agreement referred to in Clause 5.5 below, as





[Seal: Mr Andrés Domínguez Nafría – Notary Public of Madrid]

*Privileged and Confidential*

a consequence of the Restructuring of the Affected Debt in respect of the Restructured Companies that are guarantors of the Bank Debt; and

**(vii)** in the case of the debt of the Restructured Companies that are personal guarantors under the Existing ICO Financing Agreement (the **"Existing ICO Financing Agreement Guarantors"**), the effects of the Restructuring shall entail the amendment of the claims held by the Affected Creditors under the Existing ICO Financing Agreement against those Restructured Companies, in their capacity as debtors bound by the Court Approval, so that the payment waterfall provided for in the Intercreditor Agreement applies to certain proceeds or recoveries, on the terms set out in Clause 5.5.1;

all in accordance with the Restructuring Term Sheet.

**5.2.2. <u>Default Existing Notes Treatment</u>**

The treatment that shall apply by default to each Affected Creditor holding Existing Notes (the **"Default Existing Notes Treatment"**) shall have the following characteristics:

**(i)** extension at par, without any discount, of the final maturity date to 31 December 2035;

**(ii)** repayment of the principal in full on the maturity date (*bullet*);

**(iii)** a coupon bearing interest at an annual rate of 6.97%, payable in semi-annual interest periods on 30 June and 31 December of each year, with the first interest period running from the Effective Date to 31 December 2026 or, if the Closing Date has not occurred, to 30 June 2027; and

**(iv)** security comprising the Existing Security, the New Second-Ranking ICA Security Interests, the Third-Ranking Account Pledge and the New ICA Personal Guarantees, without prejudice to the amendment of the payment waterfall under the Intercreditor Agreement referred to in Clause 5.5 below, as a consequence of the Restructuring of the Affected Debt in respect of the Restructured Companies that are guarantors of the Existing Notes;

all in accordance with the Restructuring Term Sheet.





*Privileged and Confidential*

### 5.2.3. <u>Default Existing Guarantee Facilities Treatment</u>

The treatment that shall apply by default to each Affected Creditor holding claims under the Existing Guarantee Facilities (the **"Default Existing Guarantee Facilities Treatment"**) shall have the following characteristics:

**(i)** extension at par, without any discount, until 31 December 2035 of the contingent debt arising from the enforcement of guarantees issued under the Existing Guarantee Facilities, including guarantees issued after the Signing Date and up to the Effective Date under those Existing Guarantee Facilities, without any extension of the availability period of the Existing Guarantee Facilities from the Signing Date;

**(ii)** repayment of the principal in full on the maturity date (*bullet*);

**(iii)** an annual interest rate of 6.97%, payable in semi-annual interest periods, accruing only from the enforcement of the relevant guarantee and on the amount of the guarantee enforced, with payment dates falling on 30 June and 31 December of each year, and with the first interest period running from the Effective Date to 31 December 2026 or, if the Closing Date has not occurred, to 30 June 2027; and

**(iv)** security comprising the Existing Security, the New Second-Ranking ICA Security Interests, the Third-Ranking Account Pledge and the New ICA Personal Guarantees, without prejudice to the amendment of the payment waterfall under the Intercreditor Agreement referred to in Clause 5.5 below;

all in accordance with the Restructuring Term Sheet.

### 5.2.4. <u>Alternative Bank Debt Treatment</u>

The Affected Creditors holding Bank Debt may elect an alternative treatment (the **"Alternative Bank Debt Treatment"**) having the following characteristics:

**(i)** a firm commitment to subscribe for a pro rata portion of the Working Capital Financing Agreement, based on the proportion of Bank Debt held by the relevant Affected Creditor, which agreement shall constitute new financing pursuant to Article 666 of the Insolvency Act;

**(ii)** extension of the final maturity date to 4 August 2032, and of the RCF availability period to 4 July 2032, without the amounts drawn


CERTIFIED TRANSLATION



[Seal: Mr Andrés Domínguez Nafría – Notary Public of Madrid]

*Privileged and Confidential*

under the RCF therefore being converted into term loans), with a mechanism bringing forward the end of the availability period and the maturity date to 30 June 2030 if, on or before that date, the New Notes B have not been repaid, redeemed or refinanced, or the Restructured Companies have not evidenced binding commitments for their refinancing;

**(iii)** repayment of the outstanding principal, excluding the RCF, in accordance with the following repayment schedule, in instalments payable semi-annually:

| | |
| --- | --- |

| Date | Debt to be repaid on or before that date (%) |
| --- | --- |
| **31/12/2026** (or on the Closing Date, if later) | 2,414% |
| **30/06/2027** | 2,850% |
| **31/12/2027** | 2,850% |
| **30/06/2028** | 3,762% |
| **31/12/2028** | 3,762% |
| **30/06/2029** | 4,674% |
| **31/12/2029** | 4,674% |
| **30/06/2030** | 5,586% |
| **31/12/2030** | 5,586% |
| **30/06/2031** | 6,498% |
| **31/12/2031** | 6,498% |
| **30/06/2032** | 7,410% |
| **04/08/2032** | 43,436% |

The repayment schedule applicable to each Affected Creditor holding Bank Debt that elects the Alternative Bank Debt Treatment shall be calculated on the basis of its proportionate share of the total amount of the Bank Debt, excluding the RCF.

**(iv)** EURIBOR plus a margin equivalent to an annual interest rate of 2.50%, payable in semi-annual interest periods on 30 June and 31 December of each year, with the first interest period running from the Effective Date to 31 December 2026 or, if the Closing Date

*Privileged and Confidential*

33





has not occurred, to 30 June 2027). From the execution of the Restructuring Documents, that margin shall be subject to an annual reduction in accordance with Clause 8.5.2:

**(a)** by 100 bps per annum from the applicable unadjusted base margin, provided that the leverage ratio specified in each of the Affected Agreements relating to the Bank Debt is equal to or less than 3.50x, calculated without applying IFRS 16; or, alternatively,

**(b)** by 200 bps per annum from the applicable unadjusted base margin, provided that the leverage ratio specified in each of the Affected Agreements relating to the Bank Debt is equal to or less than 3.00x, calculated without applying IFRS 16;

the leverage ratio being calculated as at the end of the preceding quarter, prior to the commencement of each semi-annual interest period, in order to determine the margin applicable to that period. The first calculation shall be made on the Effective Date, taking into account the pro forma post-Restructuring Affected Debt;

**(v)** the RCF shall bear a commitment fee equal to 35% of the applicable margin, excluding EURIBOR, and shall include an undertaking that the average amount drawn during each calendar year remains below 80%, together with a clean-down requirement equal to 50% of the total amount of the RCF once in each calendar year for ten consecutive days;

**(vi)** security comprising the Existing Security, the New First-Ranking ICA Security Interests, the Second-Ranking Account Pledge and the New ICA Personal Guarantees, without prejudice to the amendment of the payment waterfall under the Intercreditor Agreement referred to in Clause 5.5 below;

**(vii)** a priority right of payment over the claims of the Affected Creditors subject to the Default Treatments, pursuant to the amendment of the Intercreditor Agreement contemplated in Clause 5.5 below, arising from the treatment proposed under the Plan for the Affected Debt of the Restructured Companies that granted the Existing Security; and

**(viii)** amendment of certain financial ratios applicable to the relevant Bank Debt, together with the related definitions, in order to align them with the Viability Plan, while retaining the adjustments for synergies and exceptional items (*one-offs*) to EBITDA, calculated without applying IFRS 16, contemplated in the Viability Plan for financial years 2026, 2027 and 2028, subject to quarterly certification





[Seal: Mr Andrés Domínguez Nafría – Notary Public of Madrid]

*Privileged and Confidential*

by the Group's Chief Financial Officer or another person duly authorised for such purpose), and the corresponding adjustments for synergies and exceptional items (*one-offs*) resulting from the closure and/or sale of certain plants not contemplated in the Viability Plan may be included in EBITDA, subject to annual certification by the auditor;

all in accordance with the Restructuring Term Sheet.

### 5.2.5. Alternative Existing Notes Treatment

The Affected Creditors holding Existing Notes may elect an alternative treatment (the **"Alternative Existing Notes Treatment"**) having the following characteristics, without being required to undertake to provide any new financing:

**(i)** a 32.5% discount to the nominal value of the Existing Notes prior to the Effective Date of the Plan;

**(ii)** extension of the final maturity date to 31 December 2036;

**(iii)** repayment of the principal in full on the maturity date (*bullet*);

**(iv)** the Restructured Companies shall not make any voluntary early redemption of the New Notes B for a period of 30 months from the Effective Date (*non-call period*), unless a market-standard *make-whole* premium is paid;

**(v)** a coupon bearing interest at an annual rate of 8.28%, payable in semi-annual interest periods on 30 June and 31 December of each year, with the first interest period running from the Effective Date to 31 December 2026 or, if the Closing Date has not occurred, to 30 June 2027. The coupon shall automatically increase (*step up*) by two percentage points per annum (2.00%) on each anniversary date commencing on 30 June 2027, with each such increase being applied to the interest rate then in effect;

**(vi)** a priority right of payment over the Affected Creditors subject to the Default Treatments, pursuant to the amendment of the Intercreditor Agreement contemplated in Clause 5.5 below;

**(vii)** security comprising the Existing Security, the New First-Ranking ICA Security Interests, the Second-Ranking Account Pledge and the New





*Privileged and Confidential*

ICA Personal Guarantees, without prejudice to the amendment of the payment waterfall under the Intercreditor Agreement referred to in Clause 5.5 below;

all in accordance with the Restructuring Term Sheet.

**5.2.6.** Alternative Existing Guarantee Facilities Treatment

The Affected Creditors holding claims under the Existing Guarantee Facilities may elect an alternative treatment (the **"Alternative Guarantee Facilities Treatment"**) having the following characteristics:

**(i)** extension until 4 August 2032 of the maturity of the amounts utilised under the facilities as at the Signing Date, with a mechanism bringing forward the end of the availability period and the maturity date to 30 June 2030 if, on or before that date, the New Notes B have not been repaid, redeemed or refinanced, or the Restructured Companies have not evidenced binding commitments for their refinancing;

**(ii)** the availability period shall in all cases end six months before the maturity date;

**(iii)** no guarantee issued may have a maturity date later than the maturity date of the relevant facility. If, on the maturity date of the facility, any guarantee remains outstanding, Antolín Irausa shall provide cash collateral equal to 100% of the guaranteed amount from the maturity date of the facility;

**(iv)** the applicable financial terms shall be those of the facility whose maturity is being extended;

**(v)** the reimbursement claims arising in favour of the Affected Creditors electing this Treatment as a result of the enforcement of guarantees issued under the Existing Guarantee Facilities that remain outstanding as at the Signing Date shall receive the same Treatment as the Affected Creditors that have elected the Alternative Bank Debt Treatment, including as regards maturity and remuneration;

for the avoidance of doubt, if the relevant reimbursement claim arises after one or more repayment dates under the repayment schedule applicable to the Alternative Bank Debt Treatment have elapsed, the aggregate amount of the instalments that would have fallen due on those dates shall be paid on the next repayment date provided for in that schedule, together with any instalment falling due on that same date;


CERTIFIED TRANSLATION



[Seal: Mr Andrés Domínguez Nafría – Notary Public of Madrid]

*Privileged and Confidential*

**(vi)** the reimbursement claims arising in favour of the Affected Creditors electing this Treatment as a result of the enforcement of guarantees issued from the Effective Date under the New Guarantee Facilities shall become due and payable upon enforcement in accordance with the terms of the New Guarantee Facilities;

**(vii)** the New Guarantee Facilities shall constitute new financing pursuant to Article 666 of the Insolvency Act;

**(viii)** a priority right of payment over the Affected Creditors subject to the Default Treatments, pursuant to the amendment of the Intercreditor Agreement contemplated in Clause 5.5 below; and

**(ix)** security comprising the Existing Security, the New First-Ranking ICA Security Interests, the Second-Ranking Account Pledge and the New ICA Personal Guarantees. Where the relevant Existing Guarantee Facility benefits from third-party security, such security shall be maintained and ratified;

all in accordance with the Restructuring Term Sheet.

**5.2.7.** Treatment of the Subordinated Debt

Extension of the final maturity date of the Affected Claims arising under the Intragroup Loans to 1 January 2036, with repayment in full on the maturity date (*bullet*), capitalisation of all interest accruing thereon and subordination to the remainder of the Affected Debt.

Furthermore, for the purposes of Article 310.2.4º of the Insolvency Act, any claims or rights of recourse, reimbursement, recovery, indemnification or subrogation that may arise in favour of any Restructured Company, New ICA Guarantor or Group company against any Restructured Company as a result of payments, receipts, enforcement proceeds or recoveries made pursuant to the personal guarantees or security interests granted in connection with the Restructuring or the Restructuring Documents shall rank as subordinated claims in relation to the remainder of the Affected Debt and shall be included in the Subordinated Debt Class. Such claims may not be paid, set off or enforced, directly or indirectly, until all Affected Debt other than the Subordinated Debt has been paid in full, except to the extent expressly provided otherwise in this Plan or the Restructuring Documents.


CERTIFIED TRANSLATION



*Privileged and Confidential*

**5.2.8.** Election of Treatments by the Affected Creditors holding Bank Debt, Existing Notes and claims under the Existing Guarantee Facilities

By executing this Plan on the Signing Date, the Original Participating Creditors unconditionally and irrevocably elect the Alternative Bank Debt Treatment and the Alternative Existing Guarantee Facilities Treatment, as applicable, in respect of the Affected Claims held by them.

Without prejudice to the notice contemplated in Clause 4.2, the Restructured Companies, acting through the Restructuring Agent, shall offer the Affected Creditors the opportunity to elect unconditionally and irrevocably, during or before the Election Period, the relevant Default Treatment or Alternative Treatment by means of:

**(i)** in the case of Affected Creditors holding Existing Notes that qualify as Eligible Noteholders, the Consent Solicitation sent by the Restructuring Agent through the mechanism described in Clause 4.2.2(ii), which shall include the mechanism whereby the Eligible Noteholders may elect between the Treatments applicable to them under this Restructuring Plan, together with the applicable deadlines and procedures for making such election; and

**(ii)** in the case of Affected Creditors holding Bank Debt and claims under the Existing Guarantee Facilities, by submitting to the Restructuring Agent the notice attached to this Plan as **Annex IX** (the **"Entity Election Form"**).

Where the relevant election is not made within the period specified in Clause 2.4.1(vi), the corresponding Default Treatment shall apply.

**5.2.9.** Refinancing Undertaking

Should the Group, before the respective maturity dates, achieve a leverage level enabling it to obtain the necessary financing on favourable market terms that would neither have an adverse financial impact on the Group nor jeopardise its viability, the Restructured Companies undertake to initiate a refinancing process allowing the debt outstanding under the Post-Restructuring Instruments, excluding the Intragroup Loans, to be repaid before its maturity date.







[Seal: Mr Andrés Domínguez Nafría – Notary Public of Madrid]

*Privileged and Confidential*

**5.3. Implementation of the Restructuring in respect of the Affected Debt**

**5.3.1.** As a result of the Restructuring, the Existing Notes shall be exchanged for the New Notes on the following terms:

**(i)** the Existing Notes held by Affected Creditors to whom the Default Existing Notes Treatment applies shall be exchanged for new notes in accordance with the Restructuring Term Sheet (such notes, the **"New Notes A"**); and

**(ii)** the Existing Notes held by Affected Creditors that elect the Alternative Existing Notes Treatment shall be exchanged for new notes in accordance with the Restructuring Term Sheet (such notes, the **"New Notes B"** and, together with the New Notes A, the **"New Notes"**).

**5.3.2.** Receipt of the New Notes shall be subject to conditions customary for capital-markets transactions of this nature. If any Affected Creditor holding Existing Notes fails, on or before the Closing Date—or any other date determined by Antolín Irausa in its capacity as issuer and notified to the Affected Creditors holding Existing Notes—to satisfy all eligibility conditions for exchanging its Existing Notes for the New Notes, the New Notes shall be issued and the beneficial interests therein shall be held on its behalf in a temporary holding trust by the Temporary Depositary (the **"Temporary Holding Trust"**) for a period of twelve months from the Closing Date, or for such other period as the Restructuring Agent and Antolín Irausa may agree in accordance with the terms of the written documentation governing the Temporary Holding Trust.

**5.3.3.** The Bank Debt shall be amended by way of a non-extinguishing novation as follows:

**(i)** the claims held by the Affected Creditors under the Existing Syndicated Financing Agreement shall be amended and restated in accordance with the Restructuring Term Sheet in a new consolidated agreement (the **"New Syndicated Financing Agreement"**);

**(ii)** the claims held by the Affected Creditors under the Existing ICO Financing Agreement shall be amended and restated in accordance with the Restructuring Term Sheet in a new consolidated agreement (the **"Amended ICO Financing Agreement"**); and


CERTIFIED TRANSLATION



**(iii)** the claims held by the EIB under the Existing EIB Financing Agreements shall be amended and restated in accordance with the Restructuring Term Sheet in a new consolidated agreement (the **"New EIB Financing Agreement"**).

**5.3.4.** The Existing Guarantee Facilities shall be amended by way of a non-extinguishing novation as follows:

**(i)** the claims held by the Affected Creditors under the Existing Guarantee Facilities to which the Default Existing Guarantee Facilities Treatment applies shall be amended in accordance with the Restructuring Term Sheet by virtue of the Plan itself (the **"Contingent Guarantee Claims"**); and

**(ii)** the claims held by the Affected Creditors under the Existing Guarantee Facilities that elect the Alternative Guarantee Facilities Treatment shall be amended and restated in accordance with the Restructuring Term Sheet in a new consolidated agreement (the **"New Guarantee Facilities"** and, together with the New Notes, the New Syndicated Financing Agreement, the Amended ICO Financing Agreement, the New EIB Financing Agreement, the Contingent Guarantee Claims and the New Guarantee Facilities, the **"Post-Restructuring Instruments"**). The New Guarantee Facilities shall constitute new financing pursuant to Article 666 of the Insolvency Act.

**5.3.5.** The Intragroup Loans shall be amended by way of a non-extinguishing novation in order to extend their final maturity date to 1 January 2036, provide for the capitalisation of all interest accruing up to that final maturity date and subordinate them to the remainder of the Affected Debt. Likewise, any rights of recourse, reimbursement, recovery, indemnification or subrogation included in the Subordinated Debt Class pursuant to this Plan shall be subject to the same subordination regime applicable to that Class.

**5.3.6.** The Intercreditor Agreement shall be amended and, where applicable, amended and restated in accordance with Clause 5.5 and the Restructuring Term Sheet.

**5.3.7.** The Working Capital Financing Agreement and the extensions of the Existing Syndicated Factoring Agreement shall be entered into in accordance with Clause 6 and the Restructuring Term Sheet.







[Seal: Mr Andrés Domínguez Nafría – Notary Public of Madrid]

*Privileged and Confidential*

**5.3.8.** All Affected Agreements, including the Existing Guarantee Facilities, shall include direct or indirect change-of-control provisions linked to the Antolín family retaining its interest in the share capital of the Group, on terms substantially equivalent to those provided for in the Existing Syndicated Financing Agreement, the Existing ICO Financing Agreement, the Existing EIB Financing Agreements and the Existing Notes. The Restructured Companies undertake to execute, as part of the Restructuring Documents, such contractual amendments as may be necessary to implement this Clause 5.3.8.

**5.4. Security Granted in Connection with the Plan**

**5.4.1.** Without prejudice to Clause 5.5.1 below, the personal guarantees granted as security for the obligations arising under the Affected Agreements (the **"Existing Personal Guarantees"**), together with the Pledges over Antolín Irausa (collectively, the Existing Personal Guarantees and the Pledges over Antolín Irausa, the **"Existing Security"**), shall be ratified and amended on such terms as may be necessary so that they secure the obligations under the New Syndicated Financing Agreement, the Amended ICO Financing Agreement, the New Notes and the New EIB Financing Agreement.

**5.4.2.** The following additional security shall also be granted:

**(i)** the New First-Ranking ICA Security Interests, securing the obligations arising under the extensions of the Existing Syndicated Factoring Agreement and the Working Capital Financing Agreement—in both cases, insofar as they relate to obligations with recourse against the Group—the New Notes B, the New Guarantee Facilities and the claims held by the Affected Creditors holding Bank Debt that have elected the Alternative Bank Debt Treatment;

**(ii)** the Second-Ranking Account Pledge, securing the obligations arising under the New Notes B, the New Guarantee Facilities and the claims held by the Affected Creditors holding Bank Debt that have elected the Alternative Bank Debt Treatment;

**(iii)** the New Second-Ranking ICA Security Interests and the Third-Ranking Account Pledge, securing the obligations arising under the New Notes A, the Contingent Guarantee Claims and the claims held by the Affected Creditors holding Bank Debt to which the Default Bank Debt Treatment applies;

41





*Privileged and Confidential*

**(iv)** the First-Ranking Account Pledge, securing the obligations arising under the Working Capital Financing Agreement and the extensions of the Existing Syndicated Factoring Agreement; and

**(v)** the New ICA Personal Guarantees, securing the obligations arising under the extensions of the Existing Syndicated Factoring Agreement and the Working Capital Financing Agreement—in both cases insofar as they relate to obligations with recourse against the Group—the Bank Debt following the Restructuring, the New Notes A, the New Notes B, the New Guarantee Facilities and the Contingent Guarantee Claims.

The New ICA Personal Guarantees, the New ICA Security Interests and the Account Pledges—except for the First-Ranking Account Pledge pursuant to Clause 5.5.7—shall be subject to the terms and conditions of the Intercreditor Agreement, as amended pursuant to Clause 5.5 below.

**5.4.3.** Furthermore, subject to the agreed security principles set out in the Existing Notes, the Existing Syndicated Financing Agreement, the Existing ICO Financing Agreement and the Existing EIB Financing Agreements, Antolín Irausa shall:

**(i)** undertake to create a pledge over the shares or equity interests in the Group's subsidiaries incorporated in India if such companies account for 5.0% of the Group's consolidated EBITDA:

**(a)** on a first-ranking basis, securing the obligations arising under the New Notes B, the extensions of the Existing Syndicated Factoring Agreement, the New Guarantee Facilities and the claims held by the Affected Creditors holding Bank Debt that have elected the Alternative Bank Debt Treatment; and

**(b)** on a second-ranking basis, securing the obligations arising under the New Notes A, the Contingent Guarantee Claims and the claims held by the Affected Creditors to which the Default Treatments apply; and

**(ii)** undertake to create a pledge over any material agreements whose expected annual profitability may reasonably represent, over the entire life of the project, more than 2% of the Group's consolidated EBITDA, the receivables under which are capable of being

42





[Seal: Mr Andrés Domínguez Nafría – Notary Public of Madrid]

*Privileged and Confidential*

capable of being pledged, subject to a cost-benefit analysis and provided that such pledge is legally permitted and does not require notice to or the consent of the counterparty or any third party, and which are not subject to the extensions of the Existing Syndicated Factoring Agreement or the Working Capital Financing Agreement, as security for the obligations arising under the New Notes B, the New Guarantee Facilities, the extensions of the Existing Syndicated Factoring Agreement, the Working Capital Financing Agreement and the claims held by the Affected Creditors holding Bank Debt that have elected the Alternative Bank Debt Treatment.

**5.4.4.** The effects of this Restructuring Plan shall be extended to the Pledges over Antolín Irausa pursuant to Article 652.2 of the Insolvency Act, since enforcement of such security would necessarily result in the insolvency of Antolín HoldCo, as pledgor, and of the remaining Restructured Companies. For these purposes, the extension of the effects of this Restructuring Plan to the Pledges over Antolín Irausa is based on the proven satisfaction of the three cumulative requirements laid down in Article 652.2 of the Insolvency Act:

**(i)** Antolín HoldCo and the Restructured Companies belong to the same group of companies within the meaning of Article 42 of the Commercial Code, since Antolín HoldCo is the direct parent company and sole shareholder of Antolín Irausa, which in turn heads the operating group comprising the remaining Restructured Companies, there being complete direct or indirect control satisfying the subjective requirement laid down by that provision;

**(ii)** Antolín HoldCo is neither a Restructured Company nor a debtor subject to this Plan and is therefore a group company not subject to the Restructuring Plan, having given its express consent to the Plan solely insofar as it concerns the extension of its effects to the Pledges over Antolín Irausa and the granting of the corresponding New ICA Personal Guarantee; and

**(iii)** enforcement of the Pledges over Antolín Irausa would necessarily cause the insolvency both of Antolín HoldCo, as pledgor, and of Antolín Irausa and the remaining Restructured Companies.

**5.4.5.** In particular, enforcement of the Pledges over Antolín Irausa would necessarily cause the insolvency both of Antolín HoldCo and of the Restructured Companies. As regards Antolín HoldCo, the shares in Antolín Irausa constitute substantially all of its assets. Accordingly, enforcement of the Pledges over Antolín Irausa would deprive Antolín HoldCo of any significant assets and leave it unable to meet its due and payable obligations, including those arising from its capacity as personal guarantor under the corresponding New ICA Personal Guarantee—which would become due and payable as a result of the change of control—and the tax liabilities that would arise from the termination of the tax consolidation group, thereby placing it in a state of insolvency within the meaning of Article 2.3 of the Insolvency Act. As regards Antolín Irausa and the remaining Restructured Companies,

43


CERTIFIED TRANSLATION



*Privileged and Confidential*

as a result of the enforcement of the Pledges over Antolín Irausa and the resulting change of control over Antolín Irausa, a cascading effect would be triggered, consisting of: **(a)** the termination of commercial agreements with the Group's principal customers, due to the triggering of the direct and indirect change-of-control clauses contained in various contractual terms; **(b)** the potential acceleration of the restructured financial liabilities as a consequence of the change of control; **(c)** the inability to meet commercial liabilities owed to suppliers and operating creditors as a result of the decline in revenue caused by the loss of the customer portfolio; and **(d)** the termination of the tax consolidation group and the consequent crystallisation of joint and several tax liabilities and potential supervening tax liabilities. All of the foregoing would inevitably result in the insolvency and the commencement of insolvency proceedings in respect of Antolín Irausa and the remaining Restructured Companies.

**5.4.6.** The extension of the effects of the Plan to the Pledges over Antolín Irausa is necessary to preserve the integrity of the Group as an economic unit, ensure the full effectiveness of the restructuring measures contemplated in this Plan and prevent the isolated enforcement of an intragroup security interest from frustrating the purpose of the Restructuring.

**5.4.7.** Antolín HoldCo acknowledges and consents to the extension of the Plan to the Pledges over Antolín Irausa.

**5.4.8.** The New ICA Guarantors firmly and irrevocably undertake to grant the New ICA Personal Guarantees, pursuant to which they shall become joint and several, irrevocable, unconditional, first-demand personal guarantors, and undertake to execute on the Closing Date any additional documents that may be necessary or advisable to give effect to such guarantees on the terms set out in this Plan and the Restructuring Documents.

**5.4.9.** Each New ICA Guarantor shall be jointly and severally liable, as a primary obligor, for the punctual and full payment of the obligations guaranteed by the New ICA Personal Guarantees, up to the maximum amount, if any, applicable under the relevant Restructuring Documents. The relevant Affected Creditors may demand payment upon first written demand once the guaranteed obligations have become due, liquid and payable, without the need for any prior demand, enforcement against the principal debtor, order, division, formal notice, judicial or arbitral declaration, or prior enforcement of any security interest or personal guarantee.

**5.4.10.** The obligations assumed by each New ICA Guarantor shall be continuing obligations and shall remain in full force and effect until the guaranteed obligations have been fully and irrevocably discharged, without being affected by any novations, extensions, forbearances,





[Seal: Mr Andrés Domínguez Nafría – Notary Public of Madrid]

*Privileged and Confidential*

amendments, refinancings, waivers, assignments, increases, substitutions or partial releases affecting the guaranteed obligations or any other security granted in connection therewith, unless the Affected Creditors expressly agree in writing to the relevant release. To the fullest extent permitted by applicable law, each New ICA Guarantor waives the benefits of order, prior enforcement against the principal debtor and division, as well as any other rights or defences that might limit, suspend or defer the enforceability of the New ICA Personal Guarantees, without prejudice to any defences arising exclusively from the full and irrevocable payment of the guaranteed obligations or from the non-existence, invalidity or unenforceability of those guaranteed obligations.

**5.4.11.** The Participating Creditors declare that the New First-Ranking ICA Security Interests and the New ICA Personal Guarantees, together with any other security that may be granted pursuant to the security-granting obligations under Clause 5.4.3 and any recovery arising under the Intercreditor Agreement, as amended in accordance with Clause 5.5, from which the Affected Creditors under the Existing ICO Financing Agreement benefit, shall be shared by them with the Affected Claims under the Existing ICO Financing Agreement following the Restructuring, in order to avoid any prejudice to the recovery of the guaranteed claim. Such sharing of security shall be implemented by reducing the ICO Tariff Guarantee in the proportion that the net proceeds of any future enforcement of the security, in relation to the guaranteed amount, bear to the aggregate amount of all liquid, due and payable debts of the Restructured Companies under the Amended ICO Financing Agreement. This shall be notified to the ICO at the appropriate time in accordance with the rules applicable to the ICO Tariff Guarantee, including the explanatory note dated 29 September 2022.

**5.5. Amendment of the Intercreditor Agreement**

**5.5.1.** Without prejudice to Clauses 5.4.1 and 5.4.2 above, part of the Restructuring shall be implemented by amending the payment waterfall set out in Clause 13.1 of the Intercreditor Agreement so as to provide, as one of the effects of this Plan, that any amount obtained from any payment or recovery in the circumstances contemplated in that Clause 13.1, including by way of set-off, distressed disposal or debt disposal, shall be applied, after payment of the relevant senior claims in accordance with the Intercreditor Agreement, as follows:

**(i)** with respect to any amount obtained from any payment or recovery in connection with the Pledges over Antolín Irausa, in accordance with the payment waterfall under the Intercreditor Agreement in force as at the Signing Date, as amended





*Privileged and Confidential*

solely for the purpose of including the payment obligations arising under the New Notes, the New Syndicated Financing Agreement, the Amended ICO Financing Agreement and the New EIB Financing Agreement, replacing the payment obligations arising under the Existing Notes, the Existing Syndicated Financing Agreement, the Existing ICO Financing Agreement and the Existing EIB Financing Agreements, respectively; and

**(ii)** with respect to any amount obtained from any payment or recovery in connection with the remaining Existing Security, the New ICA Personal Guarantees and the New ICA Security Interests:

**(a)** first, towards the payment obligations arising under the Working Capital Financing Agreement and the extensions of the Existing Syndicated Factoring Agreement, in both cases solely insofar as they relate to obligations with recourse against the Group;

**(b)** second, towards the Affected Claims of the Affected Creditors that have elected any of the corresponding Alternative Treatments, up to a maximum amount of EUR 435,000,000; and

**(c)** third, once the amount referred to in paragraph **(b)** above has been paid in full, towards the remaining Affected Claims subject to the Intercreditor Agreement, therefore excluding, among others, the Intragroup Loans, on a *pro rata* and *pari passu* basis, up to the amount of such payment obligations,

all in accordance with the Restructuring Term Sheet, as an act of implementation and execution of the Restructuring.

**5.5.2.** For the avoidance of doubt, the amendment of the payment waterfall provided for in the Intercreditor Agreement in relation to the guarantors of the Affected Debt—and, in particular, the Existing ICO Financing Agreement—constitutes an act implementing the effects of the Restructuring on the Affected Debt of those Restructured Companies, in accordance with this Restructuring Plan.

**5.5.3.** The maximum amount provided for in Clause 5.5.1(ii)(b) has been determined in accordance with the Group's capacity to grant priority of payment, whether directly or indirectly, subject to the contractual restrictions existing prior to the Restructuring under the Indentures, including, among other matters, the thresholds applicable to Restricted Payments, Permitted Investments and permitted asset disposals.

46


CERTIFIED TRANSLATION



[Seal: Mr Andrés Domínguez Nafría – Notary Public of Madrid]

*Privileged and Confidential*

**5.5.4.** BBVA, Sabadell, Banco Santander, CaixaBank and HSBC Spain, in their capacity as Original Participating Creditors that are also creditors under the Existing ICO Financing Agreement and have elected the Alternative Bank Debt Treatment, agree—and this shall be reflected in the agreement effecting the amendment by way of a non-extinguishing novation of the Intercreditor Agreement—to share with those creditors under the Existing ICO Financing Agreement that have not elected the Alternative Bank Debt Treatment any amount that they may receive on a priority basis, namely within the EUR 435 million amount described in Clause 5.5.1(ii)(b) above, as a result of any payment or recovery, including by way of set-off, arising from the distressed disposal or enforcement of the security granted by the Existing ICO Financing Guarantors. Such sharing shall be effected so that each creditor under the Existing ICO Financing Agreement receives or retains its pro rata participation in that agreement in respect of the amount jointly received on a priority basis by BBVA, Sabadell, Banco Santander, CaixaBank and HSBC Spain. Accordingly, no portion of the Existing ICO Financing Agreement shall be prejudiced, nor shall its security be economically impaired.

**5.5.5.** Accordingly, no Affected Claim under the Existing ICO Financing Agreement shall be prejudiced, nor shall the security securing it be economically impaired.

**5.5.6.** The Intercreditor Agreement shall also be amended to bring within its scope all Affected Debt instruments following the Restructuring, the Working Capital Financing Agreement and the extensions of the Existing Syndicated Factoring Agreement—in the latter two cases, insofar as they relate to obligations with recourse against the Group—and to adapt the acceleration and enforcement mechanisms applicable to the personal guarantees or security interests subject to the Intercreditor Agreement to this new scope of debt instruments governed by the Intercreditor Agreement, including the definition of **"Instructing Group"**, all in accordance with the Restructuring Term Sheet and as an act of implementation and execution of the Restructuring.

**5.5.7.** Notwithstanding the foregoing, the First-Ranking Account Pledge securing the Working Capital Financing Agreement and the extensions of the Existing Syndicated Factoring Agreement shall not be subject to the terms of the Intercreditor Agreement, as amended pursuant to this Clause 5.5.

**5.6. Interest and Fees Accrued under the Affected Agreements**

**5.6.1.** With respect to ordinary interest and fees under the Affected Agreements, excluding the Intragroup Loans, the Parties agree as follows:

47





*Privileged and Confidential*

**(i)** Ordinary interest and fees under the Affected Agreements shall continue to accrue up to and including the Effective Date and shall be payable in accordance with the terms and conditions then in force under each such Affected Agreement, without any turnover or reimbursement obligation provided for in the Intercreditor Agreement or any of the Affected Agreements applying to such payments.

**(ii)** If the Effective Date does not coincide with a scheduled ordinary interest or fee payment date under the respective Affected Agreements, an extraordinary settlement of ordinary interest and fees shall be made on the Closing Date for the period running from the most recent scheduled payment date up to and including the Effective Date. Such ordinary interest and fees shall be calculated in accordance with the terms and, where applicable, the interest rates applicable under the relevant Affected Agreements.

**(iii)** From, but excluding, the Effective Date, ordinary interest and fees relating to the Affected Debt shall accrue and be payable in accordance with the interest arrangements set out in the applicable Restructuring Documents.

**(iv)** The Affected Creditors expressly waive any right to claim from the Restructured Companies any break costs or equivalent amounts that might arise from the extraordinary settlement of interest contemplated in paragraph **(ii)** above or, more generally, from the interruption of the interest periods then in effect under the Affected Agreements as a result of the Restructuring Documents becoming effective.

**5.6.2.** The provisions of this Clause 5.6 relating to ordinary interest and fees shall under no circumstances apply to any principal instalments of the Affected Debt falling due from the Signing Date. Such principal instalments shall not be paid and shall instead be subject to the relevant Treatment, and no default interest shall accrue under the Affected Agreements in respect of those principal instalments.

**5.6.3.** Notwithstanding the foregoing, interest relating to the Intragroup Loans shall continue to accrue from the Signing Date, shall not be paid and shall be subject to the treatment set out in Clause 5.3.5.





[Seal: Mr Andrés Domínguez Nafría – Notary Public of Madrid]

*Privileged and Confidential*

**5.7. Claims Arising from the Existing Guarantee Facilities**

**5.7.1.** Reimbursement claims arising from the enforcement of guarantees already issued as at the Signing Date under the Existing Guarantee Facilities shall be subject to the Treatment applicable to the relevant Existing Guarantee Facility, and no default interest shall accrue under the Guarantee Facilities in respect of such claims from the Signing Date.

**6. EXTENSIONS OF THE EXISTING SYNDICATED FACTORING AGREEMENT AND WORKING CAPITAL FINANCING AGREEMENT**

The Group's viability depends on its ability to manage its working-capital requirements adequately. Working-capital financing instruments are an essential element of its business operations, insofar as they enable the Group to meet its current payment obligations, continue its ordinary commercial activities and preserve its relationships with suppliers, customers and other commercial counterparties.

The annual availability period provided for under the Existing Syndicated Factoring Agreement, with possible automatic renewals unless either party gives at least one month's prior notice of non-renewal, creates uncertainty that is incompatible with the Group's financing requirements during the implementation period of the Restructuring. Accordingly, unless the creditors under the Existing Syndicated Factoring Agreement decide otherwise, that instrument would mature on 23 January 2027.

In this context, it is essential that the Group have access to working-capital financing instruments suited to its operational requirements, providing stability over a time horizon of at least five years while remaining sufficiently flexible to adapt to the Group's business circumstances from time to time. The availability of these facilities is a necessary condition for the proper implementation of this Plan and the successful delivery of the Viability Plan.

The Working Capital Financing Agreement is structured as a multi-product facility comprising non-recourse factoring as the principal instrument for the advance financing of trade receivables, together with a revolving credit facility. By their very nature, these are banking products whose operation requires an efficient collections-management infrastructure. Accordingly, the institutions forming part of the Group's banking pool are the most suitable—and, in practice, the only viable—counterparties to participate in those instruments, particularly for a term as long as five years, which is exceptional for this type of financial product.

For the foregoing reasons, the Working Capital Financing Agreement contemplated in this Plan shall be entered into by institutions forming part of the Group's banking pool

49





*Privileged and Confidential*

Group, as they possess the necessary operational knowledge of the business, infrastructure for managing working-capital products, specialised technical expertise in this type of financial product and pre-existing commercial relationship with the Group required for the proper administration of these instruments. Furthermore, those banking institutions offer a degree of cooperation and operational flexibility characteristic of long-standing banking relationships, which is also reflected in their greater willingness to maintain their participation in the instrument, subject to the strict transfer restrictions set out in the Working Capital Financing Agreement.

As is customary, one of the conditions for entering into the Working Capital Financing Agreement is that it qualify as new financing pursuant to Article 666 of the Insolvency Act.

**6.1. Maintenance and Extensions of the Existing Syndicated Factoring Agreement from 23 January 2027**

**6.1.1.** The institutions participating in the Existing Syndicated Factoring Agreement that are Parties, whether as Original Participating Creditors or Acceding Creditors (the **"Purchasing Entities"**), acknowledge the essential nature of that instrument for the Group's operations and the continuation of its ordinary commercial activities. In recognition thereof, those institutions agree to maintain the Existing Syndicated Factoring Agreement in force by means of monthly extensions from 23 January 2027, the date on which the Existing Syndicated Factoring Agreement would otherwise mature, until the Working Capital Financing Agreement enters into force and becomes fully available, provided that no event of default under the Existing Syndicated Factoring Agreement occurs other than the effects of the Restructuring or any effects arising as a result thereof, its Court Approval or its implementation.

**6.1.2.** If, upon the maturity of the Existing Syndicated Factoring Agreement on 23 January 2027, the Working Capital Financing Agreement has not entered into force and become fully available, and provided that the two instruments do not operate concurrently, the Purchasing Entities shall automatically extend the availability of the Existing Syndicated Factoring Agreement on a monthly basis until the Working Capital Financing Agreement enters into force, thereby ensuring continuity in meeting the Group's working-capital requirements during the implementation of the Restructuring (such extensions, the **"Extensions of the Existing Syndicated Factoring Agreement"**).

**6.1.3.** The Extensions of the Existing Syndicated Factoring Agreement shall constitute interim financing or new financing, as applicable, pursuant to Articles 665 and 666 of the Insolvency Act, which is an essential condition for their granting. A further condition for the Extensions of the Existing Syndicated Factoring Agreement shall also be

50





[Seal: Mr Andrés Domínguez Nafría – Notary Public of Madrid]

*Privileged and Confidential*

subject to payment of the insurance premium by Antolín Irausa, maintenance of the relevant coverage, the granting of the security contemplated in the Plan, and all three institutions participating in the Existing Syndicated Factoring Agreement being Participating Creditors or otherwise having authorised the mechanism for extending the Existing Syndicated Factoring Agreement contemplated in this section.

**6.1.4.** Furthermore, any Extensions of the Existing Syndicated Factoring Agreement occurring after the Closing Date shall be secured by the First-Ranking Account Pledge, the New First-Ranking ICA Security Interests, the New ICA Personal Guarantees and any other security that may be granted pursuant to the agreed security principles set out in Clause 5.4.3, and shall benefit from the priority of payment established by the amendment of the Intercreditor Agreement contemplated in Clause 5.5.1, on the same terms as the Working Capital Financing Agreement.

**6.2. Execution of the Working Capital Financing Agreement**

On the Closing Date, the Restructured Companies and the Affected Creditors that elect the Alternative Bank Debt Treatment shall enter into the Working Capital Financing Agreement in accordance with the Restructuring Term Sheet.

**6.3. Terms of the Working Capital Financing Agreement**

**6.3.1.** The Working Capital Financing Agreement shall have the following characteristics:

**(i) Instrument:** A multi-product facility comprising non-recourse factoring and a revolving credit sub-facility, with the possibility of establishing an ancillary guarantee facility.

**(ii) Borrower under the New Working Capital Facility:** Antolín Irausa.

**(iii) New Working Capital Lenders:** Those institutions forming part of the Bank Debt that elect the Alternative Bank Debt Treatment, pro rata to their respective participation in the Bank Debt. Their participation in the Working Capital Financing Agreement shall be calculated by dividing their respective participation in the Bank Debt by the aggregate outstanding amount of the Bank Debt.

**(iv) Underwriting:** BBVA assumes an underwriting commitment in respect of the Working Capital Financing Agreement, pursuant to which it shall cover any subscription shortfall from the first euro exceeding EUR 15,000,000 up to the amount required to cover the maximum amount contemplated in paragraph **(viii)** below, namely up to EUR 205,000,000. Accordingly, the underwritten amount





*Privileged and Confidential*

by BBVA shall be reduced on a priority basis, euro for euro, by each amount committed by the New Working Capital Lenders, irrespective of the tranche or sub-tranche selected. BBVA's commitment is conditional upon Affected Creditors representing at least 65% of the Bank Debt electing the Alternative Bank Debt Treatment on the terms set out in this Plan. BBVA's underwriting commitment shall not apply to the sublimit of the revolving credit facility tranche.

**(v) Agent:** To be selected by the New Working Capital Borrower from a shortlist of three institutions to be provided by the New Working Capital Lenders.

**(vi) Purpose:** A stable and recurring financing instrument designed for the ordinary management of the Group's working capital through the advance financing of trade receivables against third parties and the availability of a revolving credit facility.

**(vii) Structure:** Working-capital financing in the form of non-recourse factoring, with credit insurance coverage whose cost shall not be borne by the Borrower, together with a revolving credit facility sub-tranche. At the discretion of the New Working Capital Borrower, that sub-tranche may include an ancillary guarantee facility, in each case subject to the consent of the relevant New Working Capital Lender from which it is requested.

**(viii) Maximum amount:** EUR 220,000,000. Aggregate exposure limit for the non-recourse factoring facility, with a sublimit of EUR 40,000,000 for the revolving credit facility sub-tranche, which Antolín Irausa may request from selected institutions willing to provide it. Any utilisation under either facility shall reduce the available amount on a euro-for-euro basis.

**(ix) Currency:** EUR and USD.

**(x) Maturity:** Until 4 August 2032, with a mechanism bringing forward the maturity date to 30 June 2030 if, on or before that date, the New Notes B have not been repaid, redeemed or refinanced, or the Restructured Companies have not evidenced binding commitments for their refinancing.

**(xi) Availability:** Revolving within the overall limit. Limits and sublimits under all facilities may be reused as transactions are repaid or cancelled. Utilisations shall be made on a *pro rata* basis among the New Working Capital Lenders from time to time.







[Seal: Mr Andrés Domínguez Nafría – Notary Public of Madrid]

*Privileged and Confidential*

**(xii) Ordinary interest rate applicable to amounts utilised under the non-recourse factoring facility, payable monthly in arrears:** EUR: EURIBOR plus 0.60%; USD: SOFR plus 0.80%. The ordinary interest rate applicable to amounts utilised under the revolving credit facility shall be EURIBOR plus an annual margin of 1.25%.

**(xiii) Ancillary guarantee facility:** Financial terms equivalent to or more favourable than those applicable to the revolving sub-tranche.

**(xiv) Default interest rate:** The ordinary interest rate plus 2% per annum.

**(xv) Conditions precedent:** The effectiveness of the Working Capital Financing Agreement shall be subject to satisfaction of the following conditions:

**(a)** the Court Approval of this Plan becoming final and recognising the Working Capital Financing Agreement as new financing pursuant to Article 666 of the Insolvency Act, unless the Court Approval is granted on terms constituting a Termination Event under Clause 13.1.1 that has not been waived, in which case the condition precedent shall be deemed not to have been satisfied; and

**(b)** the issuance of an order by the competent United States bankruptcy court recognising the Restructuring Plan pursuant to Chapter 15 of Title 11 of the United States Code in respect of all the Restructured Companies, once such order has become final and no longer subject to appeal.

For the avoidance of doubt, no fees, expenses, costs, premiums or other charges shall accrue or become payable under the Working Capital Financing Agreement until the conditions to availability set out in this paragraph **(xv)** have been satisfied.

**(xvi) Specific terms of the non-recourse factoring facility:**

**(a)** the assignment without recourse of eligible receivables in accordance with the contractual documentation and, in particular, on terms identical to those of the defined term **"Eligible Receivable"** set out in the Existing Syndicated Factoring Agreement.

**(b) Advance:** Up to 95% of the approved nominal amount of each assigned receivable, in accordance with the terms of the Existing Syndicated Factoring Agreement.


CERTIFIED TRANSLATION



*Privileged and Confidential*

**(c) Assignment fee:** 0.05% of the amounts advanced under the non-recourse factoring facility.

**(d) Limited recourse events:** Commercial disputes, fraud and other circumstances customary in the market for this type of product, as well as circumstances relating to the collection-management function delegated to the customer, including payments received by the assignor or the subsidiary that originally held the assigned receivables and not remitted to the New Working Capital Lenders; set-offs made by the debtors; and any other circumstances in which, pursuant to the agreement and subject to the corresponding security, recourse against the Group is permitted where the assigned debtors make payments to the Group notwithstanding the assignment of the receivables.

(xvii) General fees:

**(a) Commitment fee:** 0.50% per annum, payable on the undrawn portion of the amount available under the Working Capital Financing Agreement.

**(b) Structuring fee:** 0.34% per annum on the total amount contemplated in paragraph **(viii)** above, with the first payment due on the date of the first utilisation of any of the instruments contemplated in the Working Capital Financing Agreement and annually thereafter.

**(xviii)** Customers whose trade receivables are subject to advance financing shall be notified only in the event of delays in payment, and Antolín Irausa undertakes to provide its full cooperation in preparing and sending such notices.

**(xix) Representations:** Representations customary for working-capital debt instruments of this type shall be included.

**(xx) Undertakings:** Affirmative and negative undertakings customary for working-capital debt instruments of this type shall be included. The financial covenants shall be the same as those applicable under the New Syndicated Financing Agreement.

**(xxi) Events of default:** Subject to the applicable cure periods and waivers, the events customary for debt instruments of this type and similar instruments, including:

**(a)** non-payment.


CERTIFIED TRANSLATION





[Seal: Mr Andrés Domínguez Nafría – Notary Public of Madrid]

*Privileged and Confidential*

**(b)** a change of control on terms equivalent to those set out in the Existing Syndicated Financing Agreement, the Existing ICO Financing Agreement and the Existing EIB Financing Agreements, including, without limitation, any change in the direct or indirect ownership, control or voting rights of Antolín Irausa, or any agreement or arrangement having the effect of transferring *de facto* control over the management of Antolín Irausa, or over all or substantially all of its assets or operations, to a third party. A change of control may constitute a mandatory prepayment event at the request of the New Working Capital Lenders;

**(c)** any material breach of representations or undertakings;

**(d)** any duly established actual or imminent insolvency event;

**(e)** cross-default in the event of non-payment, subject to an applicable threshold, and cross-acceleration in respect of all other obligations under the New Notes, the New Syndicated Financing Agreement, the Amended ICO Financing Agreement, the New Guarantee Facilities and the New EIB Financing Agreement; and

**(f)** the commencement by the Restructured Companies of discussions or negotiations concerning a potential debt restructuring with creditors other than the New Working Capital Lenders.

**(xxii) Security and priority of payment:**

**(a) Security:** The First-Ranking Account Pledge, the New First-Ranking ICA Security Interests and the New ICA Personal Guarantees.

**(b) Priority of payment:** Under the new Intercreditor Agreement, as amended pursuant to Clause 5.5, the Working Capital Financing Agreement, insofar as it relates to obligations with recourse against the Group, shall rank in priority to all new Affected Debt instruments on the terms set out in Clause 5.5.1.

**(xxiii) Decision-making:** Decisions shall be adopted by a majority representing two thirds of the maximum available amount under the Working Capital Financing Agreement (the **"Majority New Working Capital Lenders"**). The following matters shall require the unanimous consent of the New Working Capital Lenders: any amendment to the amounts, maturity dates, interest rates, currency or security package.

55


CERTIFIED TRANSLATION



*Privileged and Confidential*

**(xxiv) Transfers:** The New Working Capital Lenders may not assign, transfer or sub-participate all or any part of their rights or obligations without the prior consent of the New Working Capital Borrower, except: **(i)** in favour of a credit institution that, in the ordinary course of its business, expressly and regularly offers products of this type, has proven experience in managing them and assumes the corresponding obligations and operational functions under the Working Capital Financing Agreement; or **(ii)** if a default under the Working Capital Financing Agreement has occurred, in which case the transfer shall be unrestricted.

**(xxv) Replacement mechanism:** The New Working Capital Borrower shall have the right to replace any New Working Capital Lender that does not consent to an amendment or waiver approved by the Majority New Working Capital Lenders or that fails to comply with its funding obligations.

**(xxvi) Governing law:** General Spanish law.

**(xxvii) Exclusive jurisdiction:** The courts of the City of Madrid, Spain.

## 7. ACCESSION OF AFFECTED CREDITORS DURING THE ACCESSION PERIOD

**7.1.** Pursuant to the Invitation and Clause 4.2 above, during the Accession Period the relevant Affected Creditors may vote in favour of this Restructuring Plan and express their intention to accede to it, without requiring any consent or agreement from the Original Participating Creditors or the Restructured Companies, which expressly accept the possibility of Affected Creditors acceding to this Plan on the terms set out in this Clause 7.

**7.2.** By acceding to this Plan, the Acceding Creditors undertake, among other matters, to become parties to the relevant Restructuring Documents to be executed on the Closing Date in accordance with this Plan.

**7.3.** Without prejudice to Clause 7.4 below in relation to the Notes, the accession of any relevant Affected Creditor shall be formalised before a Spanish notary public by means of a unilateral deed of accession substantially in the form attached as **Annex X**, a copy of which, in PDF format, the Acceding Creditor shall send as soon as possible and, in any event, within two Business Days following the date of its execution, to the Restructuring Agent at the following email address: projectaxle@glas.agency.

**7.4.** Pursuant to the terms of the Invitation, those Affected Creditors holding Existing Notes that qualify as Eligible Noteholders who





[Seal: Mr Andrés Domínguez Nafría – Notary Public of Madrid]

*Privileged and Confidential*

intend to accede to this Restructuring Plan must notify the Restructuring Agent of their intention during the Accession Period. By giving such notice, the Eligible Noteholders give their consent and irrevocably instruct the Restructuring Agent, in accordance with the voting form attached to the Invitation, to execute this Restructuring Plan in their name and on their behalf—or otherwise notify their support to the extent legally required—on the Signing Date, or to execute during the Accession Period the deed of accession contemplated in Clause 7.3, so that the Restructuring may receive Court Approval pursuant to Articles 635 et seq. of the Insolvency Act.

**7.5.** For the avoidance of doubt, a Non-Participating Creditor shall become bound by the arrangements agreed in the Plan, whether favourable or adverse to its interests, as a result of any extension of effects ordered, where applicable, by the Court Approval Order.

**7.6.** Affected Creditors that, in accordance with the mechanisms contemplated in the preceding paragraphs, have executed this Plan on the Signing Date or acceded to it pursuant to this Clause 7 shall acquire the status of Participating Creditors and shall assume all rights and obligations arising from that status under this Plan and the relevant Restructuring Documents.

**7.7.** In connection with the Eighth Additional Provision of Law 16/2022 and the other implementing regulations, the execution of this Plan by the Original Participating Creditors, as well as the accession to the Plan by the Affected Creditors under the Existing ICO Financing Agreement pursuant to this Clause 7, shall be deemed to have been made solely in respect of the portion of their Affected Claim not covered by the ICO Tariff Guarantee, unless and from such time as they expressly state otherwise. In this regard, the Original Participating Creditors declare that they shall exercise their vote in respect of the portion of their Affected Claim covered by the ICO Tariff Guarantee after the execution of this Plan and, in any event, within the established Accession Period.

## 8. COURT APPROVAL AND EXTENSION OF EFFECTS

### 8.1. Court Approval as an Essential Condition of the Restructuring

**8.1.1.** The Parties expressly state that it is an essential condition of the Restructuring, without which they would not have agreed to execute this Restructuring Plan, that all Affected Creditors, whether consensually—by executing or acceding to this Plan—or pursuant to Court Approval, in respect of all the Restructured Companies,





*Privileged and Confidential*

become parties to the Restructuring Plan and the relevant Restructuring Documents.

**8.1.2.** Accordingly, the Restructured Companies and the Participating Creditors agree that this Restructuring Plan must receive Court Approval pursuant to Articles 635 et seq. of the Insolvency Act for the purposes set out in Clause 8.2.

**8.1.3.** Each Party undertakes to execute all necessary documents and take all actions that may be reasonably necessary or advisable to obtain Court Approval of this Restructuring Plan and to support, facilitate, implement, consummate or otherwise give effect to the Restructuring and the Court Approval.

### 8.2. Application for Court Approval

**8.2.1.** Pursuant to Article 635 of the Insolvency Act, the Restructured Companies undertake to file the Application for Court Approval with the Competent Court for the following purposes:

**(i)** pursuant to Article 635.1º of the Insolvency Act, to extend the binding effects of the full and complete contents of this Restructuring Plan and the other relevant Restructuring Documents to the Non-Participating Creditors in respect of the claims held by them;

**(ii)** for the purposes of Articles 635.3º and 667 of the Insolvency Act, and given that the Affected Claims represent at least fifty-one per cent (51.00%) of the total liabilities of each Restructured Company, except Grupo Antolin South Africa (PTY) Ltd. and Grupo Antolin Logistik Deutschland GmbH, to protect all acts and legal transactions carried out to implement the Restructuring, including, without limitation, the following:

**(a)** the Restructuring of the Affected Debt, including, without limitation: **(i)** the amendment of the Bank Debt by way of a non-extinguishing novation; **(ii)** the issuances of the New Notes; **(iii)** the exchange of the Existing Notes for such New Notes and the cancellation of the Existing Notes in accordance with the Consent Solicitation; **(iv)** the New Guarantee Facilities; and **(v)** the amendment of the Intercreditor Agreement by way of a non-extinguishing novation, as described in Clause 5.5;

**(b)** the Extensions of the Existing Syndicated Factoring Agreement;





[Seal: Mr Andrés Domínguez Nafría – Notary Public of Madrid]

*Privileged and Confidential*

**(c)** the Working Capital Financing Agreement; and

**(d)** ensuring that any transaction, act, payment or security granted in implementation of the Plan cannot be subject to clawback actions in any potential insolvency proceedings;

**(iii)** to grant the Working Capital Financing Agreement, the Extensions of the Existing Syndicated Factoring Agreement and the New Guarantee Facilities the status of interim financing or new financing, as applicable, pursuant to Articles 665 and 666 of the Insolvency Act and, more specifically, the payment priorities contemplated in Articles 242.1.17º and 280.6º of the Insolvency Act in the hypothetical event that the Restructured Companies are subsequently declared insolvent;

**(iv)** for the purposes of Article 652.2 of the Insolvency Act, to extend the effects of the Restructuring Plan to the Pledges over Antolín Irausa; and

**(v)** should a jurisdictional objection be raised on the grounds that the Competent Court lacks jurisdiction in relation to the foreign Restructured Companies, and should that objection be upheld to the detriment of the Restructured Companies, to request, in the alternative, the application of Article 755 of the Insolvency Act, so that all the Restructured Companies shall in all circumstances remain subject to and protected by the Court Approval proceedings.

**8.2.2.** The Application for Court Approval shall include an authorised copy of the Restructuring Plan. In addition, the Application for Court Approval shall include the Majority Certificates issued by the Restructuring Expert and, where necessary, the Expert Valuation Report, all in accordance with Clause 11.

**8.2.3.** The Restructured Companies also undertake to send the following to the Restructuring Agent as soon as possible and, in any event, within two (2) Business Days following receipt thereof:

**(i)** copies of any orders and decisions issued by the Competent Court in connection with the Court Approval;

**(ii)** any material information concerning the progress of each procedural step, including, without limitation, the order admitting the Application for Court Approval for processing, any challenges submitted by the Non-Participating Creditors and any other matters relating to the proceedings and





*Privileged and Confidential*

approval of the Judicial Confirmation process that may be relevant to the agreements reached in the context of the Restructuring; and

(iii) evidence that the Judicial Confirmation Order has been published in the Public Insolvency Register, approving the terms requested in the Application for Judicial Confirmation, so that this Restructuring Plan and the other Restructuring Documents shall be binding upon the Non-Participating Creditors of all the Restructured Companies pursuant to Article 647 et seq. of the Insolvency Act.

### 8.3. Satisfaction of the Requirements for Judicial Confirmation

**8.3.1.** The Parties expressly acknowledge and agree, for all relevant purposes, that the Restructuring Plan satisfies the requirements laid down in Articles 638 and 639 of the Insolvency Act for the judicial confirmation of restructuring plans. In particular, the Parties hereby record that:

(i) the Restructured Companies are in a state of likelihood of insolvency, in accordance with Article 584.2 of the Insolvency Act, and the Restructuring Plan offers a reasonable prospect of avoiding insolvency proceedings and ensuring the viability of the Restructured Companies in the short and medium term;

(ii) this Restructuring Plan satisfies the content and formal requirements prescribed by the Insolvency Act, as detailed in Clauses 4 and 8.2;

(iii) this Restructuring Plan has obtained the requisite majority for its approval, as evidenced by the Majorities Certificate issued by the Restructuring Expert;

(iv) the claims included in each of the Classes have been treated on an equal basis; and

(v) the Restructuring Plan has been communicated to all Affected Creditors.

### 8.4. Extension of Effects to Non-Participating Creditors

**8.4.1.** In accordance with the foregoing, the Application for Judicial Confirmation shall request that the effects of this Restructuring Plan be extended to the Affected Debt held by the Non-Participating Creditors in respect of all the Restructured Companies, pursuant to Article 635.1 of the Insolvency Act, with effect from the Effective Date and in accordance with the provisions of this Restructuring Plan applicable to them.







[Seal: Mr Andrés Domínguez Nafría – Notary Public of Madrid]

*Privileged and Confidential*

**8.4.2.** The Application for Judicial Confirmation shall also include an express request to the Competent Court that, pursuant to Article 649 of the Insolvency Act, it declare that, as a consequence of the extension of effects, the Non-Participating Creditors shall automatically be bound, in respect of all the Restructured Companies, by the Restructuring Plan and the relevant Restructuring Documents and shall therefore be deemed, as a matter of law and contract, to be parties thereto for all purposes.

**8.5. Effects of Judicial Confirmation**

**8.5.1.** Once Judicial Confirmation has been granted, it shall be implemented in accordance with the terms set out in this Plan, and all the provisions established in the order approving such Judicial Confirmation shall apply fully and in their entirety to the Non-Participating Creditors with effect from the Effective Date, provided that this is stipulated in the Judicial Confirmation Order.

**8.5.2.** Following the issuance of the Judicial Confirmation Order by the Competent Court and once the Election Period has ended and the Closing Date has been determined in accordance with Clause 2.4.1(viii), the relevant documents and agreements required to implement the Restructuring shall be executed, with effect from the Effective Date.

**9. RECOGNITION PURSUANT TO CHAPTER 15 OF TITLE 11 OF THE UNITED STATES CODE**

**9.1.** Together with the Application for Judicial Confirmation, the Restructured Companies shall file the relevant petitions and an application for recognition of the Restructuring Plan pursuant to Chapter 15 of Title 11 of the United States Code.

**10. ASSIGNMENT**

**10.1. Assignment by the Affected Creditors**

**10.1.1.** Until the Closing Date, no Participating Creditor may sell, assign, pledge or otherwise dispose of any of its rights, transfer any of its rights or obligations in respect of, or declare or create any trust over any of its rights, title, interests or benefits in respect of, the Affected Agreements or this Restructuring Plan (each, an "**Assignment**") to, or in favour of, any person that is not already a Participating Creditor, unless each of the following conditions is satisfied:

61





*Privileged and Confidential*

(i) it is permitted under the Affected Agreements;

(ii) such person becomes unconditionally and irrevocably bound by this Restructuring Plan as though it had been a Participating Creditor under this Restructuring Plan, by executing the accession document in the form attached hereto as **Schedule X** (*mutatis mutandis*); and

(iii) the assignor notifies the Restructuring Agent of the Assignment, the name of the assignee, the amount involved and its effective date at least five (5) Business Days before the date on which it is intended to take effect. In turn, the Restructuring Agent shall notify the Restructured Companies, through Antolín Irausa, of the notice received no later than the Business Day following its receipt.

**10.1.2.** Any Participating Creditor that intends to carry out or settle—or take any equivalent action in respect of—an Assignment before the relevant assignee becomes bound by the terms of this Restructuring Plan in accordance with this Clause agrees that it shall remain a Participating Creditor and shall continue to be bound by its obligations and liabilities under this Restructuring Plan in respect of the purportedly assigned claims until the proposed assignee becomes bound by the terms of this Restructuring Plan in accordance with this Clause.

**10.2. Assignment by the Restructured Companies**

The Restructured Companies may not assign, transfer, substitute or subrogate any of the rights or obligations assumed under this Restructuring Plan without the prior express, written and unanimous consent of all the Participating Creditors.

**11. CONDITION PRECEDENT TO EFFECTIVENESS**

**11.1.** The Parties agree that the effectiveness, validity and effects of this Plan shall be subject to the satisfaction of the condition precedent consisting of the delivery by the Restructured Companies to the Notary Public before whom this Plan is executed of the relevant Majorities Certificates evidencing the following (the **"Condition Precedent to Effectiveness"**):

(i) that the Plan has been approved: (a) by all the Classes in accordance with Article 638 of the Insolvency Act; or, alternatively, (b) by a Class which, in accordance with the ranking of claims in insolvency proceedings, may reasonably be presumed to have received some payment following a valuation of each Restructured Company as a going concern (that is, that


CERTIFIED TRANSLATION



[Seal: Mr Andrés Domínguez Nafría – Notary Public of Madrid]

*Privileged and Confidential*

such Class is "in the money"), in accordance with Article 639.2 of the Insolvency Act; and

(ii) the Affected Debt corresponding to each Restructured Company (other than Grupo Antolin South Africa (PTY) Ltd. and Grupo Antolin Logistik Deutschland GmbH) represents at least 51% of the total liabilities of the relevant Restructured Company, in accordance with Article 667 of the Insolvency Act.

**11.2.** Satisfaction of the Condition Precedent to Effectiveness shall be evidenced by Antolín Irausa, in its capacity as agent for the Restructured Companies, sending an email from any of the addresses specified in **Schedule XI** to the following email addresses of the Notary Public before whom this Restructuring Plan is formalised as a public deed (or any person replacing him from time to time): andresdominguez@notariado.org and lruiz@notarialagasca88.com (with a copy to the email addresses of the Group's Legal Counsel: mlamo@ga-p.com; rlopez@ga-p.com; ffoix@ga-p.com; ldelclaux@ga-p.com; and projectaxle@ga-p.com; and to the Legal Counsel to the Original Participating Creditors: javier.castresana@aoshearman.com and oscar.guinea@aoshearman.com), attaching a copy of the Majorities Certificates for each Restructured Company and confirming satisfaction of the Condition Precedent to Effectiveness. Once satisfaction of the Condition Precedent to Effectiveness has been evidenced, Antolín Irausa, in its capacity as agent for the Restructured Companies, shall deliver to the officiating Notary Public the original Majorities Certificates and, where applicable, the Expert Valuation Report, for their incorporation by means of a notarial endorsement into the public deed formalising the Plan.

**11.3.** The Parties also expressly instruct and authorise the Notary Public officiating in respect of this Plan (or any person replacing him from time to time), who hereby accepts such instruction and authorisation, to record, once satisfaction of the Condition Precedent to Effectiveness has been evidenced to him in accordance with the terms set out above, such satisfaction by means of the appropriate notarial endorsement in the public deed by which this Agreement is formalised as a public deed pursuant to Clause 4.3, attaching the relevant Majorities Certificates and, where necessary, the Expert Valuation Report.

**11.4.** The Parties expressly request the Notary Public before whom this Restructuring Plan is formalised as a public deed (or any person replacing him from time to time), who hereby accepts such request, to give notice by email to the Restructuring Agent (at ProjectAxle@glas.agency and axel@glas.agency), the Legal Counsel to the Original Participating Creditors (at javier.castresana@aoshearman.com and oscar.guinea@aoshearman.com) and the Group's Legal Counsel (at mlamo@ga-p.com; rlopez@ga-p.com; ffoix@ga-p.com;





*Privileged and Confidential*

ldelclaux@ga-p.com and projectaxle@ga-p.com) of the satisfaction of the Condition Precedent to Effectiveness and, consequently, the entry into force of this Plan, so that notice thereof may immediately be given to the Parties.

**12. CONDITION PRECEDENT TO THE EFFECTIVE DATE**

**12.1.** The Parties agree that the Effective Date of the Plan shall be subject to satisfaction of the following condition precedent (the **"Effective Date Condition Precedent"**):

(i) the Competent Court having issued the Judicial Confirmation Order; and

(ii) the Restructuring Plan having been recognised pursuant to Chapter 15 of Title 11 of the United States Code, through the issuance by the competent United States bankruptcy court of a non-final order granting recognition of the Restructuring Plan in respect of all the Restructured Companies.

**12.2.** Satisfaction of the Effective Date Condition Precedent shall be evidenced by Antolín Irausa, in its capacity as agent for the Restructured Companies, sending an email from any of the addresses specified in **Schedule XI** to the following email addresses of the Notary Public before whom this Restructuring Plan is formalised as a public deed (or any person replacing him from time to time):

andresdominguez@notariado.org and lruiz@notarialagasca88.com (with a copy to the email addresses of the Group's Legal Counsel: mlamo@ga-p.com; rlopez@ga-p.com; ffoix@ga-p.com; ldelclaux@ga-p.com; and projectaxle@ga-p.com; and to the Legal Counsel to the Original Participating Creditors:

javier.castresana@aoshearman.com and oscar.guinea@aoshearman.com), confirming satisfaction of the Effective Date Condition Precedent and attaching copies of: (i) the non-final order of the competent United States bankruptcy court granting recognition of the Restructuring Plan pursuant to Chapter 15 of Title 11 of the United States Code; and (ii) the Judicial Confirmation Order.

**12.3.** The Parties also expressly instruct and authorise the Notary Public officiating in respect of this Plan (or any person replacing him from time to time), who hereby accepts such instruction and authorisation, to record, once satisfaction of the Effective Date Condition Precedent has been evidenced to him in accordance with the terms set out above, such satisfaction by means of the appropriate notarial endorsement in the public deed by which this Agreement is formalised as a public deed pursuant to Clause 4.3.

**12.4.** The Parties expressly request the Notary Public before whom this Restructuring Plan is formalised as a public deed (or any person replacing him from time to time), who hereby

64






[Seal: Mr Andrés Domínguez Nafría – Notary Public of Madrid]

*Privileged and Confidential*

accepts such request, to notify the Restructuring Agent (at ProjectAxle@glas.agency and axel@glas.agency), the Legal Counsel to the Original Participating Creditors (at javier.castresana@aoshearman.com and oscar.guinea@aoshearman.com) and the Group's Legal Counsel (at mlamo@ga-p.com; rlopez@ga-p.com; ffoix@ga-p.com; ldelclaux@ga-p.com; and projectaxle@ga-p.com), by email, of the satisfaction of the Effective Date Condition Precedent, so that the Restructuring Agent may immediately notify the Parties thereof.

**13. TERMINATION**

**13.1.1.** This Restructuring Plan may be terminated upon the occurrence of any of the following events (each, a **"Termination Event"**):

(i) a judgment is issued upholding a challenge and declaring the Restructuring Plan ineffective pursuant to Article 661.2 of the Insolvency Act;

(ii) a judgment is issued in connection with a challenge ordering that the effects of the Restructuring Plan not be extended to one or more Affected Creditors holding, jointly or individually, Affected Debt in an amount equal to or greater than €50,000,000;

(iii) a judgment is issued in connection with a challenge ordering that the effects of the Restructuring Plan not be extended to one or more Affected Creditors holding, jointly or individually, Affected Debt in an amount equal to or greater than €25,000,000 but less than €50,000,000;

(iv) any judgment, order or other ruling is issued that wholly or partially sets aside the order of the competent United States bankruptcy court granting recognition of the Restructuring Plan pursuant to Chapter 15 of Title 11 of the United States Code; or

(v) Judicial Confirmation is not granted on terms substantially consistent with those contemplated in paragraphs (i) to (iv) of Clause 8.2.1, including, without limitation, where the Judicial Confirmation Order contains any ruling, omission, condition, reservation, limitation or qualification affecting any of those paragraphs, or where any of the Restructured Companies is excluded from the Judicial Confirmation.

**13.1.2.** The Restructured Companies undertake to notify the Restructuring Agent of the occurrence of any Termination Event as soon as they become aware thereof and, in any event, no later than 24 hours after becoming so aware.


CERTIFIED TRANSLATION


Tradux USA CORP

26-11679-sab   Doc 2   Filed 07/20/26   Entered 07/20/26 19:17:04   Main Document
Pg 273 of 478

*Privileged and Confidential*

Likewise, the Restructuring Agent shall notify all Participating Creditors within the same maximum period of 24 hours.

**13.1.3.** The Termination Events set out in Clauses 13.1.1(i) and 13.1.1(ii) above shall result in the automatic termination of the Restructuring Plan, without the need for any further declaration or action by any of the Parties and without the possibility of waiver.

**13.1.4.** The Termination Events set out in Clauses 13.1.1(iii), 13.1.1(iv) and 13.1.1(v) above shall result in the automatic termination of the Restructuring Plan, without the need for any further declaration or action by any of the Parties, once ten (10) Business Days have elapsed from the date on which the Restructuring Agent notified the Participating Creditors thereof, unless the Restructuring Agent has received a waiver approved by the Majority of Participating Creditors, for the calculation of which the Intragroup Loans shall be excluded from both the numerator and the denominator.

**13.1.5.** Where the Termination Event arises because the Working Capital Facility Agreement, the Extensions of the Existing Syndicated Factoring Facilities or the New Guarantee Facilities have not been granted the payment priorities contemplated in Article 242.1.17 and Article 280.6 of the Insolvency Act, in the hypothetical event that the Restructured Companies are subsequently declared subject to insolvency proceedings, such Termination Event may be waived only with the unanimous consent of the holders of the relevant instrument that was excluded.

**13.1.6.** If the Restructuring Plan is terminated in accordance with Clause 13.1.2, the terms and conditions applicable to the Affected Claims shall be the same as those applicable prior to the Effective Date.

**13.1.7.** For the purposes of the foregoing, the Restructuring Agent, subject to the prior approval of the Majority of Participating Creditors and the Restructured Companies, acting through Antolín Irausa, is hereby instructed to send a notice to the Affected Creditors and to the Notary Public before whom this Restructuring Plan is formalised as a public deed, or any person replacing him from time to time, informing them of the termination of the Restructuring Plan in accordance with Clause 13.1.2.

**13.1.8.** The Parties request the Notary Public before whom this Restructuring Plan is formalised as a public deed, or any person replacing him from time to time, who hereby accepts such request, in the event that he is notified that the Plan has been terminated in accordance with Clause 13.1.7, to record such termination in the public deed formalising this Plan by means of a notarial endorsement, which shall include a statement of the

66


CERTIFIED TRANSLATION



[Seal: Mr Andrés Domínguez Nafría – Notary Public of Madrid]

*Privileged and Confidential*

termination and that, consequently, this Plan and the other instruments and agreements entered into pursuant thereto are terminated.

**13.1.9.** Furthermore, should the Plan be declared terminated, the Parties undertake to reverse or unwind, as soon as possible, all actions taken in connection therewith and shall be required to execute any public or private documents necessary for such purposes.

## 14. REPRESENTATION OF THE PARTIES

### 14.1. Representative of the Restructured Companies

**14.1.1.** The Restructured Companies hereby irrevocably appoint Antolín Irausa as their representative, agent and attorney for the purposes of this Plan and the other Restructuring Documents, and expressly authorise it, acting through its corporate bodies and attorneys-in-fact, to carry out all actions assigned to the Restructured Companies under this Plan and the other Restructuring Documents, including where this may involve self-dealing, multiple representation or a conflict of interest.

**14.1.2.** In particular, but without limitation, Antolín Irausa may take any of the following actions in the name and on behalf of the Restructured Companies:

(i) issue and receive any notices and communications arising from this Plan and the other Restructuring Documents, and provide the Restructuring Agent and, where applicable, the Participating Creditors with any documents and information required to be supplied pursuant to the Restructuring Documents, acting as the sole point of contact with the Restructuring Agent and the other Creditors for all purposes contemplated in the Restructuring Documents;

(ii) issue instructions, make decisions and grant its consent to any actions necessary for the implementation and performance of this Plan and the other Restructuring Documents, whether or not expressly contemplated therein; and

(iii) execute and formalise any documents ancillary, supplementary or related to this Plan and the other Restructuring Documents that may be necessary, and shall be expressly authorised to ratify, clarify and agree amendments thereto;





*Privileged and Confidential*

(iv) generally, execute any public or private document and take any action that may be necessary or advisable in connection with the implementation and performance of this Plan and the other Restructuring Documents.

**14.1.3.** The foregoing shall be without prejudice to the performance by the Restructured Companies of the obligations assumed under this Plan and the other Restructuring Documents.

**14.1.4.** By virtue of the provisions of the preceding paragraph, any notice, communication, action, omission, undertaking, transaction, waiver, amendment, clarification or other action carried out by Antolín Irausa pursuant to the authority granted to it by the Restructured Companies shall be legally binding upon those Restructured Companies for all purposes as though expressly executed, consented to or agreed by them. The Restructured Companies also represent to the Creditors that, in the event of any conflict between any notices or other actions of Antolín Irausa and those of any other Restructured Company, those issued or taken by Antolín Irausa shall prevail.

**14.1.5.** The Restructuring Agent, acting on its own initiative or at the request of any Participating Creditor, may request all the Restructured Companies, provided that it gives adequate reasons and justification, to ratify any actions taken by Antolín Irausa in its capacity as representative and sole point of contact of the Restructured Companies for the purposes of this Plan and the other Restructuring Documents, and to execute, jointly with Antolín Irausa, any agreement or document, whether public or private, arising from this Plan or the other Restructuring Documents, including, without limitation, any document clarifying, ratifying or amending the foregoing.

**14.2. Restructuring Agent**

**14.2.1.** The Restructured Companies appoint GLAS Specialist Services Limited to act as Restructuring Agent in connection with this Plan and the other Restructuring Documents in respect of all matters applicable thereto. GLAS Specialist Services Limited accepts such appointment.

**14.2.2.** Pursuant to this Plan, the Original Participating Creditors and the Acceding Creditors grant the Restructuring Agent a power of representation to act as the irrevocable special attorney-in-fact of the Affected Creditors, including the Non-Participating Creditors once they become bound by this Plan, for all purposes set out in this Plan and the other Restructuring Documents, and the Restructuring Agent shall

68







[Seal: Mr Andrés
Domínguez Nafría –
Notary Public of
Madrid]

*Privileged and Confidential*

be vested with all the authority and powers necessary for the performance of its duties.

**14.2.3.** Without prejudice to Clauses 14.2.5 and 14.2.6, the Restructuring Agent shall act as agent and representative of each of the Affected Creditors (including the Non-Participating Creditors once they become bound by this Plan) and is hereby authorised, on behalf of each of them, to enter into agreements, enforce their rights and represent each such Affected Creditor (once it becomes bound by this Plan) in connection with the execution of any public or private document necessary or advisable to implement the Restructuring or carry out any actions arising therefrom.

Each Affected Creditor appoints the Restructuring Agent, which accepts such appointment, as its attorney-in-fact and hereby grants it an irrevocable power of representation and authorises the Restructuring Agent, expressly waiving any self-dealing, conflict of interest or multiple representation that may arise, to:

(i) act in its name and, where required by applicable law or otherwise appropriate, in its name and on its behalf, without the need to refer to any other person or obtain any further authorisation, in connection with the acceptance, preparation, signing, execution and formalisation, whether privately or by public instrument, of any of the Restructuring Documents pursuant to this Restructuring Plan; and

(ii) accept, in its capacity as representative, any guarantee, mortgage, pledge or other security interest, including any rights of pledge, mortgage, assignment or transfer of title by way of security, granted in favour of that Affected Creditor in connection with the Restructuring Documents.

**14.2.4.** Without prejudice to Clause 14.2.15, in connection with the ratification, clarification, amendment and/or novation of this Restructuring Plan, the Restructuring Agent shall act as agent and representative of each of the Affected Creditors and is hereby authorised, on behalf of each of them, to enter into agreements, enforce their rights and represent each such Participating Creditor in connection with the execution of any public instrument for the ratification, clarification or novation, as applicable, of this Restructuring Plan.

**14.2.5.** If any Participating Creditor is unable to grant the Restructuring Agent all or any part of the powers of representation referred to herein, it expressly and irrevocably undertakes to:


CERTIFIED TRANSLATION



*Privileged and Confidential*

(i) upon execution of this Restructuring Plan, grant a specific notarised power of representation in favour of the Restructuring Agent for the purpose of carrying out the actions contemplated in this Clause 14.2; or

(ii) appear in person together with the Restructuring Agent at the place or places and at the time notified by the Restructuring Agent to the Participating Creditor, for the purpose of carrying out any actions and measures contemplated in this Clause 14.2 that may be necessary, or ratify as soon as possible any actions taken by the Restructuring Agent.

**14.2.6.** For these purposes, BBVA, BBVA USA, Banco Sabadell, Banco Santander and CaixaBank expressly state that they do not grant the special power of representation contemplated in this Clause 14.2 and undertake instead to appear in person for the execution and formalisation of any public or private documents arising from this Plan and the other Restructuring Documents, or otherwise necessary or advisable in the context of the Restructuring according to their individual judgment, in each case acting in good faith.

**14.2.7.** Among its other duties, the Restructuring Agent shall coordinate the receipt and processing of the various documents relating to the implementation of the Restructuring, including any Election Request completed by the relevant Affected Creditor and, where applicable, the delivery of such documents to the Restructured Companies and the Notary Public for their incorporation into this Restructuring Plan by means of a certified notarial copy or notarial endorsement.

**14.2.8.** In the absence of manifest error, the Restructuring Agent's determination in relation to any reconciliations and calculations, as applicable, shall be final and may not be challenged by any of the Parties.

**14.2.9.** The Restructuring Agent shall provide any Affected Creditor under the Existing Notes with such information concerning the reconciliations and calculations referred to above as that person may reasonably request for the purpose of reviewing and verifying them.

**14.2.10.** For the purpose of carrying out the reconciliations and calculations referred to above, the Restructuring Agent and/or Antolín Irausa may request, and the relevant Affected Creditor under the Existing Notes shall provide, such evidence as the Restructuring Agent and/or Antolín Irausa may reasonably require, in form and substance reasonably satisfactory to the Restructuring Agent and/or Antolín Irausa, as applicable.


CERTIFIED TRANSLATION



[Seal: Mr Andrés Domínguez Nafría – Notary Public of Madrid]

*Privileged and Confidential*

**14.2.11.** Each Party agrees that, for the purposes of (a) any reconciliation or calculation, or (b) the performance of any other obligation or function by the Restructuring Agent under this Restructuring Plan, the Restructuring Agent may:

(i) rely on the amount of the Affected Claims stated in the documentation submitted pursuant to the relevant Consent Solicitation by each Affected Creditor under the Existing Notes, duly completed and executed by the Participating Creditor pursuant to this Restructuring Plan, and assume that the amount or amounts of the Affected Claims stated therein represent the total amount of the Affected Claims held by, or owed to, that Affected Creditor;

(ii) rely on the claims held by the Affected Creditors under the Existing Syndicated Facility Agreement and the Existing ICO Facility Agreement, as recorded in the registers maintained by the facility agents and security agents under the Existing Syndicated Facility Agreement and the Existing ICO Facility Agreement and provided to the Restructuring Agent;

(iii) rely on the amount outstanding under each of the Existing Notes as notified by Antolín Irausa, in its capacity as issuer, and/or any of its agents;

(iv) assume that each Participating Creditor that has provided information regarding its Affected Claims and expressed its intention to enter into and perform this Restructuring Plan is authorised to execute, and has duly executed, the relevant documents; and

(v) base all calculations and confirmations on the amount of the relevant Affected Claims.

**14.2.12.** Each Affected Creditor, including the Non-Participating Creditors once they become bound by this Plan, irrevocably and unconditionally instructs the Restructuring Agent to immediately execute and deliver, formalise as public instruments where required under the terms of this Restructuring Plan, take all necessary steps and perform the Restructuring Agent's obligations under each of the Restructuring Documents to which it is a party, for the purpose of implementing the Restructuring.

**14.2.13.** The Restructuring Agent is a party to this Agreement for the purpose of receiving the instructions set out herein, and its role under this Restructuring Plan is purely mechanical and administrative in nature.

71





*Privileged and Confidential*

**14.2.14.** The Restructuring Agent shall promptly forward to the intended recipient Party the original or a copy of any documents delivered to the Restructuring Agent by the sending Party for that intended recipient Party.

**14.2.15.** The Restructuring Agent shall not take any action pursuant to this Clause 14 in relation to any Restructuring Document that is materially inconsistent with this Restructuring Plan, including its Schedules, taken as a whole, and shall be entitled to refrain from taking any action in the event of any uncertainty or conflict, in which case it shall seek instructions from the Participating Creditors.

**14.2.16.** Without limiting Clause 14.2.17 below, and without prejudice to any other provision of any Restructuring Document excluding or limiting the liability of the Restructuring Agent, the Restructuring Agent shall not be liable, except where caused by its wilful misconduct or gross negligence, for:

(i) any damages, costs or losses suffered by any person, any diminution in value or any liability of any nature arising from the taking or failure to take any action under or in connection with any Restructuring Document;

(ii) the exercise or non-exercise of any right, power, authority or discretion vested in it by or in connection with any Restructuring Document or any other contract, agreement or document entered into, executed or delivered in contemplation of, pursuant to or in connection with any Restructuring Document; or

(iii) without prejudice to the generality of paragraphs (i) and (ii) above, any damages, costs or losses suffered by any person, any diminution in value or any liability of any nature arising from:

(a) any act, event or circumstance not reasonably within its control; or

(b) the general risks associated with investing in, or holding assets in, any jurisdiction,

including, in each case and without limitation, any such damages, costs, losses, diminution in value or liability arising from nationalisation, expropriation or other governmental action; any regulation, foreign-exchange restriction, devaluation or fluctuation; market conditions affecting the execution or settlement of transactions or the value of assets; or any breakdown, failure or malfunction of

72


CERTIFIED TRANSLATION



[Seal: Mr Andrés Domínguez Nafría – Notary Public of Madrid]

*Privileged and Confidential*

any third-party transportation, telecommunications or computer service or system; natural disasters or events of force majeure; war, terrorism, insurrection or revolution; or strikes or labour disputes.

**14.2.17.** No Party other than the Restructuring Agent may commence any proceedings against any officer, employee or agent of the Restructuring Agent in respect of any claim that it may have against the Restructuring Agent or in respect of any act or omission of any nature by such officer, employee or agent in connection with any Restructuring Document, and any officer, employee or agent of the Restructuring Agent may rely on this Clause 14.2.17. The foregoing shall be without prejudice to the liability of the Restructuring Agent for any wilful misconduct or gross negligence of the persons referred to in this Clause.

**14.2.18.** The Restructuring Agent shall not be liable for any delay, or any consequences arising therefrom, in crediting any amount that is required to be paid by the Restructuring Agent pursuant to the Restructuring Documents, provided that the Restructuring Agent has taken all necessary steps as soon as reasonably practicable to comply with the rules or operating procedures of any recognised clearing or settlement system used by the Restructuring Agent for that purpose.

**14.2.19.** Nothing in this Plan shall require the Restructuring Agent to carry out:

(i) any know-your-customer or other identification checks in relation to any person; or

(ii) any assessment of the extent to which any transaction contemplated by this Plan may be unlawful for any Participating Creditor,

on behalf of any Participating Creditor, and each Participating Creditor confirms to the Restructuring Agent that it is solely responsible for any checks that it is required to carry out and that it may not rely on any statement made by the Restructuring Agent in relation to such checks.

**14.2.20.** Without prejudice to any provision of any Restructuring Document excluding or limiting the liability of the Restructuring Agent, any liability of the Restructuring Agent arising out of or in connection with any Restructuring Document shall be limited to the amount of the actual loss ultimately determined by a final and binding court judgment


CERTIFIED TRANSLATION



*Privileged and Confidential*

(determined by reference to the date of the Restructuring Agent's breach or, if later, the date on which the loss arises as a consequence of that breach), without taking into account any special conditions or circumstances known to the Restructuring Agent at any time that increase the amount of such loss.

Under no circumstances shall the Restructuring Agent be liable for any loss of profit, loss of goodwill, reputation, business opportunity or anticipated savings, or for any special, punitive, indirect or consequential damages, regardless of whether the Restructuring Agent had been advised of the possibility of such loss or damage, except in cases of wilful misconduct or gross negligence.

**14.2.21.** The Restructured Companies shall indemnify and hold harmless the Restructuring Agent against any duly substantiated loss, claim, cost, damage, liability or expense, including legal fees, arising from its actions as Restructuring Agent under the Restructuring Documents, except in the case of gross negligence or wilful misconduct, or where the Restructuring Agent has already been indemnified pursuant to a Restructuring Document.

**14.2.22.** The Restructured Companies and the Majority of Participating Creditors, acting jointly, may at any time request the removal of the Restructuring Agent in the event of a material and repeated failure to perform its duties, by written notice addressed to the Restructuring Agent itself and to the other Affected Creditors.

Such removal shall take effect thirty (30) Business Days after receipt of that notice, unless, before that date, the Restructured Companies and the Majority of Participating Creditors, acting jointly, have appointed a new Restructuring Agent, in which case the removal shall take effect on the date on which the replacement accepts its appointment.

**14.2.23.** If the Restructuring Agent is removed in accordance with Clause 14.2.22, the Restructured Companies and the Majority of Participating Creditors shall jointly appoint a new Restructuring Agent, which must expressly accept such appointment.

The outgoing Restructuring Agent shall, at all times and at the expense of the Restructured Companies, cooperate with the new Restructuring Agent and provide it with all documentation and information necessary for the proper performance of its duties, and its obligations shall remain in force until the new Restructuring Agent effectively assumes office.

74





[Seal: Mr Andrés Domínguez Nafría – Notary Public of Madrid]

*Privileged and Confidential*

## 15. COMMUNICATIONS AND NOTICES BETWEEN THE PARTIES

**15.1.** All communications between the Participating Creditors and the Restructured Companies relating to this Plan shall be made through the Restructuring Agent.

**15.2.** All requests, notices and communications generally between the Restructured Companies and the Restructuring Agent, or vice versa, and between the Participating Creditors and the Restructured Companies, or vice versa, which relate to or arise from this Plan and for which no specific formality is prescribed herein, shall be deemed duly made where, within the time limits established in the Plan, they are sent by email to the respective contact details and addresses designated in each case, without prejudice to their subsequent confirmation by letter signed by an authorised person or acknowledgement of receipt in the same manner in which they were received. Such communications shall be deemed duly made even where they are refused or not collected.

**15.3.** The addresses, telephone contact details and email addresses of the Parties are set out in **Schedule XI** to this Plan. The Restructured Companies agree that any notice or communication of any kind sent to the address specified in that Schedule shall be validly made for all purposes, including procedural purposes.

**15.4.** The Restructured Companies shall address their communications to the Restructuring Agent and/or the Participating Creditors at the addresses specified in **Schedule XI** to this Plan or, where applicable, in the accession document executed by the Acceding Creditors during the Accession Period.

**15.5.** Any change to the addresses, telephone contact details or email addresses stated herein shall have no effect until it has been notified in writing between the Parties or, where applicable, to the Restructuring Agent, and receipt thereof has been acknowledged in the same manner. The Restructuring Agent shall notify the Restructured Companies in writing of any change to its address, telephone contact details or email address set out in **Schedule XI**.

## 16. COSTS AND EXPENSES

The Restructured Companies shall bear and pay the following costs, taxes, levies, charges and other amounts arising directly as a result of the execution and formalisation of the Restructuring Documents, provided that such costs are reasonable and duly supported by documentary evidence:

75





*Privileged and Confidential*

(i) the fees, commissions and disbursements of the public officials involved in the execution of the Restructuring Documents, limited to the cost of one initial certified copy of each document, together with the notices, demands or formalities necessary for their performance. Any costs arising from the issuance of additional copies shall be borne by the party requesting or procuring them;

(ii) any taxes, levies, surcharges and duties imposed by any territorial authority that directly apply to the formalisation and, where applicable, registration of the Restructuring Documents. The following are expressly excluded from the Restructured Companies' payment obligations: (a) any taxes for which any Affected Creditor is the taxpayer, including, without limitation, any corporate income tax levied on its income; and (b) any taxes imposed on the assignment or transfer of the Affected Creditors' rights under the Restructuring Documents.

## 17. PREVAILING TERMS AND UNDERTAKING NOT TO AMEND

**17.1.** In the event of any inconsistency between the provisions of this Plan, any of the Affected Agreements and the other Restructuring Documents, the provisions of this Plan shall prevail for all purposes.

**17.2.** Without prejudice to the foregoing, to the extent that the provisions of this Plan or the relevant Restructuring Documents contain terms or matters that are not regulated, are open to ambiguous interpretation or present any gaps, reference shall be made, insofar as reasonably applicable, to the provisions and interpretative criteria contained in this Plan.

**17.3.** Pursuant to this Plan, the Parties mutually undertake not to novate or amend the Affected Agreements in any manner that could be more detrimental to the Restructured Companies, except with the express consent of the other Parties.

## 18. CONFIDENTIALITY AND PUBLICITY

**18.1.** Each Party acknowledges the confidential nature of all Confidential Information, and no Party shall, without the prior written consent of the other Parties, disclose its contents or any Confidential Information to any other person, and each Party shall ensure that none of its Affiliates or advisers does so, except:

 CERTIFIED TRANSLATION





[Seal: Mr Andrés Domínguez Nafría – Notary Public of Madrid]

*Privileged and Confidential*

(i) as required by law or any other applicable governmental or regulatory authority or any applicable stock exchange, or if required in connection with any legal, administrative, or arbitration proceedings, provided that: (a) the person to whom the Confidential Information is disclosed is informed of its confidential nature and that some or all of such Confidential Information may be price-sensitive; (b) whenever possible and not prohibited by applicable law, prior to such disclosure, the Party (other than the Restructured Companies) intending to make the disclosure notifies the Restructured Companies in writing of the circumstances and the content of the information to be disclosed, and consults with the Restructured Companies regarding possible measures to avoid or limit such disclosure, adopting those that the Restructured Companies reasonably require; (c) the disclosure is limited exclusively to that portion of the Confidential Information that is strictly necessary; and (d) if prior notice is not possible due to a legal impediment, the Party (other than the Restructured Companies) making the disclosure shall inform the Restructured Companies immediately and as soon as reasonably possible after such disclosure, to the extent legally permissible;

(ii) its subsidiaries and each of their respective directors, advisors, employees, and professional advisors and representatives of each of the foregoing and their respective employees, but only for those who need to know about the Restructuring and the execution of the Working Capital Financing Agreement, who have been made aware of the obligations set forth in this section and agree to be irrevocably and unconditionally bound by them, or who are otherwise subject to confidentiality obligations as a matter of law or professional practice, or to another written confidentiality obligation that is substantially similar to those set forth herein; (iii) as part of any "due diligence" measure, where the recipients have been informed of the obligations in this Clause and agree to be irrevocably and unconditionally bound by them or, alternatively, are subject to confidentiality obligations as a matter of law or professional practice;

(iv) to assignees pursuant to Clause 10.1 of this Plan, provided they agree to be irrevocably and unconditionally bound by the obligations in this Clause; and


CERTIFIED TRANSLATION



*Privileged and Confidential*

(v) to the ICO or any competent public entity or authority, to the extent that such disclosure is necessary to enable any Participating Creditor to comply with its reporting, information or accountability obligations arising under the Existing ICO Facility Agreement, the ICO Tariffs Guarantee or any applicable laws or regulations relating to those instruments, without the recipient of the information being required to enter into any confidentiality agreement for such purpose.

**18.2.** For the purposes of this Clause, **"Confidential Information"** means all information relating to the Restructured Companies, the New ICA Guarantors, the Restructuring or the Restructuring Documents that is provided to the Affected Creditors or the Restructuring Agent (or any member of its group), or to their respective directors, officers, employees, advisers and agents (the **"Receiving Party"**), by the Restructured Companies (or their subsidiaries), the New ICA Guarantors, the Affected Creditors or the Restructuring Agent (or any member of its group), or their respective directors, officers, employees, advisers and agents (the **"Disclosing Party"**), in any form, including any document, electronic file or other form of representation or record of information containing, derived from or copied from such information, but excluding information that:

(i) is or becomes publicly available, other than as a direct or indirect result of a breach by the Receiving Party or its representatives of any confidentiality agreement to which that Receiving Party or its representatives are a party; or

(ii) has been identified in writing by the Disclosing Party, at the time of its disclosure, as being non-confidential; or

(iii) is included in a press release, the form of which has been agreed between the Parties, issued at the time of execution of this Plan; or

(iv) was known to the Receiving Party before the date on which it received the information from the Disclosing Party, or is obtained by the Receiving Party after that date from a source which, to the best of its knowledge, is not connected with the Disclosing Party and which, in any event and to the best of its knowledge, did not obtain such information in breach of any confidentiality obligation and is not otherwise subject to any other confidentiality obligation.

**18.3.** Each Party shall limit the number of persons having access to the Confidential Information to the strict minimum necessary and shall use its best endeavours to protect the confidentiality of the Confidential Information, ensuring that the highest standards of security and diligence are applied.






[Seal: Mr Andrés Domínguez Nafría – Notary Public of Madrid]

*Privileged and Confidential*

**18.4.** Each Party (other than the Restructured Companies) undertakes to notify the Restructured Companies immediately upon becoming aware that any Confidential Information has been disclosed by it or by any person to whom it provided such information, in breach of the obligations set out in this Clause.

**19. DATA PROTECTION**

**19.1.** Each Party whose contact details for notice purposes are set out in Clause 15.3, acting independently as a data controller, shall inform:

(i) the natural persons acting in its name and on its behalf; and

(ii) the persons identified in this Plan in connection with that Party for notice purposes, or any other persons who may subsequently be identified,

that their personal data included in the Plan or provided pursuant thereto will be processed by each of the Parties.

**19.2.** The Data Protection Officer of each Participating Creditor may be contacted at the postal and email addresses specified in Clause 15.3.

**19.3.** The purpose of the processing, and its legal basis, is the performance of the rights and obligations arising under the Plan. The processing is strictly necessary for that purpose. In addition, where required by law, the Parties shall process personal data for the prevention of money laundering and terrorist financing, in order to comply with their obligations regarding the collection of information and identification, as well as the provision of information concerning payment transactions to the authorities of other countries, both within and outside the European Union, on the basis of the laws of certain countries and agreements entered into between them. No automated decisions that may affect the data subjects shall be made.

**19.4.** The data shall be retained throughout the term of the Plan and for such additional period as may be necessary to comply with the legal and contractual obligations relating to the implementation of the Plan.

**19.5.** The data shall be processed solely by the Parties and by those third parties to whom the Parties are legally or contractually required to disclose them. The Parties may also transfer the personal data in the event of an assignment by the


CERTIFIED TRANSLATION


ittadux
U S A  C O R P

Participating Creditors and/or the creation of liens or security interests over their claims arising under this Restructuring Plan.

**19.6.** Data subjects may exercise their rights to request access to, rectification or erasure of their personal data, restriction of processing and data portability, as well as their right to object to processing, by sending a written communication to the relevant Party at the address specified for such purposes in Clause 15.3. They may also lodge a complaint with the competent data protection authority.

## 20. SEVERABILITY

The Clauses of this Plan are independent of one another. Accordingly, should any of them be deemed wholly or partially invalid, the remaining Clauses shall remain valid and enforceable in accordance with their terms.

## 21. GOVERNING LAW

This Plan shall be interpreted and performed in accordance with its own terms and shall be governed by the general laws of Spain.

## 22. JURISDICTION

For the resolution of any disputes arising in connection with the performance, implementation or interpretation of this Plan, the Parties agree to submit to the jurisdiction of the Courts of the city of Burgos.

*[Signature page follows]*





**Exhibit F**

**Spanish Restructuring Plan (Spanish)**



ANDRES DOMINGUEZ NAFRIA
*Notario*
C/ Lagasca 88, 8º
Tel (91) 577 47 87 Fax: (91) 577 82 31
28001 MADRID
andresdominguez@notariado.org

**ES COPIA SIMPLE**

**ESCRITURA DE REFUNDICIÓN Y ELEVACIÓN A PÚBLICO DE UN PLAN DE REESTRUCTURACIÓN CONJUNTO.** --------------------

NÚMERO: CUATRO MIL DOSCIENTOS OCHENTA Y UNO. ----------------------------------------------------------

En Madrid, a diez de julio de dos mil veintiséis. ---------

Ante mí, FRANCISCO MIRAS ORTIZ **como sustituto por imposibilidad accidental de mí compañero DON ANDRÉS DOMÍNGUEZ NAFRÍA**, Notario del Ilustre Colegio de esta Capital y con residencia en la misma, -------

--------------------**COMPARECEN:**-----------------------

En representación de GRUPO ANTOLÍN-IRAUSA, S.A.U. y DETERMINADAS SOCIEDADES DEL GRUPO:

**DOÑA MARÍA CRISTINA BLANCO SANTO TOMÁS**, de nacionalidad española, mayor de edad, con domicilio a estos efectos calle Vitoria, 307 Burgos 09007, Burgos, y con D.N.I./N.I.F. número 13158416-R, en vigor.-

En representación de GRUPO ANTOLÍN-HOLDCO, S.A.: ------------------------------------------------------------------

**DON ERNESTO ANTOLÍN CALZADA,** mayor de

1

edad, de nacionalidad española, con domicilio profesional en calle Vitoria, 307 Burgos 09007, Burgos, y con D.N.I./N.I.F. 71303230-X, en vigor; y ------------------------

**DOÑA EMMA FIDELA ANTOLÍN GRANET**, mayor de edad, con domicilio a estos efectos en calle Vitoria, 307 Burgos 09007, Burgos, y con D.N.I./N.I.F. números 13153972-L, en vigor. --------------------------------

En representación de BANCO BILBAO VIZCAYA ARGENTARIA, S.A. Y BANCO BILBAO VIZCAYA ARGENTARIA, S.A., NEW YORK BRANCH: -------------

**DOÑA MARÍA LUZ BARROSO GARCÍA y DON ÁLVARO SANTOS ANGARITA,** mayores de edad, de nacionalidad española, con domicilio a estos efectos en Bilbao, Plaza de San Nicolás, número 4 y con D.N.I./N.I.F. números 51109036-T y con pasaporte de su nacionalidad número PE108920, en vigor.------------------------------------

En representación de BANCO SABADELL, S.A.: ------

**DON JUAN JOSÉ VILLAR CRUZ Y DON JAVIER VICENTE LEÓN,** mayor de edad, con domicilio a estos efectos en Sabadell, Plaça de Sant Roc, número 20 y con D.N.I./N.I.F. números 51897628-Z y 02891028-C, en vigor.

En representación de BANCO SANTANDER, S.A.:----

**DON LUCAS MARTÍN GÓMEZ Y DON FERNANDO DE LA HAZA DE LARA**, ambos mayores

de edad, con domicilio, a estos efectos, en Santander, Paseo de Pereda números 9 al 12, y con D.N.I./N.I.F. números 53615211-A y 50888463-C, respectivamente, vigentes. -----

En representación de "CAIXABANK, S.A.": ------------

**DON FELIPE PLAZA SOTO y DON EDUARDO OCEJO LARRABEITI**, mayores de edad, con domicilio profesional en Valencia, calle Pintor Sorolla, 2-4. Con DNI número 52881521-J y 16048179-K, respectivamente, vigentes.------------------------------------------------------------

En representación de BANKINTER, S.A.:----------------

**DON JORGE CUESTA MARCOS Y DON PAULO JAIME MONTEIRO,** mayor de edad, de nacionalidad española y portuguesa, a los efectos del presente otorgamiento, con domicilio en Madrid, Paseo de la Castellana 29, y con D.N.I./N.I.F. números 09797899-Z y con pasaporte de su nacionalidad número CD632312 y NIE número Y-6275252-A, respectivamente. -----------------------

En representación de "HSBC CONTINENTAL EUROPE": ---------------------------------------------------------

**DON JUAN FRANCISCO AMORAGA**

3

**CHEREGUINI Y DON SEBASTIÁN LEÓN MORENO,** mayores de edad, de nacionalidad española, con domicilio a estos efectos en Madrid, Plaza Pablo Ruiz Picasso, número 32 y con D.N.I./N.I.F. números 23055933-C y 77362814-Z, respectivamente. -------------------------------------------------

En representación de "HSBC CONTINENTAL EUROPE, SUCURSAL EN ESPAÑA": ----------------------

**DON JUAN FRANCISCO AMORAGA CHEREGUINI,** mayor de edad, de nacionalidad española, con domicilio a estos efectos en Madrid, Plaza Pablo Ruiz Picasso, número 32 y con D.N.I./N.I.F. números 23055933-C, vigente que me exhibe. ---------------------------------------

En representación de "GLAS SPECIALIST SERVICES LIMITED":-----------------------------------------------------

**DON CRISTÓBAL MONTOJO ARTEAGA**, mayor de edad, de nacionalidad española, con domicilio a estos os en Calle Núñez de Balboa 33, 4º izquierda, 28001 Madrid, y provisto de D.N.I. y N.I.F. número 70880233-Y, en vigor.--

-------------------INTERVIENEN ----------------------

1-. **DOÑA MARÍA CRISTINA BLANCO SANTO TOMÁS** en nombre y representación de: ---------------------

A-. Como Consejera Delegada de la Sociedad denominada **GRUPO ANTOLIN-IRAUSA, S.A.U.** ("**Antolín Irausa**") constituida con la denominación de

GRUPO ANTOLÍN, S.A., en virtud de escritura autorizada por el Notario de Burgos, don José María Gómez-Oliveros Sánchez De Rivera, el día 5 de noviembre de 1987, bajo el número 1.635 de mí Protocolo general, de duración indefinida, domiciliada en Burgos, Calle Vitoria, 307, Burgos, 09007. Inscrita en el Registro Mercantil de esta provincia, al tomo 182, libro 102 de la sección 3ª de Sociedades, folio 133, hoja número 1.960, inscripción 1ª. Con N.I.F. A09092305.------------------------------------------

Su legitimación para este acto resulta de su indicado cargo para el que fue nombrado en virtud de escritura autorizada por el Notario de Burgos, Don José María Gómez-Oliveros Sánchez de Rivera, el día 17 de octubre de 2023, con el número 3785 de protocolo, inscripción 153ª.---

Me asegura la plena vigencia de las facultades que con las que actúa, así como que no ha variado la capacidad jurídica de su representada. -------------------------------------

Copia autorizada de dicha escritura, yo, el Notario, tengo a la vista y devuelvo al compareciente y juzgo suficientes a estos efectos.-------------------------------------

5

DECLARACIÓN DE TITULARIDAD REAL.- Con el objeto de cumplir con la obligación de identificación del titular real que impone la Ley 10/2010, de 28 de abril, yo el Notario, he consultado la Base de Datos de Titularidad Real (BDTR) creada por Acuerdo del Consejo General del Notariado, de 24 de marzo de 2012, (BOE 28 de abril de 2012), cuyo resultado es coincidente con lo manifestado por el representante.------------------------------------------------------

B-. Como Consejera Delegada de la Sociedad denominada **GRUPO ANTOLIN-ARAGUSA, S.A.U.** ("**Antolín Aragusa**"), con domicilio social en Burgos, Parque Empresarial Monte La Abadesa. Constituida por tiempo indefinido bajo la denominación "ARA GUARNECIDOS, S.A.", en virtud de escritura otorgada el día 17 de marzo de 1978, ante el Notario de Madrid, Don Juan-Manuel de la Puente Menéndez, con el número 738 de protocolo. Adaptados sus Estatutos a la legislación sobre Sociedades Anónimas, en virtud de escritura otorgada ante el Notario de Burgos, Don José María Gómez-Oliveros Sánchez de Rivera, el día 24 de septiembre de 1992, con número 2.025 de protocolo. Cambiada su denominación por la actual en virtud de escritura otorgada ante el mismo notario, el día 22 de enero de 1999, con número 120 de protocolo. Inscrita en el Registro Mercantil de Burgos, al

tomo 117, libro 54 de la Sección 3ª del Libro de Sociedades, folio 60, hoja 544, inscripción 1ª. -------------------------------

Con N.I.F. número A-09019191. -------------------------

Sus facultades para este acto resultan de su indicado cargo para el que fue nombrada en virtud de escritura autorizada por el Notario de Burgos don Daniel González del Álamo, el día 27 de junio de 2025, número 1333 de protocolo, que causo la inscripción 94ª en la hoja abierta a nombre de la sociedad.-------------------------------------------

Me asegura la plena vigencia de las facultades que con las que actúa, así como que no ha variado la capacidad jurídica de su representada. -------------------------------------

Copia autorizada de dicha escritura, yo, el Notario, tengo a la vista y devuelvo al compareciente y juzgo suficientes a estos efectos.-------------------------------------

DECLARACIÓN DE TITULARIDAD REAL.- Con el objeto de cumplir con la obligación de identificación del titular real que impone la Ley 10/2010, de 28 de abril, yo el Notario, he consultado la Base de Datos de Titularidad Real (BDTR) creada por Acuerdo del Consejo General del

7

Notariado, de 24 de marzo de 2012, (BOE 28 de abril de 2012), cuyo resultado es coincidente con lo manifestado por el representante.-----------------------------------------------------

C-. Como Consejera Delegada de la Sociedad denominada **GRUPO ANTOLIN EUROTRIM, S.A.U.** ("**Antolín Eurotrim**") con domicilio social en Burgos, c/ Vitoria, 309. Constituida inicialmente por un plazo de duración hasta el día 31 de diciembre de 2020, bajo la denominación "PIANFEI-SOLANO, S.A.", mediante escritura otorgada en Lerma, el día 12 de septiembre de 1979, ante el Notario Don Luis Sanz Rodero, con el número 1.251 de protocolo. Inscrita en el Registro Mercantil de Burgos, al tomo 122, sección 3ª, libro 58, folio 55, hoja número 620, 1ª. Adaptados sus Estatutos a la Ley de Sociedades Anónimas mediante escritura autorizada por el Notario de Burgos, Don José María Gómez-Oliveros Sánchez de Rivera, el día 24 de septiembre de 1992, con el número 2.026 de protocolo. Inscrita en el Registro Mercantil de Burgos, al tomo 272, libro 63, folio 183, sección GE, hoja BU-2194, inscripción 10ª. Cambiada su denominación por la actual por otra otorgada ante Don José María Gómez-Oliveros Sánchez de Rivera, el día 15 de julio de 1999, con el número 2.319 de protocolo. Inscrita en el Registro Mercantil de Burgos, al tomo 272, libro 63, folio 189,

sección 8ª, hoja BU-2194, inscripción 25ª. Cambiada su duración a indefinida, mediante escritura otorgada ante el Notario Don José María Gómez-Oliveros Sánchez de Rivera, el día 27 de julio de 2017, con el número 2.362 de protocolo. Inscrita en el Registro Mercantil, al tomo 624, libro 415, folio 15, sección 8ª, hoja BU-2194, inscripción 60ª.-----------------------------------------------------------------

Con N.I.F. número A09021759. ---------------------------

Sus facultades para este acto resultan de su indicado cargo para el que fue nombrada en virtud de escritura autorizada por el Notario de Burgos don Daniel González del Álamo, el día 27 de junio de 2025, número 1334 de protocolo, que causo la inscripción 81ª en la hoja abierta a nombre de la sociedad.------------------------------------------

Me asegura la plena vigencia de las facultades que con las que actúa, así como que no ha variado la capacidad jurídica de su representada. -------------------------------------

Copia autorizada de dicha escritura, yo, el Notario, tengo a la vista y devuelvo al compareciente y juzgo suficientes a estos efectos.------------------------------------------

9

DECLARACIÓN DE TITULARIDAD REAL.- Con el objeto de cumplir con la obligación de identificación del titular real que impone la Ley 10/2010, de 28 de abril, yo el Notario, he consultado la Base de Datos de Titularidad Real (BDTR) creada por Acuerdo del Consejo General del Notariado, de 24 de marzo de 2012, (BOE 28 de abril de 2012), cuyo resultado es coincidente con lo manifestado por el representante.-------------------------------------------------------

D-. Como Consejera Delegada de la Sociedad denominada **GRUPO ANTOLIN INGENIERÍA, S.A.U.** ("**Antolín Ingeniería**") con domicilio social en Burgos, c/ Vitoria, 307. Constituida por tiempo indefinido bajo la denominación de "IRAUSA INGENIERÍA, S.A.", mediante escritura otorgada por el Notario de Burgos Don José María Gómez-Oliveros Sánchez de Rivera, el día 24 de diciembre de 1993, con el número 2.355 de protocolo. Inscrita en el Registro Mercantil de Burgos, al tomo 312, libro 103, folio 13, sección 8ª, hoja BU-3606, 1ª. Cambiada su denominación por la que actualmente ostenta, en virtud de escritura otorgada por el Notario de Burgos Don José María Gómez-Oliveros Sánchez de Rivera, el día 22 de enero de 1999, con el número 126 de protocolo. Inscrita en el Registro Mercantil, al tomo 339, libro 130, folio 207, sección 8ª, hoja BU-3606, 15ª.----------------------------------

Con N.I.F. número A-09276528. --------------------------

Sus facultades para este acto resultan de su indicado cargo para el que fue nombrada en virtud de escritura autorizada por el Notario de Burgos don José María Gómez Oliveros Sánchez de Rivera, el día 17 de octubre de 2023, número 3787 de protocolo, que causo la inscripción 101ª en la hoja abierta a nombre de la sociedad. -----------------------

Me asegura la plena vigencia de las facultades que con las que actúa, así como que no ha variado la capacidad jurídica de su representada. ------------------------------------

Copia autorizada de dicha escritura, yo, el Notario, tengo a la vista y devuelvo al compareciente y juzgo suficientes a estos efectos.-------------------------------------

DECLARACIÓN DE TITULARIDAD REAL.- Con el objeto de cumplir con la obligación de identificación del titular real que impone la Ley 10/2010, de 28 de abril, yo el Notario, he consultado la Base de Datos de Titularidad Real (BDTR) creada por Acuerdo del Consejo General del Notariado, de 24 de marzo de 2012, (BOE 28 de abril de 2012), cuyo resultado es coincidente con lo manifestado por

11

el representante.------------------------------------------------------

E-. Como Consejera Delegada de la Sociedad denominada **GRUPO ANTOLIN PLASBUR, S.A.U.** ("**Antolín Plasbur**") con domicilio social en Burgos, Calle Condado de Treviño número 21 (Polígono Industrial de Villalonquéjar). Constituida por tiempo indefinido bajo la denominación "IRAPLAST, S.A.", mediante escritura otorgada el día 6 de mayo de 1992, ante el Notario que fue de Burgos, Don Julián Sastre Martín, con el número 1.110 de protocolo. Inscrita en el Registro Mercantil de Burgos, al tomo 256, libro 47, folio 15, sección GE, hoja BU-1603, inscripción 1ª. Cambiada su denominación por la actual, mediante escritura otorgada en Burgos, ante el Notario Don José María Gómez-Oliveros Sánchez de Rivera, el día 22 de enero de 1999, con el número 124 de protocolo. Inscrita en el Registro Mercantil de Burgos, al tomo 339, libro 130, folio 32, sección 8ª, hoja BU-1603, 11ª.------------------------

Con N.I.F. número A09256975. --------------------------

Sus facultades para este acto resultan de su indicado cargo para el que fue nombrada en virtud de escritura autorizada por el Notario de Burgos don Daniel González del Álamo, el día 27 de junio de 2025, número 1336 de protocolo, que causo la inscripción 62ª en la hoja abierta a nombre de la sociedad.-------------------------------------------

Me asegura la plena vigencia de las facultades que con las que actúa, así como que no ha variado la capacidad jurídica de su representada. ------------------------------------

Copia autorizada de dicha escritura, yo, el Notario, tengo a la vista y devuelvo al compareciente y juzgo suficientes a estos efectos.--------------------------------------

DECLARACIÓN DE TITULARIDAD REAL.- Con el objeto de cumplir con la obligación de identificación del titular real que impone la Ley 10/2010, de 28 de abril, yo el Notario, he consultado la Base de Datos de Titularidad Real (BDTR) creada por Acuerdo del Consejo General del Notariado, de 24 de marzo de 2012, (BOE 28 de abril de 2012), cuyo resultado es coincidente con lo manifestado por el representante.-------------------------------------------------

F-. Como Consejera Delegada de la Sociedad denominada **GRUPO ANTOLIN RYA, S.A.U.** (“**Antolín RyA**”) con domicilio en Burgos, c/ Vitoria, 307. Constituida por tiempo indefinido con la denominación de REVESTIMIENTOS Y ASIENTOS S.A., mediante escritura otorgada en Burgos, ante el Notario Don José

13

María Gómez-Oliveros Sánchez de Rivera, el día 19 de febrero de 1987, con el número 259 de protocolo. Inscrita en el Registro mercantil de Burgos, al tomo 176, libro 97º de la Sección 3ª de Sociedades, folio 146, hoja número 1837, inscripción 1ª. Adaptados sus Estatutos mediante escritura otorgada por el Notario de Burgos Don José María Gómez-Oliveros Sánchez de Rivera, el día 24 de septiembre de 1992, con el número 2.029 de protocolo. Inscrita en el Registro mercantil de Burgos, al tomo 272, libro 63 de la Sección GE de Sociedades, folio 152, hoja número 2188, inscripción 12ª. Cambiada su denominación por la actual de GRUPO ANTOLÍN–RYA, S.A., mediante escritura otorgada por el Notario de Burgos Don José María Gómez-Oliveros Sánchez de Rivera, el día 22 de enero de 1999, con el número 119 de protocolo. Inscrita en el Registro Mercantil de Burgos, al tomo 272, libro 63 de la Sección 8, folio 159, hoja número 2188, inscripción 27ª. -----------------

Con N.I.F. número A-09075680. --------------------------

Sus facultades para este acto resultan de su indicado cargo para el que fue nombrada en virtud de escritura autorizada por el Notario de Burgos don Daniel González del Álamo, el día 27 de junio de 2025, número 1337 de protocolo, que causo la inscripción 78ª en la hoja abierta a nombre de la sociedad.-------------------------------------

Me asegura la plena vigencia de las facultades que con las que actúa, así como que no ha variado la capacidad jurídica de su representada. ------------------------------------

Copia autorizada de dicha escritura, yo, el Notario, tengo a la vista y devuelvo al compareciente y juzgo suficientes a estos efectos.------------------------------------

DECLARACIÓN DE TITULARIDAD REAL.- Con el objeto de cumplir con la obligación de identificación del titular real que impone la Ley 10/2010, de 28 de abril, yo el Notario, he consultado la Base de Datos de Titularidad Real (BDTR) creada por Acuerdo del Consejo General del Notariado, de 24 de marzo de 2012, (BOE 28 de abril de 2012), cuyo resultado es coincidente con lo manifestado por el representante.--------------------------------------------------

G-. Como Consejera Delegada de la Sociedad denominada **GRUPO ANTOLIN-AUTOTRIM, S.A.U.** domiciliada en Burgos, c/ Vitoria, 307, constituida por tiempo indefinido con la denominación AUTOTRIM, S.A. en virtud de escritura autorizada por el Notario de Burgos, Don José María Gómez-Oliveros Sánchez de Rivera, el día

15

15 de enero de 1988, con el número 21 de protocolo. Inscrita en el Registro Mercantil Provincial de Burgos, al Tomo 184, libro 104 de la Sección 3ª, Folio 111, Hoja 2044, inscripción 1ª; adaptados sus Estatutos a la L.S.A., en virtud de escritura autorizada por el mismo Notario, el día 24 de septiembre de 1992, con el número 2.033 de protocolo; y cambiada su denominación a la actual en virtud de escritura autorizada por el Notario de Burgos Don José María Gómez-Oliveros Sánchez de Rivera, el día 22 de enero de 1999, con el número 125 de protocolo. Inscrita en el Registro Mercantil de Burgos, al Tomo 272, libro 63, folio 136, Sección 8, Hoja BU-2184, inscripción 25ª. --------------

Con N.I.F. número A09097080. ---------------------------

Sus facultades para este acto resultan de su indicado cargo para el que fue nombrada en virtud de escritura autorizada por el Notario de Burgos don Daniel González del Álamo, el día 27 de junio de 2025, número 1332 de protocolo, que causo la inscripción 79ª en la hoja abierta a nombre de la sociedad.-----------------------------------------

Me asegura la plena vigencia de las facultades que con las que actúa, así como que no ha variado la capacidad jurídica de su representada.------------------------------------

Copia autorizada de dicha escritura, yo, el Notario, tengo a la vista y devuelvo al compareciente y juzgo

suficientes a estos efectos.----------------------------------------

DECLARACIÓN DE TITULARIDAD REAL.- Con el objeto de cumplir con la obligación de identificación del titular real que impone la Ley 10/2010, de 28 de abril, yo el Notario, he consultado la Base de Datos de Titularidad Real (BDTR) creada por Acuerdo del Consejo General del Notariado, de 24 de marzo de 2012, (BOE 28 de abril de 2012), cuyo resultado es coincidente con lo manifestado por el representante.----------------------------------------------

H-. Como Consejera Delegada de la Sociedad denominada **GRUPO ANTOLIN-GLASS, S.A.U.** con domicilio social en Burgos, c/ Vitoria, 309. Constituida por tiempo indefinido bajo la denominación "PIANFEI-GLASS, S.A.", mediante escritura otorgada en Burgos, el día 3 de noviembre de 1986, ante el Notario Don José-María Martín Álvarez, con el número 2.009 de protocolo. Inscrita en el Registro Mercantil de Burgos, al tomo 172 de la sección 3ª de Sociedades, libro 94, folio 149, hoja número 1.709, inscripción 1ª. Adaptados sus Estatutos a la legislación sobre Sociedades Anónimas, mediante escritura otorgada

17

ante el Notario de Burgos, Don José María Gómez-Oliveros Sánchez de Rivera, el día 24 de septiembre de 1992, con el número 2.016 de protocolo. Cambiada su denominación por la actual, mediante escritura otorgada ante el Notario de Burgos, Don José María Gómez-Oliveros Sánchez de Rivera, el día 19 de diciembre de 2000, con el número 3.511 de protocolo. Inscrita en el Registro Mercantil de Burgos, al tomo 273, libro 64, folio 37, sección 8ª, hoja BU-2216, 18ª.

Con N.I.F. número A09063611. --------------------------

Sus facultades para este acto resultan de su indicado cargo para el que fue nombrada en virtud de escritura autorizada por el Notario de Burgos don Daniel González del Álamo, el día 27 de junio de 2025, número 1335 de protocolo, que causo la inscripción 58ª en la hoja abierta a nombre de la sociedad.-------------------------------------

Me asegura la plena vigencia de las facultades que con las que actúa, así como que no ha variado la capacidad jurídica de su representada.-------------------------------

Copia autorizada de dicha escritura, yo, el Notario, tengo a la vista y devuelvo al compareciente y juzgo suficientes a estos efectos.-------------------------------

DECLARACIÓN DE TITULARIDAD REAL.- Con el objeto de cumplir con la obligación de identificación del titular real que impone la Ley 10/2010, de 28 de abril, yo el

Notario, he consultado la Base de Datos de Titularidad Real (BDTR) creada por Acuerdo del Consejo General del Notariado, de 24 de marzo de 2012, (BOE 28 de abril de 2012), cuyo resultado es coincidente con lo manifestado por el representante.--------------------------------------------------

I-. Como Gerente de la Sociedad denominada **GRUPO ANTOLÍN LUSITÂNIA, COMPONENTES AUTOMÓVEL, UNIPESSOAL, LDA. ("Antolín Lusitania")** domiciliada en Zona Industrial Polo Dois Distrito de Viana do Castelo, Concelho: Vila Nova de Cerveira, Freguesia: Campos e Vila Meâ, 4920-012 CAMPOS VNC (Portugal) e inscrita en el Registro Comercial de Vila Nova de Cerveira, persona colectiva nº 502227958, NIF español no residente N0405449J. -----------

Sus facultades para este acto resultan de su indicado cargo que me acredita vigente mediante certificado del Conservaduría del Registro Civil/Predial/Comercial de Vila Nova de Cerveira *(Conservatória do Registo Civil/Predial/Comercial de Vila Nova de Cerveira)*, que me exhibe y devuelvo, del que resultan sus facultades para este

19

otorgamiento.-------------------------------------------------------

Me asegura la señora compareciente que continúa en el desempeño de su expresado cargo, y que las facultades que le fueron conferidas mantienen su plena vigencia.------------

Yo el Notario, hago constar que a mi juicio las facultades representativas acreditadas son suficientes para el presente otorgamiento.------------------------------------------

DECLARACIÓN DE TITULARIDAD REAL.- Con el objeto de cumplir con la obligación de identificación del titular real que impone la Ley 10/2010, de 28 de abril, yo el Notario, he consultado la Base de Datos de Titularidad Real (BDTR) creada por Acuerdo del Consejo General del Notariado, de 24 de marzo de 2012, (BOE 28 de abril de 2012), cuyo resultado es coincidente con lo manifestado por el representante.------------------------------------------------

J-. Como Directora Ejecutiva de la Sociedad denominada **GRUPO ANTOLIN BRATISLAVA, S.R.O**. Fundada mediante la escritura de constitución protocolizada en Nz 117/01 el 24 de abril de 2001 ante la Notaria JUDr. Magdalena Cizova. Con domicilio en 841 07 Bratislava, Opletalova 73, República Eslovaca. Código de identificación fiscal (ICO): 35811650, NIF español no residente N0407135C.------------------------------------------

Sus facultades para este acto resultan de su indicado

cargo que me acredita vigente mediante certificado del Registro Mercantil de Bratislava (República Eslovaca), que me exhibe y devuelvo, del que resultan sus facultades para este otorgamiento. ---------------------------------------------

Me asegura la señora compareciente que continúa en el desempeño de su expresado cargo, y que las facultades que le fueron conferidas mantienen su plena vigencia. ------------

Yo el Notario, hago constar que a mi juicio las facultades representativas acreditadas son suficientes para el presente otorgamiento. ------------------------------------------

DECLARACIÓN DE TITULARIDAD REAL.- Con el objeto de cumplir con la obligación de identificación del titular real que impone la Ley 10/2010, de 28 de abril, yo el Notario, he consultado la Base de Datos de Titularidad Real (BDTR) creada por Acuerdo del Consejo General del Notariado, de 24 de marzo de 2012, (BOE 28 de abril de 2012), cuyo resultado es coincidente con lo manifestado por el representante.---------------------------------------------------

K-. Como Directora Ejecutiva y representante legal de la Sociedad denominada **GRUPO ANTOLIN OSTRAVA,**

**S.R.O.,** con domicilio social en Na Rovince 912, Hrabová, 720 00 Ostrava (República Checa), número de identificación fiscal 275 34 596, inscrita en el Registro Mercantil administrado por el Tribunal Regional de Ostrava, sección C, inscripción número 33224, NIF español no residente N0407142I. -------------------------------------------

Sus facultades para este acto resultan de su indicado cargo que me acredita vigente mediante del Registro Mercantil Ostrava (República Checa), que me exhibe y devuelvo, del que resultan sus facultades para este otorgamiento.-------------------------------------------------

Me asegura la señora compareciente que continúa en el desempeño de su expresado cargo, y que las facultades que le fueron conferidas mantienen su plena vigencia. ------------

Yo el Notario, hago constar que a mi juicio las facultades representativas acreditadas son suficientes para el presente otorgamiento. -------------------------------------------

DECLARACIÓN DE TITULARIDAD REAL.- Con el objeto de cumplir con la obligación de identificación del titular real que impone la Ley 10/2010, de 28 de abril, yo el Notario, he consultado la Base de Datos de Titularidad Real (BDTR) creada por Acuerdo del Consejo General del Notariado, de 24 de marzo de 2012, (BOE 28 de abril de 2012), cuyo resultado es coincidente con lo manifestado por

el representante.-------------------------------------------------

L-. Como Directora Ejecutiva de la Sociedad denominada **GRUPO ANTOLIN TURNOV, S.R.O.**, con domicilio social en Prumyslová 3000, 511 01 Turnov, República Checa, número de identificación fiscal CZ26702436, inscrita en el Registro Mercantil administrado por el Tribunal Regional de Hradec Králové, sección C, inscripción 20006, y con número de identificación 267 02 426, NIF español no residente N0611285H. ------------------

Sus facultades para este acto resultan de su indicado cargo que me acredita vigente mediante del Registro Mercantil Hradec Kralove (República Checa), que me exhibe y devuelvo, del que resultan sus facultades para este otorgamiento.--------------------------------------------------

Me asegura la señora compareciente que continúa en el desempeño de su expresado cargo, y que las facultades que le fueron conferidas mantienen su plena vigencia.------------

Yo el Notario, hago constar que a mi juicio las facultades representativas acreditadas son suficientes para el presente otorgamiento.---------------------------------------------

23

DECLARACIÓN DE TITULARIDAD REAL.- Con el objeto de cumplir con la obligación de identificación del titular real que impone la Ley 10/2010, de 28 de abril, yo el Notario, he consultado la Base de Datos de Titularidad Real (BDTR) creada por Acuerdo del Consejo General del Notariado, de 24 de marzo de 2012, (BOE 28 de abril de 2012), cuyo resultado es coincidente con lo manifestado por el representante.------------------------------------------------

M-. Como Directora Ejecutiva de la Sociedad denominada **ANTOLIN LIBAN S.R.O.**, con domicilio social en Komenskeho 30, PSC 507 23, Liban (República Checa), número de identificación 03561453, inscrita en el Registro Mercantil de Praga, columna C, folio n° 232999, NIF español no residente N0405441G. ----------------------

Sus facultades para este acto resultan de su indicado cargo que me acredita vigente mediante del Registro Mercantil de Hradec Kralove (República Checa), que me exhibe y devuelvo, del que resultan sus facultades para este otorgamiento.------------------------------------------------

Me asegura la señora compareciente que continúa en el desempeño de su expresado cargo, y que las facultades que le fueron conferidas mantienen su plena vigencia.------------

Yo el Notario, hago constar que a mi juicio las facultades representativas acreditadas son suficientes para el

presente otorgamiento.--------------------------------------------

DECLARACIÓN DE TITULARIDAD REAL.- Con el objeto de cumplir con la obligación de identificación del titular real que impone la Ley 10/2010, de 28 de abril, yo el Notario, he consultado la Base de Datos de Titularidad Real (BDTR) creada por Acuerdo del Consejo General del Notariado, de 24 de marzo de 2012, (BOE 28 de abril de 2012), cuyo resultado es coincidente con lo manifestado por el representante.-------------------------------------------------

N-. Como Presidenta del Consejo de Administración de la Sociedad denominada **GRUPO ANTOLIN BOHEMIA, A.S**., con domicilio social en Prumyslova zona Server, Svároska 696, 463 03 Stráz nad Nisou, República Checa, número de identificación fiscal CZ60192925, inscrita en el Registro Mercantil con el número Tribunal regional Usti nad Labem, sección B, nº. 620, NIF español no residente N0407143G. ----------------------------------------------------

Sus facultades para este acto resultan de su indicado cargo que me acredita vigente mediante certificado del Registro Mercantil Usti Nad Labemm (Republica Checa),

que me exhibe y devuelvo, del que resultan sus facultades para este otorgamiento. --------------------------------------

Me asegura la señora compareciente que continúa en el desempeño de su expresado cargo, y que las facultades que le fueron conferidas mantienen su plena vigencia. ------------

Yo el Notario, hago constar que a mi juicio las facultades representativas acreditadas son suficientes para el presente otorgamiento. -------------------------------------

DECLARACIÓN DE TITULARIDAD REAL.- Con el objeto de cumplir con la obligación de identificación del titular real que impone la Ley 10/2010, de 28 de abril, yo el Notario, he consultado la Base de Datos de Titularidad Real (BDTR) creada por Acuerdo del Consejo General del Notariado, de 24 de marzo de 2012, (BOE 28 de abril de 2012), cuyo resultado es coincidente con lo manifestado por el representante. -------------------------------------------

O-. Como administradora solidaria de la Sociedad denominada **"GRUPO ANTOLÍN SIBIU, S.R.L."**, con domicilio social en Sibiu, Europa Unita, St., No.7, Sibiu County (Rumania), número de identificación fiscal RO 22946116, inscrita en el Registro Mercantil con el número J2008000486327, NIF español no residente N0329720G. ---

Sus facultades para este acto resultan de su indicado cargo que me acredita vigente mediante certificado del

Registro Mercantil de Rumanía (*National Trade Register*), que me exhibe y devuelvo, del que resultan sus facultades para este otorgamiento. ------------------------------------------

Me asegura la señora compareciente que continúa en el desempeño de su expresado cargo, y que las facultades que le fueron conferidas mantienen su plena vigencia. ------------

Yo el Notario, hago constar que a mi juicio las facultades representativas acreditadas son suficientes para el presente otorgamiento. ------------------------------------------

DECLARACIÓN DE TITULARIDAD REAL.- Con el objeto de cumplir con la obligación de identificación del titular real que impone la Ley 10/2010, de 28 de abril, yo el Notario, he consultado la Base de Datos de Titularidad Real (BDTR) creada por Acuerdo del Consejo General del Notariado, de 24 de marzo de 2012, (BOE 28 de abril de 2012), cuyo resultado es coincidente con lo manifestado por el representante.-------------------------------------------------

P-. Como Presidenta del Consejo de Administración de la Sociedad denominada **ANTOLIN SILESIA SP ZOO,** sociedad válidamente constituida conforme a las leyes de

27

Polonia, con domicilio en WROCtAWSKA, No. 82 Strzelin 57-100, Silesia (Polonia), Statistical Number (REGON): 020075399, KRS 0000236792, Tax Identification Number (NIP): 8982065139, NIF español no residente N0405304G.

Sus facultades para este acto resultan de su indicado cargo que me acredita vigente mediante certificado del Registro Judicial Nacional de Polonia, que me exhibe y devuelvo, del que resultan sus facultades para este otorgamiento.--------------------------------------------------

Me asegura la señora compareciente que continúa en el desempeño de su expresado cargo, y que las facultades que le fueron conferidas mantienen su plena vigencia.------------

Yo el Notario, hago constar que a mi juicio las facultades representativas acreditadas son suficientes para el presente otorgamiento.------------------------------------------

DECLARACIÓN DE TITULARIDAD REAL.- Con el objeto de cumplir con la obligación de identificación del titular real que impone la Ley 10/2010, de 28 de abril, yo el Notario, he consultado la Base de Datos de Titularidad Real (BDTR) creada por Acuerdo del Consejo General del Notariado, de 24 de marzo de 2012, (BOE 28 de abril de 2012), cuyo resultado es coincidente con lo manifestado por el representante.-------------------------------------------------

Q-. Como Geschäftsführer (Directora General) de la

Sociedad denominada **GRUPO ANTOLIN BAMBERG GmbH & Co. KG**, con domicilio social en Kronacherstraße 70-80, D-96052, Bamberg y número de identificación fiscal DE 132277887, inscrita en el Registro Mercantil del Juzgado de Bamberg bajo el número HRA 8480, NIF español no residente N0405434B.------------------------------

Sus facultades para este acto resultan de su indicado cargo que me acredita vigente mediante certificado del Registro Mercantil de Bamberg, que me exhibe y devuelvo.

Me asegura la señora compareciente que continúa en el desempeño de su expresado cargo, y que las facultades que le fueron conferidas mantienen su plena vigencia.------------

Yo el Notario, hago constar que a mi juicio las facultades representativas acreditadas son suficientes para el presente otorgamiento.--------------------------------------------

DECLARACIÓN DE TITULARIDAD REAL.- Con el objeto de cumplir con la obligación de identificación del titular real que impone la Ley 10/2010, de 28 de abril, yo el Notario, he consultado la Base de Datos de Titularidad Real (BDTR) creada por Acuerdo del Consejo General del

29

Notariado, de 24 de marzo de 2012, (BOE 28 de abril de 2012), cuyo resultado es coincidente con lo manifestado por el representante.-------------------------------------------------

R-. Como Geschäftsführer (Directora General) y representante legal de la Sociedad denominada **ANTOLIN DEUTSCHLAND GmbH**, con domicilio social en Am Ziegelwerk, 1, D-85391, Allershausen, número de identificación fiscal DE-192564301, inscrita en el Registro mercantil del Juzgado de Múnich, con el número HRB 235486. Me asegura la señora compareciente que continúa en el desempeño de su expresado cargo, y que las facultades que le fueron conferidas mantienen su plena vigencia, NIF español no residente N0407141A.-----------------------------

Sus facultades para este acto resultan de su indicado cargo que me acredita vigente mediante certificado del Registro Mercantil de Múnich, que me exhibe y devuelvo. -

Me asegura la señora compareciente que continúa en el desempeño de su expresado cargo, y que las facultades que le fueron conferidas mantienen su plena vigencia.------------

Yo el Notario, hago constar que a mi juicio las facultades representativas acreditadas son suficientes para el presente otorgamiento.-------------------------------------

DECLARACIÓN DE TITULARIDAD REAL.- Con el objeto de cumplir con la obligación de identificación del

titular real que impone la Ley 10/2010, de 28 de abril, yo el Notario, he consultado la Base de Datos de Titularidad Real (BDTR) creada por Acuerdo del Consejo General del Notariado, de 24 de marzo de 2012, (BOE 28 de abril de 2012), cuyo resultado es coincidente con lo manifestado por el representante.-----------------------------------------------------

S-. Como Geschäftsführer (Directora General) y representante legal de la Sociedad denominada **GRUPO ANTOLIN LOGISTIK DEUTSCHLAND GMBH**, con domicilio social en Am Coloneum 4, D-50829, Colonia, Alemania, número de identificación fiscal DE-195635583, inscrita en el Registro mercantil del Juzgado de Colonia, con el número HRB 62880, NIF español no residente N0407139E.

Sus facultades para este acto resultan de su indicado cargo que me acredita vigente mediante certificado del Registro Mercantil de Colonia, que me exhibe y devuelvo. -

Me asegura la señora compareciente que continúa en el desempeño de su expresado cargo, y que las facultades que le fueron conferidas mantienen su plena vigencia. ------------

31

Yo el Notario, hago constar que a mi juicio las facultades representativas acreditadas son suficientes para el presente otorgamiento. -------------------------------------------

DECLARACIÓN DE TITULARIDAD REAL.- Con el objeto de cumplir con la obligación de identificación del titular real que impone la Ley 10/2010, de 28 de abril, yo el Notario, he consultado la Base de Datos de Titularidad Real (BDTR) creada por Acuerdo del Consejo General del Notariado, de 24 de marzo de 2012, (BOE 28 de abril de 2012), cuyo resultado es coincidente con lo manifestado por el representante. -------------------------------------------------

T-. Como Geschäftsführer (Directora General) y representante legal de la Sociedad denominada **ANTOLIN STRAUBING GMBH,** con domicilio social en Stettiner Str., 7, D-94315, Straubing, Alemania, número de identificación fiscal DE 812311435, registrada en el Registro Mercantil del Juzgado de Primera Instancia de Straubing número HRB 10424, NIF español no residente N0407137I. ----------------------------------------------------

Sus facultades para este acto resultan de su indicado cargo que me acredita vigente mediante certificado del Registro Mercantil de Straubing, que me exhibe y devuelvo.

Me asegura la señora compareciente que continúa en el desempeño de su expresado cargo, y que las facultades que

le fueron conferidas mantienen su plena vigencia. ------------

Yo el Notario, hago constar que a mi juicio las facultades representativas acreditadas son suficientes para el presente otorgamiento. -------------------------------------------

DECLARACIÓN DE TITULARIDAD REAL.- Con el objeto de cumplir con la obligación de identificación del titular real que impone la Ley 10/2010, de 28 de abril, yo el Notario, he consultado la Base de Datos de Titularidad Real (BDTR) creada por Acuerdo del Consejo General del Notariado, de 24 de marzo de 2012, (BOE 28 de abril de 2012), cuyo resultado es coincidente con lo manifestado por el representante. -------------------------------------------------------

U-. Como Directora Ejecutiva de la Sociedad denominada **GRUPO ANTOLIN LEAMINGTON LIMITED**, (antes GRUPO ANTOLIN KENT LIMITED), con domicilio social en Tachbrook Park Drive, Leamington Spa, Warwick, CV34 6RH Warwickshire (Reino Unido), número de identificación fiscal GB710134103, inscrita en el Registro Mercantil local con el número 3477767, NIF español no residente N0404953B. ------------------------------

33

Sus facultades para este acto resultan de su indicado cargo que me acredita vigente mediante certificado del Companies House, que me exhibe y devuelvo, del que resultan sus facultades para este otorgamiento.----------------

Me asegura la señora compareciente que continúa en el desempeño de su expresado cargo, y que las facultades que le fueron conferidas mantienen su plena vigencia.------------

Yo el Notario, hago constar que a mi juicio las facultades representativas acreditadas son suficientes para el presente otorgamiento.-------------------------------------

Como título complementario de representación, me exhibe poder especial otorgado por Doña María Cristina Blanco Santo Tomás, en su condición de Directora (*Director*) de la Sociedad, en Madrid, el día 17 de junio de 2026, notarizado por Don Edward Gardiner, Notario Público (*Notary Public*) con competencia en todo el territorio de Inglaterra y Gales, el día 18 de junio de 2026, redactado a doble columna en idiomas español e inglés, legalizado mediante Apostilla de fecha 18 de junio de 2026, cuyo original me exhibe en este acto y devuelvo.--------------

Yo, el Notario, hago constar, en relación a dicho título complementario de representación, lo siguiente, en cumplimiento de lo preceptuado en el artículo 36 del Reglamento Hipotecario: -------------------------------------



(i) Que la entidad representada está válida y legalmente constituida conforme a las leyes de Inglaterra y Gales. -------

(ii) Que la otorgante de dicho apoderamiento ha sido debidamente identificada por el Notario del país de origen reseñado. ----------------------------------------------

(iii) Que dicho Notario ha realizado debidamente juicio de suficiencia de las facultades de la otorgante, haciendo constar en dicho apoderamiento su aptitud y capacidad legal para que el citado poder pueda desplegar toda su eficacia. ---

(iv) Que se han observado las formas y solemnidades requeridas en el país de origen para el acto de apoderamiento. ---------------------------------------------

DECLARACIÓN DE TITULARIDAD REAL.- Con el objeto de cumplir con la obligación de identificación del titular real que impone la Ley 10/2010, de 28 de abril, yo el Notario, he consultado la Base de Datos de Titularidad Real (BDTR) creada por Acuerdo del Consejo General del Notariado, de 24 de marzo de 2012, (BOE 28 de abril de 2012), cuyo resultado es coincidente con lo manifestado por el representante.-----------------------------------------------

35

V-. Como Directora Ejecutiva de la Sociedad denominada **ANTOLIN INTERIORS UK LIMITED**, con domicilio social en Merse Road, North Moons Moat, Redditch, B98 9HL, United Kingdom (Reino Unido), número de identificación fiscal GB683819882, inscrita en el Registro Mercantil local con el número 01676532, NIF español no residente N0407133H.-----------------------------

Sus facultades para este acto resultan de su indicado cargo que me acredita vigente mediante certificado del Companies House, que me exhibe y devuelvo, del que resultan sus facultades para este otorgamiento.----------------

Me asegura la señora compareciente que continúa en el desempeño de su expresado cargo, y que las facultades que le fueron conferidas mantienen su plena vigencia.------------

Yo el Notario, hago constar que a mi juicio las facultades representativas acreditadas son suficientes para el presente otorgamiento.-------------------------------------------

Como título complementario de representación, me exhibe poder especial otorgado por Doña María Cristina Blanco Santo Tomás, en su condición de Directora (*Director*) de la Sociedad, en Madrid, el día 17 de junio de 2026, notarizado por Don Edward Gardiner, Notario Público (*Notary Public*) con competencia en todo el territorio de Inglaterra y Gales, el día 18 de junio de 2026,

redactado a doble columna en idiomas español e inglés, legalizado mediante Apostilla de fecha 18 de junio de 2026, cuyo original me exhibe en este acto y devuelvo.

Yo, el Notario, hago constar, en relación a dicho título complementario de representación, lo siguiente, en cumplimiento de lo preceptuado en el artículo 36 del Reglamento Hipotecario:

(i) Que la entidad representada está válida y legalmente constituida conforme a las leyes de Inglaterra y Gales.

(ii) Que la otorgante de dicho apoderamiento ha sido debidamente identificada por el Notario del país de origen reseñado. ----------------------------------------------

(iii) Que dicho Notario ha realizado debidamente juicio de suficiencia de las facultades de la otorgante, haciendo constar en dicho apoderamiento su aptitud y capacidad legal para que el citado poder pueda desplegar toda su eficacia

(iv) Que se han observado las formas y solemnidades requeridas en el país de origen para el acto de apoderamiento. ----------------------------------------------

DECLARACIÓN DE TITULARIDAD REAL.- Con el

objeto de cumplir con la obligación de identificación del titular real que impone la Ley 10/2010, de 28 de abril, yo el Notario, he consultado la Base de Datos de Titularidad Real (BDTR) creada por Acuerdo del Consejo General del Notariado, de 24 de marzo de 2012, (BOE 28 de abril de 2012), cuyo resultado es coincidente con lo manifestado por el representante.------------------------------------------------------

W-. Como apoderada y representante legal de la Sociedad denominada **ANTOLIN INTERIORS MÉXICO, SOCIEDAD ANÓNIMA DE CAPITAL VARIABLE**, constituida ante la Licenciada María Elena Guadalupe Orozco Aguirre, Notario titular de la Notaría nº 52 de la ciudad de Saltillo, Estado de Coahuila, el 30 de septiembre de 2004, bajo el número 301. Inscrita en el Registro Público de la Propiedad y de Comercio de Coahuila, Oficina Saltillo en el folio Mercantil número 25.806 2. Con domicilio en Ciudad de Silao, Estado de Guanajuato (Estados Unidos Mexicanos). Número de identificación fiscal IAI0409305B8, NIF español no residente N0405467B. ----------------------------------------

Sus facultades para este acto resultan de su indicado cargo que me acredita vigente mediante certificado del Registro Público de Comercio de Ciudad de México, que me exhibe y devuelvo, del que resultan sus facultades para

este otorgamiento. -------------------------------------------------

Me asegura la señora compareciente que continúa en el desempeño de su expresado cargo, y que las facultades que le fueron conferidas mantienen su plena vigencia. ------------

Yo el Notario, hago constar que a mi juicio las facultades representativas acreditadas son suficientes para el presente otorgamiento. ------------------------------------------

DECLARACIÓN DE TITULARIDAD REAL.- Con el objeto de cumplir con la obligación de identificación del titular real que impone la Ley 10/2010, de 28 de abril, yo el Notario, he consultado la Base de Datos de Titularidad Real (BDTR) creada por Acuerdo del Consejo General del Notariado, de 24 de marzo de 2012, (BOE 28 de abril de 2012), cuyo resultado es coincidente con lo manifestado por el representante.-------------------------------------------

X-. Como apoderada y representante legal de la Sociedad denominada **GRUPO ANTOLIN SILAO, SOCIEDAD ANONIMA DE CAPITAL VARIABLE**, constituida por una duración de 99 años, con la denominación "IRAUSA MEXICANA" ante el Licenciado

39

Francisco Javier Arce Gargollo, Notario titular del Notaría nº 74 del Distrito Federal de la Ciudad de México, el 18 de marzo de 1.994, bajo el número 66.150. Cambió su denominación por instrumento número 21.971 otorgado el 9 de febrero de 1999 ante el Licenciado José María Morera González, titular de la notaría pública número 102 de Ciudad de México. Inscrita en el Registro Público de Comercio de la Ciudad de México en el folio Mercantil número 189.000. Con domicilio en Silao, Estado de Guanajuato (Estados Unidos Mexicanos). Número de identificación fiscal GAS-940318-6J1, NIF español no residente N0405430J. --------------------------------------------

Sus facultades para este acto resultan de su indicado cargo que me acredita vigente mediante certificado del Registro Público de Comercio de Ciudad de México, que me exhibe y devuelvo, del que resultan sus facultades para este otorgamiento. -------------------------------------------

Me asegura la señora compareciente que continúa en el desempeño de su expresado cargo, y que las facultades que le fueron conferidas mantienen su plena vigencia. ------------

Yo el Notario, hago constar que a mi juicio las facultades representativas acreditadas son suficientes para el presente otorgamiento. -------------------------------------------

DECLARACIÓN DE TITULARIDAD REAL.- Con el

objeto de cumplir con la obligación de identificación del titular real que impone la Ley 10/2010, de 28 de abril, yo el Notario, he consultado la Base de Datos de Titularidad Real (BDTR) creada por Acuerdo del Consejo General del Notariado, de 24 de marzo de 2012, (BOE 28 de abril de 2012), cuyo resultado es coincidente con lo manifestado por el representante.-------------------------------------------------------

Y-. Como apoderada y representante legal de la Sociedad denominada **GRUPO ANTOLIN SALTILLO, SOCIEDAD DE RESPONSABILIDAD LIMITADA DE CAPITAL VARIABLE,** constituida ante el Licenciado Guillermo Oliver Bucio, Notario titular de la Notaría n.º 246 de la Ciudad de México, el 11 de diciembre de 2007, bajo el número 25.074. Inscrita en el Registro Público de Comercio de la Ciudad de México en el folio Mercantil número 376.013. Con domicilio en Silao, Estado de Guanajuato (Estados Unidos Mexicanos). Número de identificación fiscal GAS-071211-2S0, NIF español no residente N0405496A. ---------------------------------------------------------

Sus facultades para este acto resultan de su indicado

41

cargo que me acredita vigente mediante certificado del Registro Público de Comercio de Ciudad de México, que me exhibe y devuelvo, del que resultan sus facultades para este otorgamiento. -------------------------------------------------

Me asegura la señora compareciente que continúa en el desempeño de su expresado cargo, y que las facultades que le fueron conferidas mantienen su plena vigencia. ------------

Yo el Notario, hago constar que a mi juicio las facultades representativas acreditadas son suficientes para el presente otorgamiento. ------------------------------------------

DECLARACIÓN DE TITULARIDAD REAL.- Con el objeto de cumplir con la obligación de identificación del titular real que impone la Ley 10/2010, de 28 de abril, yo el Notario, he consultado la Base de Datos de Titularidad Real (BDTR) creada por Acuerdo del Consejo General del Notariado, de 24 de marzo de 2012, (BOE 28 de abril de 2012), cuyo resultado es coincidente con lo manifestado por el representante. ------------------------------------------------

Z-. Como apoderada y representante legal de la Sociedad denominada **GRUPO ANTOLIN TLAXCALA, SOCIEDAD DE RESPONSABILIDAD LIMITADA DE CAPITAL VARIABLE**, constituida por una duración de 99 años y con la denominación "Grupo Antolin Puebla" ante el Licenciado Luis Ángel Alfonso Chico González,

Notario titular de la Notaría n.º 5 de la ciudad de León, Estado de Guanajuato, el 13 de agosto de 2014. Número de identificación fiscal GAP140813N38. Con domicilio Virgen de la Caridad s/n, Lote 19, Vesta Park Tlaxcala, 90500 Huamantla. Cambió su denominación por la actual ante el Licenciado Luis Ángel Alfonso Chico González, Notario titular de la Notaría nº 5 de la ciudad de León, Estado de Guanajuato, el 29 de septiembre de 2014. Inscrita en el Registro mercantil de Cholula, Estado de Puebla, en el folio mercantil número 40663, NIF español no residente N0405486B. --------------------------------------------------------

Sus facultades para este acto resultan de su indicado cargo que me acredita vigente mediante certificado del Registro Público de Comercio de Ciudad de México, que me exhibe y devuelvo, del que resultan sus facultades para este otorgamiento. ----------------------------------------------

Me asegura la señora compareciente que continúa en el desempeño de su expresado cargo, y que las facultades que le fueron conferidas mantienen su plena vigencia. ------------

Yo el Notario, hago constar que a mi juicio las

43

facultades representativas acreditadas son suficientes para el presente otorgamiento. -------------------------------------------

DECLARACIÓN DE TITULARIDAD REAL.- Con el objeto de cumplir con la obligación de identificación del titular real que impone la Ley 10/2010, de 28 de abril, yo el Notario, he consultado la Base de Datos de Titularidad Real (BDTR) creada por Acuerdo del Consejo General del Notariado, de 24 de marzo de 2012, (BOE 28 de abril de 2012), cuyo resultado es coincidente con lo manifestado por el representante.------------------------------------------------------

AA-. Como Directora Ejecutiva y representante legal de la Sociedad denominada **GRUPO ANTOLIN NORTH AMERICA, INC**, entidad debidamente constituida conforme a las leyes del estado de Míchigan, domiciliada en 3410 Belle Chase Way, Suite 600, Lansing, Michigan 48911, Estados Unidos de América, con número de identificación del "Department of Licensing and Regulatory Affairs" 800517119 y número fiscal (EIN) 383096385, NIF español no residente N0405409D.------------------------------

Sus facultades para este acto resultan de su indicado cargo que me acredita vigente mediante certificado del Department of Licensing and Regulatory Affairs de Lansing (Michigan), que me exhibe y devuelvo, del que resultan sus facultades para este otorgamiento. ------------------------------

Me asegura la señora compareciente que continúa en el desempeño de su expresado cargo, y que las facultades que le fueron conferidas mantienen su plena vigencia.------------

Yo el Notario, hago constar que a mi juicio las facultades representativas acreditadas son suficientes para el presente otorgamiento.-----------------------------------------

Como título complementario de representación, me exhibe poder especial conferido mediante acuerdo unánime por escrito del Consejo de Administración (*Unanimous Written Consent of the Board of Directors*) de la Sociedad, de fecha 17 de junio de 2026, por el que se otorga poder a favor de Doña María Cristina Blanco Santo Tomás, notarizado por Don Samuel Chabbott, Notario Público (*Notary Public*) del Estado de Nueva York, el día 22 de junio de 2026, redactado en idioma inglés, legalizado mediante Apostilla expedida en la ciudad de Nueva York el día 23 de junio de 2026, con el número NYC-2937140, cuyo original me exhibe en este acto y devuelvo.--------------------

Yo, el Notario, hago constar, en relación a dicho título complementario de representación, lo siguiente, en

45

cumplimiento de lo preceptuado en el artículo 36 del Reglamento Hipotecario: --------------------------------------

(i) Que la entidad representada está válida y legalmente constituida conforme a las leyes del estado de Michigan, Estados Unidos de América. ------------------------------------

(ii) Que los otorgantes de dicho apoderamiento han sido debidamente identificados por el Notario del país de origen reseñado. -----------------------------------------------

(iii) Que dicho Notario ha realizado debidamente juicio de suficiencia de las facultades de los otorgantes, haciendo constar en dicho apoderamiento su aptitud y capacidad legal para que el citado poder pueda desplegar toda su eficacia. ---

(iv) Que se han observado las formas y solemnidades requeridas en el país de origen para el acto de apoderamiento. ----------------------------------------------

DECLARACIÓN DE TITULARIDAD REAL.- Con el objeto de cumplir con la obligación de identificación del titular real que impone la Ley 10/2010, de 28 de abril, yo el Notario, he consultado la Base de Datos de Titularidad Real (BDTR) creada por Acuerdo del Consejo General del Notariado, de 24 de marzo de 2012, (BOE 28 de abril de 2012), cuyo resultado es coincidente con lo manifestado por el representante.-----------------------------------------------------

BB-. Como Directora Ejecutiva y representante legal de

la Sociedad denominada **ANTOLIN ALABAMA LLC.**, entidad debidamente constituida conforme a las leyes del estado de Michigan, domiciliada en 3410 Belle Chase Way STE600, Lansing-Mi-48911, Michigan, Michigan, Estados Unidos de América, número de identificación del "Department of Licensing and Regulatory Affairs" 802121790, NIF español no residente N0404938C. ----------

Sus facultades para este acto resultan de su indicado cargo que me acredita vigente mediante certificado del Department of Licensing and Regulatory Affairs de Lansing (Michigan), que me exhibe y devuelvo, del que resultan sus facultades para este otorgamiento. -----------------------------

Me asegura la señora compareciente que continúa en el desempeño de su expresado cargo, y que las facultades que le fueron conferidas mantienen su plena vigencia. ------------

Yo el Notario, hago constar que a mi juicio las facultades representativas acreditadas son suficientes para el presente otorgamiento. -------------------------------------------

Como título complementario de representación, me exhibe poder especial conferido mediante acuerdo unánime

47

por escrito del Consejo de Administración (*Written Consent of the Board of Managers*) de la Sociedad, de fecha 17 de junio de 2026, por el que se otorga poder a favor de Doña María Cristina Blanco Santo Tomás, notarizado por Don Samuel Chabbott, Notario Público (*Notary Public*) del Estado de Nueva York, el día 22 de junio de 2026, redactado en idioma inglés, legalizado mediante Apostilla expedida en la ciudad de Nueva York el día 23 de junio de 2026, con el número NYC-2937141, cuyo original me exhibe en este acto y devuelvo.---------------------------------

Yo, el Notario, hago constar, en relación a dicho título complementario de representación, lo siguiente, en cumplimiento de lo preceptuado en el artículo 36 del Reglamento Hipotecario: ----------------------------------------

(i) Que la entidad representada está válida y legalmente constituida conforme a las leyes del estado de Michigan, Estados Unidos de América. ------------------------------------

(ii) Que los otorgantes de dicho apoderamiento han sido debidamente identificados por el Notario del país de origen reseñado. -----------------------------------------------

(iii) Que dicho Notario ha realizado debidamente juicio de suficiencia de las facultades de los otorgantes, haciendo constar en dicho apoderamiento su aptitud y capacidad legal para que el citado poder pueda desplegar toda su eficacia. ---

(iv) Que se han observado las formas y solemnidades requeridas en el país de origen para el acto de apoderamiento. ---------------------------------------------

DECLARACIÓN DE TITULARIDAD REAL.- Con el objeto de cumplir con la obligación de identificación del titular real que impone la Ley 10/2010, de 28 de abril, yo el Notario, he consultado la Base de Datos de Titularidad Real (BDTR) creada por Acuerdo del Consejo General del Notariado, de 24 de marzo de 2012, (BOE 28 de abril de 2012), cuyo resultado es coincidente con lo manifestado por el representante.-----------------------------------------------------

CC-. Como Directora Ejecutiva y representante legal de la Sociedad denominada **ANTOLIN INTERIORS USA, INC.**, entidad debidamente constituida conforme a las leyes del estado de Delaware, domiciliada en 3410 Belle Chase Way STE600, Lansing-Mi-48911, Michigan, Estados Unidos de América, número de identificación del "Department of Licensing and Regulatory Affairs" 801040546, número del Delaware Secretary of State / Division of Corporations 3414386 y número fiscal (EIN)

49

522330192, NIF español no residente N0404942E. ----------

Sus facultades para este acto resultan de su indicado cargo que me acredita vigente mediante certificado del Department of Licensing and Regulatory Affairs de Lansing (Michigan), que me exhibe y devuelvo, del que resultan sus facultades para este otorgamiento. ----------------------------

Me asegura la señora compareciente que continúa en el desempeño de su expresado cargo, y que las facultades que le fueron conferidas mantienen su plena vigencia. ------------

Yo el Notario, hago constar que a mi juicio las facultades representativas acreditadas son suficientes para el presente otorgamiento. -------------------------------------

Como título complementario de representación, me exhibe poder especial conferido mediante acuerdo unánime por escrito del Consejo de Administración (*Written Consent of the Board of Directors*) de la Sociedad, de fecha 17 de junio de 2026, por el que se otorga poder a favor de Doña María Cristina Blanco Santo Tomás, notarizado por Don Samuel C. Chabot, Notario Público (*Notary Public*) del Estado de Nueva York, el día 2 de julio de 2026, redactado en idioma inglés, legalizado mediante Apostilla expedida en la ciudad de Nueva York el día 2 de julio de 2026, con el número NYC-2947517, cuyo original me exhibe en este acto y devuelvo.

Yo, el Notario, hago constar, en relación a dicho título complementario de representación, lo siguiente, en cumplimiento de lo preceptuado en el artículo 36 del Reglamento Hipotecario:

(i) Que la entidad representada está válida y legalmente constituida conforme a las leyes del estado de Delaware, Estados Unidos de América.

(ii) Que los otorgantes de dicho apoderamiento han sido debidamente identificados por el Notario del país de origen reseñado.

(iii) Que dicho Notario ha realizado debidamente juicio de suficiencia de las facultades de los otorgantes, haciendo constar en dicho apoderamiento su aptitud y capacidad legal para que el citado poder pueda desplegar toda su eficacia.

(iv) Que se han observado las formas y solemnidades requeridas en el país de origen para el acto de apoderamiento.

DECLARACIÓN DE TITULARIDAD REAL.- Con el objeto de cumplir con la obligación de identificación del titular real que impone la Ley 10/2010, de 28 de abril, yo el

51

Notario, he consultado la Base de Datos de Titularidad Real (BDTR) creada por Acuerdo del Consejo General del Notariado, de 24 de marzo de 2012, (BOE 28 de abril de 2012), cuyo resultado es coincidente con lo manifestado por el representante.-------------------------------------------------

DD-. Como Directora Ejecutiva y representante legal de la Sociedad denominada **ANTOLIN SHELBY INC.**, entidad debidamente constituida conforme a las leyes del estado de Michigan, domiciliada en 3410 Belle Chase Way STE600, Lansing-Mi-48911, Michigan, Estados Unidos de América, número de identificación del "Department of Licensing and Regulatory Affairs" 801987446 y número fiscal (EIN) 814622094, NIF español no residente N0404939A.------------------------------------------------------

Sus facultades para este acto resultan de su indicado cargo que me acredita vigente mediante certificado del Department of Licensing and Regulatory Affairs de Lansing (Michigan), que me exhibe y devuelvo, del que resultan sus facultades para este otorgamiento. -----------------------------

Me asegura la señora compareciente que continúa en el desempeño de su expresado cargo, y que las facultades que le fueron conferidas mantienen su plena vigencia.------------

Yo el Notario, hago constar que a mi juicio las facultades representativas acreditadas son suficientes para el

presente otorgamiento. ------------------------------------------

Como título complementario de representación, me exhibe poder especial conferido mediante acuerdo unánime por escrito del Consejo de Administración (*Written Consent of the Board of Directors*) de la Sociedad, de fecha 17 de junio de 2026, por el que se otorga poder a favor de Doña María Cristina Blanco Santo Tomás, notarizado por Don Samuel Chabbott, Notario Público (*Notary Public*) del Estado de Nueva York, el día 22 de junio de 2026, redactado en idioma inglés, legalizado mediante Apostilla expedida en la ciudad de Nueva York el día 23 de junio de 2026, con el número NYC-2937142, cuyo original me exhibe en este acto y devuelvo.---------------------------------

Yo, el Notario, hago constar, en relación a dicho título complementario de representación, lo siguiente, en cumplimiento de lo preceptuado en el artículo 36 del Reglamento Hipotecario: -----------------------------------------

(i) Que la entidad representada está válida y legalmente constituida conforme a las leyes del estado de Michigan, Estados Unidos de América. ---------------------------------------

53

(ii) Que los otorgantes de dicho apoderamiento han sido debidamente identificados por el Notario del país de origen reseñado. ----------------------------------------------

(iii) Que dicho Notario ha realizado debidamente juicio de suficiencia de las facultades de los otorgantes, haciendo constar en dicho apoderamiento su aptitud y capacidad legal para que el citado poder pueda desplegar toda su eficacia. ---

(iv) Que se han observado las formas y solemnidades requeridas en el país de origen para el acto de apoderamiento. ---------------------------------------------

DECLARACIÓN DE TITULARIDAD REAL.- Con el objeto de cumplir con la obligación de identificación del titular real que impone la Ley 10/2010, de 28 de abril, yo el Notario, he consultado la Base de Datos de Titularidad Real (BDTR) creada por Acuerdo del Consejo General del Notariado, de 24 de marzo de 2012, (BOE 28 de abril de 2012), cuyo resultado es coincidente con lo manifestado por el representante.----------------------------------------------------

EE-. Como Directora Ejecutiva y representante legal de la Sociedad denominada **GRUPO ANTOLIN MISSOURI, LLC**, entidad debidamente constituida conforme a las leyes del estado de Michigan, domiciliada en 3410 Belle Chase Way STE600, Lansing-Mi-48911, Michigan, Estados Unidos de América, número de identificación del

"Department of Licensing and Regulatory Affairs" 801701255 y número fiscal (EIN) 462491062, NIF español no residente N0404941G. --------------------------------------

Sus facultades para este acto resultan de su indicado cargo que me acredita vigente mediante certificado del Department of Licensing and Regulatory Affairs de Lansing (Michigan), que me exhibe y devuelvo, del que resultan sus facultades para este otorgamiento. ----------------------------

Me asegura la señora compareciente que continúa en el desempeño de su expresado cargo, y que las facultades que le fueron conferidas mantienen su plena vigencia. ------------

Yo el Notario, hago constar que a mi juicio las facultades representativas acreditadas son suficientes para el presente otorgamiento. -------------------------------------------

Como título complementario de representación, me exhibe poder especial conferido mediante acuerdo unánime por escrito del Consejo de *Managers* (*Written Consent of the Board of Managers*) de la Sociedad, de fecha 17 de junio de 2026, por el que se otorga poder a favor de Doña María Cristina Blanco Santo Tomás, notarizado por Don

55

Samuel Chabbott, Notario Público (*Notary Public*) del Estado de Nueva York, el día 2 de julio de 2026, redactado en idioma inglés, legalizado mediante Apostilla expedida en la ciudad de Nueva York el día 2 de julio de 2026, con el número NYC-2947516, cuyo original me exhibe en este acto y devuelvo.

Yo, el Notario, hago constar, en relación a dicho título complementario de representación, lo siguiente, en cumplimiento de lo preceptuado en el artículo 36 del Reglamento Hipotecario:

(i) Que la entidad representada está válida y legalmente constituida conforme a las leyes del estado de Michigan, Estados Unidos de América.

(ii) Que los otorgantes de dicho apoderamiento han sido debidamente identificados por el Notario del país de origen reseñado.

(iii) Que dicho Notario ha realizado debidamente juicio de suficiencia de las facultades de los otorgantes, haciendo constar en dicho apoderamiento su aptitud y capacidad legal para que el citado poder pueda desplegar toda su eficacia.

(iv) Que se han observado las formas y solemnidades requeridas en el país de origen para el acto de apoderamiento.

DECLARACIÓN DE TITULARIDAD REAL.- Con el

objeto de cumplir con la obligación de identificación del titular real que impone la Ley 10/2010, de 28 de abril, yo el Notario, he consultado la Base de Datos de Titularidad Real (BDTR) creada por Acuerdo del Consejo General del Notariado, de 24 de marzo de 2012, (BOE 28 de abril de 2012), cuyo resultado es coincidente con lo manifestado por el representante.------------------------------------------------------

FF-. Como Directora Ejecutiva y representante legal de la Sociedad denominada **GRUPO ANTOLIN KENTUCKY, INC**, entidad debidamente constituida conforme a las leyes del estado de Michigan, domiciliada en 3410 Belle Chase Way STE600, Lansing-Mi-48911, Michigan, Estados Unidos de América, número de identificación del "Department of Licensing and Regulatory Affairs" 800019559 y número fiscal (EIN) 383906655, NIF español no residente N0405410B.------------------------------

Sus facultades para este acto resultan de su indicado cargo que me acredita vigente mediante certificado del Department of Licensing and Regulatory Affairs de Lansing (Michigan), que me exhibe y devuelvo, del que resultan sus

57

facultades para este otorgamiento. -----------------------------

Me asegura la señora compareciente que continúa en el desempeño de su expresado cargo, y que las facultades que le fueron conferidas mantienen su plena vigencia. ------------

Yo el Notario, hago constar que a mi juicio las facultades representativas acreditadas son suficientes para el presente otorgamiento. ----------------------------------------

Como título complementario de representación, me exhibe poder especial conferido mediante acuerdo unánime por escrito del Consejo de Administración (*Written Consent of the Board of Directors*) de la Sociedad, de fecha 17 de junio de 2026, por el que se otorga poder a favor de Doña María Cristina Blanco Santo Tomás, notarizado por Don Samuel Chabbott, Notario Público (*Notary Public*) del Estado de Nueva York, el día 22 de junio de 2026, redactado en idioma inglés, legalizado mediante Apostilla expedida en la ciudad de Nueva York el día 23 de junio de 2026, con el número NYC-2937143, cuyo original me exhibe en este acto y devuelvo.---------------------------------

Yo, el Notario, hago constar, en relación a dicho título complementario de representación, lo siguiente, en cumplimiento de lo preceptuado en el artículo 36 del Reglamento Hipotecario: ---------------------------------------

(i) Que la entidad representada está válida y legalmente



constituida conforme a las leyes del estado de Michigan, Estados Unidos de América. -----------------------------------

(ii) Que los otorgantes de dicho apoderamiento han sido debidamente identificados por el Notario del país de origen reseñado. ----------------------------------------------

(iii) Que dicho Notario ha realizado debidamente juicio de suficiencia de las facultades de los otorgantes, haciendo constar en dicho apoderamiento su aptitud y capacidad legal para que el citado poder pueda desplegar toda su eficacia. ---

(iv) Que se han observado las formas y solemnidades requeridas en el país de origen para el acto de apoderamiento. ---------------------------------------------

DECLARACIÓN DE TITULARIDAD REAL.- Con el objeto de cumplir con la obligación de identificación del titular real que impone la Ley 10/2010, de 28 de abril, yo el Notario, he consultado la Base de Datos de Titularidad Real (BDTR) creada por Acuerdo del Consejo General del Notariado, de 24 de marzo de 2012, (BOE 28 de abril de 2012), cuyo resultado es coincidente con lo manifestado por el representante.-------------------------------------------------

59

GG-. Como Directora Ejecutiva y representante legal de la Sociedad denominada **GRUPO ANTOLIN MICHIGAN, INC**, entidad debidamente constituida conforme a las leyes del estado de Michigan, domiciliada en 3410 Belle Chase Way STE600, Lansing-Mi-48911, Michigan, Estados Unidos de América, número de identificación del "Department of Licensing and Regulatory Affairs" 800616630, NIF español no residente N0405411J.

Sus facultades para este acto resultan de su indicado cargo que me acredita vigente mediante certificado del Department of Licensing and Regulatory Affairs de Lansing (Michigan), que me exhibe y devuelvo, del que resultan sus facultades para este otorgamiento. -----------------------------

Me asegura la señora compareciente que continúa en el desempeño de su expresado cargo, y que las facultades que le fueron conferidas mantienen su plena vigencia. ------------

Yo el Notario, hago constar que a mi juicio las facultades representativas acreditadas son suficientes para el presente otorgamiento. -------------------------------------

Como título complementario de representación, me exhibe poder especial conferido mediante acuerdo unánime por escrito del Consejo de Administración (*Written Consent of the Board of Directors*) de la Sociedad, de fecha 17 de junio de 2026, por el que se otorga poder a favor de Doña

María Cristina Blanco Santo Tomás, notarizado por Don Samuel Chabbott, Notario Público (*Notary Public*) del Estado de Nueva York, el día 22 de junio de 2026, redactado en idioma inglés, legalizado mediante Apostilla expedida en la ciudad de Nueva York el día 23 de junio de 2026, con el número NYC-2937144, cuyo original me exhibe en este acto y devuelvo.----------------------------------

Yo, el Notario, hago constar, en relación a dicho título complementario de representación, lo siguiente, en cumplimiento de lo preceptuado en el artículo 36 del Reglamento Hipotecario: ----------------------------------------

(i) Que la entidad representada está válida y legalmente constituida conforme a las leyes del estado de Michigan, Estados Unidos de América. -------------------------------------

(ii) Que los otorgantes de dicho apoderamiento han sido debidamente identificados por el Notario del país de origen reseñado. ------------------------------------------------

(iii) Que dicho Notario ha realizado debidamente juicio de suficiencia de las facultades de los otorgantes, haciendo constar en dicho apoderamiento su aptitud y capacidad legal

61

para que el citado poder pueda desplegar toda su eficacia. ---

(iv) Que se han observado las formas y solemnidades requeridas en el país de origen para el acto de apoderamiento. ----------------------------------------------

DECLARACIÓN DE TITULARIDAD REAL.- Con el objeto de cumplir con la obligación de identificación del titular real que impone la Ley 10/2010, de 28 de abril, yo el Notario, he consultado la Base de Datos de Titularidad Real (BDTR) creada por Acuerdo del Consejo General del Notariado, de 24 de marzo de 2012, (BOE 28 de abril de 2012), cuyo resultado es coincidente con lo manifestado por el representante.--------------------------------------------------

HH-. Como Directora ejecutiva y representante legal de la Sociedad denominada GRUPO ANTOLÍN SOUTH AFRICA (PTY) LTD con domicilio social Nelson Mandela Bay Logistics Park, Algoa Road, Jagvlakte Uitenhage Industries, Eastern Cape, South Africa, inscrita en el Companies and Intellectual Property Commission (CIPC), Sudáfrica — Companies and Close Corporations con el número 1996 / 014003 / 07, NIF español no residente N0405412H.--------------------------------------------------

Sus facultades para este acto resultan de su indicado cargo que me acredita vigente mediante certificado del Commissioner of Companies & Intellectual Property

Commission, que me exhibe y devuelvo, del que resultan sus facultades para este otorgamiento. --------------------------

II-. Como Directora Ejecutiva y representante legal de la Sociedad denominada **GRUPO ANTOLIN UK LIMITED**, con domicilio social en Merse Road, North Moons Moat, Redditch, B98 9HL, Reino Unido, número de identificación fiscal GB545826912, inscrita en el Registro Mercantil local con el número 2319953, NIF español no residente N0407133H. -------------------------------------------

Sus facultades para este acto resultan de su indicado cargo que me acredita vigente mediante certificado del Companies House, que me exhibe y devuelvo, del que resultan sus facultades para este otorgamiento. ----------------

Me asegura la señora compareciente que continúa en el desempeño de su expresado cargo, y que las facultades que le fueron conferidas mantienen su plena vigencia. ------------

Yo el Notario, hago constar que a mi juicio las facultades representativas acreditadas son suficientes para el presente otorgamiento. -------------------------------------------

Como título complementario de representación, me

exhibe poder especial otorgado por Doña María Cristina Blanco Santo Tomás, en su condición de Directora (*Director*) de la Sociedad, en Madrid, el día 17 de junio de 2026, notarizado por Don Edward Gardiner, Notario Público (*Notary Public*) con competencia en todo el territorio de Inglaterra y Gales, el día 18 de junio de 2026, redactado a doble columna en idiomas español e inglés, legalizado mediante Apostilla de fecha 18 de junio de 2026, cuyo original me exhibe en este acto y devuelvo

Yo, el Notario, hago constar, en relación a dicho título complementario de representación, lo siguiente, en cumplimiento de lo preceptuado en el artículo 36 del Reglamento Hipotecario: ----------------------------------------

(i) Que la entidad representada está válida y legalmente constituida conforme a las leyes de Inglaterra y Gales.

(ii) Que la otorgante de dicho apoderamiento ha sido debidamente identificada por el Notario del país de origen reseñado. -----------------------------------------------

(iii) Que dicho Notario ha realizado debidamente juicio de suficiencia de las facultades de la otorgante, haciendo constar en dicho apoderamiento su aptitud y capacidad legal para que el citado poder pueda desplegar toda su eficacia

(iv) Que se han observado las formas y solemnidades requeridas en el país de origen para el acto de



apoderamiento. ----------------------------------------------

DECLARACIÓN DE TITULARIDAD REAL.- Con el objeto de cumplir con la obligación de identificación del titular real que impone la Ley 10/2010, de 28 de abril, yo el Notario, he consultado la Base de Datos de Titularidad Real (BDTR) creada por Acuerdo del Consejo General del Notariado, de 24 de marzo de 2012, (BOE 28 de abril de 2012), cuyo resultado es coincidente con lo manifestado por el representante.------------------------------------------------

JJ-. Como apoderada y representante legal de la Sociedad denominada **GRUPO ANTOLIN CUAUTITLAN, SOCIEDAD DE RESPONSABILIDAD LIMITADA DE CAPITAL VARIABLE**, constituida ante la Licenciado Luis Angel Alfonso Chico Gonzalez, Notario titular de la Notaría nº 5 de la ciudad de León, Estado de Guanajuato, el 8 de octubre de 2018, bajo el número 16661. Inscrita en el Registro Público de Comercio de Ciudad de México en el folio Mercantil número N-2018091763. Con domicilio en Silao, Estado de Guanajuato (Estados Unidos Mexicanos). ----------------------------------------------

65

Sus facultades para este acto resultan de su indicado cargo que me acredita vigente mediante certificado del Registro Público de Comercio de Ciudad de México, que me exhibe y devuelvo, del que resultan sus facultades para este otorgamiento. --------------------------------------------------

Me asegura la señora compareciente que continúa en el desempeño de su expresado cargo, y que las facultades que le fueron conferidas mantienen su plena vigencia. ------------

Yo el Notario, hago constar que a mi juicio las facultades representativas acreditadas son suficientes para el presente otorgamiento. --------------------------------------------

DECLARACIÓN DE TITULARIDAD REAL.- Con el objeto de cumplir con la obligación de identificación del titular real que impone la Ley 10/2010, de 28 de abril, yo el Notario, he consultado la Base de Datos de Titularidad Real (BDTR) creada por Acuerdo del Consejo General del Notariado, de 24 de marzo de 2012, (BOE 28 de abril de 2012), cuyo resultado es coincidente con lo manifestado por el representante. --------------------------------------------------

KK-. Como Presidenta del Consejo de Administración de la Sociedad y representante legal de la Sociedad denominada **"GRUPO ANTOLIN ITALIA S.R.L."** sociedad sujeta a la dirección y coordinación de su socio único "GRUPO ANTOLIN IRAUSA S.A.", con domicilio

social en Calvi Risorta, Strada Statale 6, Via Breccelle s.n.c., Località Cerreto, con un capital social de 500 000 euros íntegramente desembolsado, con número de IVA, código fiscal e inscripción en el Registro Mercantil de Caserta n.º 07606870967, y número REA CE-299591, NIF español no residente N0407725A.-------------------------------

Me asegura la señora compareciente que continúa en el desempeño de su expresado cargo, y que las facultades que le fueron conferidas mantienen su plena vigencia.------------

Yo el Notario, hago constar que a mi juicio las facultades representativas acreditadas son suficientes para el presente otorgamiento.------------------------------------------

DECLARACIÓN DE TITULARIDAD REAL.- Con el objeto de cumplir con la obligación de identificación del titular real que impone la Ley 10/2010, de 28 de abril, yo el Notario, he consultado la Base de Datos de Titularidad Real (BDTR) creada por Acuerdo del Consejo General del Notariado, de 24 de marzo de 2012, (BOE 28 de abril de 2012), cuyo resultado es coincidente con lo manifestado por el representante.-------------------------------------------------

67

UU-. **"GRUPO ANTOLIN BESANÇON"** Société par actions simplifiée (Société à associé unique), sociedad de nacionalidad francesa, debidamente constituida y existente bajo las leyes de Francia, domiciliada en 8 Rue Gérard Mantion 25000 Besancon, e inscrita en el Registro de Comercio y de Sociedades de Besançon (Francia) bajo el nº RCS 328 358 734, NIF español no residente N0407723F.---

Su legitimación para este acto resulta de su designación como persona física, representante del Presidente, la sociedad **GRUPO ANTOLIN – IRAUSA, S.A. (Unipersonal),** constituida con la denominación de GRUPO ANTOLÍN, S.A. en virtud de escritura autorizada por Don Jose María Gómez Oliveros Sánchez de Rivera, el día 5 de noviembre de 1987, con el número 1.635 de protocolo, de duración indefinida, domiciliada en Burgos, Carretera Madrid-Irún Km. 244,8. Adaptados sus Estatutos a la legislación sobre Sociedades Anónimas en virtud de escritura autorizada por el mismo notario el día 24 de septiembre de 1992, con el número 2.018 de protocolo, y cambiada su denominación por la actual en la escritura de Fusión por Absorción autorizada por Don José María Gómez Oliveros Sánchez de Rivera, el día 2 de noviembre de 1993, con el número 1.894 de protocolo. Inscrita en el Registro Mercantil de Burgos, al tomo 182, libro 102 de la

sección 3ª de Sociedades, folio 133, hoja número 1.960, inscripción 1ª, lo que me acredita mediante certificado-extracto Kbis del Registro de Comercio y Sociedades de Besançon, redactado en francés, idioma que en lo pertinente conozco, debidamente apostillado y traducido, que me exhibe y devuelvo.-------------------------------------------------

Me asegura la señora compareciente que continúa en el desempeño de su expresado cargo, y que las facultades que le fueron conferidas mantienen su plena vigencia.------------

Yo el Notario, hago constar que a mi juicio las facultades representativas acreditadas son suficientes para el presente otorgamiento.--------------------------------------------

DECLARACIÓN DE TITULARIDAD REAL.- Con el objeto de cumplir con la obligación de identificación del titular real que impone la Ley 10/2010, de 28 de abril, yo el Notario, he consultado la Base de Datos de Titularidad Real (BDTR) creada por Acuerdo del Consejo General del Notariado, de 24 de marzo de 2012, (BOE 28 de abril de 2012), cuyo resultado es coincidente con lo manifestado por el representante.-------------------------------------------------

69

VV-. Como Gerente de la Sociedad denominada **"ANTOLIN TANGER"** sociedad debidamente constituida y existente bajo las leyes de Marruecos, domiciliada en ZONE FRANCHE D'EXPORTATION ILOT N° 22 B ET 21, Tanger, e inscrita en el Registro de Comercio de Tanger bajo el nº 24899, NIF español no residente N0407727G. ----

Sus facultades para este acto resultan de su indicado cargo que me acredita vigente mediante certificado del Registro mercantil de Tanger, que me exhibe y devuelvo, del que resultan sus facultades para este otorgamiento. -----

Me asegura la señora compareciente que continúa en el desempeño de su expresado cargo, y que las facultades que le fueron conferidas mantienen su plena vigencia. ------------

Yo el Notario, hago constar que a mi juicio las facultades representativas acreditadas son suficientes para el presente otorgamiento. -------------------------------------------

DECLARACIÓN DE TITULARIDAD REAL.- Con el objeto de cumplir con la obligación de identificación del titular real que impone la Ley 10/2010, de 28 de abril, yo el Notario, he consultado la Base de Datos de Titularidad Real (BDTR) creada por Acuerdo del Consejo General del Notariado, de 24 de marzo de 2012, (BOE 28 de abril de 2012), cuyo resultado es coincidente con lo manifestado por el representante. ---------------------------------------------------

WW-. Como apoderada de TRIMTEC LTDA., sociedad debidamente constituida con arreglo a las leyes de Brasil, con domicilio en Av. Henri Nestle 2600 (Cacapava), inscrita en la Junta Comercial do Estado de Sao Paulo (JUCESP), con NIRE 35213220309 y CNPJ 00.783.986/0001-13. ------

La Sociedad carece de N.I.F. español por lo que hago la oportuna advertencia respecto a su necesidad, autorizándome el compareciente a su incorporación mediante diligencia.     -------------------------------------------

Sus facultades para este acto resultan del poder especial, vigente según afirma, que tiene conferido por Don Gerson Vialta Silva y Don Paulo de Nardi en su condición de Administradores,  en Cacapava (Brasil) el día 22 de junio de 2026, ante Don Lucas Silva Fernandes Notario Público, cuyo original me exhibe en este acto, redactado a doble columna en idiomas inglés y castellano, legalizado mediante Apostilla el día 22 de junio de 2026.---------------------------

Yo, el Notario, hago constar, en relación a la representación de esta Sociedad lo siguiente, en cumplimiento de lo preceptuado en el artículo 36 del

71

Reglamento Hipotecario: --------------------------------------

 (i) Que la entidad representada está válida y legalmente constituida conforme a las leyes de Brasil.---------------------

(ii) Que el otorgante de dicho apoderamiento ha sido debidamente identificado por el Notario del país de origen reseñado. --------------------------------------------------------

(iii) Que dicho Notario ha realizado debidamente juicio de suficiencia de las facultades del otorgante, haciendo constar en dicho apoderamiento su aptitud y capacidad legal para que el citado poder pueda desplegar toda su eficacia. --

(iv) Que se han observado las formas y solemnidades requeridas en el país de origen para el acto de apoderamiento.-------------------------------------------------

Me asegura la señora compareciente que continúa en el desempeño de su expresado cargo, y que las facultades que le fueron conferidas mantienen su plena vigencia. ------------

Yo el Notario, hago constar que a mi juicio las facultades representativas acreditadas son suficientes para el presente otorgamiento. -------------------------------------------

DECLARACIÓN DE TITULARIDAD REAL.- Con el objeto de cumplir con la obligación de identificación del titular real que impone la Ley 10/2010, de 28 de abril, yo, Notario: he recabado del representante social manifestación sobre dicha titularidad real, cuyo resultado consta en acta

autorizada por mí hoy en unidad de acto. ----------------------

XX-. Como apoderada de **INTERTRIM LTDA.,** sociedad debidamente constituida con arreglo a las leyes de Brasil, con domicilio en Av. Henri Nestle 3000 (Cacapava), inscrita en la Junta Comercial do Estado de Sao Paulo (JUCESP), com NIRE 35213485892 y CNPJ 01.105.075/0001-08. ----------------------------------------------

La Sociedad carece de N.I.F. español por lo que hago la oportuna advertencia respecto a su necesidad, autorizándome el compareciente a su incorporación mediante diligencia.   -------------------------------------------

Sus facultades para este acto resultan del poder especial, vigente según afirma, que tiene conferido por Don Gerson Vialta Silva y Don Paulo de Nardi en su condición de Administradores,  en Cacapava (Brasil) el día 22 de junio de 2026, ante Don Lucas Silva Fernandes Notario Público, cuyo original me exhibe en este acto, redactado a doble columna en idiomas inglés y castellano, legalizado mediante Apostilla el día 22 de junio de 2026.---------------------------

Yo, el Notario, hago constar, en relación a la

73

representación de esta Sociedad lo siguiente, en cumplimiento de lo preceptuado en el artículo 36 del Reglamento Hipotecario: --------------------------------------

(i) Que la entidad representada está válida y legalmente constituida conforme a las leyes de Brasil.--------------------

(ii) Que el otorgante de dicho apoderamiento ha sido debidamente identificado por el Notario del país de origen reseñado.-------------------------------------------------------

(iii) Que dicho Notario ha realizado debidamente juicio de suficiencia de las facultades del otorgante, haciendo constar en dicho apoderamiento su aptitud y capacidad legal para que el citado poder pueda desplegar toda su eficacia. --

(iv) Que se han observado las formas y solemnidades requeridas en el país de origen para el acto de apoderamiento.-------------------------------------------------

Me asegura la señora compareciente que continúa en el desempeño de su expresado cargo, y que las facultades que le fueron conferidas mantienen su plena vigencia.------------

Yo el Notario, hago constar que a mi juicio las facultades representativas acreditadas son suficientes para el presente otorgamiento.-------------------------------------------

DECLARACIÓN DE TITULARIDAD REAL.- Con el objeto de cumplir con la obligación de identificación del titular real que impone la Ley 10/2010, de 28 de abril, yo,

Notario: he recabado del representante social manifestación sobre dicha titularidad real, cuyo resultado consta en acta autorizada por mí hoy en unidad de acto. ----------------------

**2.- DON ERNESTO ANTOLÍN CALZADA y DOÑA EMMA FIDELA ANTOLÍN GRANET** en representación de "**GRUPO ANTOLÍN HOLDCO, S.A.**" domiciliada en Burgos, calle Vitoria 307. Constituida por tiempo indefinido, mediante escritura otorgada en Burgos, el día 19 de febrero de 2014, ante el Notario Don José María Gómez-Oliveros Sánchez de Rivera, con el número 286 de protocolo. Inscrita en el Registro Mercantil de Burgos, al tomo 676, libro 467, folio 33, hoja BU-15343, inscripción 1ª. -------------------------------------------------------------------

Con N.I.F. número A09553702. ----------------------------

Manifiesta que el objeto social de la sociedad consiste en: "1. La suscripción, adquisición administración, gestión, tenencia, disfrute y enajenación, por cualquier título, de participaciones sociales, acciones, derechos, opciones, futuros y obligaciones de sociedades mercantiles, cotizadas o no. 2. La prestación de asesoramiento y asistencia técnica,

75

financiera y de gestión relacionado con aquellas sociedades en las que haya invertido o pueda invertir en virtud de derechos para la participación en su capital social o recursos propios de aquellas sociedades. 3. La prestación de servicios de asistencia o apoyo a las sociedades o empresas participadas o comprendidas dentro de su grupo de sociedades, incluyendo la concesión de préstamo participativos o no a dichas sociedades, así como la concesión de las garantías o afianzamientos que resulten oportunos.------------------------------------------------------------

En su carácter de personas físicas representante designada por las consejeras delegadas Mancomunadas, las Sociedades **CANEA, S.L.**, sociedad de nacionalidad española, domiciliada en Burgos, calle Aparicio y Ruiz, 3°, 4° dcha, inscrita en el Registro Mercantil de Burgos, al tomo 301, ropo 89, hoja BU-3258, y con NIF B09271156 e **INJAT, S.L.**, sociedad de nacionalidad española, domiciliada en Burgos, Plaza Santa Maria, número 2. 10C, inscrita en el Registro Mercantil de Burgos, al Tomo 787, Libro 578, Folio 49, Hoja BU-18681, y con NIF número B16766354.------------------------------------------------------------

Fueron nombradas **CANEA, S.L. e INJAT, S.L.** consejeras delegadas de "GRUPO ANTOLÍN HOLDCO, S.A." en virtud de escrituras autorizadas por el Notario de

Burgos Don José María Gómez-Oliveros Sanchez De Rivera, los días 14 de julio de 2020 y 29 de septiembre de 2021, con número 1572 y 3702 respectivamente. -------------

**DON ERNESTO ANTOLÍN CALZADA** fue designado persona física representante para el desempeño de dicho cargo en virtud de escritura autorizada por el Notario de Burgos Don Daniel González del Álamo, el día 26 de febrero de 2026, con número 432 de protocolo. ---------------

Y **DOÑA EMMA FIDELA ANTOLÍN GRANET** en virtud del acuerdo del Consejo de Administración, en su reunión celebrada el día 25 de septiembre de 2023, lo que me acredita con certificación expedida por el Secretario del Consejo de Administracion, don Alberto Guerra San José con el visto bueno de la Presidenta la propia Doña Emma Fidela Antolín Granet, cuyas firmas se encuentran debidamente legitimadas notarialmente y constan inscritos en la hoja a vierta a nombre de la sociedad.--------------------

Me aseguran los señores comparecientes que continúan en el desempeño de su expresado cargo, y que las facultades que le fueron conferidas mantienen su plena vigencia.-------

77

Yo el Notario, hago constar que a mi juicio las facultades representativas acreditadas son suficientes para el presente otorgamiento.-------------------------------------------

DECLARACIÓN DE TITULARIDAD REAL.- Con el objeto de cumplir con la obligación de identificación del titular real que impone la Ley 10/2010, de 28 de abril, yo el Notario, he consultado la Base de Datos de Titularidad Real (BDTR) creada por Acuerdo del Consejo General del Notariado, de 24 de marzo de 2012, (BOE 28 de abril de 2012), cuyo resultado es coincidente con lo manifestado por el representante.-------------------------------------------------

3-. **DOÑA MARÍA LUZ BARROSO GARCÍA y DON ÁLVARO SANTOS ANGARITA,** en nombre y representación de la Entidad **BANCO BILBAO VIZCAYA ARGENTARIA, S.A. ("BBVA"),** de además interviene en representación de **BANCO BILBAO VIZCAYA ARGENTARIA, S.A., NEW YORK BRANCH ("BBVA USA")** la primero tiene su domicilio en Bilbao, Plaza de San Nicolás, 4, y provista de N.I.F. A-48265169; adoptó la denominación de Banco Bilbao Vizcaya, S.A., en virtud de escritura de fusión de los Bancos "Banco de Bilbao, S.A." y "Banco de Vizcaya, S.A." autorizada por el Notario de Bilbao, D. José-María Arriola Arana, el 1 de octubre de 1988, bajo el número 4.350 de su protocolo; adoptó sus

estatutos a la Ley de Sociedades Anónimas, en escritura autorizada por el citado Notario Sr. Arriola, el día 22 de marzo de 1990, número 808 de su protocolo; inscrita en el Registro Mercantil de Vizcaya, al tomos 2.227, folio 49, Sección 8, hoja BI-17A, inscripción 156ª; cambiada su denominación inicial por la actual por fusión de las entidades "Banco Bilbao Vizcaya, S.A." y "Argentaria, Caja Postal, Banco Hipotecario, S.A." en la que la primera de dichas Sociedades absorbe a la segunda, mediante escritura autorizada en Bilbao por el Notario D. José-María Arriola Arana, el día 25 de enero de 2000, bajo el número 149 de su protocolo, inscrita en el Registro Mercantil de Vizcaya, al tomo 3.858, folio 1, Sección 8, hoja B-17-A, inscripción 1.035ª, . -------------------------------------------------------------

Sus facultades para este acto resultan: --------------------

- En cuanto a la Sra. **Barroso García**, a virtud del poder, vigente según afirma, que tiene conferido mediante escritura otorgada en Madrid, el día 20 de mayo de 2016, ante el Notario Don Juan José de Palacio Rodríguez, con el número 1.285 de su protocolo, que causó la inscripción

3.448ª de la hoja social en el Registro Mercantil, de la que tengo a la vista copia autorizada. ------------------------------

- En cuanto al Sr. **Santos Angarita**, del poder, vigente según afirma, que tiene conferido mediante escritura otorgada en Madrid, el día 29 de febrero de 2024, ante el Notario Don Rodrigo Tena Arregui, con el número 407 de protocolo, que causó la inscripción 4658ª de la hoja social en el Registro Mercantil, del que tengo a la vista copia autorizada. -------------------------------------------------------

Me aseguran los indicados apoderados, la plena vigencia de las facultades con que actúan, así como que no ha variado la capacidad jurídica de su representada.----------

DECLARACIÓN DE TITULARIDAD REAL: Yo, el Notario, hago constar expresamente que son de aplicación a la Sociedad interviniente, las excepciones a la obligación de identificación del titular real, de conformidad con lo establecido en el artículo 9 de la Ley 10/2010, de 28 de abril, artículo 15. a) del Real Decreto 304/2014, de 5 de mayo, por el que se aprueba el Reglamento de dicha Ley, y apartado 3.6 (IV. MEDIDAS DE CONTROL INTERNO) del Manual de Procedimiento de Prevención del Blanqueo de Capitales y de la Financiación del Terrorismo. ------------

Asimismo, yo el Notario, hago constar que he consultado la Base de Datos de Titularidad Real (BDTR)

creada por Acuerdo del Consejo General del Notariado, de 24 de marzo de 2012, (BOE 28 de abril de 2012), en la cual consta literalmente: *"La persona jurídica de cuya titularidad real se solicita información consta en las bases de datos del CGN como entidad susceptible de aplicación de medidas simplificadas de diligencia debida (art. 15 del RD 304/2014, de 5 de mayo). Por ello, tal y como establece el artículo 17 de dicho RD, y en función del riesgo, podrían ser aplicables una o varias de las medidas contenidas en el número 1 (letras a-d). En concreto esta persona jurídica está contemplada en el "Apartado c" del artículo 15 del RD 304/2014 como Entidad Financiera"*. -----------------------

4-. **DON JUAN JOSÉ VILLAR CRUZ y DON JAVIER VICENTE LEÓN,** en nombre y representación de "**BANCO DE SABADELL, S.A.**" ("**Banco Sabadell**"), con domicilio social en Sabadell, Plaça de Sant Roc, número 20; constituida de forma indefinida, mediante escritura autorizada por el Notario Don Antonio Capdevila, el día 31 de diciembre de 1881; adaptados sus Estatutos al Real Decreto Legislativo 154/1989 de 22 de diciembre, por

81

el que se aprueba el Texto Refundido de la Ley de Sociedades Anónimas y refundidos en escritura autorizada por el Notario de Sabadell, Don Máximo Catalán Pardo, en 26 de abril de 1990, y modificado su domicilio social por escritura autorizada por el Notario de Sabadell, Don Javier Micó Giner, en 28 de febrero de 2007 e inscrita en el Registro Mercantil de Alicante, tomo 4070, folio 1, sección 8ª, hoja 156980, Con N.I.F. A-08000143.---------------------

El Banco es una entidad de crédito sujeta a la supervisión del Banco de España e inscrita en el Registro administrativo especial con el número 0081. La sede del Banco de España se encuentra en Madrid, en la calle Alcalá, 48, 28014 Madrid. La dirección de Internet es www.bde.es.

Banco Sabadell, S.A. absorbió íntegramente a la entidad SABADELL SOLBANK, S.A. en escritura autorizada por el Notario de Sabadell, Don Javier Micó Giner, el día 11 de marzo de 2014 con el número 2.891 de protocolo, que causó la inscripción 1848ª en la hoja social.-------------------------

Sus facultades para este acto resultan: --------------------

- En cuanto a la Sr. **Villar Cruz**, del poder, vigente según afirma, que tiene conferido mediante escritura otorgada en Barcelona, el día 24 de abril de 2008, ante el Notario Don Miguel Álvarez y Ángel, con el número 1199 de protocolo, que causó inscripción en el Registro Mercantil

de Alicante, del que tengo a la vista copia autorizada. -------

- Y en cuanto a la Sr. **Vicente León**, del poder, vigente según afirma, que tiene conferido mediante escritura otorgada en Barcelona, el día 26 de marzo de 2013, ante el Notario Don Jesús Benavides Lima, con el número 432 de protocolo, que causó la inscripción en el Registro Mercantil de Barcelona, del que tengo a la vista copia autorizada. -----

DECLARACIÓN DE TITULARIDAD REAL: Yo, el Notario, hago constar expresamente que son de aplicación a la Sociedad interviniente, las excepciones a la obligación de identificación del titular real, de conformidad con lo establecido en el artículo 9 de la Ley 10/2010, de 28 de abril, artículo 15. a) del Real Decreto 304/2014, de 5 de mayo, por el que se aprueba el Reglamento de dicha Ley, y apartado 3.6 (IV. MEDIDAS DE CONTROL INTERNO) del Manual de Procedimiento de Prevención del Blanqueo de Capitales y de la Financiación del Terrorismo. ------------

Asimismo, yo el Notario, hago constar que he consultado la Base de Datos de Titularidad Real (BDTR) creada por Acuerdo del Consejo General del Notariado, de

83

24 de marzo de 2012, (BOE 28 de abril de 2012), en la cual consta literalmente: "*La persona jurídica de cuya titularidad real se solicita información consta en las bases de datos del CGN como entidad susceptible de aplicación de medidas simplificadas de diligencia debida (art. 15 del RD 304/2014, de 5 de mayo). Por ello, tal y como establece el artículo 17 de dicho RD, y en función del riesgo, podrían ser aplicables una o varias de las medidas contenidas en el número 1 (letras a-d). En concreto esta persona jurídica está contemplada en el "Apartado c" del artículo 15 del RD 304/2014 como Entidad Financiera*". ------------------------

5-. **DON LUCAS MARTÍN GÓMEZ y DON FERNANDO DE LA HAZA DE LARA** en nombre y representación, como **apoderados** de **BANCO SANTANDER, S.A.** (en adelante, "**Banco Santander**") domiciliada en Santander, Paseo de Pereda números 9 al 12, inscrita en el Registro Mercantil con la hoja número S-1960 y con Código de identificación fiscal A-39000013. ----------

Su objeto social está constituido, en síntesis, por las actividades propias de las entidades bancarias y financieras.

Sus facultades resultan: -------------------------------------

a) En cuanto al Sr. **Martín Gómez**, del poder formalizado mediante la escritura pública otorgada el día 25 de noviembre de 2021, ante el Notario de Madrid, don Juan

de Dios Valencia García, número 3327 de orden de protocolo. --------------------------------------------------------

b) Y en cuanto al Sr. **De La Haza De Lara,** de la escritura pública otorgada el día 9 de julio de 2013 ante el notario de Madrid, don Juan de Dios Valencia García, número 1152 de orden de protocolo. --------------------------

Copias autorizadas de dichas escrituras públicas, con nota de inscripción en el Registro Mercantil, me exhiben. A mi juicio, de ellas, resulta que tienen facultades suficientes para el otorgamiento de la presente escritura pública, y, en particular, para la cancelación de hipotecas. -------------------

Declaran la vigencia de las facultades en virtud de las cuales actúan y la persistencia de la capacidad jurídica y circunstancias de la sociedad por la que intervienen. ---------

DECLARACIÓN DE TITULARIDAD REAL: Yo, el Notario, hago constar expresamente que son de aplicación a la Sociedad interviniente, las excepciones a la obligación de identificación del titular real, de conformidad con lo establecido en el artículo 9 de la Ley 10/2010, de 28 de abril, artículo 15.c) del Real Decreto 304/2014, de 5 de

85

mayo, por el que se aprueba el Reglamento de dicha Ley, y apartado 3.6 (IV. MEDIDAS DE CONTROL INTERNO) del Manual de Procedimiento de Prevención del Blanqueo de Capitales y de la Financiación del Terrorismo. ------------

Asimismo, yo el Notario, hago constar que he consultado la Base de Datos de Titularidad Real (BDTR) creada por Acuerdo del Consejo General del Notariado, de 24 de marzo de 2012, (BOE 28 de abril de 2012), en la cual consta literalmente: "*La persona jurídica de cuya titularidad real se solicita información consta en las bases de datos del CGN como entidad susceptible de aplicación de medidas simplificadas de diligencia debida (art. 15 del RD 304/2014, de 5 de mayo). Por ello, tal y como establece el artículo 17 de dicho RD, y en función del riesgo, podrían ser aplicables una o varias de las medidas contenidas en el número 1(letras a-d). En concreto esta persona jurídica está contemplada en el "Apartado c" del artículo 15 del RD 304/2014 como Entidad Financiera*.--------------------------

6-. **DON FELIPE PLAZA SOTO y DON EDUARDO OCEJO LARRABEITI,** como apoderados mancomunados, en nombre y representación de la mercantil **CAIXABANK, S.A. ("CaixaBank")**, domiciliada en Valencia, calle Pintor Sorolla, 2-4, inscrita en el Registro Mercantil de Valencia al tomo 10370, folio 1, hoja V-

178351; de duración indefinida, constituida con la denominación de "Grupo de Servicios, S.A.", mediante escritura autorizada por el Notario de Barcelona D. Eduardo Blat Gimeno, el día 12 de diciembre de 1980, modificada su denominación varias veces y adoptado el nombre de "Criteria CaixaCorp, S.A.", inmediatamente anterior al actual, mediante escritura autorizada por el Notario de Barcelona, D. Tomás Giménez Duart, con el número 3.511 de su protocolo, consta inscrita en el Registro Mercantil de Barcelona, hoja B-41232. --------------------------------------

Sus facultades para este acto resultan: --------------------

-. En cuanto al Sr. **Plaza Soto**, hace uso de las facultades que resultan de la escritura de apoderamiento otorgada en Barcelona, ante la Notario, doña María Dolores Gimenez Arbona, el día 3 de noviembre de 2022, número 2601 de protocolo, que causó la inscripción 783ª en la referida hoja abierta a la Sociedad en el Registro Mercantil.

-. Y en cuanto al Sr. **Ocejo Larrabeiti**, hace uso de las facultades que resultan de la escritura de apoderamiento otorgada en Barcelona, ante la Notario, doña María Dolores

Gimenez Arbona, el día 29 de mayo de 2023, número 1087 de protocolo, que causó la inscripción 906ª en la referida hoja abierta a la Sociedad en el Registro Mercantil. ----------

<u>DECLARACIÓN DE TITULARIDAD REAL</u>: Yo, el Notario, hago constar expresamente que son de aplicación a la Sociedad interviniente, las excepciones a la obligación de identificación del titular real, de conformidad con lo establecido en el artículo 9 de la Ley 10/2010, de 28 de abril, artículo 15. a) del Real Decreto 304/2014, de 5 de mayo, por el que se aprueba el Reglamento de dicha Ley, y apartado 3.6 (IV. MEDIDAS DE CONTROL INTERNO) del Manual de Procedimiento de Prevención del Blanqueo de Capitales y de la Financiación del Terrorismo. ------------

Asimismo, yo el Notario, hago constar que he consultado la Base de Datos de Titularidad Real (BDTR) creada por Acuerdo del Consejo General del Notariado, de 24 de marzo de 2012, (BOE 28 de abril de 2012), en la cual consta literalmente: "*La persona jurídica de cuya titularidad real se solicita información consta en las bases de datos del CGN como entidad susceptible de aplicación de medidas simplificadas de diligencia debida (art. 15 del RD 304/2014, de 5 de mayo). Por ello, tal y como establece el artículo 17 de dicho RD, y en función del riesgo, podrían ser aplicables una o varias de las medidas contenidas en el*

*número 1 (letras a-d). En concreto esta persona jurídica está contemplada en el "Apartado c" del artículo 15 del RD 304/2014 como Entidad Financiera".* ------------------------

7-. **DON JORGE CUESTA MARCOS y DON PAULO JAIME MONTEIRO** en nombre y representación de la entidad de crédito **BANKINTER, S.A.** ("**Bankinter**"), duración indefinida, con domicilio en Madrid, Paseo de la Castellana número 29, constituida con la denominación de "Banco Intercontinental Español, S.A." (Bankinter), Banco Industrial y de Negocios, sometido al Decreto Ley de 29 de noviembre de 1962, mediante escritura otorgada en esta Capital, el día 4 de junio de 1965, ante el Notario que fue de Madrid, D. Alejandro Bérgamo Llabrés, ampliada su anterior denominación ante el Notario que también fue de esta Capital, D. Manuel de la Cámara Álvarez, el día 5 de septiembre de 1980, con el número 2.518 de su protocolo. Inscrita en el Registro Mercantil de esta Capital, al tomo 1.758 general, 1.259 de la sección 3 del libro de Sociedades, folio 220, hoja 9.643, inscripción 1ª. -------------------------------------------------------------

Adaptada a la Ley de Sociedades Anónimas, mediante escritura otorgada en Madrid, el 24 de julio de 1990, ante el Notario Don Agustín Sánchez Jara, con el número 2.052 de su protocolo, en la cual adoptó la nueva denominación de BANKINTER, SOCIEDAD ANÓNIMA, y actualmente se rige por los Estatutos refundidos, según escritura otorgada ante el citado Notario Sr. Sánchez Jara, el día 28 de septiembre de 1990, con el número 2.556 de su protocolo, que causó la inscripción 1.692ª de la hoja abierta a la Sociedad en dicho Registro Mercantil; y modificados nuevamente sus Estatutos por escritura otorgada en Madrid, el día 26 de octubre de 1992, ante el Notario D. Agustín Sánchez Jara, con el número 3.425 de su protocolo, debidamente inscrita en el mentado Registro Mercantil, con la hoja M-7766. Provista del número de identificación fiscal: A-28157360. -------------------------------------------------

Sus facultades para este acto resultan: --------------------

- En cuanto al Sr. **Cuesta Marcos**, del poder, vigente según afirma, que tiene conferido mediante escritura otorgada en Madrid, el día 3 de febrero de 2022, ante el Notario Don Jesús María Ortega Fernández, con el número 296 de su protocolo, que causó la inscripción 9343ª de la hoja social en el Registro Mercantil, de la que tengo a la vista copia autorizada. -------------------------------------------

- Y en cuanto al Sr. **Monteiro**, del poder, vigente según afirma, que tiene conferido mediante escritura otorgada en Madrid, el día 3 de febrero de 2022, ante la Notario don Jesús Mª Ortega Fernández, con el número 302 de su protocolo, que causó la inscripción 9418ª de la hoja social en el Registro Mercantil, de la que tengo a la vista copia autorizada. ------------------------------------------------------------

DECLARACIÓN DE TITULARIDAD REAL: Yo, el Notario, hago constar expresamente que son de aplicación a la Sociedad interviniente, las excepciones a la obligación de identificación del titular real, de conformidad con lo establecido en el artículo 9 de la Ley 10/2010, de 28 de abril, artículo 15. a) del Real Decreto 304/2014, de 5 de mayo, por el que se aprueba el Reglamento de dicha Ley, y apartado 3.6 (IV. MEDIDAS DE CONTROL INTERNO) del Manual de Procedimiento de Prevención del Blanqueo de Capitales y de la Financiación del Terrorismo. ------------

Asimismo, yo el Notario, hago constar que he consultado la Base de Datos de Titularidad Real (BDTR) creada por Acuerdo del Consejo General del Notariado, de

24 de marzo de 2012, (BOE 28 de abril de 2012), en la cual consta literalmente: "*La persona jurídica de cuya titularidad real se solicita información consta en las bases de datos del CGN como entidad susceptible de aplicación de medidas simplificadas de diligencia debida (art. 15 del RD 304/2014, de 5 de mayo). Por ello, tal y como establece el artículo 17 de dicho RD, y en función del riesgo, podrían ser aplicables una o varias de las medidas contenidas en el número 1 (letras a-d). En concreto esta persona jurídica está contemplada en el "Apartado c" del artículo 15 del RD 304/2014 como Entidad Financiera*". ------------------------

8-. **DON JUAN FRANCISCO AMORAGA CHEREGUINI Y DON SEBASTIÁN LEÓN MORENO,** como apoderados mancomunados, en nombre y representación de la Entidad **HSBC Continental Europe ("HSBC")**, sociedad anónima de derecho francés, con domicilio social en 38, Avenue Kléber, 75116 – Paris, Francia, e inscrita en el Registro Mercantil de París con el número 775 670 284 RCS. Tiene asignado el N.I.F. número **N0014939C**.-------------------------------------------------

Su objeto es el desarrollo en España de las actividades propias de su matriz, que están constituidas, en síntesis, por las propias de las entidades financieras. ------------------------

Sus facultades resultan: ------------------------------------

En cuanto Al Sr. **Chereguini Amoraga**, del poder conferido a su favor mediante la escritura pública otorgada el día 27 de julio de 2022, ante el Notario de Madrid, don Antonio-Luis Reina Gutiérrez, número 7.048 de orden de protocolo. -----------------------------------------------------------

**Y en cuanto al Sr. León Moreno**, del poder conferido a su favor mediante la escritura pública otorgada el día 22 de junio de 2023, ante el Notario de Madrid, don Antonio-Luis Reina Gutiérrez, número 5.839 de orden de protocolo.

**<u>DECLARACIÓN DE TITULARIDAD REAL:</u>** Yo, el Notario, hago constar expresamente que son de aplicación a la Sociedad interviniente, las excepciones a la obligación de identificación del titular real, de conformidad con lo establecido en el artículo 9 de la Ley 10/2010, de 28 de abril, artículo 15.d) del Real Decreto 304/2014, de 5 de mayo, por el que se aprueba el Reglamento de dicha Ley, y apartado 3.6 (IV. MEDIDAS DE CONTROL INTERNO) del Manual de Procedimiento de Prevención del Blanqueo de Capitales y de la Financiación del Terrorismo. ------------

Asimismo, yo el Notario, hago constar que he

93

consultado la Base de Datos de Titularidad Real (BDTR) creada por Acuerdo del Consejo General del Notariado, de 24 de marzo de 2012, (BOE 28 de abril de 2012), en la cual consta literalmente: "*La persona jurídica de cuya titularidad real nos solicita información consta en las bases de datos del Consejo General del Notariado como entidad susceptible de aplicación de medidas simplificadas de diligencia debida (art. 15 del RD 304/2014, de 5 de mayo). Por ello, tal y como establece el artículo 17 de dicho RD y en función del riesgo, podrían ser aplicables una o varias de las medidas contenidas en el número 1 (letras a - d).*". --

9-. **DON JUAN FRANCISCO AMORAGA CHEREGUINI** como apoderado de **"HSBC Continental Europe, SUCURSAL EN ESPAÑA"**, domiciliada en Madrid, Plaza Pablo Ruiz Picasso nº 1, Torre Picasso, planta 32, constituida por escritura otorgada ante el Notario de Madrid, Don Antonio Luis Reina Gutiérrez, el 2 de octubre de 2018, número 8.427 de orden de su protocolo, e inscrita en el Registro Mercantil de esta Provincia, al tomo 38.314 general de la Sección 8ª del Libro de Sociedades, folio 1, hoja número M-681702, inscripción 1ª. -----------------------

Tiene asignado el N.I.F. número W2502598B. -----------

Sus facultades para este acto resultan de del poder conferido a su favor mediante la escritura pública otorgada

el día 20 de enero de 2022, ante el Notario de Madrid, don Antonio-Luis Reina Gutiérrez, número 426 de orden de protocolo. ----------------------------------------------------------

**DECLARACIÓN DE TITULARIDAD REAL:** Yo, el Notario, hago constar expresamente que son de aplicación a la Sociedad interviniente, las excepciones a la obligación de identificación del titular real, de conformidad con lo establecido en el artículo 9 de la Ley 10/2010, de 28 de abril, artículo 15.d) del Real Decreto 304/2014, de 5 de mayo, por el que se aprueba el Reglamento de dicha Ley, y apartado 3.6 (IV. MEDIDAS DE CONTROL INTERNO) del Manual de Procedimiento de Prevención del Blanqueo de Capitales y de la Financiación del Terrorismo. ------------

Asimismo, yo el Notario, hago constar que he consultado la Base de Datos de Titularidad Real (BDTR) creada por Acuerdo del Consejo General del Notariado, de 24 de marzo de 2012, (BOE 28 de abril de 2012), en la cual consta literalmente: "*La persona jurídica de cuya titularidad real nos solicita información consta en las bases de datos del Consejo General del Notariado como entidad*

95

*susceptible de aplicación de medidas simplificadas de diligencia debida (art. 15 del RD 304/2014, de 5 de mayo). Por ello, tal y como establece el artículo 17 de dicho RD y en función del riesgo, podrían ser aplicables una o varias de las medidas contenidas en el número 1 (letras a - d).".* --

10.- **DON CRISTÓBAL MONTOJO ARTEAGA** como apoderado de **GLAS SPECIALIST SERVICES LIMITED** (el "**Agente de la Reestructuración**") sociedad con domicilio en 10 Old Bailey, 2nd Floor, London, EC4M 7NG Ludgate, Inglaterra y N.I.F. N6061001A, inscrita en el Registro Mercantil de y de Sociedades de Inglaterra y Gales, bajo el número 784614. -----------------------------------------

Sus facultades para este acto resultan del poder especial, vigente según afirma, que tiene conferido por Don Brian Jonathan Carne en su condición de representante legal, en Londres el día 1 de julio de 2025, ante doña Eleonora Andrea Ceolin Notario Público, cuyo original me exhibe en este acto, redactado a doble columna en idiomas inglés y castellano, legalizado mediante Apostilla el día 2 de julio de 2025.------------------------------------------------------------

Yo, el Notario, hago constar, en relación a la representación de esta Sociedad lo siguiente, en cumplimiento de lo preceptuado en el artículo 36 del Reglamento Hipotecario: ---------------------------------------



(i) Que la entidad representada está válida y legalmente constituida conforme a las leyes de Inglaterra y Gales. ------

(ii) Que el otorgante de dicho apoderamiento ha sido debidamente identificado por el Notario del país de origen reseñado. ------------------------------------------------------------

(iii) Que dicho Notario ha realizado debidamente juicio de suficiencia de las facultades del otorgante, haciendo constar en dicho apoderamiento su aptitud y capacidad legal para que el citado poder pueda desplegar toda su eficacia. --

(iv) Que se han observado las formas y solemnidades requeridas en el país de origen para el acto de apoderamiento.-------------------------------------------------

DECLARACIÓN DE TITULARIDAD REAL.- Con el objeto de cumplir con la obligación de identificación del titular real que impone la Ley 10/2010, de 28 de abril, yo, Notario: he recabado del representante social manifestación sobre dicha titularidad real, cuyo resultado consta en acta autorizada por el Notario de Madrid, don José-Miguel Garcia Lombardía, el 17 de febrero de 2026, con el número 920 de protocolo, manifestando no haberse modificado su

97

contenido. ------------------------------------------------------------

En adelante, las entidades referidas en los apartados 1.A. al 1.JJ, ambos inclusive, ya sea en su condición de deudora principal o garante de la Deuda Afectada, serán denominadas conjuntamente las **"Sociedades Reestructuradas"** y, cada una de ellas, individualmente, una **"Sociedad Reestructurada"**. -----------------------------

En adelante, las entidades referidas en los apartados 1. KK. a la 2, ambos inclusive, ya sea en su condición de deudora principal o garante de la Deuda Afectada, serán denominadas conjuntamente las **"Garantes Adicionales"** y, cada una de ellas, individualmente, una **"Garante Adicional"**.

En adelante, las entidades referidas en los apartados (3) a (9) anteriores, ambos inclusive, serán denominados conjuntamente, los **"Acreedores Participantes Originales"**. ----------------------------------------------------------

En adelante, las Sociedades Reestructuradas, los Garantes Adicionales, los Acreedores Participantes Originales y el Agente de la Reestructuración serán denominados, conjuntamente, las **"Partes"**. -------------------

Las personas intervinientes por cada una de las Partes, así como las facultades representativas de las mismas y los datos de cada una de las Partes a efectos de identificación de

las mismas constan en la diligencia de intervención que se unirá al presente Plan.---------------------------------------------

Juzgo a los comparecientes, según intervienen, con la bajo mi responsabilidad, con facultades representativas suficientes para formalizar esta **ESCRITURA DE REFUNDICIÓN Y ELEVACIÓN A PÚBLICO DE UN PLAN DE REESTRUCTURACIÓN CONJUNTO** (artículo 583 del TRLC), y con capacidad legal para ello y, al efecto, -----------------------------------------------------------

---------------------- **EXPONEN:** --------------------------

**I.-** Que el pasado 24 de junio de 2026 se suscribió un plan de reestructuración conjunto en relación con las Sociedades Reestructuradas, el cual fue elevado a público en esa misma fecha mediante escritura otorgada ante el Notario autorizante con el número 3847 de orden de protocolo (el "**Plan de Reestructuración Original**").-----------------------

**II.-** Que las partes firmantes del Plan de Reestructuración han detectado una omisión formal e involuntaria y han decidido proceder a su subsanación mediante la formalización de un texto refundido.-------------

**III.-** Que, a la vista de lo anterior, las Partes intervinientes en esta escritura han suscrito en el día de hoy un documento privado junto con sus anexos, denominado "PLAN DE REESTRUCTURACIÓN CONJUNTO", en los términos, con los pactos y condiciones que se establecen en el mismo y del que me entregan un ejemplar para su protocolización, en lo sucesivo, el **"Plan de Reestructuración"**, y del que tomo plena razón y constancia de sus términos y condiciones. --------------------

**IV.-** Que es intención de las Partes elevar a público dicho Plan de Reestructuración, para que tenga los efectos legales oportunos, especialmente su sometimiento a la Ley 1/2000, de 7 de enero, de Enjuiciamiento Civil (en lo sucesivo, la **"LEC"**) y al Real Decreto Legislativo 1/2020, de 5 de mayo, por el que se aprueba el texto refundido de la Ley Concursal (tal y como haya sido modificado en cada momento y, en particular, en virtud de la Ley 16/2022 de 5 de septiembre, en lo sucesivo el **"TRLC"**) y, según intervienen otorgan esta escritura, con sujeción a las siguientes,---------------------------------------------------------

--------------- **ESTIPULACIONES:** --------------------

**PRIMERA. Prevalencia del Plan de Reestructuración.** Las Partes acuerdan en virtud de la presente que los términos y condiciones previstos en el Plan

de Reestructuración Original pasen a regularse íntegramente por el Plan de Reestructuración que forma parte de la presente escritura, sin solución de continuidad y con carácter modificativo, no extintivo, debiéndose de acreditar el cumplimiento de las Condiciones Suspensivas a las que hace referencia la Estipulación Sexta siguiente de conformidad con el Plan de Reestructuración.-----------------

**SEGUNDA. Elevación a público**: Queda elevado a público el Plan de Reestructuración, que me entregan, suscrito por las Partes en esta misma fecha, el cual consta extendido en papel común, para que forme parte integrante de esta escritura, e insertar en sus copias y traslados, dándose aquí su contenido por íntegramente reproducido a fin de evitar innecesarias repeticiones, y al que me remito en todas sus partes. El Plan de Reestructuración ha quedado protocolizado en esta matriz, del que aceptan, aprueban y ratifican todos y cada uno de los acuerdos, términos y condiciones en él reseñados y sus anexos, obligándose a su más estricto cumplimiento.-------------------------------------

**TERCERA. Ratificación**: las Partes, según

101

intervienen, ratifican íntegramente y en todos sus términos el Plan de Reestructuración.  El Plan de Reestructuración así ratificado y elevado a público adquiere la condición de título ejecutivo a todos los efectos previstos en la LEC y en las demás disposiciones legales aplicables. -----------------------

**CUARTA. Definiciones**: Las Partes expresamente hacen constar que todos los términos definidos en la presente escritura tendrán el significado que se establece en el Plan de Reestructuración.------------------------------------

**QUINTA. Título**: El Plan de Reestructuración, así ratificado y elevado a público, adquiere la condición de documento público a los efectos del cumplimiento de lo dispuesto en el artículo 634 del TRLC y a todos los efectos previstos en los artículos 517.2.4º, 572 y concordantes de la Ley 1/2000 de Enjuiciamiento Civil, de 7 de enero y, además, desplegarán los efectos previstos en los artículos 1.216 y siguientes, 1.924.3 y 1.929 del Código Civil y en las demás disposiciones legales aplicables y, por consiguiente, las obligaciones que se deriven del contenido del mismo tendrán carácter ejecutivo.------------------------------------

**SEXTA.- Condiciones Suspensivas**. El Plan de Reestructuración elevado a público contiene dos condiciones suspensivas: --------------------------------------

(i) una condición suspensiva para la entrada en vigor

referida en la Cláusula 11 del mismo (la "**Condición Suspensiva para la Entrada en Vigor**"); y------------------

(ii) una condición suspensiva para la efectividad referida en la Cláusula 12 del mismo (la "**Condición Suspensiva para la Efectividad**");--------------------------

dándose aquí sus contenidos por íntegramente reproducidos a fin de evitar innecesarias repeticiones.-------

De acuerdo con lo previsto en el Plan de Reestructuración, las Partes instruyen y autorizan expresamente al notario autorizante para que expida cuantas diligencias sean necesarias a la presente a efectos de dejar constancia del cumplimiento de la Condición Suspensiva para la Entrada en Vigor y Condición Suspensiva para la Efectividad.------------------------------------------------------

**SÉPTIMA.- Requerimientos al Notario**. De conformidad con la Cláusula 11 del Plan de Reestructuración, las Partes requieren al Notario para que, una vez haya recibido las Certificaciones de Mayorías y, en su caso, el Informe de Valoración del Experto (tal y como estos términos se definen en el Plan de Reestructuración),

103

incorpore dichas Certificaciones de Mayorías y, en su caso, el Informe de Valoración del Experto, a la presente Escritura mediante diligencia. -----------------------------------

Asimismo, de conformidad con la Cláusula 12 del Plan de Reestructuración, las Partes requieren al Notario para que, una vez se le haya acreditado el cumplimiento de la Condición Suspensiva de Efectividad en los términos del Plan de Reestructuración, lo haga constar así mediante la oportuna diligencia a la presente Escritura. --------------------

Los requerimientos quedan aceptados.---------------------

**OCTAVA.- Adhesión**. --------------------------------------

Las Partes requieren al notario para que incorpore a la presente escritura las actas de adhesión al Plan de Reestructuración, en los términos previstos en la Cláusula 7 (*Adhesión de Acreedores Afectados durante el Periodo de Adhesión*) del Plan de Reestructuración. -----------------------

El requerimiento queda aceptado. -------------------------

**NOVENA. Gastos**: La presente escritura pública se considera un documento sin cuantía de conformidad con el artículo 634.2 del TRLC. Todos los honorarios, gastos e impuestos que se deriven del contrato que por medio de la presente queda elevado a público, así como los derivados de la presente escritura, serán satisfechos por **GRUPO ANTOLÍN – IRAUSA, S.A.** ----------------------------------

**DÉCIMA.- Copias**: Cualquiera de las Partes podrá solicitar directamente al Notario autorizante, la expedición de copias autorizadas de la presente escritura. Las primeras copias correrán a cargo de **GRUPO ANTOLÍN – IRAUSA, S.A.** y las segundas y ulteriores copias, a cargo de la parte solicitante. -------------------------------------------

**UNDÉCIMA.- Ley y jurisdicción**: La presente escritura se regirá e interpretará de acuerdo con la ley común española. Las Partes se someten irrevocablemente para el conocimiento y resolución de cualquier reclamación que pudiera derivarse de la presente escritura a la jurisdicción de los Tribunales y Juzgados de la ciudad de Burgos. -------------------------------------------------------------

Yo, el Notario, hago constar, en cumplimiento de lo establecido en el artículo 23 de la Ley del Notariado, que he consultado la lista de números de identificación fiscal revocados de la AGENCIA ESTATAL DE ADMINISTRACIÓN TRIBUTARIA, a través del acceso habilitado en el Sistema Integrado de Gestión del Notariado (SIGNO), resultando que las mercantiles aquí representadas

105

no figuran en dicha lista, por lo que es procedente el otorgamiento de esta escritura.----------------------------------

------------------OTORGAMIENTO:--------------------

Leída esta escritura, de conformidad con lo prevenido en el artículo 193 del Reglamento Notarial, los señores comparecientes a quienes hice las reservas y advertencias legales y fiscales y de la legislación de Protección de Datos de carácter personal, la aceptan y firman. ---------------------

**<u>Protección de datos de carácter personal</u>**. --------------

Quedan informados los comparecientes de lo siguiente:

Sus datos personales serán objeto de tratamiento en esta Notaría, los cuales son necesarios para el cumplimiento de las obligaciones legales del ejercicio de la función pública notarial, conforme a lo previsto en la normativa establecida en la legislación notarial, de prevención del blanqueo de capitales, tributaria y, en su caso, sustantiva que resulte aplicable al acto o negocio jurídico documentado. La comunicación de los datos personales es un requisito legal, encontrándose el otorgante obligado a facilitar los datos personales, y estando informado de que la consecuencia de no facilitar tales datos es que no sería posible autorizar o intervenir el presente documento público. Sus datos se conservarán con carácter confidencial. ------------------------

La finalidad del tratamiento de los datos es cumplir la

normativa para autorizar/intervenir el presente documento, su facturación, seguimiento posterior y las funciones propias de la actividad notarial de obligado cumplimiento, de las que pueden derivarse la existencia de decisiones automatizadas, autorizadas por la Ley, adoptadas por las Administraciones Públicas y entidades cesionarias autorizadas por Ley, incluida la elaboración de perfiles precisos para la prevención e investigación por las autoridades competentes del blanqueo de capitales y la financiación del terrorismo. ------------------------------------

El Notario realizará las cesiones de dichos datos que sean de obligado cumplimiento a las Administraciones Públicas, a las entidades y sujetos que estipule la Ley y, en su caso, al Notario que suceda o sustituya al actual en esta notaría. -----------------------------------------------------------

Los datos proporcionados se conservarán durante los años necesarios para cumplir con las obligaciones legales del Notario o quien le sustituya o suceda. ----------------------

Puede ejercitar sus derechos de acceso, rectificación, supresión, limitación, portabilidad y oposición al

107

tratamiento por correo postal ante el Notario autorizante. Asimismo, tiene el derecho a presentar una reclamación ante una autoridad de control. --------------------------------------

Los datos serán tratados y protegidos según la Legislación Notarial, la Ley Orgánica 3/2018, de 5 de diciembre, de Protección de Datos Personales y garantía de los derechos digitales (o la Ley que la sustituya) y su normativa de desarrollo, y el Reglamento (UE) 2016/679 del Parlamento Europeo y del Consejo de 27 de abril de 2016, relativo a la protección de las personas físicas en lo que respecta al tratamiento de datos personales y a la libre circulación de estos datos y por el que se deroga la Directiva 95/46/CE. ---------------------------------------------------------

Invito a los comparecientes a leer por sí esta escritura y, una vez que lo han efectuado, la leo yo, el Notario, que he comunicado el contenido del instrumento con la extensión necesaria para el cabal conocimiento de su alcance y efectos, atendidas las circunstancias de los comparecientes, dando fe yo, el Notario, de que después de la lectura, los comparecientes han hecho constar haber quedado debidamente informados del contenido del instrumento, haber prestado a éste su libre consentimiento, lo aprueban y firman.-------------------------------------------------------------

De haber identificado a los comparecientes por sus

documentos de identidad antes reseñados, con retrato y firma, expedido por autoridad pública; de que el consentimiento ha sido libremente prestado así como de que el otorgamiento se adecua a la legalidad y a la voluntad debidamente informada de los otorgantes e intervinientes; y de todo lo contenido en este instrumento público, extendido en cincuenta y cinco folios de papel timbrado del Estado, exclusivo para documentos notariales, de la misma serie, números, el del presente y los cincuenta y cuatro correlativos siguientes, cuya expresión informática queda incorporada con la misma fecha y bajo el mismo número, en el correspondiente protocolo electrónico, yo, el Notario, doy fe. -------------------------------------------------------------------

Están las firmas de los comparecientes. Signado: Francisco Miras Ortiz. Rubricados y sellado. -----------------

**DILIGENCIA**.- En Madrid, a diez de julio de dos mil veintiséis. -------------------------------------------------------------

Yo, ANDRÉS DOMÍNGUEZ NAFRIA, Notario de Madrid, la extiendo para hacer constar que, en el día de hoy, se ha cumplido la Condición Suspensiva de Entrada en

Vigor en los términos que constan en la escritura que antecede, dejando incorporados las Certificaciones de Mayorías y el Informe de Valoración del Experto a la presente, de conformidad con la Cláusula 11 del Plan de Reestructuración. -------------------------------------------------

Y de lo consignado en esta diligencia que va extendida en el presente folio de papel exclusivo para documentos notariales yo, Notario, doy fe.   --------------------------------
Signado: Andrés Domínguez Nafría. Rubricados y sellado.

-------------------------------------------------------------------
-------------------------------------------------------------------
-------------------------------------------------------------------
-------------------------------------------------------------------
-------------------------------------------------------------------
-------------------------------------------------------------------
-------------------------------------------------------------------
-------------------------------------------------------------------
-------------------------------------------------------------------
-------------------------------------------------------------------
-------------------------------------------------------------------
-------------------------------------------------------------------
-------------------------------------------------------------------
------------- SIGUEN DOCUMENTOS UNIDOS-------------

*Privileged and Confidential*

**PLAN DE REESTRUCTURACIÓN CONJUNTO**

entre

**GRUPO ANTOLÍN-IRAUSA, S.A.U.**
y
**DETERMINADAS SOCIEDADES DEL GRUPO**
como Sociedades Reestructuradas

**BANCO BILBAO VIZCAYA ARGENTARIA, S.A.**
**BANCO BILBAO VIZCAYA ARGENTARIA, S.A., NEW YORK BRANCH**
**BANCO DE SABADELL, S.A.**
**BANCO SANTANDER, S.A.**
**BANKINTER, S.A.**
**CAIXABANK, S.A.**
**HSBC CONTINENTAL EUROPE**
**HSBC CONTINENTAL EUROPE, SUCURSAL EN ESPAÑA**
como Acreedores Participantes Originales

**ANTOLIN TANGER S.A.R.L.**
**GRUPO ANTOLIN BESANÇON S.A.S.**
**TRIMTEC LTDA.**
**INTERTRIM LTDA.**
**GRUPO ANTOLÍN ITALIA, S.A.R.L.**
**GRUPO ANTOLÍN HOLDCO, S.A.**
como Nuevos Garantes ICA

y

**GLAS SPECIALIST SERVICES LIMITED**
como Agente de la Reestructuración

**10 de julio de 2026**

# G A _ P
Gómez-Acebo & Pombo

111

*Privileged and Confidential*

## ÍNDICE

*COMPARECEN*............................................................................................. 5

*EXPONEN* ................................................................................................... 8

*CLÁUSULAS*.............................................................................................. 16

*1.     DEFINICIONES E INTERPRETACIÓN* ............................................ 16

    *1.1.     Términos definidos* ................................................................. 16

    *1.2.     Interpretación* ........................................................................ 16

*2.     OBJETO Y NATURALEZA DEL PLAN DE REESTRUCTURACIÓN* ............. 17

    *2.1.     Objeto* .................................................................................. 17

    *2.2.     Naturaleza del Plan de Reestructuración* ................................. 18

    *2.3.     Acuerdo único*........................................................................ 19

    *2.4.     Fases de la Reestructuración* .................................................. 19

*3.     FORMACIÓN DE CLASES* ................................................................ 21

    *3.1.     Consideración previa* .............................................................. 21

    *3.2.     Criterios generales de formación de clases* ............................. 21

    *3.3.     Clases* .................................................................................. 22

    *3.4.     Aprobación de la Reestructuración. Mayorías y pacto de sindicación* ................... 25

*4.     CUMPLIMIENTO DE REQUISITOS DEL PLAN DE REESTRUCTURACIÓN*
    26

    *4.1.     Requisitos legales de contenido* ............................................. 26

    *4.2.     Notificación del Plan de Reestructuración* ............................... 26

    *4.3.     Formalización en documento público* ...................................... 28

*5.     TÉRMINOS Y TRATAMIENTO DE LA REESTRUCTURACIÓN DE LA
DEUDA AFECTADA*.................................................................................. 29

    *5.1.     Términos de la Reestructuración* ............................................ 29

    *5.2.     Tratamiento de la Deuda Afectada* .......................................... 29

    *5.3.     Implementación de la Reestructuración en la Deuda Afectada*............................. 39

    *5.4.     Garantías otorgadas en el contexto del Plan*.............................. 41

    *5.5.     Novación del Contrato entre Acreedores*.................................. 45

    *5.6.     Intereses y comisiones devengados bajo los Contratos Afectados*........................... 47

    *5.7.     Créditos derivados de las Líneas de Avales Existentes*.............................. 49

*Privileged and Confidential*

6.      **PRÓRROGAS DEL FACTORING SINDICADO EXISTENTE Y CONTRATO DE FINANCIACIÓN DE CIRCULANTE** ................................................................ *49*

    *6.1.    Mantenimiento y prórrogas del Factoring Sindicado Existente desde el 23 de enero de 2027* ................................................................................................ *50*

    *6.2.    Formalización del Contrato de Financiación de Circulante* .................................. *51*

    *6.3.    Condiciones del Contrato de Financiación de Circulante* ..................................... *51*

7.      **ADHESIÓN DE ACREEDORES AFECTADOS DURANTE EL PERIODO DE ADHESIÓN** ............................................................................................................ *56*

8.      **HOMOLOGACIÓN Y EXTENSIÓN DE EFECTOS** ........................................ *57*

    *8.1.    Homologación Judicial como condición esencial de la Reestructuración* ............. *57*

    *8.2.    Solicitud de Homologación* ................................................................................... *58*

    *8.3.    Cumplimiento de requisitos para la Homologación Judicial* ................................. *60*

    *8.4.    Extensión de efectos a los Acreedores No Participantes* ....................................... *60*

    *8.5.    Efectos de la Homologación Judicial* .................................................................... *61*

9.      **RECONOCIMIENTO CONFORME AL CAPÍTULO 15 (CHAPTER 15) DEL TÍTULO 11 DEL CÓDIGO DE LOS ESTADOS UNIDOS** ................................ *61*

10.     **CESIÓN** ......................................................................................................... *61*

    *10.1.   Cesión por los Acreedores Afectados* .................................................................... *61*

    *10.2.   Cesión por las Sociedades Reestructuradas* ......................................................... *62*

11.     **CONDICIÓN SUSPENSIVA PARA LA ENTRADA EN VIGOR** ...................... *62*

12.     **CONDICIÓN SUSPENSIVA PARA LA FECHA DE EFECTIVIDAD** .............. *64*

13.     **RESOLUCIÓN** ............................................................................................... *65*

14.     **REPRESENTACIÓN DE LAS PARTES** .......................................................... *67*

    *14.1.   Representante de las Sociedades Reestructuradas* .................................................. *67*

    *14.2.   Agente de la Reestructuración* ............................................................................... *68*

15.     **COMUNICACIONES Y NOTIFICACIONES ENTRE LAS PARTES** .............. *75*

16.     **GASTOS** ....................................................................................................... *75*

17.     **PREVALENCIA Y COMPROMISO DE NO MODIFICACIÓN** ........................ *76*

18.     **CONFIDENCIALIDAD Y PUBLICIDAD** ........................................................ *76*

19.     **PROTECCIÓN DE DATOS** ............................................................................ *79*

20.     **CONSERVACIÓN DEL ACUERDO** ............................................................... *80*

21.     **LEGISLACIÓN APLICABLE** ......................................................................... *80*

22.     **JURISDICCIÓN** ........................................................................................... *80*

3

*Privileged and Confidential*

*ANEXO I. DEFINICIONES*............................................................................ *92*

*ANEXO II. DEUDA AFECTADA* ................................................................ *106*

   *Anexo II Parte I Deuda Bancaria*............................................................. *106*

   *Anexo II Parte II Bonos Existentes*.......................................................... *142*

   *Anexo II Parte III Líneas de Avales Existentes* ....................................... *152*

   *Anexo II Parte IV Préstamos Intragrupo* ................................................ *161*

*ANEXO III. DEUDA NO AFECTADA* ...................................................... *177*

*ANEXO IV. CLASES DE CADA UNA DE LAS SOCIEDADES REESTRUCTURADAS*
....................................................................................................................... *190*

*ANEXO V. PLAN DE VIABILIDAD*........................................................... *192*

*ANEXO VI. REQUISITOS LEGALES DE CONTENIDO DEL PLAN DE
REESTRUCTURACIÓN* ............................................................................. *194*

   *Apéndice I al Anexo VI. Datos de las Sociedades Reestructuradas*.................. *202*

   *Apéndice II al Anexo VI. Activo y pasivo de las Sociedades Reestructuradas*.................. *210*

*ANEXO VII. HOJA DE TÉRMINOS DE LA REESTRUCTURACIÓN* ....................... *211*

*ANEXO VIII. INVITACIÓN*........................................................................ *213*

*ANEXO IX. FORMULARIO DE ELECCIÓN DE ENTIDADES*................................ *215*

   *Apéndice al Anexo IX. Formulario de Elección de Entidades: Deuda Afectada*............... *216*

*ANEXO X. DOCUMENTO DE ADHESIÓN*................................................ *218*

*ANEXO XI. DATOS A EFECTOS DE NOTIFICACIONES*......................... *221*

*Privileged and Confidential*

## PLAN DE REESTRUCTURACIÓN CONJUNTO

En Madrid, a 10 de julio de 2026

Con la participación de D. Andrés Domínguez Nafría, Notario del Ilustre Colegio Notarial de Madrid (o aquél que le sustituya en la Fecha de Firma).

### COMPARECEN

De una parte,

(A)    **GRUPO ANTOLÍN-IRAUSA, S.A.U.** ("**Antolín Irausa**")

(B)    **GRUPO ANTOLÍN ARAGUSA, S.A.U.** ("**Antolín Aragusa**")

(C)    **GRUPO ANTOLÍN EUROTRIM, S.A.U.** ("**Antolín Eurotrim**")

(D)    **GRUPO ANTOLÍN INGENIERÍA, S.A.U.** ("**Antolín Ingeniería**")

(E)    **GRUPO ANTOLÍN PLASBUR, S.A.U.** ("**Antolín Plasbur**")

(F)    **GRUPO ANTOLÍN RYA, S.A.U.** ("**Antolín RyA**")

(G)    **GRUPO ANTOLÍN-AUTOTRIM, S.A.U.**

(H)    **GRUPO ANTOLÍN-GLASS, S.A.U.**

(I)    **GRUPO ANTOLÍN LUSITÂNIA, COMPONENTES AUTOMÓVEL, UNIPESSOAL, LDA.** ("**Antolín Lusitania**")

(J)    **GRUPO ANTOLIN BRATISLAVA S.R.O.**

(K)    **GRUPO ANTOLÍN OSTRAVA S.R.O.**

(L)    **GRUPO ANTOLÍN TURNOV S.R.O.**

(M)    **ANTOLIN LIBAN, S.R.O.**

(N)    **GRUPO ANTOLÍN BOHEMIA, A.S.**

(O)    **GRUPO ANTOLIN SIBIU SRL**

5

*Privileged and Confidential*

(P)   ANTOLIN SILESIA SP. Z O.O.

(Q)   GRUPO ANTOLIN BAMBERG GMBH & CO. KG

(R)   ANTOLIN DEUTSCHLAND GMBH

(S)   GRUPO ANTOLIN LOGISTIK DEUTSCHLAND GMBH

(T)   ANTOLIN STRAUBING GMBH

(U)   ANTOLIN INTERIORS UK LIMITED

(V)   GRUPO ANTOLIN LEAMINGTON LIMITED

(W)   GRUPO ANTOLIN UK LIMITED

(X)   ANTOLÍN INTERIORS MÉXICO, S.A. DE C.V.

(Y)   GRUPO ANTOLÍN SILAO, S.A. DE C.V.

(Z)   GRUPO ANTOLÍN SALTILLO, S. DE R.L. DE C.V.

(AA)   GRUPO ANTOLÍN TLAXCALA, S. DE R.L. DE C.V.

(BB)   GRUPO ANTOLIN CUAUTITLÁN, S. DE R.L. DE C.V.

(CC)   GRUPO ANTOLÍN NORTH AMERICA, INC

(DD)   ANTOLÍN ALABAMA, LLC

(EE)   ANTOLIN INTERIORS USA, INC.

(FF)   ANTOLÍN SHELBY, INC.

(GG)   GRUPO ANTOLIN MISSOURI, LLC

(HH)   GRUPO ANTOLÍN KENTUCKY, INC.

(II)   GRUPO ANTOLÍN MICHIGAN, INC.

(JJ)   GRUPO ANTOLIN SOUTH AFRICA (PTY) LTD.

6

A estos efectos, Antolín Irausa suscribe el presente Plan en su condición de deudor principal bajo los Bonos Existentes, el Contrato de Financiación Sindicada Existente, los Contratos de Financiación BEI Existentes y las Líneas de Avales Existentes, así como prestataria y garante bajo el Contrato de Financiación ICO Existente.

Asimismo, las entidades referidas en los apartados (A) a (F) anteriores suscriben el presente Plan en su condición de prestatarios bajo el Contrato de Financiación ICO Existente y, junto con las entidades referidas en los apartados (G) a (JJ), como garantes bajo los Bonos Existentes, el Contrato de Financiación Sindicada Existente, el Contrato de Financiación ICO Existente y los Contratos de Financiación BEI, así como en su condición de deudores principales bajo los Préstamos Intragrupo correspondientes en los que ostenten tal condición.

En adelante, las entidades referidas en los apartados (A) a (JJ) anteriores, ambos inclusive, ya sea en su condición de deudora principal, prestataria, o garante de la Deuda Afectada, serán denominadas conjuntamente las "**Sociedades Reestructuradas**" y, cada una de ellas, individualmente, una "**Sociedad Reestructurada**".

De otra parte,

(KK)   **Banco Bilbao Vizcaya Argentaria, S.A. ("BBVA")**

(LL)   **Banco Bilbao Vizcaya Argentaria, S.A., New York Branch ("BBVA USA")**

(MM)  **Banco de Sabadell, S.A. ("Banco Sabadell")**

(NN)   **Banco Santander, S.A. ("Banco Santander")**

(OO)   **Bankinter, S.A. ("Bankinter")**

(PP)   **CaixaBank, S.A. ("CaixaBank")**

(QQ)   **HSBC Continental Europe ("HSBC Europe")**

(RR)   **HSBC Continental Europe, Sucursal en España ("HSBC España")**

En adelante, las entidades referidas en los apartados (KK) a (RR) anteriores, ambos inclusive, serán denominados conjuntamente, los "**Acreedores Participantes Originales**".

De otra parte,

(SS)   **GLAS Specialist Services Limited** (el "**Agente de la Reestructuración**").

7

117

*Privileged and Confidential*

En adelante, las Sociedades Reestructuradas, los Acreedores Participantes Originales y el Agente de la Reestructuración serán denominados, conjuntamente, las "**Partes**".

Y de otra parte,

(TT)    **GRUPO ANTOLÍN HOLDCO, S.A.** ("**Antolín HoldCo**").

(UU)    **GRUPO ANTOLIN ITALIA S.R.L.**

(VV)    **GRUPO ANTOLIN BESANÇON SAS**

(WW)    **ANTOLIN TANGER SARL**

(XX)    **TRIMTEC LTDA.**

(YY)    **INTERTRIM LTDA.**

Las entidades referidas en los apartados (TT) a (YY) anteriores (las "**Nuevas Garantes ICA**") suscriben el presente Plan a los efectos de obligarse a constituirse como garantes personales a primer requerimiento mediante el otorgamiento de las Nuevas Garantías Personales ICA en los términos previstos en la Cláusula 5.4.8 y, en el caso de Antolín HoldCo, también a los efectos de tomar razón y consentir la extensión del Plan a las Prendas sobre Antolín Irausa a los efectos del Artículo 652.2 de la Ley Concursal y conforme a los términos previstos en la Cláusula 5.4.4 y siguientes.

Las personas intervinientes por cada una de las Partes, así como las facultades representativas de las mismas y los datos de cada una de las Partes a efectos de su identificación constan en la diligencia de intervención que se unirá al presente Plan.

## EXPONEN

I.      Que las Sociedades Reestructuradas y las Nuevas Garantes ICA son sociedades pertenecientes al mismo grupo empresarial dedicado al desarrollo, diseño y fabricación de componentes de interior para la industria del automóvil (el "**Grupo**").

II.     Que, las Sociedades Reestructuradas, según corresponda, tienen suscritos, entre otros, los instrumentos de deuda que se detallan a continuación (conjuntamente, los "**Contratos Afectados**") que se corresponde con el perímetro de afectación del presente Plan:

(a)     la emisión por Antolín Irausa de bonos sénior garantizados y sujetos a ley del Estado de Nueva York (EE.UU.) con vencimiento final el 30 de abril de 2028,

8

*Privileged and Confidential*

regidos por el instrumento de emisión (*indenture*) de fecha 29 de junio de 2021 (tal y como el mismo haya sido novado y complementado en cada momento, el "**Instrumento de Emisión de los Bonos 2028**"), y formalizada en la escritura de emisión de obligaciones otorgada el 23 de julio de 2021 ante el notario de Burgos, D. José María Gómez-Oliveros, con el número 2881 de orden de su protocolo (los "**Bonos 2028**");

(b)    la emisión por Antolín Irausa de bonos sénior garantizados y sujetos a ley del Estado de Nueva York (EE.UU.) con vencimiento final el 30 de enero de 2030, regidos por el instrumento de emisión (*indenture*) de fecha 31 de julio de 2024 (tal y como el mismo haya sido novado y complementado en cada momento, el "**Instrumento de Emisión de los Bonos 2030**"), y formalizada en la escritura de emisión de obligaciones otorgada en esa misma fecha ante el notario de Burgos, D. José María Gómez-Oliveros, con el número 3132 de orden de su protocolo (los "**Bonos 2030**" y, conjuntamente con los Bonos 2028, los "**Bonos Existentes**");

(c)    el contrato de financiación sindicada (*senior facilities agreement*) sujeto a ley inglesa originalmente suscrito el 13 de marzo de 2014 por Antolín Irausa, como deudora, ciertas sociedades del Grupo, como garantes personales, Banco Bilbao Vizcaya Argentaria, S.A., Banco de Sabadell, S.A., Banco Santander, S.A., Bankinter, S.A., BNP Paribas S.A. Sucursal en España, CaixaBank, S.A. y Deutsche Bank AG, London Branch, como *mandated lead arrangers*, Banca March, S.A. y Banco Espírito Santo, S.A. Sucursal en España, como *arrangers*, Deutsche Bank AG, London Branch, como agente y agente de garantías, y las entidades financieras que en cada momento ostentan la condición de acreditantes, elevado a público mediante escritura otorgada el 2 de abril de 2014 ante el notario de Burgos, D. José María Gómez-Oliveros Sánchez de Rivera, con el número 683 de orden de su protocolo (tal y como el mismo ha sido novado y refundido en cada momento, y, en particular, tal y como fue novado y refundido el 19 de julio de 2024, el "**Contrato de Financiación Sindicada Existente**");

(d)    el contrato de financiación sindicada sujeto a ley española y con aval del Estado en virtud de la línea de avales concedida a empresas del Real Decreto-Ley 4/2025, de 8 de abril, de Medidas Urgentes de Respuesta a la Amenaza Arancelaria y de Relanzamiento Comercial (junto con su norma de desarrollo, el "**Aval ICO Aranceles**"), suscrito el 4 de agosto de 2025 por Antolín Irausa, Antolín Aragusa, Antolín Eurotrim, Antolín Ingeniería, Antolín Plasbur y Antolín RyA, como deudores, ciertas sociedades del Grupo, como garantes personales, Banco Bilbao Vizcaya Argentaria, S.A., como agente, Deutsche Bank AG, London Branch, como agente de garantías, y Banco Bilbao Vizcaya Argentaria, S.A., Banco de Sabadell, S.A., Banco Santander, S.A., CaixaBank, S.A., HSBC Continental Europe, Sucursal en España e Instituto de Crédito Oficial, E.P.E., como entidades

9

119

*Privileged and Confidential*

financiadoras, elevado a público mediante escritura otorgada en la misma fecha ante el notario de Madrid, D. Andrés Domínguez Nafría, con número 5225 de orden de su protocolo (tal y como el mismo haya sido novado en cada momento, el "**Contrato de Financiación ICO Existente**");

(e)    el contrato de financiación (*finance contract*) denominado "Antolin Car Interiors RDI" suscrito el 12 de junio de 2018 por Antolín Irausa, como deudora, ciertas sociedades del Grupo, como garantes personales, y el Banco Europeo de Inversiones ("**BEI**"), como acreedor, elevado a público mediante escritura otorgada en esa misma fecha ante el notario de Burgos, D. José María Gómez-Oliveros Sánchez de Rivera, con el número 1806 de orden de su protocolo (tal y como el mismo haya sido novado en cada momento, el "**Contrato de Financiación BEI I**");

(f)    el contrato de financiación (*finance contract*) denominado "Antolin Car Interiors RDI B" suscrito el 23 de diciembre de 2020 por Antolín Irausa, como deudora, ciertas sociedades del Grupo, como garantes personales, y BEI, como acreedor, elevado a público mediante escritura otorgada el 9 de julio de 2021 ante el notario de Burgos, D. José María Gómez-Oliveros Sánchez de Rivera, con el número 2688 de orden de su protocolo (tal y como el mismo haya sido novado en cada momento, el "**Contrato de Financiación BEI II**" y, conjuntamente con el Contrato de Financiación BEI I, los "**Contratos de Financiación BEI Existentes**").

(g)    los avales emitidos bajo las líneas de avales y seguros de caución suscritos entre Antolín Irausa, por un lado, y BBVA, BBVA USA, HSBC Europe y Atradius, por otro, que se detallan en el **Anexo II Parte III** y que incluyen, a efectos aclaratorios, la Línea de Avales BBVA como línea accesoria (*Ancillary Facility*) suscrita al amparo del Contrato de Financiación Sindicada Existente (las "**Líneas de Avales Existentes**"); y

(h)    los contratos de préstamo intragrupo suscritos entre las Sociedades Reestructuradas y que se detallan en el **Anexo II Parte IV** (los "**Préstamos Intragrupo**"), junto con los correspondientes intereses devengados y no pagados derivados de los mismos identificados en dicho Anexo.

Las Sociedades Reestructuradas referidas en los apartados (B) a (JJ) de las comparecencias tienen la condición de garantes personales de los Bonos 2028, los Bonos 2030, el Contrato de Financiación Sindicada Existente, el Contrato de Financiación ICO Existente y los Contratos de Financiación BEI Existentes. Dichas Sociedades Reestructuradas son parte de este Plan de cara a reestructurar su deuda tal y como corresponde en virtud de la garantía personal a primer requerimiento otorgada al

10

amparo de estos Contratos Afectados y con renuncia expresa a excusión o cualquier otra excepción.

A fecha del presente Plan de Reestructuración, los importes debidos en virtud de los Contratos Afectados son los que se detallan en el **Anexo II** (la "**Deuda Afectada**").

A efectos aclaratorios y en relación con el Artículo 616 de la Ley Concursal, se deja expresa constancia de que la Deuda Afectada se deriva de los créditos financieros derivados de los Contratos Afectados (los "**Créditos Afectados**").

III.  Que, Antolín Irausa, determinadas sociedades del Grupo, Deutsche Bank AG, London Branch y Deutsche Trustee Company Limited, entre otros, suscribieron el 21 de marzo de 2014 un contrato entre acreedores (*intercreditor agreement*) sujeto a ley inglesa, elevado a público mediante escritura otorgada el 2 de abril de 2014 ante el notario de Burgos, D. José María Gómez-Oliveros, con el número 684 de su orden de protocolo (tal y como el mismo haya sido novado en cada momento, el "**Contrato entre Acreedores**"). El Contrato entre Acreedores incluye, entre otros aspectos, el rango de prelación *pari passu* de las obligaciones debidas bajo los Bonos Existentes, el Contrato de Financiación Sindicada Existente, el Contrato de Financiación ICO Existente y los Contratos de Financiación BEI Existentes.

IV.  Que Antolín Irausa, como vendedor y agente de cobros, BBVA, CaixaBank y HSBC Factoring (France), como compradores, y BBVA como banco agente, suscribieron el 23 de enero de 2025 un contrato de factoring sindicado (*Receivables Purchase and Servicing Agreement*) sujeto a legislación común española (el "**Factoring Sindicado Existente**"). El Factoring Sindicado Existente establece un periodo anual de disponibilidad renovable automáticamente salvo notificación de no renovación con un plazo de preaviso mínimo de un mes.

V.  Que el Grupo ocupa una posición de liderazgo en el mercado global de componentes de interior para la industria del automóvil, con presencia en numerosos países y una cartera diversificada de fabricantes de automóviles a nivel mundial como clientes. Dicha posición de liderazgo es el resultado directo de la visión estratégica de la familia Antolín, fundadora y gestora del Grupo durante más de siete décadas, cuyo apellido constituye la propia denominación e identidad corporativa de todo el grupo de sociedades encabezado por Antolín Irausa. Bajo el liderazgo de la familia, el Grupo ha desarrollado una estrategia sostenida de inversión en innovación tecnológica, internacionalización y diversificación de productos que le ha permitido consolidar su posición competitiva. La gestión familiar representa un factor diferencial y ha dotado al Grupo de una estabilidad institucional y una orientación estratégica a largo plazo que resultan especialmente valiosas en un sector tan competitivo y cíclico como el de la automoción, permitiendo construir relaciones sólidas de confianza con clientes,

11

*Privileged and Confidential*

empleados y demás grupos de interés que constituyen un activo intangible esencial para la competitividad del Grupo.

VI.    Que la relevancia de la vinculación de la familia Antolín en la gestión y el control del Grupo tiene su reflejo en las cláusulas de cambio de control vinculadas a personas específicas de la familia Antolín e incluidas en Contratos Afectados y en muchos otros contratos operativos de naturaleza comercial suscritos por el Grupo con terceros proveedores y clientes.

VII.    Que, no obstante y sin perjuicio de lo anterior, el sector de la automoción atraviesa un periodo de incertidumbre sin precedentes en las últimas décadas, derivado de la confluencia de múltiples factores exógenos que están impactando de forma severa en la cadena de valor del automóvil y, muy en particular, en la industria de fabricantes de componentes, segmento en el que opera el Grupo. En particular, la política arancelaria impulsada por los Estados Unidos de América ha alterado profundamente las condiciones de competencia en el mercado norteamericano. El anuncio e imposición progresiva de aranceles a la importación de vehículos y componentes de automoción no fabricados en territorio estadounidense ha generado un impacto directo sobre el conjunto de la industria automovilística global y, de forma particularmente acusada, sobre los proveedores de componentes europeos con presencia industrial en Estados Unidos, entre los que se encuentra el Grupo.

VIII.    Que a los factores sectoriales y geopolíticos anteriormente mencionados se suman dificultades derivadas de la integración del negocio de interiores de la multinacional canadiense Magna International (conocido como "Magna Interiors"), cuya adquisición por el Grupo fue financiada parcialmente con algunos de los Contratos Afectados, incrementando significativamente el apalancamiento del Grupo. La adecuada integración financiera de este negocio se vio gravemente comprometida por dos crisis consecutivas de carácter excepcional: la pandemia de COVID-19 en 2020, que paralizó temporalmente la producción automovilística mundial, y el estallido de la guerra de Ucrania en febrero de 2022, que provocó tensiones en las cadenas de suministro y un encarecimiento generalizado de materias primas y energía. Si bien el Grupo ha logrado actualmente recuperar sus márgenes operativos y presenta una situación de negocio sólida, con una cartera de clientes diversificada y una posición competitiva reforzada, dicha recuperación se ha producido en un momento en que la estructura financiera del Grupo ya se encontraba comprometida por el elevado apalancamiento, agravado por las crisis exógenas sobrevenidas, lo que genera una carga financiera que el Grupo prevé difícilmente sostenible a medio y largo plazo conforme a los términos actuales.

IX.    Que, en el contexto descrito y como consecuencia de lo anterior, en previsión del incumplimiento, durante el ejercicio 2026, de determinados ratios financieros previstos en el Contrato de Financiación Sindicada Existente, el Contrato de Financiación ICO

12

*Privileged and Confidential*

Existente y los Contratos de Financiación BEI Existentes, el Grupo tramitó las correspondientes solicitudes de dispensa (*waiver*) respecto de dichos ratios financieros, las cuales fueron debidamente autorizadas bajo cada uno de los referidos instrumentos de deuda.

X. Que una parte significativa de dicha Deuda Afectada incorpora un mecanismo de anticipación de su vencimiento final al 29 de octubre de 2027 que operaría en caso de que los Bonos 2028 no fueran refinanciados para esa fecha. Esto, unido a los vencimientos de determinada Deuda Afectada que tendrán lugar en 2027, supondría una concentración relevante de vencimientos en ese ejercicio que hace necesaria la adopción temprana de una solución ordenada, especialmente a la vista del actual contexto económico y geopolítico. Asimismo, el Factoring Sindicado Existente, instrumento de circulante fundamental para la operativa del Grupo, vence el próximo 23 de enero de 2027, por lo que la necesidad de asegurar una línea bancaria de financiación de circulante a largo plazo se convierte en una cuestión esencial y crítica para la viabilidad del Grupo, lo que ha sido uno de los puntos más relevantes de las negociaciones.

XI. Que, ante lo que constituye un escenario de probabilidad de insolvencia, las Sociedades Reestructuradas han presentado a ciertos Acreedores Afectados una propuesta de una potencial reestructuración de la Deuda Afectada orientada a configurar un escenario que permita atender de forma ordenada el pago de dicha deuda y garantizar la viabilidad del Grupo en el corto y medio plazo, que ha sido formalmente aceptada por los Acreedores Participantes Originales a fecha de hoy, sin perjuicio de la comunicación anterior que se ha hecho al resto de Acreedores Afectados en los términos descritos más adelante. Con esta finalidad, el Grupo ha elaborado, con el apoyo del Asesor Financiero, un plan de viabilidad que se adjunta como **Anexo V** (conjuntamente, el "**Plan de Viabilidad**"). El Plan de Viabilidad es en el que se basa la presente Reestructuración y confirma que la Reestructuración dota al Grupo de la estabilidad operativa y de liquidez necesarias para afrontar el contexto actual económico y geopolítico, y permitirá al Grupo mantener su solvencia en el corto y medio plazo. En lo sucesivo, el término "**Reestructuración**" se referirá al proceso de reestructuración de la Deuda Afectada con el alcance y con sujeción a los términos que se establecen en el presente Plan de Reestructuración.

XII. Las Sociedades Reestructuradas han formulado un Plan de Viabilidad conjunto para todas ellas, que a su vez conlleva la viabilidad de cada una de ellas de manera individual. Esta situación obedece a la realidad operante del Grupo y a su funcionamiento y actividad conjunta como grupo societario, cuya integración operativa, financiera y de gestión de las Sociedades Reestructuradas es de tal grado que sus flujos de caja, sus necesidades de liquidez y su capacidad de generación de recursos no pueden ser razonablemente evaluados de forma aislada, sino únicamente desde una perspectiva consolidada.

13

*Privileged and Confidential*

**XIII.** Que, como consecuencia de lo anterior, las Sociedades Reestructuradas y los Acreedores Participantes Originales han considerado esenciales las siguientes actuaciones para el buen fin de la Reestructuración, en los términos previstos en el mismo:

    (a)    El nombramiento de Lexaudit Concursal, S.L.P. como Experto en la Reestructuración ante la Sección de lo Mercantil del Tribunal de Instancia de Burgos, Plaza número 1, de conformidad con lo dispuesto en el Artículo 672.1.1º de la Ley Concursal, por parte de las Sociedades Reestructuradas ante la eventualidad de que pudiera existir una clase disidente.

           En este sentido, con fecha 14 de mayo de 2026, la Sección de lo Mercantil del Tribunal de Instancia de Burgos, Plaza número 1, dictó el auto 89/2026 decretando la designación de Lexaudit Concursal, S.L.P. como Experto en la Reestructuración. Asimismo, la Sección de lo Mercantil del Tribunal de Instancia de Burgos, Plaza número 1, dictó un auto de rectificación con fecha 1 de junio de 2026 en el que confirmaba que el nombramiento del Experto en la Reestructuración corresponde tanto a Antolín Irausa, como al resto de las Sociedades Reestructuradas solicitantes del nombramiento.

    (b)    La Homologación Judicial a los efectos de obtener las protecciones y efectos jurídicos previstos en los Artículos 635 y siguientes de la Ley Concursal, de modo que se produzca la vinculación plena de todos los Acreedores Afectados a este Plan de Reestructuración y se protejan las actuaciones previstas en el presente Plan frente a eventuales acciones rescisorias y se den las protecciones y privilegios correspondientes a financiación interina o nueva financiación, según corresponda, a las Prórrogas del Factoring Sindicado Existente y al Contrato de Financiación de Circulante.

**XIV.** Que, con carácter previo a la presentación del presente Plan de Reestructuración, y con el objetivo de alcanzar un acuerdo que estableciese los términos y condiciones esenciales de la reestructuración de la deuda del Grupo y asegurar de ese modo la estabilidad del Grupo y su viabilidad a corto y medio plazo, las Sociedades Reestructuradas, y determinados acreedores participantes originales, entre otros, han suscrito un contrato de apoyo de la Reestructuración denominado en inglés *"Recapitalisation Support Agreement"* con fecha 23 de junio de 2026 (el ***"Recapitalisation Support Agreement"*** o **"RSA"**), en virtud del cual las partes firmantes asumieron, entre otros, el compromiso de votar favorablemente y adoptar las medidas que resultasen necesarias para la Reestructuración con los derechos y obligaciones asumidos al amparo del mismo.

**XV.** Que es condición esencial para las Partes que: (i) la Reestructuración se implemente conforme al presente Plan de Reestructuración y al régimen previsto en los Artículos

14

*Privileged and Confidential*

614 y siguientes de la Ley Concursal; (ii) se homologue a los efectos de los Artículos 635 y siguientes de la Ley Concursal con el objetivo de, entre otros, extender sus efectos a acreedores disidentes, si los hubiera, al amparo de la Deuda Afectada; (iii) se otorguen las preferencias de cobro y protecciones contempladas en la Ley Concursal al Contrato de Financiación de Circulante, a las Nuevas Líneas de Avales y a las Prórrogas del Factoring Sindicado Existente; (iv) se extiendan los efectos del Plan a las Prendas sobre Antolín Irausa de conformidad con el Artículo 652.2 de la Ley Concursal; y (v) se protejan todas las actuaciones previstas en el presente Plan de Reestructuración frente a eventuales acciones rescisorias al amparo de lo dispuesto en los Artículos 667 y siguientes de la Ley Concursal, incluyendo el otorgamiento de todas las garantías personales y reales incluidas en este Plan.

XVI. Que la viabilidad del Plan de Reestructuración depende, en gran medida, de la disponibilidad de instrumentos de financiación de circulante adecuados a las necesidades operativas del Grupo. A estos efectos, los Acreedores Participantes Originales optan por el Tratamiento Alternativo de la Deuda Bancaria, asumiendo con ello el compromiso firme de suscripción de una parte proporcional del Contrato de Financiación de Circulante, el cual tendrá la consideración de nueva financiación de conformidad con el Artículo 666 de la Ley Concursal. Dicha elección de los Acreedores Participantes Originales del Tratamiento Alternativo ha permitido alcanzar el umbral mínimo del 65% de la Deuda Bancaria requerido para la activación del mecanismo de aseguramiento (*backstop*) de BBVA en virtud del cual ha asumido un compromiso de suscripción (*underwriting*) del Contrato de Financiación de Circulante previsto en el presente Plan. La consecución de este nivel mínimo de suscripción, junto con la activación del referido mecanismo de *backstop*, constituía una condición indispensable para que las Sociedades Reestructuradas pudieran lanzar formalmente el presente Plan de Reestructuración, garantizando así la plena disponibilidad del Contrato de Financiación de Circulante.

XVII. Que los Estados Unidos de América es una jurisdicción significativa en términos de los activos e ingresos del Grupo. Asimismo, los Bonos Existentes se rigen por las leyes del Estado de Nueva York (EE.UU.). En consecuencia, de forma paralela al Plan de Reestructuración, las Sociedades Reestructuradas tienen la intención de presentar solicitudes y petición de reconocimiento del Plan de Reestructuración como un procedimiento extranjero principal (*foreign main proceeding*) en Estados Unidos en virtud del Capítulo 15 (*Chapter 15*) del Título 11 del Código de los Estados Unidos (*United States Code*). Las Sociedades Reestructuradas tienen la intención de realizar dichas solicitudes y petición de conformidad con el Capítulo 15 (*Chapter 15*) del Código de los Estados Unidos (*United States Code*) tan pronto como sea posible después de la Solicitud de Homologación.

15

*Privileged and Confidential*

XVIII. Que, en virtud de cuanto antecede, y con sujeción a los términos y condiciones que se relacionan en el clausulado que se incluye seguidamente, las Partes han convenido en suscribir el presente plan de reestructuración al amparo de lo previsto en el Libro II de la Ley Concursal (el "**Plan de Reestructuración**", el "**Plan**" o el "**Contrato**"), que se regirá por las siguientes,

CLÁUSULAS

### 1. DEFINICIONES E INTERPRETACIÓN

#### 1.1. Términos definidos

1.1.1. Los términos y expresiones que comiencen por mayúsculas y no sean un nombre propio o el comienzo de una oración tendrán el significado que se les asigna en el **<u>Anexo I</u>**.

#### 1.2. Interpretación

1.2.1. Los términos definidos en singular tendrán el mismo significado cuando se empleen en plural, y viceversa.

1.2.2. Salvo que expresamente se disponga lo contrario, todas las referencias a cláusulas, párrafos, apartados y anexos se entenderán hechas a las correspondientes cláusulas, párrafos, apartados y anexos del presente Plan.

1.2.3. Salvo que expresamente se disponga lo contrario, todas las referencias hechas en este Plan a normas jurídicas, de cualquier rango, se entenderán hechas a dichas normas según su redacción vigente en cada momento y, en caso de ser derogadas, a las normas que las deroguen o sustituyan en la regulación de la materia de que se trate.

1.2.4. Los Anexos forman parte integrante de este Plan de Reestructuración a todos los efectos. Cualquier referencia a este Plan de Reestructuración se entenderá hecha al presente Plan de Reestructuración incluyendo todos sus Anexos. Asimismo, cualquier referencia a cualesquiera Documentos de la Reestructuración se entenderá referida a dicho Documento de la Reestructuración junto con todos sus Anexos correspondientes.

1.2.5. Cualquier intervalo o periodo de tiempo definido en un número específico de días previos o posteriores a un hecho concreto se calculará sin incluir en ese intervalo o periodo de tiempo la fecha en que dicho hecho tenga lugar.

1.2.6. La redacción del presente Plan ha sido el resultado de la negociación y los esfuerzos conjuntos de las Partes, y no corresponde a modelos predispuestos de ninguna de ellas, reflejando las cláusulas la voluntad real de las Partes. Por ello, se declaran inaplicables

16

*Privileged and Confidential*

las reglas de interpretación previstas en el Artículo 1.288 del Código Civil y cualquier otra norma o principio especial de la legislación de consumidores y usuarios.

1.2.7. Las Partes acuerdan que en la medida en que en la regulación prevista en el presente Plan o en los correspondientes Documentos de la Reestructuración existan términos o aspectos no regulados o cuya interpretación pueda ser ambigua o existan lagunas, se acudirá, en tanto sea razonablemente aplicable, a la regulación y criterios interpretativos contenida en el presente Plan.

## 2.     OBJETO Y NATURALEZA DEL PLAN DE REESTRUCTURACIÓN

### 2.1.    Objeto

2.1.1. El presente documento persigue establecer el marco contractual y el procedimiento a través del cual se debe implementar la Reestructuración respecto a la totalidad de la Deuda Afectada mediante la modificación de ciertas condiciones de los Créditos Afectados, a efectos de garantizar la viabilidad de las Sociedades Reestructuradas en el corto y medio plazo. Asimismo, se establecen determinadas condiciones que serán de aplicación común a la Deuda Afectada y a la Reestructuración con el objetivo de otorgar estabilidad al Grupo durante el proceso de tramitación de la Solicitud de Homologación, así como tras la Fecha de Cierre, incluyendo, sin limitación, las condiciones en las que se producirá, en su caso, la extensión de la Reestructuración a los Acreedores No Participantes.

2.1.2. El presente Plan de Reestructuración ha sido aprobado por el órgano de administración o de gobierno que corresponda de las Sociedades Reestructuradas y se estructura conforme a lo dispuesto en el Artículo 633 de la Ley Concursal.

2.1.3. Una vez homologado el Plan de Reestructuración y en ejecución de lo previsto en el mismo, la Reestructuración conllevará, entre otras, la formalización de las siguientes operaciones o, en su caso, la realización de las siguientes actuaciones con el objetivo de implementar la Reestructuración:

(i)     la novación con naturaleza modificativa, pero no extintiva, de los términos de la Deuda Bancaria y los créditos derivados de las Líneas de Avales Existentes según los tratamientos asignados a la clase a la que corresponden;

(ii)    el canje de los Bonos Existentes por los Nuevos Bonos de conformidad con los Instrumentos de Emisión y en los términos de la Solicitud de Consentimiento;

17

*Privileged and Confidential*

(iii)   las Prórrogas del Factoring Sindicado Existente y la formalización de un nuevo contrato de financiación de circulante en los términos descritos en la Cláusula 6 (el "**Contrato de Financiación de Circulante**");

(iv)   la novación y ratificación de las Garantías Existentes, así como el otorgamiento de las Nuevas Garantías Reales ICA, las Nuevas Garantías Personales ICA y las Prendas sobre Cuentas; y

(v)   la modificación del Contrato entre Acreedores en los términos descritos en la Cláusula 5.5.

## 2.2.   Naturaleza del Plan de Reestructuración

2.2.1.   Las Partes manifiestan que su intención es que el presente Plan de Reestructuración constituya un plan de reestructuración a los efectos de los Artículos 614 y siguientes de la Ley Concursal, homologable a los efectos de los Artículos 635 y siguientes de la Ley Concursal y protegido frente a acciones rescisorias a los efectos del Artículo 667 de la Ley Concursal.

2.2.2.   El Plan de Reestructuración se apoya y es consistente con el Plan de Viabilidad y, en virtud de los Artículos 614 y siguientes de la Ley Concursal, la Reestructuración tendrá como resultado, entre otras cosas:

(i)   el cumplimiento de las recomendaciones incorporadas a la Directiva de Reestructuraciones y a la Ley Concursal en materia de anticipación de los procesos de reestructuración en virtud de los mecanismos de "alerta temprana";

(ii)   asegurar el negocio de las Sociedades Reestructuradas en el corto y medio plazo y evitar así un eventual concurso de acreedores;

(iii)   el mantenimiento del empleo y la actividad de las Sociedades Reestructuradas en los términos actuales;

(iv)   ajustar los vencimientos de la Deuda Afectada de conformidad con el Plan de Viabilidad;

(v)   obtener nueva financiación a través del Contrato de Financiación de Circulante y, de manera provisional hasta la entrada en vigor con plena disponibilidad de dicho contrato, mediante las Prórrogas del Factoring Sindicado Existente, siempre sujeto a las condiciones incluidas en este Plan;

(vi)   atender de forma ordenada el pago de la Deuda Afectada;

18

*Privileged and Confidential*

(vii)   garantizar el mantenimiento de la estructura actual de capital; y

(viii)  asegurar la viabilidad del Grupo.

2.2.3.  Las Partes reconocen y aceptan que el cumplimiento de los requisitos que se establecen en las disposiciones de la Ley Concursal antes citadas constituye un elemento esencial del consentimiento de los Acreedores Participantes, sin el cual no habrían accedido a participar en la Reestructuración ni habrían consentido formalizar el presente Plan. Asimismo, el presente Plan se otorga sobre la base de que estarán sometidos la totalidad de los Acreedores Afectados a la Reestructuración, ya sea por suscripción voluntaria del presente Plan o a través del arrastre como consecuencia de la Homologación Judicial.

2.2.4.  Este Plan de Reestructuración tiene la condición de plan de reestructuración conjunto de las Sociedades Reestructuradas, conforme al Artículo 642.2 de la Ley Concursal.

## 2.3.    Acuerdo único

2.3.1.  Las Partes hacen constar que, en ejecución de los acuerdos alcanzados, formalizan en este acto el presente Plan de Reestructuración.

2.3.2.  La totalidad de los Documentos de la Reestructuración y la Hoja de Términos de la Reestructuración se consideran parte integrante de este Plan de Reestructuración y, con independencia de que su formalización esté instrumentada a través de diferentes contratos (y de cuándo se suscriban), deben entenderse a todos los efectos como contratos coligados que constituyen un acuerdo único en virtud del cual se lleva a cabo la Reestructuración.

## 2.4.    Fases de la Reestructuración

2.4.1.  Habida cuenta de la multitud de partes afectadas por la Reestructuración, las Partes convienen que la Reestructuración se implementa en las siguientes fases:

(i)   Firma del *Recapitalisation Support Agreement*: La formalización del *Recapitalisation Support Agreement* el 23 de junio de 2026 por, entre otros, las Sociedades Reestructuradas, Antolín HoldCo y ciertas entidades participantes originales, de conformidad con el Expositivo XIV.

(ii)  Envío de la Invitación y Periodo de Adhesión: Con carácter previo a la formalización del presente Plan, se ha habilitado un periodo de adhesión hasta el 22 de julio de 2026 (que podrá ser prorrogado a instancia de Antolín Irausa mediante notificación al Agente de la Reestructuración al efecto) (el "**Periodo de Adhesión**") en los términos y condiciones previstos en la Cláusula 4.2 siguiente.

19

*Privileged and Confidential*

(iii)    Formalización del Plan: En cualquier momento desde el inicio del Periodo de Adhesión, se formalizará el presente Plan por las Sociedades Reestructuradas, los Acreedores Participantes Originales y el Agente de la Reestructuración. Las adhesiones de otros Acreedores Afectados que manifiesten su apoyo al Plan se realizarán (compareciendo en su propio nombre o a través del Agente de la Reestructuración) conforme a lo previsto en la Cláusula 7.

(iv)    Entrada en vigor del Plan: En la Fecha de Entrada en Vigor se evidenciará el cumplimiento de la Condición Suspensiva de Entrada en Vigor mediante la entrega de los correspondientes Certificados de Mayorías por el Experto en la Reestructuración, tal y como se describe en la Cláusula 11.

(v)    Presentación de la Solicitud de Homologación: Las Sociedades Reestructuradas presentarán en el Tribunal Competente la Solicitud de Homologación del Plan de Reestructuración, conforme a lo previsto en la Cláusula 8.2.1.

(vi)    Periodo de Elección: Los Acreedores Afectados podrán ejercitar su elección entre los Tratamientos que les resulten aplicables de conformidad con la Cláusula 5.2.8 durante, al menos, veinte (20) Días Hábiles desde el 2 de julio de 2026 (o, en el caso de los Bonos Existentes, desde la fecha en que el Agente de la Reestructuración remita la Solicitud de Consentimiento), sin perjuicio, en ambos casos, de la facultad de Antolín Irausa de extender cualquiera de dichos plazos (en el caso del Periodo de Elección de la Deuda Bancaria, nunca más allá del 31 de agosto de 2026) mediante notificación al Agente de la Reestructuración al efecto (el "**Periodo de Elección**").

(vii)    Fecha de Efectividad del Plan: Cuando se evidencie el cumplimiento de la Condición Suspensiva para Efectividad conforme a lo previsto en la Cláusula 12.

(viii)    Cierre de la Reestructuración: Tras la Fecha de Efectividad, siempre que haya finalizado el Periodo de Elección, Antolín Irausa fijará una Fecha de Cierre para la suscripción y formalización de los restantes Documentos de la Reestructuración, así como aquellos documentos y contratos que sean necesarios para implementar el Plan con efectos desde la Fecha de Efectividad incluyendo, sin limitación, la emisión de las correspondientes opiniones legales de capacidad por parte del Asesor Legal del Grupo, y las opiniones legales de validez y ejecutabilidad por parte del Asesor Legal de los Acreedores Participantes, en términos satisfactorios para los Acreedores Participantes Originales. La Fecha de Cierre nunca será más tarde de 3 meses desde la Fecha de Efectividad, sin perjuicio de su extensión por acuerdo entre las Sociedades Reestructuradas, a través de Antolín Irausa, y la Mayoría de Acreedores Participantes.

*Privileged and Confidential*

**3.    FORMACIÓN DE CLASES**

**3.1.    Consideración previa**

3.1.1.    Los Acreedores Afectados son todos titulares de la Deuda Afectada, siendo éste el perímetro de afectación del presente Plan.

3.1.2.    El Plan de Reestructuración no afecta a acreedores comerciales, ni a acreedores titulares de créditos de derecho público, ni a determinada deuda contingente que se encuentra íntegramente garantizada por activos totalmente líquidos, tal y como se explicará, y, por tanto, quedan fuera del perímetro de la Deuda Afectada de conformidad con lo dispuesto en el apartado 8 del **Anexo VI**.

3.1.3.    La Deuda Afectada no tiene la consideración de créditos de derecho público a los efectos del Artículo 624 bis de la Ley Concursal.

**3.2.    Criterios generales de formación de clases**

3.2.1.    De acuerdo con lo previsto en el Artículo 622 de la Ley Concursal, los titulares de la Deuda Afectada deberán votar agrupados por clases en cada una de las Sociedades Reestructuradas.

3.2.2.    Las Sociedades Reestructuradas y los Acreedores Participantes entienden que la formación de las Clases prevista en la Cláusula 3.2.1 es el criterio más objetivo teniendo en cuenta el tipo de Créditos Afectados (esto es, aquellos incluidos en el perímetro de afectación), dado que la formación de clases debe atender a la existencia de un interés común y, según el Artículo 623 de la Ley Concursal, se considera que existe interés común entre los créditos de igual rango determinado por el orden de pago en el concurso de acreedores, si bien dentro de un mismo rango concursal podrán separarse en distintas clases, cuando haya razones suficientes que lo justifiquen.

3.2.3.    Por tanto, el rango concursal se configura como uno de los primeros criterios de formación de las Clases en el presente Plan, de forma que –respecto de cada Sociedad Reestructurada y siempre que existan créditos de las clases en cuestión– se distinguen aquellos créditos concursales ordinarios (formados por los Bonos Existentes, la Deuda Bancaria y los créditos derivados de las Líneas de Avales Existentes) de los créditos concursales subordinados que se deriven de los Préstamos Intragrupo y de cualesquiera derechos de repetición, reembolso, regreso, indemnización o subrogación que tengan carácter subordinado conforme al presente Plan.

21

*Privileged and Confidential*

3.2.4.    Los créditos concursales ordinarios (formados por los Bonos Existentes, la Deuda Bancaria y las Líneas de Avales Existentes) se separan, a su vez, en tres clases de créditos diferentes por los siguientes motivos:

    (i)    Los distintos tratamientos alternativos ofrecidos a cada una de las Clases, esto es, la Deuda Bancaria, a las Líneas de Avales Existentes y a los Bonos Existentes en línea con lo previsto en las Cláusulas 5.2.4, 5.2.5 y 5.2.6 siguientes se derivan de otorgar un tratamiento paritario a todas las clases ordinarias. En este sentido, resulta un elemento esencial para la viabilidad del Grupo la obtención de un instrumento de financiación de circulante de aquellas entidades que forman parte del denominado grupo (*pool*) bancario del Grupo, atendiendo a criterios de negocio, operativos y de disponibilidad del producto.

    (ii)    La diferente naturaleza de los instrumentos de Deuda Bancaria frente a los Bonos Existentes, configurándose los primeros como contratos privados de financiación con restricciones para su cesión y los segundos como valores admitidos a cotización en un mercado regulado, sujetos a la normativa de mercado de capitales. Esta circunstancia aconseja articular tratamientos diferenciados y soluciones adaptadas dentro del presente Plan de Reestructuración, atendiendo a las particularidades de cada categoría de instrumento.

    (iii)    La necesidad de modificar determinadas obligaciones y ratios financieros establecidos únicamente en determinados instrumentos de financiación bancaria –esto es, el Contrato de Financiación Sindicada Existente, el Contrato de Financiación ICO Existente y los Contratos de Financiación BEI Existentes– con el fin de garantizar la viabilidad a las Sociedades Reestructuradas en el corto y medio plazo, frente a los Bonos Existentes, que no incorporan este tipo de obligaciones ni ratios financieros.

    (iv)    La naturaleza de crédito contingente de los avales emitidos bajo las Líneas de Avales Existentes.

## 3.3.    Clases

En atención a lo dispuesto en la Cláusula 3.2 anterior y, de conformidad con lo previsto en el Artículo 622 de la Ley Concursal, los Acreedores Afectados titulares de Créditos Afectados se agruparán en las siguientes clases:

*Privileged and Confidential*

3.3.1.    Clases de Antolín Irausa

(i)    Clase Deuda Bancaria

(a)    Formada por aquellos Créditos Afectados derivados del Contrato de Financiación Sindicada Existente (incluyendo, a efectos aclaratorios, el importe del RCF dispuesto a Fecha de Firma, pero excluyendo aquellos Créditos Afectados que se consideren Líneas de Avales Existentes), el Contrato de Financiación ICO Existente y los Contratos de Financiación BEI Existentes, en los que Antolín Irausa es deudor principal, prestatario o garante personal.

(b)    La Deuda Afectada correspondiente a esta Clase es la descrita en el **Anexo II Parte I**.

(ii)    Clase Bonos

(a)    Formada por aquellos Créditos Afectados derivados de los Bonos 2028 y de los Bonos 2030 en los que Antolín Irausa es el emisor y deudor principal.

(b)    La Deuda Afectada correspondiente a esta Clase es la descrita en el **Anexo II Parte II**.

(iii)    Clase Líneas de Avales

(a)    Formada por aquellos Créditos Afectados derivados de las Líneas de Avales Existentes que no cuentan con garantía real y de los que Antolín Irausa es el avalado principal.

(b)    La Deuda Afectada correspondiente a esta Clase es la descrita en el **Anexo II Parte III**.

(iv)    Clase Deuda Subordinada

(a)    Formada por (i) los Créditos Afectados derivados de los Préstamos Intragrupo en los que Antolín Irausa es deudor principal; y (ii) los intereses devengados y no pagados derivados de dichos Préstamos Intragrupo en los que Antolín Irausa es deudor principal; y, en su caso, por cualesquiera derechos de repetición, reembolso, regreso, indemnización o subrogación frente a Antolín Irausa que tengan carácter subordinado conforme al presente Plan.

23

*Privileged and Confidential*

(b)   La Deuda Afectada correspondiente a esta Clase es la descrita en el **Anexo II Parte IV**.

3.3.2.   Clases de las restantes Sociedades Reestructuradas

Sin perjuicio de lo dispuesto en la presente Cláusula 3.3.2, se adjunta como **Anexo IV** un detalle de las Clases de Créditos Afectados por cada una de las Sociedades Reestructuradas (distinto de Antolín Irausa). A efectos aclaratorios, Grupo Antolin South Africa (PTY) Ltd. no tiene Clase Deuda Subordinada por no tener Créditos Afectados derivados de Préstamos Intragrupo.

(i)   Clase Deuda Bancaria

(a)   Formada por aquellos Créditos Afectados derivados del Contrato de Financiación Sindicada Existente (incluyendo, a efectos aclaratorios, el RCF, pero excluyendo aquellos Créditos Afectados que se consideren Líneas de Avales Existentes), el Contrato de Financiación ICO Existente, y los Contratos de Financiación BEI Existentes, en los que la Sociedad Reestructurada correspondiente (distinto de Antolín Irausa) es deudora principal, prestataria y/o garante personal, según corresponda.

(b)   La Deuda Afectada correspondiente a esta Clase es la descrita en el **Anexo II Parte I**.

(ii)   Clase Bonos

(a)   Formada por aquellos Créditos Afectados derivados de los Bonos 2028 y de los Bonos 2030 en los que la Sociedad Reestructurada correspondiente (distinto de Antolín Irausa) es garante personal.

(b)   La Deuda Afectada correspondiente a esta Clase es la descrita en el **Anexo II Parte II**.

(iii)   Clase Líneas de Avales

(a)   Formada por aquellos Créditos Afectados derivados de las Líneas de Avales Existentes que no cuentan con garantía real y de los que la Sociedad Reestructurada correspondiente (distinto de Antolín Irausa) es garante personal.

(b)   La Deuda Afectada correspondiente a esta Clase es la descrita en el **Anexo II Parte III**.

24

*Privileged and Confidential*

(iv)   Clase Deuda Subordinada

    (a)   Formada por (i) los Créditos Afectados derivados de los Préstamos Intragrupo en los que la Sociedad Reestructurada correspondiente (distinto de Antolín Irausa) es deudor principal; y (ii) los intereses devengados y no pagados derivados de dichos Préstamos Intragrupo en los que cada una de las Sociedades Reestructuradas es deudor principal; y, en su caso, por cualesquiera derechos de repetición, reembolso, regreso, indemnización o subrogación frente a dicha Sociedad Reestructurada que tengan carácter subordinado conforme al presente Plan.

    (b)   La Deuda Afectada correspondiente a esta Clase es la descrita en el **Anexo II Parte IV**.

### 3.4.   Aprobación de la Reestructuración. Mayorías y pacto de sindicación

3.4.1.   Pacto de sindicación

    (i)   De conformidad con el Artículo 630.1 de la Ley Concursal, dado que el Plan de Reestructuración afecta a créditos vinculados por pactos de sindicación, como es el caso de, respectivamente, los Bonos 2028, los Bonos 2030, el Contrato de Financiación Sindicada Existente y el Contrato de Financiación ICO Existente (conjuntamente, los "**Instrumentos Sindicados**" y, cada uno de ellos, un "**Instrumento Sindicado**"), deben aplicárseles, a cada uno de los Instrumentos Sindicados, respectivamente, las mayorías previstas en el Artículo 629 de la Ley Concursal, salvo que el propio pacto de sindicación de cada uno de dichos instrumentos prevea una mayoría inferior para aprobar esos efectos.

    (ii)   Los Instrumentos Sindicados no establecen mayorías inferiores a las previstas en el Artículo 629 de la Ley Concursal. Por ello, en tanto tienen la consideración de Créditos Afectados sin garantía real, se les debe aplicar el umbral de más de dos tercios del importe del pasivo correspondiente a cada Instrumento Sindicado para considerar que el Plan ha sido aprobado por cada uno de ellos respectivamente.

    (iii)   En caso de que vote a favor la mayoría necesaria de Acreedores Afectados correspondientes para cada uno de los Instrumentos Sindicados, se entenderá que aceptan el Plan de Reestructuración la totalidad de los Acreedores Afectados que se encuentren vinculados por dichos pactos de sindicación (esto es, respectivamente, los Bonos 2028, los Bonos 2030, el Contrato de Financiación Sindicada Existente y el Contrato de Financiación ICO Existente), de conformidad con lo previsto en el Artículo 630.2 de la Ley Concursal.

25

*Privileged and Confidential*

(iv) En consecuencia, el voto favorable de los Acreedores Afectados titulares de importes que representen más de dos tercios de cada uno de los Instrumentos Sindicados supone el voto favorable del 100% de los Acreedores Afectados de, respectivamente, los Instrumentos Sindicados.

3.4.2. Mayorías

(i) A los efectos de cumplir con lo dispuesto en el Artículo 634.1 de la Ley Concursal, el Experto en la Reestructuración emitirá, antes de la Solicitud de Homologación, la Certificación de Mayorías que acredite que se han obtenido las mayorías descritas en los Artículos 638 o 639 de la Ley Concursal (según sea el caso), teniendo en cuenta la totalidad de Acreedores Participantes.

(ii) De conformidad con lo previsto en la Cláusula 11, las Sociedades Reestructuradas se comprometen a entregar una copia de la Certificación de Mayorías al Notario tan pronto la reciban del Experto en la Reestructuración. Las Partes, por medio de la presente, instruyen al Notario, el cual acepta, para que incorpore la copia de la Certificación de Mayorías al presente Plan, mediante diligencia a efectos de cumplir con lo dispuesto en el Artículo 634.1 de la Ley Concursal.

(iii) Una vez confirmadas las mayorías por la Certificación de Mayorías emitida por el Experto en la Reestructuración, se considera que se ha producido la Fecha de Entrada en Vigor.

## 4. CUMPLIMIENTO DE REQUISITOS DEL PLAN DE REESTRUCTURACIÓN

### 4.1. Requisitos legales de contenido

4.1.1. A efectos de acreditar el cumplimiento de los requisitos legales de contenido del Plan de Reestructuración, se incluye en el **Anexo VI** las menciones legales expresamente previstas en el Artículo 633 de la Ley Concursal.

### 4.2. Notificación del Plan de Reestructuración

4.2.1. Con la finalidad de dar cumplimento a los requisitos de notificación previstos en el Artículo 627 de la Ley Concursal, las Sociedades Reestructuradas manifiestan que el Plan de Reestructuración ha sido comunicado a todos los Acreedores Afectados, según lo previsto a continuación.

4.2.2. Las Sociedades Reestructuradas, a través del Agente de la Reestructuración, han remitido la invitación cuya copia se adjunta al presente Plan como **Anexo VIII** (la "**Invitación**"), junto con la versión de firma del Plan de Reestructuración, para, a los

26

*Privileged and Confidential*

efectos de lo previsto en los Artículos 627 y 628 de la Ley Concursal, invitar a la adhesión al *Recapitalisation Support Agreement* y/o manifestar su apoyo al presente Plan de Reestructuración, según corresponda a cada Acreedor Afectado, de la siguiente manera:

(i)   en el caso de la Deuda Bancaria y las Líneas de Avales Existentes, mediante notificación a los Acreedores Afectados de la Deuda Bancaria y las Líneas de Avales Existentes, conforme a los mecanismos de notificación previstos en los Contratos Afectados correspondientes;

(ii)   en el caso de los Bonos Existentes, mediante envío de la Invitación a los Acreedores Afectados de los Bonos Existentes a través de Euroclear Bank SA/NV (Euroclear) y Clearstream Banking S.A. (Clearstream) y de conformidad con las normas de Euronext; y

(iii)   se ha publicado la Invitación en la página web del Grupo (español: http://antolin.com/es/inversores/comunicados-2026;                     inglés: https://www.antolin.com/en/inversores/publications-2026) y en la página web habilitada por el Agente de la Reestructuración en relación con la Reestructuración (https://glas-agency.appiancloud.com/suite/sites/GRUPO-ANTOLIN-IRAUSA-SAU).

4.2.3.   Las Sociedades Reestructuradas han remitido la versión de firma del Plan de Reestructuración a los Acreedores Afectados de la Deuda Subordinada de conformidad con lo dispuesto en el Artículo 627 de la Ley Concursal.

4.2.4.   La Invitación incluye la posibilidad durante el Periodo de Adhesión de:

(i)   adherirse libremente al *Recapitalisation Support Agreement* (sin necesidad del consentimiento o acuerdo alguno de cualquiera de las partes del RSA) y comprometerse a la adhesión al presente Plan cuando sea requerido a ello en los términos previstos en el *Recapitalisation Support Agreement*; y/o

(ii)   votar a favor o en contra y adherirse libremente, en su caso, al Plan y a los restantes Documentos de la Reestructuración que correspondan de la siguiente forma:

(a)   los Acreedores Afectados de la Deuda Bancaria y de las Líneas de Avales Existentes pueden votar a favor o en contra y, en caso de voto positivo, adherirse al Plan mediante un documento de adhesión de conformidad con la Cláusula 7 siguiente;

27

*Privileged and Confidential*

(b)     los Acreedores Afectados de los Bonos Existentes que tengan la condición de Bonistas Elegibles pueden votar a favor o en contra y, en caso de voto positivo, instruir irrevocablemente al Agente de la Reestructuración para que formalice el Plan en su nombre y representación, de conformidad con la Cláusula 7 siguiente; y

(c)     los Acreedores Afectados de los Bonos Existentes que no tengan la condición de Bonistas Elegibles, pueden votar en contra del Plan.

### 4.3.    Formalización en documento público

Con la finalidad de cumplir con lo previsto en el Artículo 634 de la Ley Concursal, el presente Plan de Reestructuración es objeto de elevación a público en la presente fecha por las Sociedades Reestructuradas, los Acreedores Participantes Originales, las Nuevas Garantes ICA y el Agente de la Reestructuración (en su propio nombre y por cuenta de los Acreedores Participantes que no hayan comparecido en su propio nombre) en virtud de escritura de elevación a público autorizada por el Notario del Ilustre Colegio Notarial de Madrid, D. Andrés Domínguez Nafría (o aquél que le sustituya en la Fecha de Firma), a efectos de que conste formalizado en documento público español.

Las Partes y las Nuevas Garantes ICA instruyen al Notario ante el que se eleva a público el presente Plan de Reestructuración (o aquél que le sustituya en la Fecha de Firma), el cual acepta, para que comunique tan pronto como sea posible por correo electrónico desde cualquiera de las siguientes direcciones andresdominguez@notariado.org; lruiz@notarialagasca88.com o cualquier otra con dominio "@notarialagasca88.com" (con copia a las direcciones electrónicas del Asesor Legal del Grupo (mlamo@ga-p.com; rlopez@ga-p.com; ffoix@ga-p.com; ldelclaux@ga-p.com; y projectaxle@ga-p.com) y del Asesor Legal de los Acreedores Participantes Originales (javier.castresana@aoshearman.com; y oscar.guinea@aoshearman.com)) al Experto en la Reestructuración (a las siguientes direcciones: jmaymi@lexaudit.com; vfernandez@lexaudit.com; danielarteta@lexaudit.com; aardura@lexaudit.com; jvilella@lexaudit.com) de la formalización del presente Plan de Reestructuración en términos sustancialmente parecidos al siguiente:

*"Yo, [Andrés Domínguez Nafría], Notario del Ilustre Colegio Notarial de Madrid, confirmo, en virtud de la presente, la formalización ante mí en el día de hoy de la escritura de elevación a público del Plan de Reestructuración por parte de Grupo Antolín-Irausa, S.A.U., determinadas sociedades de su grupo, como sociedades reestructuradas y nuevas garantes, según corresponda, Banco Bilbao Vizcaya Argentaria, S.A., Banco Bilbao Vizcaya Argentaria, S.A., New York Branch, Banco de Sabadell, S.A., Banco Santander, S.A., Bankinter, S.A., CaixaBank, S.A., HSBC Continental Europe y HSBC Continental Europe, Sucursal en España, como acreedores*

28

*Privileged and Confidential*

*participantes originales, y GLAS Specialist Services Limited, como agente de la reestructuración, [así como la adhesión inmediatamente posterior de [●] como acreedor adherido de dicho Plan de Reestructuración], sin que se hayan producido adhesiones adicionales en el día de hoy ni se haya notificado ningún voto en contra del Plan de Reestructuración, lo cual les comunico a efectos de proceder a las actuaciones que sean necesarias para dar cumplimiento a la Condición Suspensiva de Entrada en Vigor y a cualesquiera otros efectos previstos en el propio Plan de Reestructuración"*.

5.     **TÉRMINOS Y TRATAMIENTO DE LA REESTRUCTURACIÓN DE LA DEUDA AFECTADA**

5.1.   **Términos de la Reestructuración**

Las Partes incorporan como **Anexo VII** al presente Plan de Reestructuración la hoja de términos (*term sheet*) (la "**Hoja de Términos de la Reestructuración**"), en la que se recogen los principales términos y condiciones de la Reestructuración y las condiciones en las que quedarán afectados los Contratos Afectados como consecuencia de la misma, incluyendo: (i) un resumen de la Reestructuración y de la Deuda Afectada; (ii) los términos generales de la Reestructuración, incluyendo el tratamiento de cada categoría de Deuda Afectada; y (iii) los términos documentales de la Deuda Afectada post-Reestructuración, en los que se regulan, entre otros aspectos, las condiciones del Contrato de Financiación de Circulante, las novaciones de los distintos Contratos Afectados asociados a la Deuda Bancaria y a las Líneas de Avales Existentes, los documentos de emisión de los Nuevos Bonos, las Nuevas Garantías Reales ICA, las Nuevas Garantías Personales ICA, las Prendas sobre Cuentas y la novación del Contrato entre Acreedores.

5.2.   **Tratamiento de la Deuda Afectada**

La premisa fundamental de la Reestructuración prevista en el presente Plan es la extensión del vencimiento final de la Deuda Afectada que, por defecto, se extenderá hasta el 31 de diciembre de 2035, sin aplicar quita alguna y adaptando las condiciones financieras de la deuda así extendida.

En relación con la Clase Deuda Bancaria, dado que resulta fundamental para el Grupo tener comprometidas y disponibles líneas nuevas de financiación de su capital circulante para garantizar su viabilidad, conforme al Plan de Viabilidad, se ha ofrecido a todos los Acreedores Afectados de la Deuda Bancaria la opción de suscribir dicha nueva financiación a través del Contrato de Financiación de Circulante a cambio de una menor extensión de su deuda hasta el 4 de agosto de 2032, unas nuevas garantías con rango sénior y un derecho de cobro prioritario que resulta de la Reestructuración de la Deuda Afectada de las Sociedades Reestructuradas que son garantes. Por tanto, todos los

29

*Privileged and Confidential*

Acreedores Afectados de la Deuda Bancaria podrán, si así lo desean, obtener el mismo tratamiento si se comprometen a otorgar el Contrato de Financiación de Circulante.

A fin de otorgar un tratamiento equivalente a los Acreedores Afectados de los Bonos Existentes y de las Líneas de Avales Existentes, se les ofrece la posibilidad de acogerse a un tratamiento alternativo con una extensión hasta el 31 de diciembre de 2030 y el 4 de agosto de 2032, respectivamente, y la misma mejora en las garantías y en la prioridad del derecho de cobro, en unas condiciones financieramente equivalentes a las de la Deuda Bancaria.

De esta forma, los tratamientos ofrecidos a los Acreedores Afectados de las distintas Clases con el mismo rango concursal son equivalentes entre sí, garantizando así un tratamiento paritario conforme a la Ley Concursal.

5.2.1.    Tratamiento por Defecto de la Deuda Bancaria

El tratamiento que aplicará con carácter predeterminado a cada uno de los Acreedores Afectados de la Deuda Bancaria (el "**Tratamiento por Defecto de la Deuda Bancaria**") tendrá las siguientes características:

(i)    extensión a la par, sin descuento, de la fecha de vencimiento final al 31 de diciembre de 2035;

(ii)    amortización íntegra del principal en la fecha de vencimiento (*bullet*);

(iii)    con respecto a los Créditos Afectados derivados de los importes bajo el RCF, éstos serán prestamizados;

(iv)    tipo de interés anual de 6,97%, pagadero en períodos de interés semestrales con fechas de pago el 30 de junio y el 31 de diciembre de cada año, siendo el primer periodo de interés el comprendido entre la Fecha de Efectividad y el 31 de diciembre de 2026 (o, si la Fecha de Cierre no hubiera tenido lugar, el 30 de junio de 2027);

(v)    modificación de determinados ratios financieros de la Deuda Bancaria correspondiente para adaptarlos al Plan de Viabilidad;

(vi)    garantías consistentes en las Garantías Existentes, las Nuevas Garantías Reales ICA de Segundo Rango, la Prenda de Tercer Rango sobre Cuentas y las Nuevas Garantías Personales ICA, sin perjuicio de la novación del orden de prelación de pagos del Contrato entre Acreedores de la Cláusula 5.5 siguiente, como

30

*Privileged and Confidential*

consecuencia de la Reestructuración de la Deuda Afectada con respecto a las Sociedades Reestructuradas que sean garantes de la Deuda Bancaria; y

(vii) en el caso de la deuda de las Sociedades Reestructuradas que sean garantes personales del Contrato de Financiación ICO Existente (las "**Garantes del Contrato de Financiación ICO Existente**"), los efectos de la Reestructuración implican la novación del crédito que los Acreedores Afectados del Contrato de Financiación ICO Existente tienen frente a dichas Sociedades Reestructuradas en condición de deudores homologados de tal modo que le aplique el orden de prelación previsto en el Contrato entre Acreedores en relación con determinados cobros o recuperaciones, en los términos de la Cláusula 5.5.1;

todo ello de conformidad con la Hoja de Términos de la Reestructuración.

5.2.2.   Tratamiento por Defecto de los Bonos Existentes

El tratamiento que aplicará con carácter predeterminado a cada uno de los Acreedores Afectados de los Bonos Existentes (el "**Tratamiento por Defecto de los Bonos Existentes**") tendrá las siguientes características:

(i) extensión a la par, sin descuento, de la fecha de vencimiento final al 31 de diciembre de 2035;

(ii) amortización íntegra del principal en la fecha de vencimiento (*bullet*);

(iii) cupón con un tipo de interés anual de 6,97%, pagadero en períodos de interés semestrales con fechas de pago el 30 de junio y el 31 de diciembre de cada año, siendo el primer periodo de interés el comprendido entre la Fecha de Efectividad y el 31 de diciembre de 2026 (o, si la Fecha de Cierre no hubiera tenido lugar, el 30 de junio de 2027); y

(iv) garantías consistentes en las Garantías Existentes, las Nuevas Garantías Reales ICA de Segundo Rango, la Prenda de Tercer Rango sobre Cuentas y las Nuevas Garantías Personales ICA, sin perjuicio de la novación del orden de prelación de pagos del Contrato entre Acreedores de la Cláusula 5.5 siguiente, como consecuencia de la Reestructuración de la Deuda Afectada con respecto a las Sociedades Reestructuradas que sean garantes de los Bonos Existentes;

todo ello de conformidad con la Hoja de Términos de la Reestructuración.

31

*Privileged and Confidential*

5.2.3.   Tratamiento por Defecto de las Líneas de Avales Existentes

El tratamiento que aplicará con carácter predeterminado a cada uno de los Acreedores Afectados de las Líneas de Avales Existentes (el "**Tratamiento por Defecto de las Líneas de Avales Existentes**") tendrá las siguientes características:

(i)     extensión a la par, sin descuento, hasta el 31 de diciembre de 2035 de la deuda contingente derivada de la ejecución de los avales emitidos al amparo de las Líneas de Avales Existentes, incluyendo los avales emitidos tras la Fecha de Firma y hasta la Fecha de Efectividad al amparo de dichas Líneas de Avales Existentes, sin extensión del periodo de disponibilidad de las Líneas de Avales Existentes desde la Fecha de Firma;

(ii)    amortización íntegra del principal en la fecha de vencimiento (*bullet*);

(iii)   tipo de interés anual de 6,97%, pagadero en períodos de interés semestrales, a devengar únicamente desde la ejecución del aval correspondiente sobre el importe del aval ejecutado, con fechas de pago el 30 de junio y el 31 de diciembre de cada año, siendo el primer periodo de interés el comprendido entre la Fecha de Efectividad y el 31 de diciembre de 2026 (o, si la Fecha de Cierre no hubiera tenido lugar, el 30 de junio de 2027); y

(iv)    garantías consistentes en las Garantías Existentes, las Nuevas Garantías Reales ICA de Segundo Rango, la Prenda de Tercer Rango sobre Cuentas y las Nuevas Garantías Personales ICA, sin perjuicio de la novación del orden de prelación de pagos del Contrato entre Acreedores de la Cláusula 5.5 siguiente;

todo ello de conformidad con la Hoja de Términos de la Reestructuración.

5.2.4.   Tratamiento Alternativo de la Deuda Bancaria

Los Acreedores Afectados de la Deuda Bancaria podrán optar por un tratamiento alternativo (el "**Tratamiento Alternativo de la Deuda Bancaria**") con las siguientes características:

(i)     compromiso firme de suscripción de una parte proporcional del Contrato de Financiación de Circulante en atención a la prorrata de Deuda Bancaria que titule el Acreedor Afectado correspondiente, contrato que tendrá la consideración de nueva financiación de conformidad con el Artículo 666 de la Ley Concursal;

(ii)    extensión de la fecha de vencimiento final al 4 de agosto de 2032 (y del periodo de disponibilidad del RCF al 4 de julio de 2032, sin que los importes dispuestos

32

*Privileged and Confidential*

bajo el RCF sean, por tanto, objeto de prestamización), con un mecanismo de anticipación del periodo de disponibilidad y del vencimiento al 30 de junio de 2030 en caso de que, en o antes de dicha fecha, los Nuevos Bonos B no hayan sido amortizados, redimidos o refinanciados, o las Sociedades Reestructuradas no acrediten compromisos vinculantes para su refinanciación;

(iii)    amortización del principal pendiente, excluyendo el RCF, de conformidad con el siguiente calendario de amortización con cuotas pagaderas semestralmente:

| Fecha | Deuda a amortizar en o antes de dicha fecha (%) |
|---|---|
| **31/12/2026**<br>(o en la Fecha de Cierre, si fuera posterior) | 2,414% |
| **30/06/2027** | 2,850% |
| **31/12/2027** | 2,850% |
| **30/06/2028** | 3,762% |
| **31/12/2028** | 3,762% |
| **30/06/2029** | 4,674% |
| **31/12/2029** | 4,674% |
| **30/06/2030** | 5,586% |
| **31/12/2030** | 5,586% |
| **30/06/2031** | 6,498% |
| **31/12/2031** | 6,498% |
| **30/06/2032** | 7,410% |
| **04/08/2032** | 43,436% |

El calendario de amortización previsto para cada Acreedor Afectado de la Deuda Bancaria que opte por el Tratamiento Alternativo de la Deuda Bancaria se calculará sobre la base de su participación en el importe total de la Deuda Bancaria, excluyendo el RCF.

(iv)    EURIBOR más un margen equivalente a un tipo de interés anual de 2,50% pagadero en períodos de interés semestrales con fechas de pago el 30 de junio y el 31 de diciembre de cada año, siendo el primer periodo de interés el comprendido entre la Fecha de Efectividad y el 31 de diciembre de 2026 (o, si la Fecha de Cierre

33

143

*Privileged and Confidential*

no hubiera tenido lugar, el 30 de junio de 2027). Dicho margen será bonificable anualmente desde la formalización de los Documentos de la Reestructuración de conformidad con la Cláusula 8.5.2:

(a)   en 100 bps por año sobre el margen base aplicable sin ajustar, siempre que el ratio de apalancamiento previsto en cada uno de los Contratos Afectados de la Deuda Bancaria sea igual o inferior a 3,50x (realizándose el cálculo sin aplicar la norma contable IFRS 16); o, alternativamente,

(b)   en un 200 bps por año sobre el margen base aplicable sin ajustar, siempre que el ratio de apalancamiento previsto en cada uno de los Contratos Afectados de la Deuda Bancaria sea igual o inferior a 3,00x (realizándose el cálculo sin aplicar la norma contable IFRS 16);

siendo el ratio de apalancamiento calculado sobre el cierre del trimestre anterior con carácter previo al inicio de cada periodo semestral de interés, para fijar el margen aplicable para ese periodo. El primer cálculo se realizará en Fecha de Efectividad teniendo en cuenta la Deuda Afectada pro forma post-Reestructuración;

(v)   el RCF tendrá una comisión de disponibilidad equivalente a un 35% del margen aplicable (excluyendo EURIBOR) e incluiría el compromiso de que el importe dispuesto medio durante el año natural sea inferior al 80%, así como un *clean down* del 50% del importe total del RCF una vez al año natural durante 10 días consecutivos;

(vi)   garantías consistentes en las Garantías Existentes, las Nuevas Garantías Reales ICA de Primer Rango, la Prenda de Segundo Rango sobre Cuentas y las Nuevas Garantías Personales ICA, sin perjuicio de la novación del orden de prelación de pagos del Contrato entre Acreedores de la Cláusula 5.5 siguiente;

(vii)   derecho de cobro prioritario sobre los créditos de los Acreedores Afectados de los Tratamientos por Defecto, de conformidad con la novación del Contrato entre Acreedores prevista en la Cláusula 5.5 siguiente, que resulta del propio contenido del Plan en la Deuda Afectada de las Sociedades Reestructuradas que hayan otorgado las Garantías Existentes; y

(viii)   modificación de determinados ratios financieros de la Deuda Bancaria correspondiente, así como las definiciones asociadas, para adaptarlos al Plan de Viabilidad, manteniéndose los ajustes de sinergias y partidas excepcionales (*one-offs*) al EBITDA (sin aplicar la norma contable IFRS 16) previstos en el Plan de Viabilidad para los ejercicios 2026, 2027 y 2028 (sujeto a certificación trimestral

34

*Privileged and Confidential*

del director financiero del Grupo o persona debidamente apoderada para ello), pudiéndose incorporar al EBITDA (sujeto a certificación anual del auditor) los correspondientes ajustes de sinergias y partidas excepcionales (*one-offs*) resultantes del cierre y/o venta de algunas plantas no previstas en el Plan de Viabilidad;

todo ello de conformidad con la Hoja de Términos de la Reestructuración.

5.2.5.  Tratamiento Alternativo de los Bonos Existentes

Los Acreedores Afectados de los Bonos Existentes podrán optar por un tratamiento alternativo (el "**Tratamiento Alternativo de los Bonos Existentes**") con las siguientes características y sin necesidad de comprometer el otorgamiento de financiación nueva:

(i)    descuento del 32,5% respecto del valor nominal de los Bonos Existentes con carácter previo a la Fecha de Efectividad del Plan;

(ii)   extensión de la fecha de vencimiento final al 31 de diciembre de 2030;

(iii)  amortización íntegra del principal en la fecha de vencimiento (*bullet*);

(iv)   las Sociedades Reestructuradas no realizarán amortizaciones anticipadas voluntarias de los Nuevos Bonos B durante un periodo de 30 meses desde la Fecha de Efectividad (*non-call period*) salvo abono de una prima *make-whole* de mercado;

(v)    cupón con un tipo de interés anual de 8,28%, pagadero en período de interés semestrales con fechas de pago el 30 de junio y el 31 de diciembre de cada año, siendo el primer periodo de interés el comprendido entre la Fecha de Efectividad y el 31 de diciembre de 2026 (o, si la Fecha de Cierre no ha tenido lugar, el 30 de junio de 2027). El cupón se incrementará automáticamente (*step-up*) en dos (2) puntos porcentuales anuales (2,00%) en cada fecha de aniversario a partir del 30 de junio de 2027, aplicándose dicho incremento sobre el tipo de interés vigente en cada momento;

(vi)   derecho de cobro prioritario sobre los Acreedores Afectados de los Tratamientos por Defecto, de conformidad con la novación del Contrato entre Acreedores prevista en la Cláusula 5.5 siguiente;

(vii)  garantías consistentes en las Garantías Existentes, las Nuevas Garantías Reales ICA de Primer Rango, la Prenda de Segundo Rango sobre Cuentas y las Nuevas

35

145

*Privileged and Confidential*

Garantías Personales ICA, sin perjuicio de la novación del orden de prelación de pagos del Contrato entre Acreedores de la Cláusula 5.5 siguiente;

todo ello de conformidad con la Hoja de Términos de la Reestructuración.

5.2.6.  Tratamiento Alternativo de las Líneas de Avales Existentes

Los Acreedores Afectados de las Líneas de Avales Existentes podrán optar por un tratamiento alternativo (el "**Tratamiento Alternativo de las Líneas de Avales**") con las siguientes características:

(i)    extensión del vencimiento por el importe dispuesto bajo las líneas a Fecha de Firma hasta 4 de agosto de 2032, con un mecanismo de anticipación del periodo de disponibilidad y del vencimiento al 30 de junio de 2030 en caso de que, en o antes de dicha fecha, los Nuevos Bonos B no hayan sido amortizados, redimidos o refinanciados, o las Sociedades Reestructuradas no acrediten compromisos vinculantes para su refinanciación;

(ii)   el periodo de disponibilidad será siempre hasta seis meses antes de vencimiento;

(iii)  ningún aval emitido puede tener fecha de vencimiento superior a la de la línea, en caso de que a fecha de vencimiento de la línea exista un aval en vuelo, Antolín Irausa otorgará un "cash collateral" por el 100% del importe avalado desde la fecha de vencimiento de la línea;

(iv)   términos económicos aplicables serán los de la línea cuyo vencimiento sea objeto de extensión;

(v)    los créditos de reembolso que nazcan a favor de los Acreedores Afectados que escojan este Tratamiento como resultado de la ejecución de avales emitidos en virtud de las Líneas de Avales Existentes que se encuentren vigentes a Fecha de Firma, recibirán el mismo Tratamiento que los Acreedores Afectados que hayan optado por el Tratamiento Alternativo de la Deuda Bancaria (incluyendo en términos de plazo y remuneración);

a efectos aclaratorios, si el crédito de reembolso correspondiente naciera una vez transcurridas una o varias fechas de amortización previstas en el calendario de amortización aplicable al Tratamiento Alternativo de la Deuda Bancaria, el importe agregado de las cuotas que habrían vencido en dichas fechas deberá abonarse en la siguiente fecha de amortización prevista en dicho calendario, junto con la cuota que, en su caso, venza en esa misma fecha;

36

*Privileged and Confidential*

(vi) los créditos de reembolso que nazcan a favor de los Acreedores Afectados que escojan este Tratamiento como resultado de la ejecución de los avales que se emitan desde la Fecha de Efectividad en virtud de las Nuevas Líneas de Avales serán exigibles en ejecución conforme a los términos previstos en las Nuevas Líneas de Avales;

(vii) las Nuevas Líneas de Avales tendrán la consideración de nueva financiación de conformidad con el Artículo 666 de la Ley Concursal;

(viii) derecho de cobro prioritario sobre los Acreedores Afectados de los Tratamientos por Defecto, de conformidad con la novación del Contrato entre Acreedores prevista en la Cláusula 5.5 siguiente; y

(ix) garantías consistentes en las Garantías Existentes, las Nuevas Garantías Reales ICA de Primer Rango, la Prenda de Segundo Rango sobre Cuentas y las Nuevas Garantías Personales ICA. En caso de que la correspondiente Línea de Avales Existentes tuviera garantía de terceros, estas serán mantenidas y ratificadas;

todo ello de conformidad con la Hoja de Términos de la Reestructuración.

5.2.7.   Tratamiento de la Deuda Subordinada

Extensión de la fecha de vencimiento final de los Créditos Afectados derivados de los Préstamos Intragrupo al 1 de enero de 2036, con amortización íntegra en la fecha de vencimiento (*bullet*), capitalización de todos los intereses que se devenguen y subordinación frente al resto de la Deuda Afectada.

Asimismo, a efectos de lo dispuesto en el Artículo 310.2.4º de la Ley Concursal, tendrán la consideración de créditos subordinados frente al resto de la Deuda Afectada y quedarán integrados en la Clase Deuda Subordinada cualesquiera créditos o derechos de repetición, reembolso, regreso, indemnización o subrogación que pudieran nacer a favor de cualquier Sociedad Reestructurada, Nueva Garante ICA o sociedad del Grupo frente a cualquier Sociedad Reestructurada como consecuencia de pagos, cobros, ejecuciones o recuperaciones realizados en cumplimiento de las garantías personales o reales otorgadas en el marco de la Reestructuración o de los Documentos de la Reestructuración. Dichos créditos no podrán ser satisfechos, compensados ni reclamados, directa o indirectamente, hasta que la Deuda Afectada distinta de la Deuda Subordinada haya sido íntegramente satisfecha, salvo en la medida en que el presente Plan o los Documentos de la Reestructuración dispongan expresamente otra cosa.

37

*Privileged and Confidential*

5.2.8. Elección de Tratamientos por los Acreedores Afectados de la Deuda Bancaria, los Bonos Existentes y las Líneas de Avales Existentes

Mediante la formalización del presente Plan en la Fecha de Firma, los Acreedores Participantes Originales manifiestan de manera incondicional e irrevocable la elección del Tratamiento Alternativo de la Deuda Bancaria y del Tratamiento Alternativo de las Líneas de Avales Existentes, según corresponda, respecto de los Créditos Afectados de los que sean titulares.

Sin perjuicio de la comunicación prevista en la Cláusula 4.2, las Sociedades Reestructuradas, a través del Agente de la Reestructuración, ofrecerán a los Acreedores Afectados la posibilidad de escoger de manera incondicional e irrevocable el Tratamiento por Defecto o el Tratamiento Alternativo que les corresponda durante el Periodo de Elección (o con anterioridad al mismo) mediante:

(i)     en el caso de los Acreedores Afectados titulares de Bonos Existentes que tengan la condición de Bonistas Elegibles, la Solicitud de Consentimiento remitida por el Agente de la Reestructuración a través del mecanismo descrito en la Cláusula 4.2.2(ii), que incluirá el mecanismo mediante el cual los Bonistas Elegibles podrán elegir entre los Tratamientos que les resulten aplicables en virtud del presente Plan de Reestructuración, así como los plazos y mecanismos aplicables para el ejercicio de dicha elección; y

(ii)    en el caso de los Acreedores Afectados de la Deuda Bancaria y de las Líneas de Avales Existentes, mediante el envío de la comunicación que se adjunta al presente Plan como **Anexo IX** (el "**Formulario de Elección de Entidades**") al Agente de la Reestructuración.

En caso de falta de ejercicio de la facultad dentro del plazo indicado en la Cláusula 2.4.1(vi), se aplicará por defecto el Tratamiento por Defecto correspondiente.

5.2.9. Compromiso de refinanciación

De alcanzar el Grupo, con anterioridad a la fecha de los correspondientes vencimientos, una cifra de apalancamiento que le permita acceder a los recursos necesarios en condiciones favorables de mercado que no impliquen un impacto financiero negativo en el Grupo o que comprometan su viabilidad, las Sociedades Reestructuradas se comprometen a poner en marcha un proceso de refinanciación que permita el repago de la deuda bajo los Instrumentos Post Reestructuración (excluyendo los Préstamos Intragrupo) antes de su fecha de vencimiento.

**5.3.    Implementación de la Reestructuración en la Deuda Afectada**

5.3.1.   Como consecuencia de la Reestructuración, los Bonos Existentes serán canjeados por los Nuevos Bonos en los siguientes términos:

(i)    los Bonos Existentes cuya titularidad corresponda a los Acreedores Afectados a los que se les aplique el Tratamiento por Defecto de los Bonos Existentes serán canjeados por nuevos bonos con arreglo a la Hoja de Términos de la Reestructuración (dichos bonos, los "**Nuevos Bonos A**"); y

(ii)   los Bonos Existentes cuya titularidad corresponda a los Acreedores Afectados que opten por el Tratamiento Alternativo de los Bonos Existentes serán canjeados por nuevos bonos con arreglo a la Hoja de Términos de la Reestructuración (dichos bonos, los "**Nuevos Bonos B**" y, conjuntamente con los Nuevos Bonos A, los "**Nuevos Bonos**").

5.3.2.   La recepción de los Nuevos Bonos está sujeta a condiciones en términos estándar para operaciones de mercado de valores de esta naturaleza. Si algún Acreedor Afectado de los Bonos Existentes no cumple en, o antes de, la Fecha de Cierre (o cualquier otra fecha determinada por Antolín Irausa, en su condición de emisor, y notificada a los Acreedores Afectados de los Bonos Existentes) con todas las condiciones de elegibilidad para canjear sus Bonos Existentes por los Nuevos Bonos, los Nuevos Bonos serán emitidos y sus derechos económicos (*beneficial interests*) sobre los mismos se mantendrán depositados en un depósito temporal (*holding period trust*) por el Depositario Temporal (el "**Depósito Temporal**") en su nombre durante un plazo de doce meses a contar desde la Fecha de Cierre, o según acuerden de otro modo el Agente de la Reestructuración y Antolín Irausa conforme a los términos de la documentación escrita que rija el Depósito Temporal.

5.3.3.   La Deuda Bancaria será objeto de novación modificativa no extintiva de la siguiente forma:

(i)    los créditos cuya titularidad corresponda a los Acreedores Afectados del Contrato de Financiación Sindicada Existente serán novados con arreglo a la Hoja de Términos de la Reestructuración en un nuevo texto refundido (el "**Nuevo Contrato de Financiación Sindicada**");

(ii)   los créditos cuya titularidad corresponda a los Acreedores Afectados del Contrato de Financiación ICO Existente serán novados con arreglo a la Hoja de Términos de la Reestructuración en un nuevo texto refundido (el "**Contrato de Financiación ICO Modificado**"); y

39

*Privileged and Confidential*

(iii)   los créditos cuya titularidad corresponda a BEI en relación con los Contratos de Financiación BEI Existentes serán novados con arreglo a la Hoja de Términos de la Reestructuración en un nuevo texto refundido (el "**Nuevo Contrato de Financiación BEI**").

5.3.4.   Las Líneas de Avales Existentes serán objeto de novación modificativa no extintiva de la siguiente forma:

(i)   los créditos cuya titularidad corresponda a los Acreedores Afectados de las Líneas de Avales Existentes a los que se les aplique el Tratamiento por Defecto de las Líneas de Avales Existentes serán novados con arreglo a la Hoja de Términos de la Reestructuración en virtud del propio Plan (los "**Créditos Contingentes de Avales**"); y

(ii)   los créditos cuya titularidad corresponda a los Acreedores Afectados de las Líneas de Avales Existentes que opten por el Tratamiento Alternativo de las Líneas de Avales serán novados con arreglo a la Hoja de Términos de la Reestructuración en un nuevo texto refundido (las "**Nuevas Líneas de Avales**" y, conjuntamente con los Nuevos Bonos, el Nuevo Contrato de Financiación Sindicada, el Contrato de Financiación ICO Modificado, el Nuevo Contrato de Financiación BEI, los Créditos Contingentes de los Avales y las Nuevas Líneas de Avales, los "**Instrumentos Post Reestructuración**"). Las Nuevas Líneas de Avales tendrán la consideración de nueva financiación de conformidad con el Artículo 666 de la Ley Concursal.

5.3.5.   Los Préstamos Intragrupo serán objeto de novación modificativa no extintiva, a los efectos de extender su fecha de vencimiento final al 1 de enero de 2036 y acordar la capitalización de todos los intereses que se devenguen hasta dicha fecha de vencimiento final, así como su subordinación frente al resto de Deuda Afectada. Igualmente, los derechos de repetición, reembolso, regreso, indemnización o subrogación que se integren en la Clase Deuda Subordinada conforme al presente Plan quedarán sujetos al mismo régimen de subordinación previsto para dicha Clase.

5.3.6.   El Contrato entre Acreedores será novado (y, en su caso, se suscribirá un texto refundido) con arreglo a los términos previstos en la Cláusula 5.5 y en la Hoja de Términos de la Reestructuración.

5.3.7.   El Contrato de Financiación de Circulante y las Prórrogas del Factoring Sindicado Existente serán otorgados con arreglo a los términos previstos en la Cláusula 6 y en la Hoja de Términos de la Reestructuración.

*Privileged and Confidential*

5.3.8.   Todos los Contratos Afectados (incluyendo las Líneas de Avales Existentes) incluirán cláusulas de cambio de control directo o indirecto vinculadas a la permanencia de la familia Antolín en el capital del Grupo en términos sustancialmente equivalentes a los previstos en el Contrato de Financiación Sindicada Existente, el Contrato de Financiación ICO Existente, los Contratos de Financiación BEI Existentes y los Bonos Existentes. Las Sociedades Reestructuradas se comprometen a formalizar, en el marco de los Documentos de la Reestructuración, las modificaciones contractuales que resulten necesarias para implementar lo previsto en la presente Cláusula 5.3.8.

**5.4.   Garantías otorgadas en el contexto del Plan**

5.4.1.   Sin perjuicio de lo dispuesto en la Cláusula 5.5.1 siguiente, las garantías personales otorgadas en garantía de las obligaciones derivadas de los Contratos Afectados (las "**Garantías Personales Existentes**"), así como las Prendas sobre Antolín Irausa (conjuntamente, las Garantías Personales Existentes y las Prendas sobre Antolín Irausa, las "**Garantías Existentes**") serán ratificadas y novadas en los términos que resulten necesarios de manera que garanticen las obligaciones bajo el Nuevo Contrato de Financiación Sindicada, el Contrato de Financiación ICO Modificado, los Nuevos Bonos y el Nuevo Contrato de Financiación BEI.

5.4.2.   Asimismo, se otorgan las siguientes garantías adicionales:

(i)    las Nuevas Garantías Reales ICA de Primer Rango en garantía del cumplimiento de las obligaciones derivadas de las Prórrogas del Factoring Sindicado Existente y del Contrato de Financiación de Circulante (en ambos casos en lo que respecta a las obligaciones con recurso frente al Grupo), los Nuevos Bonos B, las Nuevas Líneas de Avales y los créditos cuya titularidad corresponde a los Acreedores Afectados de la Deuda Bancaria que hayan optado por el Tratamiento Alternativo de la Deuda Bancaria;

(ii)   la Prenda de Segundo Rango sobre Cuentas en garantía del cumplimiento de las obligaciones derivadas de los Nuevos Bonos B, las Nuevas Líneas de Avales y los créditos cuya titularidad corresponde a los Acreedores Afectados de la Deuda Bancaria que hayan optado por el Tratamiento Alternativo de la Deuda Bancaria;

(iii)  las Nuevas Garantías Reales ICA de Segundo Rango y la Prenda de Tercer Rango sobre Cuentas en garantía del cumplimiento de las obligaciones derivadas de los Nuevos Bonos A, los Créditos Contingentes de Avales y los créditos titularidad de los Acreedores Afectados a los que se les apliquen el Tratamiento por Defecto de la Deuda Bancaria;

41

*Privileged and Confidential*

(iv) la Prenda de Primer Rango sobre Cuentas en garantía del cumplimiento de las obligaciones derivadas del Contrato de Financiación de Circulante y de las Prórrogas del Factoring Sindicado Existente; y

(v) las Nuevas Garantías Personales ICA en garantía del cumplimiento de las Prórrogas del Factoring Sindicado Existente y del Contrato de Financiación de Circulante (en ambos casos en lo que respecta a las obligaciones con recurso frente al Grupo), la Deuda Bancaria tras la Reestructuración, los Nuevos Bonos A, los Nuevos Bonos B, las Nuevas Líneas de Avales y los Créditos Contingentes de Avales.

Las Nuevas Garantías Personales ICA, las Nuevas Garantías Reales ICA y las Prendas sobre Cuentas (salvo la Prenda de Primer Rango sobre Cuentas de conformidad con la Cláusula 5.5.7) quedarán sujetas a los términos y condiciones previstos en el Contrato entre Acreedores, tal y como sea novado en virtud de la Cláusula 5.5 siguiente.

5.4.3. Asimismo, Antolín Irausa, con sujeción a los principios de otorgamiento de garantías (*agreed security principles*) previstos en los Bonos Existentes, el Contrato de Financiación Sindicada Existente, el Contrato de Financiación ICO Existente y los Contratos de Financiación BEI Existentes:

(i) otorgará una promesa de constitución de un derecho real de prenda sobre las acciones o participaciones del capital social de las sociedades filiales del Grupo establecidas en India en caso de que dichas sociedades alcancen un 5,0% del EBITDA consolidado del Grupo:

(a) en primer rango, en garantía del cumplimiento de las obligaciones derivadas de los Nuevos Bonos B, las Prórrogas del Factoring Sindicado Existente, el Contrato de Financiación de Circulante, las Nuevas Líneas de Avales y los créditos cuya titularidad corresponde a los Acreedores Afectados de la Deuda Bancaria que hayan optado por el Tratamiento Alternativo de la Deuda Bancaria; y

(b) en segundo rango, en garantía del cumplimiento de las obligaciones derivadas de los Nuevos Bonos A, los Créditos Contingentes de Avales y los créditos titularidad de los Acreedores Afectados a los que se les apliquen los Tratamientos por Defecto; y

(ii) otorgará una promesa de constitución de un derecho real de prenda sobre aquellos contratos materiales cuya rentabilidad anual esperada pueda razonablemente representar durante toda la vida del proyecto más de un 2% del EBITDA consolidado del Grupo, cuyos derechos de crédito sean susceptibles de

42

pignoración (sujeta a un coste de análisis de coste/beneficio y siempre que esté legalmente permitida y no requiera la notificación o consentimiento de la contraparte o un tercero) y no sean objeto de las Prórrogas del Factoring Sindicado Existente o del Contrato de Financiación de Circulante, en garantía del cumplimiento de las obligaciones derivadas de los Nuevos Bonos B, las Nuevas Líneas de Avales, las Prórrogas del Factoring Sindicado Existente, el Contrato de Financiación de Circulante y los créditos cuya titularidad corresponde a los Acreedores Afectados de la Deuda Bancaria que hayan optado por el Tratamiento Alternativo de la Deuda Bancaria.

5.4.4.   Los efectos del presente Plan de Reestructuración se extenderán a las Prendas sobre Antolín Irausa de conformidad con lo previsto en el Artículo 652.2 de la Ley Concursal en tanto la ejecución de dichas garantías reales supondría necesariamente la insolvencia de Antolín HoldCo, como pignorante, y del resto de las Sociedades Reestructuradas. A estos efectos, la extensión de los efectos del presente Plan de Reestructuración a las Prendas sobre Antolín Irausa se fundamenta en la concurrencia acreditada de los tres presupuestos acumulativos exigidos por el Artículo 652.2 de la Ley Concursal: (i) Antolín HoldCo y las Sociedades Reestructuradas pertenecen al mismo grupo de sociedades en el sentido del Artículo 42 del Código de Comercio, en la medida en que Antolín HoldCo es la sociedad matriz directa y socio único de Antolín Irausa, la cual, a su vez, encabeza el grupo operativo integrado por las restantes Sociedades Reestructuradas, existiendo un dominio total, directo e indirecto, que satisface el presupuesto subjetivo exigido por la norma; (ii) Antolín HoldCo no ostenta la condición de Sociedad Reestructurada ni de deudora sometida al presente Plan, de modo que se trata de una sociedad del grupo no sometida al Plan de Reestructuración, habiendo únicamente prestado su conformidad expresa al Plan en lo que afecta a la extensión de sus efectos a las Prendas sobre Antolín Irausa y el otorgamiento de la Nueva Garantía Personal ICA correspondiente; y (iii) la ejecución de las Prendas sobre Antolín Irausa causaría necesariamente la insolvencia tanto de Antolín HoldCo, como pignorante, como de Antolín Irausa y del resto de las Sociedades Reestructuradas.

5.4.5.   En particular, la ejecución de las Prendas sobre Antolín Irausa provocaría necesariamente la insolvencia tanto de Antolín HoldCo como de las Sociedades Reestructuradas. Por lo que respecta a Antolín HoldCo, las acciones de Antolín Irausa constituyen la práctica totalidad de su activo patrimonial, de modo que la ejecución de las Prendas sobre Antolín Irausa dejaría a Antolín HoldCo desprovista de todo patrimonio significativo y sin capacidad para atender sus obligaciones exigibles, incluidas las derivadas de su condición de garante personal bajo la Nueva Garantía Personal ICA correspondiente (que devendrían exigibles como consecuencia del cambio de control) y los pasivos fiscales que aflorarían por la ruptura del grupo de consolidación fiscal, situándola en un estado de insolvencia en los términos del Artículo 2.3 de la Ley Concursal. Por lo que respecta a Antolín Irausa y al resto de las Sociedades

43

*Privileged and Confidential*

Reestructuradas, la ejecución de las Prendas sobre Antolín Irausa y el consiguiente cambio de control sobre Antolín Irausa desencadenaría un efecto en cascada consistente en: (a) la resolución de los contratos comerciales con los principales clientes del Grupo, al activarse las cláusulas de cambio de control directo e indirecto contenidas en varias condiciones contractuales; (b) el potencial vencimiento del pasivo financiero reestructurado como consecuencia del cambio de control, (c) la imposibilidad de atender el pasivo comercial frente a proveedores y acreedores operativos, como consecuencia de la caída de ingresos derivada de la pérdida de la cartera de clientes; y (d) la ruptura del grupo de consolidación fiscal y el consiguiente afloramiento de obligaciones tributarias solidarias y potenciales pasivos fiscales sobrevenidos. Todo ello conduciría de manera inevitable a la insolvencia y al concurso de acreedores de Antolín Irausa y del resto de las Sociedades Reestructuradas.

5.4.6. La extensión de los efectos del Plan a las Prendas sobre Antolín Irausa resulta necesaria para preservar la integridad del Grupo como unidad económica, garantizar la plena eficacia de las medidas de reestructuración previstas en el presente Plan y evitar que la ejecución aislada de una garantía intragrupo pueda frustrar la finalidad de la Reestructuración.

5.4.7. Antolín HoldCo toma razón y consiente a la extensión del Plan a las Prendas sobre Antolín Irausa.

5.4.8. Las Nuevas Garantes ICA se comprometen de forma firme e irrevocable al otorgamiento de las Nuevas Garantías Personales ICA de tal forma que se constituirán en garantes personales, solidarios, irrevocables, incondicionales y a primer requerimiento, comprometiéndose a formalizar en la Fecha de Cierre cualesquiera documentos adicionales que resulten necesarios o convenientes para instrumentar dichas garantías en los términos previstos en el presente Plan y en los Documentos de la Reestructuración.

5.4.9. Cada Nueva Garante ICA responderá, de forma solidaria y como obligación propia, del pago puntual y completo de las obligaciones garantizadas por las Nuevas Garantías Personales ICA, hasta el importe máximo que, en su caso, resulte aplicable conforme a los correspondientes Documentos de la Reestructuración. Los Acreedores Afectados correspondientes podrán exigir el pago a primer requerimiento escrito, una vez vencidas, líquidas y exigibles las obligaciones garantizadas, sin necesidad de previa reclamación, excusión, orden, división, interpelación, declaración judicial o arbitral ni realización previa de cualquier garantía real o personal.

5.4.10. Las obligaciones asumidas por cada Nueva Garante ICA tendrán carácter continuado y permanecerán vigentes hasta la íntegra e irrevocable satisfacción de las obligaciones garantizadas, sin que se vean afectadas por cualesquiera novaciones, prórrogas, esperas,

*Privileged and Confidential*

modificaciones, refinanciaciones, dispensas, cesiones, ampliaciones, sustituciones o liberaciones parciales que afecten a las obligaciones garantizadas o a cualesquiera otras garantías otorgadas en relación con las mismas, salvo que los Acreedores Afectados acuerden expresamente por escrito la liberación correspondiente. Cada Nueva Garante ICA renuncia, en la máxima medida permitida por la ley aplicable, a los beneficios de orden, excusión, división y a cualesquiera otros derechos o excepciones que pudieran limitar, suspender o diferir la exigibilidad de las Nuevas Garantías Personales ICA, sin perjuicio de las excepciones que deriven exclusivamente del pago íntegro e irrevocable de las obligaciones garantizadas o de la inexistencia, nulidad o inexigibilidad de dichas obligaciones garantizadas.

5.4.11. Los Acreedores Participantes declaran que las Nuevas Garantías Reales ICA de Primer Rango, y las Nuevas Garantías Personales ICA, así como cualquier otra garantía que pudiera llegar a otorgarse conforme a las obligaciones de otorgamiento de garantías de la Cláusula 5.4.3 y cualquier recuperación derivada del Contrato entre Acreedores, tal y como haya sido novado de conformidad con los términos previstos en la Cláusula 5.5, de las que se beneficien los Acreedores Afectados del Contrato de Financiación ICO Existente serán compartidas por ellos con los Créditos Afectados del Contrato de Financiación ICO Existente tras la Reestructuración, con la finalidad de evitar cualquier tipo de perjuicio a la recuperación de dicho crédito avalado. Dicha compartición de garantías se articula mediante la reducción del Aval ICO Aranceles en la proporción que, sobre el importe avalado, represente el producto líquido de una eventual ejecución de la garantía en el futuro respecto de la suma de todas las deudas líquidas, vencidas y exigibles de las Sociedades Reestructuradas en virtud del Contrato de Financiación ICO Modificado, lo que será comunicado a ICO en el momento oportuno, de conformidad con la norma que resulte aplicable para el Aval ICO Aranceles (incluyendo la nota aclaratoria de fecha 29 de septiembre de 2022).

**5.5. Novación del Contrato entre Acreedores**

5.5.1. Sin perjuicio de lo dispuesto en las Cláusulas 5.4.1 y 5.4.2 anteriores, parte de la Reestructuración se implementará mediante la modificación del orden de prelación de pagos previsto en la Cláusula 13.1 del Contrato entre Acreedores para recoger, como uno de los efectos del presente Plan, que cualquier importe obtenido de cualquier cobro o recuperación en los supuestos previstos en dicha Cláusula 13.1 (incluso por vía de compensación, venta forzosa (*distressed disposal*) o venta de deuda (*debt disposal*)) se destinará (tras el pago de los correspondientes créditos senior correspondientes conforme al Contrato entre Acreedores):

(i) respecto de cualquier importe obtenido de cualquier cobro o recuperación en relación con las Prendas sobre Antolín Irausa, conforme al orden de prelación de pagos del Contrato entre Acreedores existente a Fecha de Firma, novado

45

*Privileged and Confidential*

únicamente a efectos de incluir las obligaciones de pago derivadas de los Nuevos Bonos, el Nuevo Contrato de Financiación Sindicada, el Contrato de Financiación ICO Modificado y el Nuevo Contrato de Financiación BEI para reemplazar las obligaciones de pago derivadas de los Bonos Existentes, el Contrato de Financiación Sindicada Existente, el Contrato de Financiación ICO Existente y los Contratos de Financiación BEI, respectivamente; y

(ii) respecto de cualquier importe obtenido de cualquier cobro o recuperación en relación con el resto de Garantías Existentes, las Nuevas Garantías Personales ICA y las Nuevas Garantías Reales ICA:

   (a) primero, a las obligaciones de pago derivadas del Contrato de Financiación de Circulante y de las Prórrogas del Factoring Sindicado Existente (en ambos casos exclusivamente en lo que respecta a las obligaciones con recurso frente al Grupo);

   (b) segundo, a los Créditos Afectados de los Acreedores Afectados que hayan escogido alguno de los Tratamientos Alternativos correspondientes, hasta un importe máximo de 435.000.000 €; y

   (c) tercero, y una vez se haya satisfecho íntegramente el importe al que hace referencia el apartado (b) anterior, a los restantes Créditos Afectados que se encuentren sujetos al Contrato entre Acreedores (por tanto, excluyendo, entre otros, los Préstamos Intragrupo), pro rata y *pari passu*, hasta el límite del importe de dichas obligaciones de pago,

todo ello de conformidad con la Hoja de Términos de la Reestructuración como acto de implementación y ejecución de la Reestructuración.

5.5.2. A efectos aclaratorios, la modificación del orden de prelación de pagos previsto en el Contrato entre Acreedores en relación con las Garantes de la Deuda Afectada (y, de modo particular, del Contrato de Financiación ICO Existente) supone un acto de implementación de los propios efectos de la Reestructuración sobre la propia Deuda Afectada de dichas Sociedades Reestructuradas de conformidad con lo dispuesto en el presente Plan de Reestructuración.

5.5.3. El importe máximo previsto en la Cláusula 5.5.1(ii)(b) ha sido determinado de conformidad con la capacidad del Grupo de otorgar prioridad de cobro (directa o indirectamente) de conformidad con las limitaciones contractuales existentes con carácter previo a la Reestructuración en los Instrumentos de Emisión, incluyendo, entre otros, los umbrales de pagos permitidos (*Restricted Payments*), inversiones permitidas (*Permitted Investments*) y ventas permitidas de activos.

46

*Privileged and Confidential*

5.5.4.  BBVA, Sabadell, Banco Santander, CaixaBank y HSBC España, en su calidad de Acreedores Participantes Originales que son también acreedores bajo el Contrato de Financiación ICO Existente y han elegido el Tratamiento Alternativo de la Deuda Bancaria, acuerdan, y así se recogerá en el contrato de novación modificativa y no extintiva del Contrato entre Acreedores, compartir con aquellos acreedores del Contrato de Financiación ICO Existente que no hayan optado por el Tratamiento Alternativo de la Deuda Bancaria cualquier importe que puedan recibir con carácter preferente (esto es, dentro del importe de 435 millones de euros descrito en la Cláusula 5.5.1(ii)(b) anterior) como consecuencia de cualquier cobro o recuperación (incluso por vía de compensación) derivado de la enajenación forzosa (*distressed disposal*) o ejecución de las garantías otorgadas por los Garantes de la Financiación ICO Existente. Esta compartición se hará de manera que a cada acreedor del Contrato de Financiación ICO Existente reciba o mantenga su prorrata de participación en dicho contrato de la cantidad recibida con carácter preferente de forma conjunta por BBVA, Sabadell, Banco Santander, CaixaBank y HSBC España. De esta manera, ningún porcentaje del Contrato de Financiación ICO Existente se verá perjudicado ni sus garantías económicamente afectadas.

5.5.5.  De esta manera, ningún Crédito Afectado bajo el Contrato de Financiación ICO Existente se verá perjudicado ni sus garantías económicamente afectadas.

5.5.6.  Asimismo, el Contrato entre Acreedores será novado para incluir, dentro de su ámbito de aplicación, todos los instrumentos de Deuda Afectada tras la Reestructuración, el Contrato de Financiación de Circulante y las Prórrogas del Factoring Sindicado Existente (en estos dos últimos casos, en lo que respecta a las obligaciones con recurso frente al Grupo), así como adaptar los mecanismos de vencimiento y ejecución de las garantías personales o reales sujetas al Contrato entre Acreedores a este nuevo perímetro de instrumentos de deuda afectados por el Contrato entre Acreedores (incluyendo la definición de "*Instructing Group*"), todo ello de conformidad con la Hoja de Términos de la Reestructuración y como acto de implementación y ejecución de la Reestructuración.

5.5.7.  Sin perjuicio de lo anterior, la Prenda de Primer Rango sobre Cuentas otorgada en garantía del Contrato de Financiación de Circulante y las Prórrogas del Factoring Sindicado Existente no estará sujeta a los términos del Contrato entre Acreedores, tal y como resulte novado en virtud de la presente Cláusula 5.5.

**5.6.    Intereses y comisiones devengados bajo los Contratos Afectados**

5.6.1.  En relación con los intereses ordinarios y las comisiones bajo los Contratos Afectados (a excepción de los Préstamos Intragrupo), las Partes acuerdan lo siguiente:

47

157

*Privileged and Confidential*

(i) Los intereses ordinarios y las comisiones bajo los Contratos Afectados continuarán devengándose hasta la Fecha de Efectividad (inclusive) y serán pagaderos de conformidad con los términos y condiciones actualmente vigentes en cada uno de dichos Contratos Afectados, sin que resulte de aplicación a dichos pagos obligación de reembolso o reintegro (*turnover*) alguna que pueda estar prevista en el Contrato entre Acreedores o en cualquiera de los Contratos Afectados.

(ii) En el supuesto de que la Fecha de Efectividad no coincida con una fecha de liquidación de intereses ordinarios o de comisiones prevista en los Contratos Afectados respectivos, se practicará una liquidación de intereses ordinarios y de comisiones extraordinaria en la Fecha de Cierre por el periodo comprendido entre la última fecha de liquidación ordinaria y la Fecha de Efectividad (inclusive), calculándose los intereses ordinarios y las comisiones conforme a los términos y tipos de interés, en su caso, aplicables bajo los Contratos Afectados correspondientes.

(iii) Desde la Fecha de Efectividad (exclusive), los intereses ordinarios y comisiones correspondientes a la Deuda Afectada devengarán y serán pagaderos de conformidad con el régimen de intereses previsto en los Documentos de la Reestructuración que resulten de aplicación.

(iv) Los Acreedores Afectados renuncian expresamente a reclamar a las Sociedades Reestructuradas cualesquiera costes de ruptura o importes equivalentes que pudieran derivarse de la liquidación extraordinaria de intereses prevista en el apartado (ii) anterior o, en general, de la interrupción de los periodos de interés vigentes bajo los Contratos Afectados como consecuencia de la entrada en vigor de los Documentos de la Reestructuración.

5.6.2. Lo previsto en la presente Cláusula 5.6 en relación con los intereses ordinarios y las comisiones no resultará de aplicación en ningún caso a las cuotas de principal de la Deuda Afectada que sean pagaderas desde la Fecha de Firma, las cuales no serán pagadas y serán afectadas conforme al Tratamiento correspondiente, y no devengarán intereses de demora al amparo de los Contratos Afectados respecto de las referidas cuotas de principal.

5.6.3. Sin perjuicio de lo anterior, los intereses asociados a los Préstamos Intragrupo continuarán devengándose desde la Fecha de Firma, los cuales no serán pagados y serán afectados conforme a lo previsto en la Cláusula 5.3.5.

48

*Privileged and Confidential*

### 5.7.    Créditos derivados de las Líneas de Avales Existentes

5.7.1.    Los créditos de reembolso derivados de la ejecución de los avales que estuvieran ya emitidos a Fecha de Firma al amparo de las Líneas de Avales Existentes serán afectados conforme al Tratamiento que le resulte de aplicación a la Línea de Avales Existentes que corresponda, y no devengarán intereses de demora al amparo de las Líneas de Avales respecto de dichos créditos desde la Fecha de Firma.

## 6.    PRÓRROGAS DEL FACTORING SINDICADO EXISTENTE Y CONTRATO DE FINANCIACIÓN DE CIRCULANTE

La viabilidad del Grupo depende de su capacidad de gestionar adecuadamente sus necesidades de circulante. Los instrumentos de financiación de circulante constituyen un elemento esencial en la operativa de sus negocios, en la medida en que permiten al Grupo atender sus obligaciones corrientes de pago, mantener su actividad comercial ordinaria y preservar las relaciones con sus proveedores, clientes y demás partes contrapartes comerciales.

El periodo anual de disponibilidad previsto en el Factoring Sindicado Existente, con posibles renovaciones automáticas, salvo notificación de no renovación por cualquiera de las partes con un preaviso mínimo de un mes, genera una incertidumbre incompatible con las necesidades financieras del Grupo durante el período de ejecución de la Reestructuración. Por tanto, salvo decisión en contrario de los acreedores bajo el Factoring Sindicado Existente, este instrumento vencería el 23 de enero de 2027.

En este contexto, resulta fundamental que el Grupo disponga de instrumentos de financiación de circulante adecuados a sus necesidades operativas, que ofrezcan estabilidad durante un horizonte temporal de, al menos, 5 años y que, a su vez, sean flexibles para adaptarse a las circunstancias del negocio en cada momento. La disponibilidad de estas líneas constituye una condición necesaria para la correcta ejecución del presente Plan y el aseguramiento de su Plan de Viabilidad.

El Contrato de Financiación de Circulante se articula como una línea multiproducto que incorpora el factoring sin recurso como instrumento principal de anticipo de créditos comerciales y una línea de crédito *revolving*. Se trata de instrumentos que son, por su propia naturaleza, productos bancarios cuya operativa requiere una infraestructura de gestión de cobros que debe funcionar de forma eficiente. Por ello, las entidades que forman parte del denominado grupo (*pool*) bancario del Grupo constituyen las contrapartes idóneas (y, en la práctica, las únicas viables) para participar en dichos instrumentos, máxime durante un plazo tan largo como son 5 años, extraordinario para este tipo de producto financiero.

Por las razones expuestas, el Contrato de Financiación de Circulante previsto en el presente Plan será otorgado por entidades que forman parte del denominado grupo (*pool*) bancario del

49

*Privileged and Confidential*

Grupo, al disponer del conocimiento operativo del negocio, la infraestructura para la gestión de productos de circulante, la experiencia técnica especializada para este tipo de productos financieros y la relación comercial preexistente con el Grupo necesaria para la correcta administración de estos instrumentos. Asimismo, dichas entidades bancarias ofrecen un grado de cooperación y flexibilidad operativa que resulta característico de las relaciones bancarias de larga duración, lo que también se refleja en una mayor disposición a mantener su participación en el instrumento, sometiéndose a estrictas restricciones de transmisibilidad que se reflejan en el Contrato de Financiación de Circulante.

Como suele ser habitual, una de las condiciones para el otorgamiento del Contrato de Financiación de Circulante es su consideración de dinero nuevo, de conformidad con el Artículo 666 de la Ley Concursal.

### 6.1.    Mantenimiento y prórrogas del Factoring Sindicado Existente desde el 23 de enero de 2027

6.1.1.    Las entidades participantes en el Factoring Sindicado Existente que son Parte (ya sea como Acreedores Participantes Originales o Acreedores Adheridos) (las "**Entidades Adquirentes**") son conocedoras del carácter esencial que dicho instrumento reviste para la operativa del Grupo y para el mantenimiento de su actividad comercial ordinaria. En reconocimiento de dicha circunstancia, las referidas entidades acuerdan mantener vigente el Factoring Sindicado Existente mediante prórrogas de carácter mensual desde el 23 de enero de 2027, fecha en la que vencería el Factoring Sindicado Existente, hasta la entrada en vigor con plena disponibilidad del Contrato de Financiación de Circulante, siempre que no se produzca ningún tipo de incumplimiento previsto en el Factoring Sindicado Existente distinto de la Reestructuración o de efectos que tengan lugar como resultado de la misma, su Homologación Judicial o su implementación.

6.1.2.    En caso de que, llegada la fecha de vencimiento del Factoring Sindicado Existente el 23 de enero de 2027, no haya tenido lugar la entrada en vigor con plena disponibilidad del Contrato de Financiación de Circulante, y sin que puedan solaparse ambos instrumentos en funcionamiento, las Entidades Adquirentes prorrogarán la disponibilidad del Factoring Sindicado Existente de forma automática y con carácter mensual hasta la entrada en vigor del Contrato de Financiación de Circulante, garantizando así la continuidad de las necesidades de circulante del Grupo durante el proceso de implementación de la Reestructuración (dichas prórrogas, las "**Prórrogas del Factoring Sindicado Existente**").

6.1.3.    Las Prórrogas del Factoring Sindicado Existente tendrán la consideración de financiación interina o de nueva financiación, según corresponda, de conformidad con los Artículos 665 y 666 de la Ley Concursal, lo cual es una condición esencial para su otorgamiento. Será además condición para las Prórrogas del Factoring Sindicado

50

*Privileged and Confidential*

Existente el pago de la prima de aseguramiento por parte de Antolín Irausa, así como el mantenimiento de la cobertura, el otorgamiento de las garantías reguladas en el Plan y que las tres entidades participantes en el Factoring Sindicado Existente sean Acreedores Participantes o hayan de alguna otra forma autorizado el mecanismo de prórrogas del Factoring Sindicado Existente previsto en este apartado.

6.1.4.   Asimismo, las Prórrogas del Factoring Sindicado Existente que se produzcan después de la Fecha de Cierre deberán estar garantizadas con la Prenda de Primer Rango sobre Cuentas, las Nuevas Garantías Reales ICA de Primer Rango, las Nuevas Garantías Personales ICA, así como cualquier otra garantía que pudiera llegar a otorgarse conforme a los principios de otorgamiento de garantías de la Cláusula 5.4.3, y se beneficiarán de la prioridad de cobro prevista en la novación del Contrato entre Acreedores regulada en la Cláusula 5.5.1 en los mismos términos que el Contrato de Financiación de Circulante.

**6.2.   Formalización del Contrato de Financiación de Circulante**

En la Fecha de Cierre, las Sociedades Reestructuradas y los Acreedores Afectados que opten por el Tratamiento Alternativo de la Deuda Bancaria formalizarán el Contrato de Financiación de Circulante con arreglo a la Hoja de Términos de la Reestructuración.

**6.3.   Condiciones del Contrato de Financiación de Circulante**

6.3.1.   El Contrato de Financiación de Circulante tendrá las siguientes características:

(i)     Instrumento: Línea multiproducto que incluye factoring sin recurso y un subtramo de línea de crédito *revolving*, con la posibilidad de generar un instrumento accesorio (*ancillary*) de avales.

(ii)    Acreditada del Nuevo Circulante: Antolín Irausa.

(iii)   Entidades del Nuevo Circulante: Aquellas entidades que formen parte de la Deuda Bancaria y que escojan el Tratamiento Alternativo de la Deuda Bancaria, a prorrata de su participación en la Deuda Bancaria. Su participación en el Contrato de Financiación de Circulante será la resultante de dividir su participación en la Deuda Bancaria entre el importe total pendiente de la Deuda Bancaria.

(iv)    Aseguramiento: BBVA asume un compromiso de suscripción (*underwriting*) del Contrato de Financiación de Circulante en virtud del cual asumirá cualquier déficit de suscripción (*shortfall*) a partir del primer euro que exceda de 15.000.000 € y hasta un importe necesario para cubrir el máximo previsto en el apartado (viii) siguiente (esto es, hasta 205.000.000 euros). De esta manera, el importe asegurado

51

*Privileged and Confidential*

por BBVA se reducirá con carácter prioritario por cada euro comprometido por las Entidades del Nuevo Circulante, independientemente del tramo o subtramo elegido. Este compromiso de BBVA está condicionado a que los Acreedores Afectados representativos de, al menos, el 65% de la Deuda Bancaria, escojan el Tratamiento Alternativo de la Deuda Bancaria en los términos previstos en el presente Plan. El compromiso de suscripción de BBVA no se realizará en el sublímite del tramo de líneas de crédito *revolving*.

(v)   Agente: A determinar por la Acreditada del Nuevo Circulante entre una terna de tres entidades a facilitar por las Entidades del Nuevo Circulante.

(vi)   Finalidad: Instrumento de financiación de carácter estable y recurrente, diseñado para la gestión ordinaria del capital circulante del Grupo mediante el anticipo de créditos comerciales frente a terceros y la disponibilidad de una línea de crédito *revolving*.

(vii)   Modalidad: Financiación de circulante en la modalidad de factoring sin recurso (con cobertura de crédito cuyo coste no será asumido por la Acreditada) con un subtramo de líneas de crédito *revolving*, dicho subtramo tendrá la posibilidad de generar un instrumento accesorio (*ancillary*) de avales a discreción de la Acreditada del Nuevo Circulante, y siempre con la autorización de la Entidad del Nuevo Circulante correspondiente a la que se solicite.

(viii)   Importe máximo de 220.000.000 €. Límite de riesgo conjunto para la modalidad de factoring sin recurso; y un sublímite de 40.000.000 € para el subtramo de líneas de crédito *revolving*, que Antolín Irausa podrá solicitar a determinadas entidades que acepten darlo. La disposición bajo cualquiera de las modalidades reducirá euro a euro el importe disponible.

(ix)   Moneda: EUR y USD.

(x)   Vencimiento: Hasta 4 de agosto de 2032, con un mecanismo de anticipación de dicho vencimiento a 30 de junio de 2030 en caso de que, en o antes de dicha fecha, los Nuevos Bonos B no hayan sido amortizados, redimidos o refinanciados, o las Sociedades Reestructuradas no acrediten compromisos vinculantes para su refinanciación.

(xi)   Disponibilidad: Carácter *revolving* dentro del límite global. Reutilización de límites y sublímites en todas las modalidades conforme se amorticen o cancelen operaciones. Las disposiciones deberán hacerse a *pro rata* entre las Entidades del Nuevo Circulante en cada momento.

52

*Privileged and Confidential*

(xii) Tipo de interés ordinario aplicable a los importes dispuestos bajo la modalidad de factoring sin recurso pagaderas a mes vencido: EUR: EURIBOR más 0,60%; USD: SOFR más 0,80%. Tipo de interés ordinario aplicable a los importes dispuestos bajo la línea de crédito revolving: EURIBOR más un margen anual equivalente de 1,25%.

(xiii) *Ancillary* avales: condiciones económicas equivalentes o inferiores para el subtramo *revolving*.

(xiv) Tipo de interés de demora: El tipo de interés ordinario más un 2% anual.

(xv) Condiciones suspensivas: La efectividad del Contrato de Financiación de Circulante queda condicionada al cumplimiento de las siguientes condiciones:

    (a) firmeza de la Homologación Judicial del presente Plan que reconozca al Contrato de Financiación de Circulante la condición de nueva financiación conforme al Artículo 666 de la Ley Concursal, salvo que la Homologación Judicial se produzca en términos que constituyan un Supuesto de Resolución conforme a la Cláusula 13.1.1 que no haya sido dispensado en cuyo caso se tendrá por no cumplida la condición suspensiva; y

    (b) la emisión de una resolución dictada por el tribunal de quiebras competente de Estados Unidos en virtud de la cual se produzca el reconocimiento del Plan de Reestructuración en virtud del Capítulo 15 (*Chapter 15*) del Título 11 del Código de los Estados Unidos (*United States Code*) con respecto a todas las Sociedades Reestructuradas, una vez dicha resolución adquiera firmeza y sea no recurrible (firme).

A efectos aclaratorios, no se devengarán ni deberán abonarse comisiones, gastos, costes, primas y cualesquiera otros cargos en virtud del Contrato de Financiación de Circulante hasta que no se hayan cumplido las condiciones de disponibilidad previstas en este apartado (xv).

(xvi) Condiciones específicas del *factoring* sin recurso:

    (a) cesión de créditos sin recurso elegibles conforme a la documentación contractual y, en particular, en idénticos que el término definido "Elegible Receivable" recogido en el Factoring Sindicado Existente.

    (b) Anticipo: hasta 95% del importe nominal aprobado de cada crédito cedido conforme a las condiciones del Factoring Sindicado Existente.

53

*Privileged and Confidential*

(c)    comisión de cesión: 0,05% de los importes adelantados en virtud del *factoring* sin recurso.

(d)    Supuesto de recurso limitado: disputas comerciales, fraude y otras habituales de mercado para este tipo de productos, así como supuestos ligados a la gestión de cobro delegada en el cliente (pagos recibidos por el cedente, o la filial titular original de los créditos cedidos, y no abonados a las Entidades del Nuevo Circulante; compensaciones realizadas por los deudores; y cualesquiera otros supuestos en los que, al amparo del contrato y con las garantías correspondientes, proceda el recurso frente al Grupo en caso de que los deudores cedidos efectúen pagos al Grupo a pesar de estar cedidos los créditos).

(xvii) Comisiones generales:

(a)    Comisión de disponibilidad: 0,50% al año, pagadera por la parte no dispuesta del importe del Contrato de Financiación de Circulante.

(b)    Comisión de estructuración: 0,34% anual sobre el importe total previsto en el apartado (viii) anterior, pagadero un primer pago en la fecha en la que se lleve a cabo una disposición de cualquiera de los instrumentos previstos en el Contrato de Financiación de Circulante y, a partir de ese momento, anualmente.

(xviii) La notificación a los clientes cuyos créditos comerciales sean objeto del anticipo únicamente se llevará a cabo en caso de retraso en los cobros, para lo que Antolín Irausa se obliga a prestar su total colaboración para la elaboración y envío de dichas notificaciones.

(xix)  Manifestaciones: se incluirán las manifestaciones habituales para este tipo de instrumentos de deuda circulante.

(xx)   Obligaciones: se incluirán las obligaciones de hacer y no hacer habituales para este tipo de instrumentos de deuda circulante. Los covenants financieros serán los mismos que los aplicables al Nuevo Contrato de Financiación Sindicada.

(xxi)  Causas de resolución anticipada: Sujeto a periodos de subsanación y dispensa, las habituales para este tipo de instrumentos de deuda y similares, incluyendo:

(a)    impago;

54

*Privileged and Confidential*

(b)   cambio de control en términos equivalentes al Contrato de Financiación Sindicada Existente, el Contrato de Financiación ICO Existente y los Contratos de Financiación BEI Existentes, incluyendo (sin limitación) cualquier cambio en la titularidad directa o indirecta, en el control o en los derechos de voto de Antolín Irausa, o cualquier acuerdo o pacto cuyo efecto sea la transmisión del control *de facto* sobre la gestión, o sobre todos o prácticamente todos los activos o las operaciones de Antolín Irausa a un tercero (el cambio de control se podrá incluir como supuesto de amortización anticipada obligatoria a solicitud de las Entidades del Nuevo Circulante);

(c)   incumplimiento relevante de manifestaciones u obligaciones;

(d)   supuestos de insolvencia probada actual o inminente;

(e)   incumplimiento cruzado (*cross-default*) en caso de impago (sujeto a umbral) y declaración de vencimiento cruzado (*acceleration*) en caso de las restantes obligaciones, respecto de los Nuevos Bonos, el Nuevo Contrato de Financiación Sindicada, el Contrato de Financiación ICO Modificado, las Nuevas Líneas de Avales y el Nuevo Contrato de Financiación BEI; y

(f)   el inicio por parte de las Sociedades Reestructuradas de conversaciones o negociaciones acerca de una potencial reestructuración de deuda con otros acreedores distintos de las Entidades del Nuevo Circulante.

(xxii)  Garantías y prioridad de cobro:

(a)   Garantías: la Prenda de Primer Rango sobre Cuentas, las Nuevas Garantías Reales ICA de Primer Rango y las Nuevas Garantías Personales ICA.

(b)   Prioridad de cobro: Bajo el nuevo Contrato entre Acreedores modificado de conformidad con la Cláusula 5.5, el Contrato de Financiación de Circulante (en lo que respecta a las obligaciones con recurso frente al Grupo) tendrá prioridad de cobro sobre todos los nuevos instrumentos de la Deuda Afectada en los términos de la Cláusula 5.5.1.

(xxiii)  Toma de decisiones: Régimen de toma de decisiones por mayoría de dos tercios del importe máximo disponible del Contrato de Financiación de Circulante (la "**Mayoría de las Entidades del Nuevo Circulante**"). Las siguientes materias requerirán el consentimiento unánime de las Entidades del Nuevo Circulante: modificación de importes, plazos de vencimiento, tipos de interés, moneda o del paquete de garantías.

55

*Privileged and Confidential*

(xxiv) Cesiones: Las Entidades del Nuevo Circulante no podrán ceder, transferir ni subparticipar total o parcialmente sus derechos u obligaciones sin el consentimiento previo de la Acreditada del Nuevo Circulante, salvo (i) a favor de una entidad de crédito que, en el marco de su actividad ordinaria, ofrezca expresamente este tipo de productos de forma recurrente, cuente con experiencia acreditada en su gestión y asuma las obligaciones y la operativa correspondientes bajo el Contrato de Financiación de Circulante; o (ii) si existiera un incumplimiento (*default*) del Contrato de Financiación de Circulante, en cuyo caso la cesión será libre.

(xxv) Mecanismo de sustitución: La Acreditada del Nuevo Circulante dispondrá de un derecho de sustitución respecto de las Entidades del Nuevo Circulante que no consientan una modificación o dispensa aprobada por la Mayoría de las Entidades del Nuevo Circulante o que incumplan sus obligaciones de disposición.

(xxvi) Ley aplicable: Legislación común española.

(xxvii) Jurisdicción exclusiva de los tribunales de la ciudad de Madrid (España).

7.    **ADHESIÓN DE ACREEDORES AFECTADOS DURANTE EL PERIODO DE ADHESIÓN**

7.1.    De conformidad con lo previsto en la Invitación y en la Cláusula 4.2 anterior, durante el Periodo de Adhesión los Acreedores Afectados correspondientes podrán votar a favor y manifestar su voluntad de adherirse a este Plan de Reestructuración, sin necesidad de consentimiento o acuerdo alguno por los Acreedores Participantes Originales y las Sociedades Reestructuradas, quienes aceptan expresamente la posibilidad de la adhesión de Acreedores Afectados a este Plan en los términos previstos en esta Cláusula 7.

7.2.    Mediante su adhesión al presente Plan, los Acreedores Adheridos se comprometen, entre otras cuestiones, a ser parte de los Documentos de la Reestructuración correspondientes que proceda formalizar en la Fecha de Cierre conforme a lo previsto en el presente Plan.

7.3.    Sin perjuicio de lo previsto en la Cláusula 7.4 siguiente con respecto de los Bonos, la adhesión de cualquier Acreedor Afectado que corresponda deberá formalizarse ante notario español mediante documento unilateral de adhesión conforme al modelo que se adjunta como **Anexo X**, copia (en formato .pdf) de la cual el Acreedor Adherido remitirá en el plazo más breve posible y, en todo caso, en los dos Días Hábiles siguientes a su fecha de formalización, al Agente de la Reestructuración a la siguiente dirección de correo electrónico: projectaxle@glas.agency.

7.4.    De conformidad con los términos de la Invitación, aquellos Acreedores Afectados titulares de Bonos Existentes que tengan la condición de Bonistas Elegibles que

56

*Privileged and Confidential*

pretendan adherirse al presente Plan de Reestructuración deben notificar su intención al Agente de la Reestructuración durante el Periodo de Adhesión. Mediante dicha notificación, los Bonistas Elegibles prestan su consentimiento e instruyen irrevocablemente al Agente de la Reestructuración, conforme al modelo de voto incluido como anexo a la Invitación, para que este formalice en su nombre y representación (o de alguna otra forma notifique el apoyo con el alcance legalmente necesario) el presente Plan de Reestructuración en la Fecha de Firma o suscriba durante el Periodo de Adhesión el documento de adhesión previsto en la Cláusula 7.3, con el objeto de que la Reestructuración sea homologada judicialmente conforme a los Artículos 635 y siguientes de la Ley Concursal.

7.5.   A efectos aclaratorios, la vinculación del Acreedor No Participante por los pactos alcanzados en el Plan (sean estos favorables o desfavorables a sus intereses) se producirá como resultado de la eventual extensión de los efectos producida, en su caso, por el Auto de Homologación Judicial.

7.6.   Los Acreedores Afectados que, de conformidad con los mecanismos previstos en los apartados anteriores, hubieran formalizado el presente Plan en la Fecha de Firma o se hubieran adherido de conformidad con la presente Cláusula 7, adquirirán la condición de Acreedores Participantes, y asumirán cuantos derechos y obligaciones se deriven de dicha posición conforme al presente Plan y en los correspondientes Documentos de la Reestructuración.

7.7.   En relación con la Disposición Adicional Octava de la Ley 16/2022 y demás normativa de desarrollo, la suscripción del presente Plan por los Acreedores Participantes Originales, así como las adhesiones al Plan de los Acreedores Afectados del Contrato de Financiación ICO Existente de conformidad con la presente Cláusula 7, se entenderán realizadas únicamente respecto de la parte de su Crédito Afectado que no esté cubierta por el Aval ICO Aranceles, salvo y desde el momento que expresamente indiquen lo contrario. En este sentido, los Acreedores Participantes Originales declaran que ejercitarán su voto con respecto a la parte de su Crédito Afectado cubierto por el Aval ICO Aranceles en fecha posterior a la firma del presente Plan, y siempre dentro del periodo establecido de adhesiones.

8.   **HOMOLOGACIÓN Y EXTENSIÓN DE EFECTOS**

8.1.   **Homologación Judicial como condición esencial de la Reestructuración**

8.1.1.   Las Partes manifiestan expresamente que es condición esencial de la Reestructuración, sin la cual no habrían accedido a formalizar este Plan de Reestructuración, que todos los Acreedores Afectados, ya sea de manera consensual (por firma o adhesión a este Plan), ya sea en virtud de la Homologación Judicial, respecto de todas las Sociedades

57

167

*Privileged and Confidential*

Reestructuradas, sean parte del Plan de Reestructuración y de los Documentos de la Reestructuración.

8.1.2. En consecuencia, las Sociedades Reestructuradas y los Acreedores Participantes acuerdan que el presente Plan de Reestructuración deberá ser objeto de Homologación de conformidad con lo previsto en los Artículos 635 y siguientes de la Ley Concursal, a los efectos previstos en la Cláusula 8.2.

8.1.3. Cada Parte se compromete a firmar los documentos necesarios y a adoptar las medidas que sean necesarias o convenientes de manera razonable para obtener la Homologación del presente Plan de Reestructuración y para apoyar, facilitar, implementar, consumar o de otro modo dar cumplimiento a la Reestructuración y a la Homologación.

## 8.2. Solicitud de Homologación

8.2.1. De conformidad con el Artículo 635 de la Ley Concursal, las Sociedades Reestructuradas se comprometen a presentar la Solicitud de Homologación ante el Tribunal Competente, con la finalidad de:

(i) según lo previsto en el Artículo 635.1º de la Ley Concursal, extender la vinculación al contenido completo e íntegro del presente Plan de Reestructuración y del resto de Documentos de la Reestructuración que correspondan a los Acreedores No Participantes respecto de los créditos de su titularidad;

(ii) a los efectos de lo previsto en los Artículos 635.3º y 667 de la Ley Concursal y dado que el importe de los Créditos Afectados representan, al menos, el cincuenta y uno por ciento (51,00%) del pasivo total de cada una de las Sociedades Reestructuradas (a excepción de Grupo Antolin South Africa (PTY) Ltd. y de Grupo Antolin Logistik Deutschland GmbH), proteger todos los actos y negocios jurídicos que se lleven a cabo para implementar la Reestructuración, incluyendo, sin limitación, los siguientes:

(a) la Reestructuración de la Deuda Afectada, incluyendo, sin limitación alguna, (i) la novación modificativa y no extintiva de la Deuda Bancaria, (ii) las emisiones de los Nuevos Bonos, (iii) el canje de los Bonos Existentes por dichos Nuevos Bonos y la cancelación de los Bonos Existentes de conformidad con la Solicitud de Consentimiento, (iv) las Nuevas Líneas de Avales y (v) la novación modificativa y no extintiva del Contrato entre Acreedores descrita en la Cláusula 5.5;

(b) las Prórrogas del Factoring Sindicado Existente;

*Privileged and Confidential*

(c)    el Contrato de Financiación de Circulante; y

(d)    garantizar que cualquier operación, acto, pago y garantía en ejecución del Plan no pueda ser objeto de acciones rescisorias en un eventual concurso de acreedores;

(iii)    otorgar al Contrato de Financiación de Circulante, a las Prórrogas del Factoring Sindicado Existente y a las Nuevas Líneas de Avales la consideración de financiación interina o de nueva financiación, según corresponda, de conformidad con los Artículos 665 y 666 de la Ley Concursal y, en concreto, las preferencias de cobro contempladas en el Artículo 242.1.17º y en el Artículo 280.6º de la Ley Concursal en el hipotético escenario de que las Sociedades Reestructuradas fueran después declaradas en concurso de acreedores;

(iv)    a los efectos de lo previsto en el Artículo 652.2 de la Ley Concursal, extender los efectos del Plan de Reestructuración a las Prendas sobre Antolín Irausa; y

(v)    en el supuesto de que se formule declinatoria por falta de competencia del Tribunal Competente en relación con las Sociedades Reestructuradas de nacionalidad extranjera y dicha declinatoria sea estimada en perjuicio de las Sociedades Reestructuradas, tener solicitado con carácter subsidiario la aplicación del Artículo 755 de la Ley Concursal, de manera que todas las Sociedades Reestructuradas queden sujetas a, y protegidas por, en todo caso, el proceso de homologación.

8.2.2.    La Solicitud de Homologación incorporará una copia autorizada del Plan de Reestructuración. Adicionalmente, la Solicitud de Homologación deberá incorporar las Certificaciones de Mayorías emitidas por el Experto en la Reestructuración, así como el Informe de Valoración del Experto, en caso de que fuera necesario, todo ello conforme a lo previsto en la Cláusula 11.

8.2.3.    Las Sociedades Reestructuradas se comprometen, asimismo, a remitir al Agente de la Reestructuración tan pronto como sea posible y, en todo caso, en los dos (2) Días Hábiles siguientes a su recepción:

(i)    copias de los autos y resoluciones del Tribunal Competente en relación con la Homologación Judicial;

(ii)    cualquier información relevante sobre los avances de cada trámite procesal (en particular, pero sin limitación, la providencia de admisión a trámite de la Solicitud de Homologación Judicial), las impugnaciones recibidas de los Acreedores No Participantes y cualesquiera otras cuestiones relativas a la tramitación y

59

*Privileged and Confidential*

aprobación del proceso de Homologación Judicial que sean relevantes para los acuerdos alcanzados en el contexto de la Reestructuración; y

(iii)   acreditación de que se haya publicado el Auto de Homologación Judicial en el Registro Público Concursal aceptando los términos solicitados en la Solicitud de Homologación Judicial para que resulte vinculante el presente Plan de Reestructuración y los restantes Documentos de la Reestructuración a los Acreedores No Participantes de todas las Sociedades Reestructuradas en virtud del Artículo 647 y siguientes de la Ley Concursal.

## 8.3.   Cumplimiento de requisitos para la Homologación Judicial

8.3.1.   Las Partes expresamente reconocen y aceptan, a los efectos oportunos, que el Plan de Reestructuración cumple con los requisitos que se establecen en los Artículos 638 y 639 de la Ley Concursal, para la homologación de planes de reestructuración. En particular las Partes hacen constar que:

(i)   las Sociedades Reestructuradas se encuentran en estado de probabilidad de insolvencia, de conformidad con el Artículo 584.2 de la Ley Concursal y que el Plan de Reestructuración ofrece una perspectiva razonable de evitar el concurso y asegurar la viabilidad de las Sociedades Reestructuradas en el corto y medio plazo;

(ii)   el presente Plan de Reestructuración cumple con los requisitos de contenido y forma exigidos en la Ley Concursal, tal y como se detalla en las Cláusulas 4 y 8.2;

(iii)   el presente Plan de Reestructuración cuenta con una mayoría suficiente para aprobar el presente Plan de Reestructuración, tal y como se evidencia en la Certificación de Mayorías emitida por el Experto en la Reestructuración;

(iv)   los créditos incluidos en cada una de las Clases han sido tratados de forma paritaria; y

(v)   el Plan de Reestructuración ha sido comunicado a todos los Acreedores Afectados.

## 8.4.   Extensión de efectos a los Acreedores No Participantes

8.4.1.   Conforme con lo previsto anteriormente, en la Solicitud de Homologación, se solicitará la extensión de los efectos de este Plan de Reestructuración a la Deuda Afectada de los Acreedores No Participantes respecto de todas las Sociedades Reestructuradas conforme a lo dispuesto en el Artículo 635.1 de la Ley Concursal, con efectos desde la Fecha de Efectividad, de conformidad con las disposiciones de este Plan de Reestructuración que les sean aplicables.

*Privileged and Confidential*

8.4.2. La Solicitud de Homologación incluirá también una petición expresa del Tribunal Competente para que, de conformidad con el Artículo 649 de la Ley Concursal, se declare que, como consecuencia de la extensión de efectos, los Acreedores No Participantes quedarán automáticamente vinculados, respecto de todas las Sociedades Reestructuradas, por el Plan de Reestructuración y los Documentos de la Reestructuración que correspondan, debiendo por tanto ser considerados legal y contractualmente parte de los mismos a todos los efectos.

**8.5. Efectos de la Homologación Judicial**

8.5.1. Producida la Homologación Judicial, se procederá a su implementación en los términos previstos en el presente Plan y les serán de aplicación a los Acreedores No Participantes íntegra y completamente todas las previsiones establecidas en la resolución en la que se apruebe dicha Homologación Judicial con efectos desde la Fecha de Efectividad, si así lo recoge el Auto de Homologación Judicial.

8.5.2. Tras la emisión del Auto de Homologación Judicial por el Tribunal Competente y una vez finalizado el Periodo de Elección y fijada la Fecha de Cierre de conformidad con lo previsto en la Cláusula 2.4.1(viii), se suscribirán los correspondientes documentos y contratos que sean necesarios para implementar la Reestructuración, con efectos desde la Fecha de Efectividad.

**9. RECONOCIMIENTO CONFORME AL CAPÍTULO 15 (*CHAPTER 15*) DEL TÍTULO 11 DEL CÓDIGO DE LOS ESTADOS UNIDOS**

**9.1.** Junto con la Solicitud de Homologación, las Sociedades Reestructuradas presentarán solicitudes y una aplicación de reconocimiento del Plan de Reestructuración en virtud del Capítulo 15 (*Chapter 15*) del Título 11 del Código de los Estados Unidos (*United States Code*).

**10. CESIÓN**

**10.1. Cesión por los Acreedores Afectados**

10.1.1. Hasta la Fecha de Cierre, ningún Acreedor Participante podrá vender, ceder, pignorar o disponer de otro modo de ninguno de sus derechos o transferir ninguno de sus derechos u obligaciones respecto de, o declarar o crear ningún fideicomiso (*trust*) de ninguno de sus derechos, títulos, intereses o beneficios respecto de, los Contratos Afectados o este Plan de Reestructuración (cada uno, una "**Cesión**") a, o a favor de, ninguna persona que no sea ya un Acreedor Participante, salvo que se cumplan cada una de las siguientes condiciones:

61

*Privileged and Confidential*

(i) que se permita bajo los Contratos Afectados;

(ii) que esa persona quede incondicional e irrevocablemente vinculada a este Plan de Reestructuración, como si hubiera sido Acreedor Participante de este Plan de Reestructuración, mediante la formalización del documento de adhesión cuyo modelo se adjunta como **Anexo X** (*mutatis mutandis*); y

(iii) que el cedente comunique al Agente de la Reestructuración la cesión, nombre del cesionario, cuantía y fecha de entrada en vigor, al menos 5 Días Hábiles de antelación a la fecha en la que ésta haya que tener efectividad. A su vez, el Agente de la Reestructuración comunicará a las Sociedades Reestructuradas, a través de Antolín Irausa, la comunicación recibida dentro del Día Hábil siguiente a su recepción.

10.1.2. Cualquier Acreedor Participante que pretenda llevar a cabo o liquidar (o cualquier acción equivalente) una Cesión antes de que el cesionario correspondiente quede vinculado por los términos de este Plan de Reestructuración de acuerdo con esta Cláusula acepta que seguirá como Acreedor Participante de sus obligaciones y responsabilidades bajo este Plan de Reestructuración respecto de los créditos supuestamente cedidos hasta que el cesionario propuesto quede vinculado por los términos de este Plan de Reestructuración de conformidad con esta Cláusula.

**10.2. Cesión por las Sociedades Reestructuradas**

Las Sociedades Reestructuradas no podrán ceder, transferir, sustituir ni subrogar los derechos y obligaciones contraídas en virtud del presente Plan de Reestructuración, sin el consentimiento previo expreso, escrito y unánime de la totalidad de los Acreedores Participantes.

**11. CONDICIÓN SUSPENSIVA PARA LA ENTRADA EN VIGOR**

**11.1.** Las Partes acuerdan que la eficacia, validez y efectos del presente Plan quedan sometidos al cumplimiento de la condición suspensiva consistente en la entrega por parte de las Sociedades Reestructuradas al Notario interviniente del presente Plan las correspondientes Certificaciones de Mayorías que evidencien (la "**Condición Suspensiva de Entrada en Vigor**"):

(i) que el Plan ha sido aprobado: (a) por todas las Clases de conformidad con lo previsto en el Artículo 638 de la Ley Concursal; o, alternativamente, (b) por una Clase que, de acuerdo con la clasificación concursal de créditos, pueda razonablemente presumirse que hubiese recibido algún pago tras una valoración de cada Sociedad Reestructurada como empresa en funcionamiento (esto es, que

62

*Privileged and Confidential*

dicha Clase se encuentra "dentro del dinero" o *in the money*), de conformidad con lo previsto en el Artículo 639.2º de la Ley Concursal; y

(ii)    que la Deuda Afectada correspondiente a cada Sociedad Reestructurada (a excepción de Grupo Antolin South Africa (PTY) Ltd. y de Grupo Antolin Logistik Deutschland GmbH) representa al menos el 51% del pasivo total de la Sociedad Reestructurada correspondiente, de conformidad con lo previsto en el Artículo 667 de la Ley Concursal.

**11.2.**   El cumplimiento de la Condición Suspensiva de Entrada en Vigor se acreditará mediante el envío por parte de Antolín Irausa, en su condición de agente de las Sociedades Reestructuradas, de un correo electrónico desde cualquiera de las direcciones indicadas en el **Anexo XI** a las siguientes direcciones del Notario ante el que se eleva a público el presente Plan de Reestructuración (o aquél que pueda sustituirle en cada momento) andresdominguez@notariado.org y lruiz@notarialagasca88.com (con copia a las direcciones electrónicas del Asesor Legal del Grupo (mlamo@ga-p.com; rlopez@ga-p.com; ffoix@ga-p.com; ldelclaux@ga-p.com; y projectaxle@ga-p.com) y al Asesor Legal de los Acreedores Participantes Originales (javier.castresana@aoshearman.com; y oscar.guinea@aoshearman.com)), adjuntando copia de las Certificaciones de Mayorías para cada Sociedad Reestructurada y confirmando el cumplimiento de la Condición Suspensiva de Entrada en Vigor. Una vez se acredite el cumplimiento de la Condición Suspensiva de Entrada en Vigor, Antolín Irausa, en su condición de agente de las Sociedades Reestructuradas, deberá hacer entrega al Notario interviniente de las Certificaciones de Mayorías originales, así como, en su caso, el Informe de Valoración del Experto, para su incorporación mediante diligencia a la escritura de elevación a público del Plan.

**11.3.**   Asimismo, las Partes instruyen y autorizan expresamente al Notario interviniente de este Plan (o aquél que pueda sustituirle en cada momento), el cual acepta, para que, una vez se le haya acreditado el cumplimiento de la Condición Suspensiva de Entrada en Vigor en los términos establecidos anteriormente, lo haga constar así mediante la oportuna diligencia en la escritura pública en la que se eleva a público el presente Contrato de conformidad con la Cláusula 4.3, adjuntando las correspondientes Certificaciones de Mayorías y, en caso de que fuera necesario, el Informe de Valoración del Experto.

**11.4.**   Las Partes solicitan expresamente al Notario ante el que se eleva a público el presente Plan de Reestructuración (o aquél que pueda sustituirle en cada momento), el cual acepta, que notifique mediante la remisión de un correo electrónico al Agente de la Reestructuración (a las direcciones ProjectAxle@glas.agency; y axel@glas.agency), al Asesor Legal de los Acreedores Participantes Originales (a las direcciones javier.castresana@aoshearman.com; y oscar.guinea@aoshearman.com) y al Asesor Legal del Grupo (mlamo@ga-p.com; rlopez@ga-p.com; ffoix@ga-p.com;

63

173

*Privileged and Confidential*

ldelclaux@ga-p.com; y projectaxle@ga-p.com) del cumplimiento de la Condición Suspensiva de Entrada en Vigor y, por tanto, la entrada en vigor del presente Plan para su inmediato traslado a las Partes.

**12. CONDICIÓN SUSPENSIVA PARA LA FECHA DE EFECTIVIDAD**

**12.1.** Las Partes acuerdan que la Fecha de Efectividad del Plan queda sometida al cumplimiento de la condición suspensiva consistente en (la "**Condición Suspensiva de Efectividad**"):

(i) que el Tribunal Competente dicte Auto de Homologación Judicial; y

(ii) que se haya producido el reconocimiento del Plan de Reestructuración en virtud del Capítulo 15 (*Chapter 15*) del Título 11 del Código de los Estados Unidos (*United States Code*), mediante la emisión de una resolución no firme por el tribunal de quiebras competente de Estados Unidos que otorgue el reconocimiento del Plan de Reestructuración con respecto a todas las Sociedades Reestructuradas.

**12.2.** El cumplimiento de la Condición Suspensiva de Efectividad se acreditará mediante el envío por parte de Antolín Irausa, en su condición de agente de las Sociedades Reestructuradas, de un correo electrónico desde cualquiera de las direcciones indicadas en el **Anexo XI** a las siguientes direcciones del Notario ante el que se eleva a público el presente Plan de Reestructuración (o aquél que pueda sustituirle en cada momento) andresdominguez@notariado.org y lruiz@notarialagasca88.com (con copia a las direcciones electrónicas del Asesor Legal del Grupo (mlamo@ga-p.com; rlopez@ga-p.com; ffoix@ga-p.com; ldelclaux@ga-p.com; y projectaxle@ga-p.com) y al Asesor Legal de los Acreedores Participantes Originales (javier.castresana@aoshearman.com; y oscar.guinea@aoshearman.com), confirmando el Cumplimiento de la Condición Suspensiva de Efectividad y adjuntando copia de la (i) la resolución no firme del tribunal de quiebras competente de Estados Unidos que otorgue reconocimiento al Plan de Reestructuración en virtud del Capítulo 15 (*Chapter 15*) del Título 11 del Código de los Estados Unidos (*United States Code*); y (ii) el Auto de Homologación Judicial.

**12.3.** Asimismo, las Partes instruyen y autorizan expresamente al Notario interviniente de este Plan (o aquél que pueda sustituirle en cada momento), el cual acepta, para que, una vez se le haya acreditado el cumplimiento de la Condición Suspensiva de Efectividad en los términos establecidos anteriormente, lo haga constar así mediante la oportuna diligencia en la escritura pública en la que se eleva a público el presente Contrato de conformidad con la Cláusula 4.3.

**12.4.** Las Partes solicitan expresamente al Notario ante el que se eleva a público el presente Plan de Reestructuración (o aquél que pueda sustituirle en cada momento), el cual

*Privileged and Confidential*

acepta, que notifique mediante la remisión de un correo electrónico al Agente de la Reestructuración (a las direcciones ProjectAxle@glas.agency; y axel@glas.agency), al Asesor Legal de los Acreedores Participantes Originales (a las direcciones javier.castresana@aoshearman.com; y oscar.guinea@aoshearman.com) y al Asesor Legal del Grupo (mlamo@ga-p.com; rlopez@ga-p.com; ffoix@ga-p.com; ldelclaux@ga-p.com; y projectaxle@ga-p.com) del cumplimiento de la Condición Suspensiva de Efectividad para su inmediato traslado a las Partes por el Agente de la Reestructuración.

13.   **RESOLUCIÓN**

13.1.1.   El presente Plan de Reestructuración podrá ser resuelto en caso de que (cada uno de ellos, un "**Supuesto de Resolución**"):

(i)   se dicte sentencia estimatoria de una impugnación que declare la ineficacia del Plan de Reestructuración conforme al Artículo 661.2 de la Ley Concursal;

(ii)   se dicte sentencia de una impugnación que acuerde no extender los efectos del Plan de Reestructuración a uno o varios Acreedores Afectados que, conjunta o individualmente, ostenten Deuda Afectada por un importe igual o superior a 50.000.000 €;

(iii)   se dicte sentencia de una impugnación que acuerde no extender los efectos del Plan de Reestructuración a uno o varios Acreedores Afectados que, conjunta o individualmente, ostenten Deuda Afectada por un importe igual o superior a 25.000.000 € e inferior a 50.000.000 €;

(iv)   se dicte cualquier tipo de resolución que deje sin efecto total o parcialmente la resolución del tribunal de quiebras competente de Estados Unidos que otorgue reconocimiento al Plan de Reestructuración conforme al Capítulo 15 (*Chapter 15*) del Título 11 del Código de los Estados Unidos (*United States Code*); o

(v)   la Homologación Judicial no se produzca en los términos sustancialmente previstos en los apartados (i) a (iv) de la Cláusula 8.2.1, incluyendo, sin carácter limitativo, cualquier pronunciamiento, omisión, condición, reserva, limitación o salvedad en el Auto de Homologación Judicial que afecte a cualquiera de dichos apartados, o que se excluya de la Homologación Judicial a cualquiera de las Sociedades Reestructuradas.

13.1.2.   Las Sociedades Reestructuradas se obligan a comunicar al Agente de la Reestructuración el acaecimiento de cualquier Supuesto de Resolución tan pronto tenga conocimiento y, en ningún caso, más tarde de 24 horas desde dicho conocimiento.

65

*Privileged and Confidential*

Igualmente, el Agente de la Reestructuración notificará a todos los Acreedores Participantes en idéntico plazo máximo de 24 horas.

13.1.3.  Los Supuestos de Resolución previstos en las Cláusulas 13.1.1(i) y 13.1.1(ii) anteriores producirán una resolución automática del Plan de Reestructuración, sin necesidad de declaración adicional ni actuación alguna por cualquiera de las Partes, sin posibilidad de dispensa.

13.1.4.  Los Supuestos de Resolución previstos en las Cláusulas 13.1.1(iii), 13.1.1(iv) y 13.1.1(v) anteriores producirán la resolución automática del Plan de Reestructuración, sin necesidad de declaración adicional ni actuación alguna por cualquiera de las Partes, una vez hayan transcurrido diez (10) Días Hábiles desde que el Agente de la Reestructuración lo haya notificado a los Acreedores Participantes, salvo que éste recibiera un acuerdo de dispensa por parte de la Mayoría de Acreedores Participantes (de cuyo cómputo, tanto en el numerador como en el denominador, se eliminarán los Préstamos Intragrupo).

13.1.5.  En el caso de que el Supuesto de Resolución derivara de que el Contrato de Financiación de Circulante, las Prórrogas del Factoring Sindicado Existente o las Nuevas Líneas de Avales no se les otorgaran las preferencias de cobro contempladas en el Artículo 242.1.17º y en el Artículo 280.6º de la Ley Concursal, en el hipotético escenario de que las Sociedades Reestructuradas fueran después declaradas en concurso de acreedores, sólo podrá dispensarse por la unanimidad de los titulares del instrumento correspondiente que hubiera sido excluido.

13.1.6.  En caso de que se produzca la resolución del Plan de Reestructuración de conformidad con la Cláusula 13.1.2, los términos y condiciones aplicables a los Créditos Afectados serán los mismos que fueran de aplicación con anterioridad a la Fecha de Efectividad.

13.1.7.  A los efectos de lo anterior, el Agente de la Reestructuración, previo acuerdo favorable de la Mayoría de Acreedores Participantes y de las Sociedades Reestructuradas, a través de Antolín Irausa, queda instruido por la presente para remitir una comunicación a los Acreedores Afectados y al Notario ante el que se eleva a público el presente Plan de Reestructuración (o aquél que pueda sustituirle en cada momento) informando de la resolución del Plan de Reestructuración de conformidad con la Cláusula 13.1.2.

13.1.8.  Las Partes solicitan al Notario ante el que se eleva a público el presente Plan de Reestructuración (o aquél que pueda sustituirle en cada momento), el cual acepta, que, en caso de que se le notifique que se ha producido la resolución del Plan de conformidad con la Cláusula 13.1.7, lo haga constar en la escritura de elevación a público del presente Plan mediante diligencia, que incluirá la manifestación relativa a que se ha producido la

66

*Privileged and Confidential*

resolución y que, por tanto, el presente Plan y los restantes actos y contratos suscritos a su amparo, quedan resueltos.

13.1.9. Asimismo, en caso de que se produjese la declaración de resolución del Plan, las Partes se comprometen a deshacer o resolver lo antes posible todas aquellas actuaciones que se hubieran realizado, quedando obligados a formalizar cualquier documentación pública o privada que sea necesaria a tales efectos.

**14. REPRESENTACIÓN DE LAS PARTES**

**14.1. Representante de las Sociedades Reestructuradas**

14.1.1. Las Sociedades Reestructuradas confieren en este acto a Antolín Irausa su representación irrevocable, constituyéndole en su agente y representante a los efectos de este Plan y los restantes Documentos de la Reestructuración y autorizándole expresamente para que, por medio de sus órganos y apoderados, pueda llevar a cabo todas las actuaciones que se atribuyen a las Sociedades Reestructuradas en este Plan y los restantes Documentos de la Reestructuración, aun en el caso de que incurra en las figuras de autocontratación, multi-representación y conflicto de interés.

14.1.2. En particular, pero sin limitación, Antolín Irausa podrá realizar cualquiera de las siguientes actuaciones en nombre y representación de las Sociedades Reestructuradas:

(i) emitir y recibir cuantas notificaciones y comunicaciones se deriven de este Plan y los restantes Documentos de la Reestructuración y entregar al Agente de la Reestructuración y, en su caso, a los Acreedores Participantes cuanta documentación e información deba suministrarse conforme a lo previsto en los Documentos de la Reestructuración, instituyéndose como el interlocutor único frente al Agente de la Reestructuración y los restantes Acreedores a todos los efectos previstos en los Documentos de la Reestructuración;

(ii) emitir instrucciones, adoptar decisiones y prestar su consentimiento a las actuaciones que sean precisas para el desarrollo y cumplimiento de este Plan y los restantes Documentos de la Reestructuración, tanto si están previstas en ellos como si no lo están;

(iii) suscribir y formalizar cuantos documentos conexos, complementarios o relacionados con este Plan y de los restantes Documentos de la Reestructuración sean necesarios, estando expresamente facultado para ratificar, aclarar y acordar modificaciones de los mismos;

67

177

*Privileged and Confidential*

(iv)   en general, otorgar cualquier documento, público o privado, y llevar a cabo cualquier actuación que sea necesaria o conveniente en relación con el desarrollo y cumplimiento de este Plan y los restantes Documentos de la Reestructuración.

14.1.3.   Lo anterior se entiende sin perjuicio del cumplimiento por las Sociedades Reestructuradas de las obligaciones asumidas en este Plan y demás Documentos de la Reestructuración.

14.1.4.   En virtud de lo dispuesto en el apartado precedente, cualquier notificación, comunicación, acción, omisión, compromiso, transacción, renuncia, modificación o aclaración o cualquier otra actuación llevada a cabo por Antolín Irausa conforme al mandato conferido por las Sociedades Reestructuradas, vinculará a dichas Sociedades Reestructuradas a todos los efectos legales como si éstas lo hubieran suscrito, consentido o convenido de forma expresa. Asimismo, las Sociedades Reestructuradas manifiestan a favor de los Acreedores que, en caso de conflicto entre cualesquiera notificaciones u otras acciones de Antolín Irausa, de cualquier otra Sociedad Reestructurada, prevalecerán las realizadas por Antolín Irausa.

14.1.5.   El Agente de la Reestructuración (por iniciativa propia o a requerimiento de cualquier Acreedor Participante) podrá solicitar a todas las Sociedades Reestructuradas, en el caso de que lo razone y justifique suficientemente, la ratificación de las actuaciones llevadas a cabo por Antolín Irausa como representante e interlocutor de las Sociedades Reestructuradas a efectos de este Plan y de los restantes Documentos de la Reestructuración, así como la formalización, conjuntamente con Antolín Irausa, de cualquier contrato o documento (ya sea público o privado) que se derive de este Plan o de los restantes Documentos de la Reestructuración (incluyendo, sin limitación, documentos de aclaración, ratificación y modificación de los anteriores).

**14.2.   Agente de la Reestructuración**

14.2.1.   Las Sociedades Reestructuradas nombran a GLAS Specialist Services Limited para que actúe como Agente de la Reestructuración en relación con este Plan y de los restantes Documentos de la Reestructuración, en las cuestiones que resulten de aplicación. GLAS Specialist Services Limited acepta dicha designación.

14.2.2.   Los Acreedores Participantes Originales y los Acreedores Adheridos confieren, en virtud de este Plan, un mandato representativo a favor del Agente de la Reestructuración para que actúe como mandatario especial con carácter irrevocable de los Acreedores Afectados (incluyendo los Acreedores No Participantes, una vez que los mismos queden vinculados por este Plan), a todos los efectos establecidos en este Plan y en los restantes Documentos de la Reestructuración, quedando el Agente de la Reestructuración

68

*Privileged and Confidential*

investido de todas las facultades y poderes necesarios para al desempeño de sus funciones.

14.2.3.   Sin perjuicio de lo dispuesto en las Cláusulas 14.2.5 y 14.2.6, el Agente de la Reestructuración intervendrá como agente y representante de cada uno de los Acreedores Afectados (incluyendo los Acreedores No Participantes, una vez que los mismos queden vinculados por este Plan) y el Agente de la Reestructuración queda autorizado, en nombre de cada uno de ellos, a celebrar, hacer valer sus derechos y representar a cada uno de dichos Acreedores Afectados (una vez que los mismos queden vinculados por este Plan) en relación con el otorgamiento de cualquier documento público o privado necesario o conveniente para implementar la Reestructuración o llevar a cabo los actos que se deriven de la misma. Cada uno de los Acreedores Afectados designa al Agente de la Reestructuración (que acepta) como su apoderado y por la presente otorga un poder de representación irrevocable y autoriza al Agente de la Reestructuración (renunciando expresamente a cualquier autocontratación, conflicto de intereses o multirepresentación que pudiera surgir) para:

(i)    actuar en su nombre y, si así lo exige la legislación aplicable o si procede, en su nombre y por su cuenta (sin necesidad de remitirse a ninguna otra persona o de recibir su autorización) en relación con la aceptación, la preparación, la suscripción, el otorgamiento y suscripción en privado o en documento público de cualquiera de los Documentos de la Reestructuración conforme al presente Plan de Reestructuración; y

(ii)   que acepte como representante suyo cualquier garantía, hipoteca, prenda o cualquier otra garantía real, incluidos derechos de prenda, hipoteca, cesión o transferencia de título a efectos de garantía que se otorguen a favor de ese Acreedor Afectado en relación con los Documentos de la Reestructuración.

14.2.4.   Sin perjuicio de lo dispuesto en la Cláusula 14.2.15, en relación con la ratificación, clarificación, modificación y/o novación del presente Plan de Reestructuración, el Agente de la Reestructuración intervendrá como agente y representante de cada uno de los Acreedores Afectados y queda autorizado, en nombre de cada uno de ellos, a celebrar, hacer valer sus derechos y representar a cada uno de dichos Acreedores Participantes en relación con el otorgamiento de cualquier documento público para la ratificación o aclaración o novación, según corresponda, del presente Plan de Reestructuración.

14.2.5.   En caso de que cualquiera de los Acreedores Participantes no pudiera otorgar al Agente de la Reestructuración la totalidad o parte de las facultades de representación aquí referidas, se compromete expresa e irrevocablemente a:

69

179

*Privileged and Confidential*

(i)   otorgar en el momento de la suscripción del presente Plan de Reestructuración un poder notarial de representación específico a favor del Agente de la Reestructuración a los efectos de realizar las acciones previstas en la presente Cláusula 14.2; o

(ii)   comparecer personalmente junto con el Agente de la Reestructuración en el lugar o lugares y a la hora que éste notifique al Acreedor Participante a los efectos de llevar a cabo las actuaciones y medidas previstas en la presente Cláusula 14.2 que fueran necesarias o a ratificar a la mayor brevedad posible las actuaciones realizadas por el Agente de la Reestructuración.

14.2.6.   A estos efectos, BBVA, BBVA USA, Banco Sabadell, Banco Santander, y CaixaBank manifiestan expresamente que no otorgan el poder especial de representación previsto en esta Cláusula 14.2 y se obligan, en su lugar, a comparecer personalmente para la formalización de cuantos documentos públicos o privados deriven del presente Plan y de los restantes Documentos de la Reestructuración o resulten necesarios o convenientes en el contexto de la Reestructuración en atención a su criterio individual, siempre actuando de buena fe.

14.2.7.   El Agente de la Reestructuración coordinará, entre otras funciones, de la recepción y tramitación de diversos documentos relacionados con la implementación de la Reestructuración, incluyendo cualquier Solicitud de Elección cumplimentada por el Acreedor Afectado correspondiente, y, en su caso, la entrega de tales documentos a las Sociedades Reestructuradas y al Notario para su incorporación al presente Plan de Reestructuración mediante testimonio o diligencia notarial.

14.2.8.   En ausencia de error manifiesto, la decisión del Agente de la Reestructuración en relación con las conciliaciones y los cálculos (según proceda) tendrá un carácter definitivo y no podrá impugnarse por ninguna de las Partes.

14.2.9.   El Agente de la Reestructuración proporcionará a cualquier Acreedor Afectado de los Bonos Existentes la información relativa a las conciliaciones y cálculos anteriormente mencionados que dicha persona pueda razonablemente solicitar a efectos de evaluar y comprobar dichas conciliaciones y cálculos.

14.2.10.   Para llevar a cabo las conciliaciones y los cálculos mencionados anteriormente, el Agente de la Reestructuración y/o Antolín Irausa podrán solicitar, y el Acreedor Afectado de los Bonos Existentes correspondiente deberá entregar las pruebas que razonablemente puedan requerir el Agente de la Reestructuración y/o Antolín Irausa (a satisfacción razonable del Agente de la Reestructuración y/o Antolín Irausa (según corresponda)).

70

*Privileged and Confidential*

14.2.11. Cada una de las Partes acepta que, a efectos de (a) cualquier conciliación o cálculo, o (b) del desempeño de cualquier otra obligación o función por parte del Agente de la Reestructuración en virtud del presente Plan de Reestructuración, el Agente de la Reestructuración podrá:

(i) basarse en el importe de los Créditos Afectados que figura en la documentación remitida al amparo de la Solicitud de Consentimiento correspondiente de cada Acreedor Afectado de los Bonos debidamente cumplimentada y suscrita por el Acreedor Participante en virtud del presente Plan de Reestructuración, y asumirá que el/los importe(s) de los Créditos Afectados que figuren en ésta representan el importe total de los Créditos Afectados de los que es titular, o que se adeudan a dicho Acreedor Afectado;

(ii) confiar en los créditos titulados por los Acreedores Afectados del Contrato de Financiación Sindicada Existente y del Contrato de Financiación ICO Existente en los registros reflejados por los agentes y los agentes de garantías del Contrato de Financiación Sindicada Existente y el Contrato de Financiación ICO Existente y remitido al Agente de la Reestructuración;

(iii) confiar en la cantidad debida por cada uno de los Bonos Existentes remitida por Antolín Irausa, en su condición de emisor, y/o cualquiera de sus agentes;

(iv) asumir que cada uno de los Acreedores Participantes que ha proporcionado información en relación con sus Créditos Afectados y manifestado su voluntad de celebrar y cumplir el presente Plan de Reestructuración, está facultado para suscribir y ha suscrito dichos documentos; y

(v) basar todos los cálculos y confirmaciones en el importe de los Créditos Afectados correspondientes.

14.2.12. Cada uno de los Acreedores Afectados (incluyendo los Acreedores No Participantes, una vez que los mismos queden vinculados por este Plan) da instrucciones irrevocables e incondicionales al Agente de la Reestructuración para que inmediatamente firmen y entreguen, eleven a público (cuando ello se requiera de conformidad con los términos del presente Plan de Reestructuración), adopten todas las medidas necesarias y cumplan con las obligaciones del Agente de la Reestructuración en virtud de cada uno de los Documentos de la Reestructuración en los que el Agente de la Reestructuración sea parte, a los efectos de implementar la Reestructuración.

14.2.13. El Agente de la Reestructuración es parte de este Contrato para recibir las instrucciones que aquí se establecen y su función en el marco de este Plan de Reestructuración tiene una naturaleza meramente mecánica y administrativa.

71

*Privileged and Confidential*

14.2.14. El Agente de la Reestructuración remitirá inmediatamente a la Parte destinataria el original o copia de cualesquiera documentos que la Parte remitente le entregue al Agente de la Reestructuración para dicha Parte destinataria.

14.2.15. El Agente de la Reestructuración no adoptará ninguna medida de conformidad con lo dispuesto en la presente Cláusula 14 en relación con ningún Documento de la Reestructuración que sea sustancialmente incompatible con el presente Plan de Reestructuración (incluidos sus Anexos) considerado en su conjunto y tendrá derecho a no entablar ninguna acción en el caso de cualquier incertidumbre o conflicto, en cuyo caso solicitará instrucciones a los Acreedores Participantes.

14.2.16. Sin limitar lo dispuesto en la Cláusula 14.2.17 siguiente (y sin perjuicio de cualquier otra disposición de cualquier Documento de la Reestructuración que excluya o limite la responsabilidad del Agente de la Reestructuración), el Agente de la Reestructuración no será responsable (salvo que sean causados por su dolo o negligencia grave) de:

(i) cualesquiera daños, costes o pérdidas sufridos por cualquier persona, cualquier disminución de valor, o cualquier responsabilidad de cualquier naturaleza que se derive de la adopción o no adopción de cualquier actuación en virtud de, o en relación con, cualquier Documento de la Reestructuración;

(ii) el ejercicio o no ejercicio de cualquier derecho, facultad, autoridad o discrecionalidad que le haya sido conferido por, o en relación con, cualquier Documento de la Reestructuración o cualquier otro contrato, acuerdo o documento celebrado, otorgado o suscrito en previsión de, en virtud de, o en relación con, cualquier Documento de la Reestructuración; o

(iii) sin perjuicio de la generalidad de los apartados (i) y (ii) anteriores, cualesquiera daños, costes o pérdidas sufridos por cualquier persona, cualquier disminución de valor o cualquier responsabilidad de cualquier naturaleza que se derive de:

(a) cualquier acto, evento o circunstancia que no esté razonablemente bajo su control; o

(b) los riesgos generales de inversión en, o de tenencia de activos, en cualquier jurisdicción,

incluyendo (en cada caso y sin limitación) dichos daños, costes, pérdidas, disminución de valor o responsabilidad que se deriven de: nacionalización, expropiación u otras actuaciones gubernamentales; cualquier regulación, restricción cambiaria, devaluación o fluctuación; condiciones de mercado que afecten a la ejecución o liquidación de operaciones o al valor de activos; cualquier avería, fallo o mal funcionamiento de

72

*Privileged and Confidential*

cualquier servicio o sistema de transporte, telecomunicaciones o informático de terceros; desastres naturales o casos de fuerza mayor; guerra, terrorismo, insurrección o revolución; o huelgas o conflictos laborales.

14.2.17. Ninguna Parte (distinta del Agente de la Reestructuración) podrá iniciar procedimiento alguno contra cualquier directivo, empleado o agente del Agente de la Reestructuración, en relación con cualquier reclamación que pudiera tener contra el Agente de la Reestructuración o en relación con cualquier acto u omisión de cualquier naturaleza por parte de dicho directivo, empleado o agente en relación con cualquier Documento de la Reestructuración, pudiendo cualquier directivo, empleado o agente del Agente de la Reestructuración ampararse en la presente Cláusula 14.2.17. Todo ello, sin perjuicio de la responsabilidad del Agente de la Reestructuración por las actuaciones dolosas o con negligencia grave de las personas incluidas en la presente Cláusula.

14.2.18. El Agente de la Reestructuración no será responsable de cualquier retraso (ni de las consecuencias derivadas del mismo) en la acreditación en cuenta de cualquier importe que, conforme a los Documentos de la Reestructuración, deba ser abonado por el Agente de la Reestructuración, siempre que el Agente de la Reestructuración haya adoptado todas las medidas necesarias tan pronto como fuera razonablemente posible para cumplir con las normas o procedimientos operativos de cualquier sistema de compensación o liquidación reconocido utilizado por el Agente de la Reestructuración a tal efecto.

14.2.19. Nada en el presente Plan obligará al Agente de la Reestructuración a llevar a cabo:

(i)     comprobaciones de identificación del cliente (*know your customer*) ni de ningún otro tipo en relación con persona alguna; ni

(ii)    comprobación alguna sobre la medida en que cualquier operación contemplada en el presente Plan pudiera ser ilícita para cualquier Acreedor Participante,

por cuenta de cualquier Acreedor Participante, y cada Acreedor Participante confirma al Agente de la Reestructuración que es el único responsable de cualesquiera comprobaciones que esté obligado a realizar y que no podrá basarse en declaración alguna relativa a dichas comprobaciones formulada por el Agente de la Reestructuración.

14.2.20. Sin perjuicio de cualquier disposición de cualquier Documento de la Reestructuración que excluya o limite la responsabilidad del Agente de la Reestructuración, la responsabilidad del Agente de la Reestructuración que se derive de, o en relación con, cualquier Documento de la Reestructuración quedará limitada al importe del daño efectivo que haya sido finalmente determinado por resolución judicial firme

73

*Privileged and Confidential*

(determinado por referencia a la fecha de incumplimiento del Agente de la Reestructuración o, si fuera posterior, la fecha en que la pérdida se produzca como consecuencia de dicho incumplimiento), pero sin tener en cuenta cualesquiera condiciones o circunstancias especiales conocidas por el Agente de la Reestructuración en cualquier momento que incrementen el importe de dicha pérdida. En ningún caso será el Agente de la Reestructuración responsable de lucro cesante, pérdida de fondo de comercio (*goodwill*), reputación, oportunidad de negocio o ahorro previsto, ni de daños especiales, punitivos, indirectos o consecuenciales, con independencia de que el Agente de la Reestructuración hubiera sido advertido de la posibilidad de tales pérdidas o daños, salvo en aquellos casos en los que exista dolo o negligencia grave.

14.2.21. Las Sociedades Reestructuradas deberán indemnizar y mantener indemne al Agente de la Reestructuración frente a cualquier pérdida, reclamación, coste, daño, responsabilidad o gasto (incluyendo honorarios legales), debidamente justificados, derivados de su actuación como Agente de la Reestructuración en virtud de los Documentos de la Reestructuración salvo en caso de negligencia grave, dolo o que el Agente de la Reestructuración ya haya sido indemnizado en virtud de un Documento de la Reestructuración.

14.2.22. Las Sociedades Reestructuradas y la Mayoría de Acreedores Participantes, conjuntamente, podrán solicitar en cualquier momento el cese del Agente de la Reestructuración en caso de incumplimiento relevante y reiterado de sus funciones, mediante notificación escrita dirigida al propio Agente de la Reestructuración y al resto de Acreedores Afectados. Dicho cese surtirá efectos transcurridos treinta (30) Días Hábiles desde la recepción de dicha notificación, salvo que, con anterioridad a esa fecha, las Sociedades Reestructuradas y la Mayoría de Acreedores Participantes, conjuntamente, hubieran designado un nuevo Agente de la Reestructuración, en cuyo caso el cese surtirá efectos en la fecha de aceptación del cargo por el sustituto.

14.2.23. En caso de cese del Agente de la Reestructuración de conformidad con la Cláusula 14.2.22, las Sociedades Reestructuradas y la Mayoría de Acreedores Participantes designarán conjuntamente un nuevo Agente de la Reestructuración, que deberá aceptar expresamente dicha designación. El Agente de la Reestructuración cesante deberá cooperar, en todo momento y a coste de las Sociedades Reestructuradas, con el nuevo Agente de la Reestructuración y facilitarle toda la documentación e información necesaria para el adecuado desempeño de sus funciones, manteniendo sus obligaciones vigentes hasta la efectiva asunción del cargo por el nuevo Agente de la Reestructuración.

*Privileged and Confidential*

**15.   COMUNICACIONES Y NOTIFICACIONES ENTRE LAS PARTES**

**15.1.**   Todas las comunicaciones entre los Acreedores Participantes y las Sociedades Reestructuradas que tengan relación con el presente Plan se efectuarán a través del Agente de la Reestructuración.

**15.2.**   Todas las solicitudes, notificaciones, avisos y comunicaciones en general entre las Sociedades Reestructuradas y el Agente de la Reestructuración, o a la inversa, y entre los Acreedores Participantes y las Sociedades Reestructuradas, o a la inversa, que se refieran al presente Plan o deriven del mismo y no tuvieran prevista en él una formalidad especial, se entenderán debidamente realizadas cuando, dentro de los plazos que se fijan en el Plan, se lleven a cabo mediante correo electrónico dirigidos a los respectivos indicativos y domicilios en cada caso designados, sin perjuicio de que posteriormente se confirmen por carta suscrita por persona facultada o se acuse recibo en la misma forma en la que se reciben. Dichas comunicaciones se entenderán debidamente realizadas aun cuando sean rehusadas o no recogidas.

**15.3.**   Los domicilios, indicativos de teléfono, correo electrónico de las Partes son los que se relacionan en el **Anexo XI** del presente Plan, aceptando las Sociedades Reestructuradas como válidamente efectuadas a todos los efectos, incluso procesales, cualquier notificación o comunicación de la índole que sea realizada al domicilio indicado en tal Anexo.

**15.4.**   Las Sociedades Reestructuradas deberán dirigir sus comunicaciones al Agente de la Reestructuración y/o a los Acreedores Participantes en los domicilios señalados en el **Anexo XI** del presente Plan o, en su caso, en el documento de adhesión suscrito por los Acreedores Adheridos durante el Periodo de Adhesión.

**15.5.**   Cualquier modificación en los domicilios o indicativos de teléfono, correo electrónico reseñados no tendrá ningún efecto mientras no haya sido notificada por escrito entre las Partes o, en su caso, al Agente de la Reestructuración y éste acuse recibo de igual forma. El Agente de la Reestructuración deberá notificar por escrito a las Sociedades Reestructuradas cualquier modificación en su domicilio o indicativos de teléfono o correo electrónico reseñados en el **Anexo XI**.

**16.   GASTOS**

Las Sociedades Reestructuradas asumen a su cargo, la obligación de pagar los siguientes gastos, tributos, arbitrios, cargas y demás conceptos que se originen como consecuencia directa del otorgamiento y formalización de los Documentos de la Reestructuración, siempre que dichos gastos sean razonables y estén debidamente justificados documentalmente:

75

185

*Privileged and Confidential*

(i)     Los honorarios, corretajes y suplidos de los fedatarios públicos que intervengan
        en el otorgamiento de los Documentos de la Reestructuración, limitados al coste
        de una primera copia autorizada de cada documento, así como las notificaciones,
        requerimientos o trámites necesarios para su cumplimiento. Los gastos derivados
        de la expedición de copias adicionales serán asumidos por la parte que los solicite
        o promueva.

(ii)    Los tributos, arbitrios, recargos y tasas de cualquier ámbito territorial que graven
        directamente la formalización y, en su caso, inscripción, de los Documentos de la
        Reestructuración. Quedan expresamente excluidos de la obligación de pago de las
        Sociedades Reestructuradas: (a) los tributos cuyo sujeto pasivo sea cualquiera de
        los Acreedores Afectados incluido, sin limitación, el Impuesto sobre Sociedades
        que grave sus rendimientos; y (b) cualesquiera tributos que graven la cesión o
        transmisión de los derechos de los Acreedores Afectados bajo los Documentos de
        la Reestructuración.

**17.    PREVALENCIA Y COMPROMISO DE NO MODIFICACIÓN**

**17.1.** En caso de discrepancia entre lo dispuesto en el presente Plan, cualquiera de los
        Contratos Afectados y los restantes Documentos de la Reestructuración, prevalecerá a
        todos los efectos lo dispuesto en el presente Plan.

**17.2.** Sin perjuicio de lo anterior en la medida en que en la regulación prevista en el presente
        Plan o en los correspondientes Documentos de la Reestructuración existan términos o
        aspectos no regulados o cuya interpretación pueda ser ambigua o existan lagunas, se
        acudirá, en tanto sea razonablemente aplicable, a la regulación y criterios interpretativos
        contenidos en el presente Plan.

**17.3.** Por medio del presente Plan, las Partes se comprometen entre sí a no realizar novaciones
        o modificaciones de los Contratos Afectados que pudieran resultar más perjudiciales
        para las Sociedades Reestructuradas, salvo con el consentimiento expreso de las
        restantes Partes.

**18.    CONFIDENCIALIDAD Y PUBLICIDAD**

**18.1.** Cada una de las Partes reconoce el carácter confidencial de toda la Información
        Confidencial y ninguna de las Partes (y cada parte se asegurará de que ninguna de sus
        filiales y asesores lo haga), sin el consentimiento previo por escrito de las otras partes,
        revelará su contenido o cualquier Información Confidencial a ninguna otra persona,
        excepto:

*Privileged and Confidential*

(i)    según lo requiera la ley o cualquier otra autoridad gubernamental o regulatoria aplicable o cualquier bolsa de valores aplicable, o si se requiere en relación con cualquier procedimiento legal, administrativo o de arbitraje, siempre y cuando: (a) la persona a la que se le entregue la Información Confidencial sea informada de su naturaleza confidencial y que parte o la totalidad de dicha Información Confidencial pueda ser información sensible al precio; (b) siempre que sea posible y no esté prohibido por la normativa aplicable, con carácter previo a dicha divulgación, la Parte (distinta de las Sociedades Reestructuradas) que pretenda realizar la divulgación notifique por escrito a las Sociedades Reestructuradas de las circunstancias y del contenido de la información que será divulgada, y consulte con las Sociedades Reestructuradas las posibles medidas para evitar o limitar dicha divulgación, adoptando aquellas que las Sociedades Reestructuradas razonablemente requieran; (c) la divulgación se limite exclusivamente a aquella porción de la Información Confidencial que sea estrictamente necesaria; y (d) en caso de que la notificación previa no sea posible por impedimento legal, la Parte (distinta de las Sociedades Reestructuradas) que realice la divulgación informe a las Sociedades Reestructuradas de forma inmediata y tan pronto como sea razonablemente posible tras dicha divulgación, siempre que sea legalmente posible;

(ii)    sus filiales y a cada uno de sus respectivos directores, asesores, empleados y asesores profesionales y representantes de cada uno de los anteriores y de sus respectivos empleados, únicamente para quienes deban conocer de la Reestructuración y de la formalización del Contrato de Financiación de Circulante, que hayan tenido conocimiento de las obligaciones establecidas en esta sección y acepten quedar irrevocable e incondicionalmente vinculados por ellas o que, en cualquier caso, estén sujetos a obligaciones de confidencialidad como cuestión de derecho o de práctica profesional o a otra obligación de confidencialidad por escrito que sea sustancialmente similar a las que se establecen en la presente;

(iii)    como parte de cualquier medida de "diligencia debida", cuando los destinatarios hayan sido informados de las obligaciones de esta Cláusula y acepten quedar irrevocable e incondicionalmente vinculados por ellas o, alternativamente, estén sujetos a obligaciones de confidencialidad como cuestión de derecho o práctica profesional;

(iv)    a los cesionarios de conformidad con la Cláusula 10.1 del presente Plan, siempre que acepten quedar irrevocable e incondicionalmente vinculados a las obligaciones previstas en esta Cláusula; y

*Privileged and Confidential*

(v) al ICO o a cualquier entidad o autoridad pública competente, en la medida en que dicha divulgación sea necesaria para que cualquier Acreedor Participante pueda cumplir con sus obligaciones de *reporting*, información o rendición de cuentas derivadas del Contrato de Financiación ICO Existente, del Aval ICO Aranceles o de cualquier normativa aplicable en relación con dichos instrumentos, sin que sea necesario que el destinatario de la información suscriba acuerdo de confidencialidad alguno a tal efecto.

18.2. A los efectos de la presente Cláusula, "**Información Confidencial**" significa toda la información relacionada con las Sociedades Reestructuradas, las Nuevas Garantes ICA, la Reestructuración o los Documentos de la Reestructuración, que se proporcione a los Acreedores Afectados o al Agente de la Reestructuración (o a sociedades de su grupo) o a sus respectivos administradores, directivos, empleados, asesores y agentes (la "**Parte Receptora**"), por las Sociedades Reestructuradas (o sus filiales), por las Nuevas Garantes ICA o por los Acreedores Afectados o al Agente de la Reestructuración (o sociedades de su grupo) y sus respectivos administradores, directivos, empleados, asesores y agentes (la "**Parte Proveedora**"), en cualquier forma, e incluyendo cualquier documento, archivo electrónico o cualquier otra forma de representación o registro de información que contenga o se derive o copie de dicha información pero excluye la información que:

(i) es o se convierte en información pública, salvo como resultado directo o indirecto del incumplimiento por la Parte Receptora o sus representantes de un acuerdo de confidencialidad en el que esa Parte Receptora o sus representantes sean parte; o

(ii) haya sido identificada por escrito en el momento de la entrega como no confidencial por la Parte Proveedora; o

(iii) esté incluida en un comunicado de prensa, cuya forma haya sido acordada entre las Partes, emitido en el momento de la firma del presente Plan; o

(iv) sea conocida por la Parte Receptora antes de la fecha en que la Parte Receptora reciba la información de la Parte Proveedora o la Parte Receptora la obtenga después de esa fecha, de una fuente que, según tiene conocimiento de ello, no esté relacionada con la Parte Proveedora y que, en cualquier caso, según tenga conocimiento de ello, no se haya obtenido incumpliendo ninguna obligación de confidencialidad ni esté sujeta a ninguna otra obligación de confidencialidad.

18.3. Cada Parte limitará el número de personas que tengan acceso a la Información Confidencial al mínimo estrictamente necesario y empleará sus mejores esfuerzos para proteger la confidencialidad de la Información Confidencial, garantizando que se apliquen las máximas medidas de seguridad y diligencia.

*Privileged and Confidential*

**18.4.** Cada Parte (distinta de las Sociedades Reestructuradas) se obliga a informar de forma inmediata a las Sociedades Reestructuradas en cuanto tenga conocimiento de que cualquier Información Confidencial ha sido divulgada por ella misma o por cualquiera de las personas a las que hubiera facilitado dicha información, en incumplimiento de las Obligaciones previstas en la presente Cláusula.

**19.** **PROTECCIÓN DE DATOS**

**19.1.** Cada una de las Partes, cuyos datos a efectos de notificaciones constan en la Cláusula 15.3, actuando de forma independiente como responsable del tratamiento, informará:

    (i)    a las personas físicas que actúan en su nombre y representación; y

    (ii)    a las personas que se indican en el presente Plan en relación con dicha Parte a efecto de notificaciones o a aquellas otras que se pudieran indicar con posterioridad,

que sus datos personales que constan en el Plan o que sean suministrados conforme al mismo serán tratados por cada una de las Partes.

**19.2.** El Delegado de Protección de Datos de cada uno de los Acreedores Participantes puede ser contactado en la dirección postal y dirección electrónica que se indica en la Cláusula 15.3.

**19.3.** La finalidad del tratamiento, así como su base jurídica, es el cumplimiento de los derechos y obligaciones derivados del Plan. El tratamiento es estrictamente necesario para esta finalidad. Adicionalmente, en caso de ser aplicable por obligación legal, tratarán los datos personales para la prevención del blanqueo de capitales y financiación del terrorismo a los efectos de que puedan cumplir con las obligaciones de recogida de información e identificación, así como de suministro de información sobre operaciones de pago a las autoridades de otros países, dentro y fuera de la Unión Europea, sobre la base de la legislación de algunos países y acuerdos firmados entre los mismos. No se tomarán decisiones automatizadas que puedan afectar a los interesados.

**19.4.** Los datos se conservarán por todo el tiempo de vigencia del Plan y por el tiempo necesario para cumplir con las obligaciones legales y contractuales relacionadas con la ejecución del Plan.

**19.5.** Los datos serán tratados únicamente por las Partes y por aquellos terceros a los que las Partes estén legal o contractualmente obligadas a comunicarlos. Igualmente, las Partes podrán ceder los datos personales en caso de cesión por parte de los Acreedores

79

*Privileged and Confidential*

Participantes y/o constitución de gravámenes o garantías sobre sus derechos de crédito derivados del presente Plan de Reestructuración.

**19.6.** Los interesados podrán ejercer los derechos de solicitar el acceso a sus datos personales, su rectificación o supresión, la limitación del tratamiento, la portabilidad de sus datos, así como su derecho a oponerse al tratamiento, dirigiendo una comunicación por escrito a la Parte en cuestión a la dirección que a tales efectos se especifica en la Cláusula 15.3. Asimismo, podrán presentar una reclamación ante la Autoridad de protección de datos competente.

**20.** **CONSERVACIÓN DEL ACUERDO**

Las Cláusulas del presente Plan son independientes entre sí, de forma tal que, si alguna de ellas fuese considerada inválida total o parcialmente, las restantes cláusulas se mantendrán válidas y exigibles en sus términos.

**21.** **LEGISLACIÓN APLICABLE**

El presente Plan será interpretado y cumplido en sus propios términos, y se regirá por la legislación común española.

**22.** **JURISDICCIÓN**

Para la solución de cuantas controversias puedan surgir en relación con el cumplimiento, ejecución e interpretación del presente Plan, queda convenida la sumisión de las Partes a la jurisdicción de los Juzgados y Tribunales de la ciudad de Burgos.

*[Hoja de firmas a continuación]*