**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 15 |
| GRUPO ANTOLIN-IRAUSA, S.A.U.,[1] | Case No. 26-11679 (___) |
| Debtors in a Foreign Proceeding. | (Joint Administration Requested) |

**DECLARATION OF**
**CRISTINA BLANCO SANTO TOMÁS PURSUANT TO**
**11 U.S.C. § 1515 AND RULE 1007(A)(4) OF THE FEDERAL**
**RULES OF BANKRUPTCY PROCEDURE AND IN SUPPORT**
**OF THE VERIFIED PETITION FOR (I) RECOGNITION OF FOREIGN**
**MAIN PROCEEDING, (II) RECOGNITION OF FOREIGN REPRESENTATIVE,**
**AND (III) RELATED RELIEF UNDER CHAPTER 15 OF THE BANKRUPTCY CODE**

Pursuant to 28 U.S.C. § 1746, I, Cristina Blanco Santo Tomás, declare under penalty of perjury as follows to the best of my knowledge, information, and belief:

1. I am over the age of 18 and, if called upon, could testify to all matters set forth in this declaration based upon my own personal knowledge except for those portions specified as being otherwise. I am making this declaration in accordance with section 1515 of title 11 of the United States Code, 11 U.S.C. §§ 101-153 (the "Bankruptcy Code") and rule 1007(a)(4) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

2. I am the Chief Executive Officer of Grupo Antolin-Irausa, S.A.U. (the "Foreign Representative"). I am intimately familiar with the above-captioned debtors (collectively, the "Debtors" or the "Company"), which are the subject of a jointly administered foreign proceeding in Spain (the "Spanish Proceeding") before the *Sección de lo Mercantil del Tribunal*

---

[1] A complete list of each of the Debtors in these chapter 15 cases may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/Antolin. The location of Debtor Grupo Antolin-Irausa, S.A.U.'s corporate headquarters and the Debtors' service address in these chapter 15 cases is C/Vitoria número 307 / Burgos / 09007 / Spain.

*de Instancia de Burgos, Plaza número 1* (the "Spanish Court"), and, as such, have knowledge of the matters contained in this declaration (this "Declaration").

3.      I submit this Declaration in support of (a) the official form chapter 15 petitions for the Debtors (the "Voluntary Petitions"); (b) the *Verified Petition for (I) Recognition of Foreign Main Proceeding, (II) Recognition of Foreign Representative, and (III) Related Relief Under Chapter 15 of the Bankruptcy Code* (the "Verified Petition");[2] (c) the *Motion for Provisional Relief Pursuant to Section 1519 of the Bankruptcy Code* (the "Provisional Relief Motion"); (d) the *Motion for Entry of an Order (I) Scheduling Recognition Hearing and (II) Specifying Form and Manner of Service of Notice* (the "Scheduling Motion"); and (e) the *Motion for Order (I) Directing Joint Administration of Cases Under Chapter 15 of the Bankruptcy Code and (II) Authorizing Foreign Representative to File Consolidated Lists of Information Required by Bankruptcy Rule 1007(A)(4)* (the "Joint Administration Motion").

**Background**

**I.      Grupo Antolin's Business Operations.**

**A.      Business Overview.**

4.      Over the last seventy-five years, family-owned Grupo Antolin has evolved from a neighborhood auto repair shop into an industry-leading Tier 1 supplier of automotive interior solutions, supplying leading OEMs across the automotive sector, including many of the world's largest automobile manufacturers, such as Ford Motor Company, General Motors, Hyundai Motor Company, Volkswagen Group, Renault-Nissan, and Stellantis, to name a few. Founded in 1950 in Burgos, Spain by Mr. Avelino Antolín López and his sons, Avelino and José, Grupo Antolin was originally a neighborhood mechanic shop in the business of repairing vehicles and agricultural

---

[2]      Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Verified Petition.

machinery. The family's invention of the rubber-metal steering joint, an innovation that solved important safety problems in the steering of vehicles, catapulted the Company's industrial growth.

5.     As of the Petition Date, Grupo Antolin operates in twenty-three countries with 111 production plants and "just-in-time" delivery centers, twenty-five technical-commercial offices, and approximately 20,000 employees worldwide. As described further below, in the United States, Grupo Antolin operates ten production plants, one technical-commercial office, and employs nearly 2,100 people across the country. The Company supplies more than 110 automotive brands and approximately twenty OEMs, with its components appearing in more than 500 vehicle models globally, including nine of the ten best-selling vehicles worldwide.

6.     Grupo Antolin operates primarily through three business units: (a) doors, integrated products, instrument panels, central consoles, and coatings, which business unit focuses on the manufacture of those vehicle components; (b) headliners, which business unit focuses on the manufacture of components for vehicle roofs; and (c) electronic systems, which business unit includes lighting technologies, overhead consoles, smart surfaces, human-machine interface systems, and sun visors, reflecting Grupo Antolin's continued focus on higher-value technological and electronic solutions for automotive interiors.

7.     Grupo Antolin's operations depend critically on "just-in-time" delivery to OEM assembly lines, uninterrupted supplier relationships, continuous access to working capital facilities, and the maintenance of OEM confidence in the Company's ability to perform under long-term supply contracts. Any disruption to production, working capital, or supplier or customer relationships could result in cascading harm to the Company's revenue, customer retention, competitive position, and, ultimately, its restructuring efforts and viability to operate as a going concern.

8.      Grupo Antolin's business is guided by a culture of family spirit, responsibility and sustainability, evolution and innovation, and talent and commitment—values that inform the Company's long-term approach to customers, employees, suppliers, and other stakeholders. Innovation, in particular, has remained central to Grupo Antolin's strategy, including through its development of advanced technological solutions designed to anticipate customer needs and contribute to the transformation of mobility.  For example, in 2023, Grupo Antolin launched Genius, an artificial intelligence project aimed at developing systems that recognize drivers' emotional and cognitive states so that the vehicle interior can automatically adapt to their needs. As part of the Genius project, Grupo Antolin partnered with psychologists, neurologists, other specialists, and several leading Spanish institutions.  Grupo Antolin's longstanding commitment to innovation and international growth has been recognized through numerous awards and distinctions, including the Prince Felipe Award for Internationalization and the Castilla y León Prize for Scientific and Technical Research and Innovation.  Grupo Antolin is a trusted innovator in automotive interiors, known for its evolving roster of technical and customized interior solutions and international best practices.  Grupo Antolin had 311 products in development as of December 2025.

9.      For the year ended December 31, 2025, Grupo Antolin generated approximately €3.73 billion in sales and approximately €296.2 million in EBITDA, reflecting an EBITDA margin of approximately 9.0 percent.

10.     Although the Company remains a global automotive interiors supplier with substantial geographic, product, and customer diversification, its business has been affected by industry-wide headwinds, including weaker demand in various markets, production volatility, foreign exchange headwinds, tariff-related uncertainty, military conflicts and attendant commodity

price increases, regulatory changes, and a slower-than-expected transition to electric vehicles. As a result, Grupo Antolin's 2025 sales declined by approximately 11.1 percent as compared to 2024. In response, the Company has continued to focus on cost control, working-capital management, capital expenditure optimization, and other measures designed to preserve liquidity and strengthen its balance sheet.

### B.  Centralized Business Model.

11.  Grupo Antolin operates internationally through an integrated business model centralized in Burgos, Spain. The Company's subsidiaries are organized into three distinct functional categories: (a) production plants, which are dedicated to the manufacture of components and associated logistics operations; (b) technical-commercial offices ("OTCs"), which provide commercial, technical, innovation, and corporate support services; and (c) Grupo Antolin-Ingenieria, S.A.U. ("Antolin Ingenieria"), which has entered into a framework agreement with lead Debtor Grupo Antolin-Irausa S.A.U. ("Antolin-Irausa") for research, development, and innovation projects ("R&D&I") on behalf of the Company. Both the production plants and the OTCs operate under the direction and supervision of the employees and senior management of lead Debtor Antolin-Irausa or, with regard to R&D&I, Antolin-Ingenieria.

12.  The Debtors' centralized operations are supported by a formal contractual framework under which strategic, commercial, and operational decision-making authority is coordinated through Antolin-Irausa. For example, Antolin-Irausa's relationships with each production plant is governed by a contract known as a Principal Master Agreement ("PMA") under which Antolin-Irausa acts as the principal and the plants focus primarily on productive functions and logistics activities under the direction and supervision of Antolin-Irausa. Separately, Antolin-Irausa's and Antolin-Ingenieria's relationships with each OTC are governed by a suite of service agreements (the "OTC Agreements"), under which the OTCs assist in implementing the

5

business strategy designed by Antolin-Irausa and Antolin-Ingenieria from Burgos, Spain. Under the PMAs and OTC Agreements, subsidiaries coordinate with Antolin-Irausa before negotiating or entering into contracts with OEM customers.

13. The governing bodies of the Debtors' subsidiaries are composed primarily of individuals of Spanish nationality and residence. The chief executive officer of Antolin-Irausa holds each the position of director and or usually has been granted joint powers of attorney in nearly all the Company's non-Spanish subsidiaries, ensuring continuity across the corporate scheme.

14. Moreover, all of the Company's key intangible assets, including patents, trademarks, customer portfolios, manufacturing know-how, and logistics management systems, are owned by Antolin-Irausa in Burgos, Spain. Antolin-Irausa's subsidiaries use these assets only under a non-exclusive license in connection with fulfilling their production obligations. Antolin-Irausa also maintains a centralized treasury and cash-management system through cash-pooling arrangements, and contracts for group-wide functions like insurance on behalf of all subsidiaries. The Spanish Tax Administration has officially recognized this centralized model through an Advance Pricing Agreement entered into with Antolin-Irausa.

**C.    Connections to the United States.**

15. Grupo Antolin maintains operations in the United States. As of the Petition Date, the Company operates ten production plants and one technical-commercial office in the United States, employing nearly 2,100 people across the country. In the United States, approximately one out of every three cars on the road incorporates Grupo Antolin components. For the year ended December 31, 2025, Grupo Antolin generated approximately €1.24 billion in sales in North America, representing approximately 33.4 percent of the Company's total consolidated sales.

16.     Seven of the Debtors are entities registered under the laws of various states throughout the United States.  In addition, the Debtors hold material assets and owe obligations to parties that are located in or connected to the United States.  Importantly, the Existing Notes—representing approximately €630.3 million of the Debtors' funded indebtedness—are governed by the laws of the state of New York and were issued pursuant to indentures containing New York forum selection clauses.

17.     The Company's U.S. operations are integral to its global "just-in-time" supply model, serving major OEM customers, including Ford Motor Company, General Motors, and Stellantis, at their North American assembly facilities.  Grupo Antolin's U.S. production plants manufacture headliners, door panels, lighting technologies, and other interior components for delivery directly to OEM assembly lines across North America.  Any disruption to the Company's U.S. operations—including through enforcement actions by individual creditors—could cascade throughout Grupo Antolin's integrated production network and undermine the orderly restructuring that the Spanish Proceeding is designed to facilitate.

## II.     Prepetition Corporate and Capital Structure.

18.     The Debtors are private entities organized under the laws of various jurisdictions, including the laws of the United States and the laws of Spain, and are part of Grupo Antolin's integrated corporate structure, which is headed operationally by Debtor Antolin-Irausa.  As of December 31, 2025, Debtor Antolin-Irausa's share capital comprised 8,023,241 registered shares, all of a single class and series, with a par value of €4.67 each, fully subscribed and paid up.  As of December 31, 2025, all of Antolin-Irausa's shares were held by Grupo Antolin Holdco, S.A. ("HoldCo"), and all such shares carried the same voting and dividend rights.  A simplified chart depicting the Debtors' organizational structure is attached hereto as **Exhibit A**.

A.      **Affected Debt.**

19.     As of the Petition Date, the Debtors are borrowers, issuers, and/or guarantors of approximately €1.25 billion of Affected Debt (as defined herein), excluding the Intragroup Loans (as defined herein).  The Spanish Restructuring Plan affects the Existing Notes, the Existing Syndicated Facilities Agreement, the Existing ICO Facilities Agreement, the Existing EIB Financing Agreements, the Ancillary Guarantee Facilities, the Existing Guarantee Lines, and the Intragroup Loans (each as defined herein and, collectively, the "Affected Debt" and the creditors party thereto, the "Affected Creditors").  The Debtors' Affected Debt is summarized in the table below and described in further detail immediately following.[3]

| Facility | Maturity | Interest Rate | Approx. Amount Outstanding |
|---|---|---|---|
| **2028 Notes** | April 30, 2028 | 3.50% | €380.3 million |
| **2030 Notes** | January 30, 2030 | 10.375% | €250.0 million |
| **Term Loan** | June 30, 2029[4] | EURIBOR + 2.5% to 4.0% | €243.4 million |
| **RCF** | June 30, 2029[5] | EURIBOR + 2.5% to 4.0% | €162.2 million |
| **Existing ICO Facilities Agreement** | August 4, 2032[6] | EURIBOR + 3.00% | €150.0 million |
| **EIB Financing Agreement I** <br> **EIB Financing Agreement II** | May 31, 2028[7] <br> July 31, 2028[8] | 2.945% <br> 2.945% | €45.2 million |
| **Ancillary Guarantee Facilities** | Varies | Varies | €5.8 million |
| **Existing Guarantee Lines** | Varies | Varies | €13.8 million |

---

[3]     The summaries provided herein are qualified in their entirety by the provisions of the relevant credit documents.

[4]     The Term Loan is subject to a springing maturity to October 29, 2027, if the 2028 Notes are not refinanced in full on or prior to October 29, 2027.

[5]     The RCF is subject to a springing maturity to October 29, 2027, if the 2028 Notes are not refinanced in full on or prior to October 29, 2027.

[6]     The Existing ICO Facilities Agreement provides for a springing maturity to October 29, 2027 if the 2028 Notes are not refinanced in full on or prior to October 29, 2027, or July 31, 2029, if the 2030 Notes are not refinanced in full on or prior to July 31, 2029.

[7]     The EIB Financing Agreement I is subject to a springing maturity pursuant to which EIB may cancel the credit and demand prepayment of all amounts outstanding thereunder if the 2028 Notes are not refinanced in full on or prior to October 29, 2027.

[8]     The EIB Financing Agreement II is subject to a springing maturity pursuant to which EIB may cancel the credit and demand prepayment of all amounts outstanding thereunder if the 2028 Notes are not refinanced in full on or prior to October 29, 2027.

8

| *Total Affected Debt*[9] | *€1,250.7 million* |
|---|---|

### a.   Existing Notes.

20.    Grupo Antolin's capital structure includes two series of senior secured notes issued by Debtor Antolin-Irausa:  (a) the 2028 Notes and (b) the 2030 Notes (each as defined and further described below).  The Existing Notes are governed by New York law and share, on a *pari passu* basis, with the Debtors' obligations under the Existing Syndicated Facilities Agreement, the Existing EIB Financing Agreements, and the Existing ICO Facilities Agreement pursuant to the Intercreditor Agreement (as defined herein), and are secured by a Spanish law pledge granted by non-Debtor HoldCo over 100 percent of the issued share capital of Debtor Antolin-Irausa (the "Share Pledge").  The Existing Notes are otherwise unsecured.  The Existing Notes are part of the Affected Debt and are treated as a separate class under the Spanish Restructuring Plan.

### (i)   2028 Notes.

21.    On June 29, 2021, Debtor Antolin-Irausa issued €390 million aggregate principal amount of 3.50 percent senior secured notes due April 30, 2028 (the "2028 Notes"), pursuant to an indenture, dated as of June 29, 2021, by and among Antolin-Irausa, as issuer, Deutsche Trustee Company Limited (the "Notes Trustee"), as trustee, Deutsche Bank AG, London Branch (the "Agent"), as security agent, paying agent, and transfer agent, Deutsche Bank Luxembourg S.A. (the "Registrar"), as registrar, and the guarantors party thereto (as amended, supplemented, or otherwise modified from time to time, the "2028 Notes Indenture").  The 2028 Notes are traded on the Luxembourg Stock Exchange's Euro MTF market.  In June and July 2022, Grupo Antolin redeemed and cancelled €9.7 million aggregate principal amount of the 2028 Notes.  As of

---

[9]   This figure excludes Intragroup Loans, which are also part of the Affected Debt.

June 30, 2026, €380.3 million aggregate principal amount of the 2028 Notes remained outstanding. The 2028 Notes mature on April 30, 2028.

### (ii) 2030 Notes.

22. On July 31, 2024, Debtor Antolin-Irausa issued €250 million aggregate principal amount of 10.375 percent senior secured notes due January 30, 2030 (the "2030 Notes" and, together with the 2028 Notes, the "Existing Notes"), pursuant to an indenture, dated as of July 31, 2024, by and among Antolin-Irausa, as issuer, the Notes Trustee, as trustee, the Agent, as security agent, paying agent, and transfer agent, the Registrar, as registrar, and the guarantors party thereto (as amended, supplemented, or otherwise modified from time to time, the "2030 Notes Indenture" and, together with the 2028 Notes Indenture, the "Notes Indentures"). The 2030 Notes are traded on the Luxembourg Stock Exchange's Euro MTF market. As of June 30, 2026, €250 million aggregate principal amount of the 2030 Notes remained outstanding. The 2030 Notes mature on January 30, 2030.

### b. Existing Syndicated Facilities Agreement.

23. On March 13, 2014, Debtor Antolin-Irausa, as borrower, certain Debtors, as guarantors, the Agent, as agent and security agent, certain arrangers, and the lenders party thereto from time to time, entered into a senior facilities agreement governed by English law (as amended and restated from time to time, including as amended and restated on July 19, 2024, the "Existing Syndicated Facilities Agreement"). The Existing Syndicated Facilities Agreement provides for, among other things, a euro-denominated term loan facility (the "Term Loan"), a multi-currency revolving credit facility (the "RCF"), and ancillary guarantee facilities (the "Ancillary Guarantee Facilities").

24. As of June 30, 2026, approximately €243.4 million was outstanding under the Term Loan. The Term Loan bears interest at EURIBOR plus an applicable margin of between

2.50 percent to 4.00 percent, subject to the terms of the Existing Syndicated Facilities Agreement. As of June 30, 2026, approximately €162.2 million was outstanding under the RCF. The RCF bears interest at EURIBOR plus an applicable margin of between 2.50 percent to 4.00 percent, subject to the terms of the Existing Syndicated Facilities Agreement. Both the Term Loan and the RCF mature on June 30, 2029, subject to a springing maturity that would accelerate the maturity for each to October 29, 2027, if the 2028 Notes are not refinanced in full on or prior to October 29, 2027. As of June 30, 2026, approximately €5.8 million was outstanding under the Ancillary Guarantee Facilities.

25.    In addition to the obligations under the Existing Syndicated Facilities Agreement being guaranteed by certain Debtors, subject to applicable limitations, the lenders under the Existing Syndicated Facilities Agreement also share, on a *pari passu* basis with the Debtors' obligations under the Existing Notes, the Existing EIB Financing Agreements, and the Existing ICO Facilities Agreement pursuant to the Intercreditor Agreement (as defined herein), in the Share Pledge. The debt arising under the Existing Syndicated Facilities Agreement is part of the Affected Debt in the Spanish Restructuring Plan.

### c.    Existing ICO Facilities Agreement.

26.    On August 4, 2025, Debtors Antolin-Irausa, Grupo Antolin-Aragusa, S.A.U., Grupo Antolin-Eurotrim, S.A.U., Antolin-Ingenieria, Grupo Antolin-Plasbur, S.A.U., and Grupo Antolin-RyA, S.A.U., as borrowers, certain Debtors, as guarantors, Banco Bilbao Vizcaya Argentaria, S.A. ("BBVA"), as agent, Deutsche Bank AG, London Branch, as security agent, and the lenders party thereto from time to time, entered into a syndicated financing agreement governed by Spanish law (the "Existing ICO Facilities Agreement").

27.    The Existing ICO Facilities Agreement provided €150 million of financing and was fully drawn as of June 30, 2026. The Existing ICO Facilities Agreement bears interest at

EURIBOR plus a 3.00 percent margin and is backed by a Spanish government guarantee covering 75 percent of the amount thereof pursuant to the guarantee line made available under Royal Decree-Law 4/2025, of April 8, on Urgent Measures to Address the Tariff Threat and Revitalize Trade.  The Existing ICO Facilities Agreement matures on August 4, 2032, subject to a springing maturity to (a) October 29, 2027, if the 2028 Notes are not refinanced in full on or prior to October 29, 2027, or (b) July 31, 2029, if the 2030 Notes are not refinanced in full on or prior to July 31, 2029.

28.     In addition to the obligations under the Existing ICO Facilities Agreement being guaranteed by certain Debtors, subject to applicable limitations, the lenders under the Existing ICO Facilities Agreement also share, on a *pari passu* basis, with the Debtors' obligations under the Existing Notes, the Existing Syndicated Facilities Agreement, and the Existing EIB Financing Agreements pursuant to the Intercreditor Agreement (as defined herein), in the Share Pledge.  The debt arising under the Existing ICO Facilities Agreement is part of the Affected Debt in the Spanish Restructuring Plan.

**d.     Existing EIB Financing Agreements.**

29.     On June 12, 2018, Debtor Antolin-Irausa, as borrower, certain Debtors, as guarantors, and the European Investment Bank ("EIB"), as lender, entered into a finance contract entitled "Antolin Car Interiors RDI" in an original principal amount of €100 million (the "EIB Financing Agreement I").  The proceeds of EIB Financing Agreement I were used to finance Grupo Antolin's "Antolin Car Interiors RDI" project, which supported Grupo Antolin's R&D&I strategy for vehicle-interior solutions.  The EIB Financing Agreement I matures on May 31, 2028, subject to a springing maturity pursuant to which EIB may cancel the credit and demand prepayment of all amounts outstanding thereunder if the 2028 Notes are not refinanced in full on or prior to October 29, 2027.

12

30.     On December 23, 2020, Debtor Antolin-Irausa, as borrower, certain Debtors, as guarantors, and EIB, as lender, entered into an additional finance contract entitled "Antolin Car Interiors RDI B" in an original principal amount of €40 million (the "EIB Financing Agreement II" and, together with EIB Financing Agreement I, the "Existing EIB Financing Agreements" and, together with the Existing Syndicated Facilities Agreement and Existing ICO Facilities Agreement, the "Bank Debt").  The EIB Financing Agreement II matures on July 31, 2028, subject to a springing maturity pursuant to which EIB may cancel the credit and demand prepayment of all amounts outstanding thereunder if the 2028 Notes are not refinanced in full on or prior to October 29, 2027.

31.     As of June 30, 2026, approximately €45.2 million remained outstanding under the Existing EIB Financing Agreements.

32.     In addition to the obligations under the Existing EIB Financing Agreements being guaranteed by certain Debtors, subject to applicable limitations, the EIB also shares, on a *pari passu* basis, with the Debtors' obligations under the Existing Notes, the Existing Syndicated Facilities Agreement, and the Existing ICO Facilities Agreement pursuant to the Intercreditor Agreement (as defined herein), in the Share Pledge.  The debt arising under the Existing EIB Financing Agreements is part of the Affected Debt in the Spanish Restructuring Plan.

### e.     Existing Guarantee Lines.

33.     The Affected Debt also includes certain guarantee lines, surety bonds, and related arrangements entered into between Debtor Antolin-Irausa, BBVA, BBVA New York Branch, HSBC Continental Europe, and Atradius Crédito y Caución, S.A. de Seguros y Reaseguros (collectively, the "Existing Guarantee Lines").  As of June 30, 2026, approximately €13.8 million was outstanding under the Existing Guarantee Lines (excluding the Ancillary Guarantee

Facilities). The Ancillary Guarantee Facilities are, however, treated as part of the Existing Guarantee Lines for purposes of the Spanish Restructuring Plan and treatment thereunder.

### f.   Intragroup Loans.

34. Certain Debtors are parties to intragroup loan agreements (the "Intragroup Loans"), which are also part of the Affected Debt.

### g.   Intercreditor Agreement.

35. On March 21, 2014, Debtor Antolin-Irausa, Deutsche Trustee Company Limited, as senior secured notes trustee, and the Agent, as security agent, entered into an intercreditor agreement (as amended, supplemented, or otherwise modified from time to time, the "Intercreditor Agreement"), which governs the relative rights of holders of the Affected Debt, as well as the ranking and enforcement of related security and guarantees. Specifically, pursuant to the Intercreditor Agreement, the obligations under the Existing Notes, the Existing Syndicated Facilities Agreement, the Existing ICO Facilities Agreement, and the Existing EIB Financing Agreements are ranked on a *pari passu* basis.

## III.   Events Leading to Chapter 15 Filing.

36. Grupo Antolin's current financial position results from a combination of strategic expansion, industry disruption, and macroeconomic pressures facing the global automotive sector. In 2015, Grupo Antolín acquired Magna Interiors for approximately $525 million, which included thirty-six manufacturing facilities and approximately 12,000 employees, making the Company one of the largest automotive interior suppliers in the world. While the acquisition substantially expanded the Company's global production platform and customer base, it also significantly increased Grupo Antolin's funded indebtedness.

37. Beginning in 2020, the COVID-19 pandemic caused widespread production shutdowns, supply chain disruption, and demand volatility across the automotive sector. These

14

effects were compounded by the disruption to energy markets and raw material costs following the Russia-Ukraine conflict beginning in 2022, which increased production costs across European manufacturing operations.  Grupo Antolin experienced margin pressure from rising input costs that could not be fully recovered through customer pricing adjustments in the short term.

38.     More recently, military conflict in the Middle East and tariff-related uncertainty, particularly affecting North American operations, have created additional planning challenges. Foreign-exchange headwinds, weaker demand in key Asian markets, and a slower-than-anticipated transition to electric vehicles have further affected revenue expectations.  The combined effect of these pressures resulted in a sales decline of approximately 11.1 percent in 2025 as compared to the year prior.

39.     Critically, the Company faces a concentration of near-term maturities across its capital structure.  The Group's Existing Syndicated Factoring Facility,[10] which is essential for day-to-day working capital management, matures on January 23, 2027, and has historically been extended on a short-term, uncommitted basis.  The Existing Syndicated Facilities Agreement and the Existing ICO Facilities Agreement include springing maturity provisions that would accelerate maturities to October 29, 2027, if the 2028 Notes are not refinanced by that date.  In addition, the 2028 Notes mature on April 30, 2028, and the Existing EIB Financing Agreements mature in May 2028 and June 2028.

40.     Several ratings agencies have reflected these pressures in recent downgrades.  In late June 2026, S&P Global Ratings downgraded Grupo Antolin to CCC- with a negative outlook, and Moody's Ratings ("Moody's") downgraded the corporate family rating to Caa2, the

---

[10]   "Existing Syndicated Factoring Facility" means the syndicated factoring facility provided pursuant to that certain receivables servicing agreement dated January 23, 2025, between Antolin-Irausa, as seller and collection agent, BBVA, CaixaBank, and HSBC Factoring (France), as buyers, and BBVA, as agent bank.

probability of default rating to Caa3-PD, and the Existing Notes ratings to Caa3. Moody's cited weak liquidity, high leverage of 9.4 times adjusted debt-to-EBITDA as of March 2026, negative free cash flow, and reliance on uncommitted and short-term factoring arrangements.[11]

41.     Notwithstanding these challenges, the Company maintains a meaningful business outlook supported by its brand recognition and global reach. The Company's order book exceeds €13 billion through 2029, and adjusted EBITDA margins have improved from approximately 7 percent in fiscal year 2023 to approximately 9 percent in fiscal year 2025, reflecting ongoing cost management and productivity improvements. The Company's diversified global footprint across twenty-three countries and relationships with substantially all major OEMs provide resilience against concentration risk. Nevertheless, the Company's operational strength cannot overcome the unsustainability of its current capital structure absent the proposed Restructuring Transactions, which are designed to address the following imperatives:

42.     *First*, the Company must avoid a disorderly acceleration or enforcement by any creditor group that could trigger cross-defaults across the capital structure and lead to cascading insolvency to the detriment of parties in interest. The existing debt documents contain cross-default and cross-acceleration provisions that could convert a single event of default into a system-wide liquidity crisis for the entire Company. *Second*, the Company must maintain supplier and customer confidence to preserve its "just-in-time" production capabilities. Grupo Antolin's operations depend on continuous access to raw materials and components from a global supplier base, and on maintaining the confidence of OEM customers that the Company will continue to perform under its supply contracts. Any signal of financial instability could result in suppliers

---

[11]     *See Grupo Antolin Downgraded To 'CCC-' On Proposed Debt Restructuring; Outlook Negative*, S&P Global Ratings (June 25, 2026); *Moody's Ratings downgrades Grupo Antolin's CFR to Caa2 and instrument ratings on existing senior secured notes to Caa3; outlook remains negative*, Moody's Ratings (June 26, 2026).

demanding cash-on-delivery terms or customers redirecting production to alternative suppliers, either of which would accelerate a decline in the Company's competitive position. ***Third***, the Company must preserve its working capital position and replace or bridge its existing uncommitted factoring facility with longer-term committed working capital financing. The Existing Syndicated Factoring Facility matures on January 23, 2027, and the Company has historically depended on annual extensions of this facility to fund day-to-day operations. The absence of committed, longer-term working capital financing represents a material vulnerability to the Company's viability as a going concern that these Restructuring Transactions are designed to address. ***Finally***, the Restructuring Transactions must be coordinated across multiple jurisdictions and among numerous obligor and guarantor entities to avoid fragmentation of proceedings and ensure that all affected financial instruments are addressed consistently across the globe.

## IV.   The Restructuring Transactions and the Spanish Proceeding.

### A.   Overview of Spanish Pre-Insolvency Restructuring Proceeding.

43.   As more fully set forth in the Declaration of the Foreign Counsel,[12] Spanish law provides for court-supervised, pre-insolvency restructuring proceedings under Royal Legislative Decree 1/2020, of May 5, approving the consolidated text of the Insolvency Law (as amended, restated, and/or replaced, the "Insolvency Law") established by Law 16/2022, of September 5, amending the consolidated text of the Insolvency Law, approved by Royal Legislative Decree 1/2020, of May 5, for the implementation of Directive (EU) 2019/1023 of the European Parliament and of the Council of June 20, 2019, on frameworks for preventive restructuring, discharge of debts and disqualifications, and measures to increase the efficiency of restructuring, insolvency,

---

[12] "Declaration of the Foreign Counsel" means the *Declaration of Ferran Foix Miralles in Support of Verified Petition for (I) Recognition of Foreign Main Proceeding, (II) Recognition of Foreign Representative, and (III) Related Relief Under Chapter 15 of the Bankruptcy Code*, filed contemporaneously herewith.

17

and debt discharge proceedings, and amending Directive (EU) 2017/1132 of the European Parliament and of the Council on certain aspects of company law.

44.     Spanish restructuring proceedings are governed by the Insolvency Law.  In 2022, the Insolvency Law introduced a new tool, referred to as a restructuring plan, which can amend or modify a company's capital structure (including debt and equity) to assure the company's viability for the medium and short term.  Specifically, a restructuring plan can affect or modify the composition, terms and conditions, or structure of a debtor's assets, liabilities, and/or equity, including sales of assets, business units, or the company as a whole, as well as affect operational changes.  A restructuring plan can affect nearly all claims of a debtor, other than tort claims, claims of employees, or certain specific financial guarantees.  Claims resulting from public laws can be affected by the restructuring plan but are significantly restricted.

45.     A debtor is eligible to file a request for homologation (*i.e.*, court approval) of a restructuring plan if the debtor is facing:  (1) current insolvency; (2) imminent insolvency, whereby a debtor expects it will not be able to meet its payment obligations as they come due within three months; or (3) probable insolvency, whereby a debtor expects it will not be able to meet its payment obligations as they come due within two years.  The Debtors fall within prong (3) of the grounds for eligibility set out above, meaning that they anticipate being unable to regularly meet their payment obligations as they come due within the next two years.

46.     The court-supervised process for approval of a restructuring plan, referred to as "homologation," among other things, prevents future claw-backs of the restructuring plan transactions, allows the effects of the restructuring plan to be extended to non-consenting creditors, and protects interim and new financing.  Accordingly, debtors routinely seek court approval to

18

ensure finality of the restructuring transactions contemplated by the restructuring plan and enforceability against all affected creditors.

47.     In order to be eligible for homologation, the restructuring plan has to be approved in one of these three ways:  (1) the plan received unanimous approval from all classes; (2) the plan is approved by a majority of classes, including at least one class of creditors with special or ordinary privilege[13]; or (3) at least one class that is reasonably expected to receive a recovery under the restructuring plan (based on a valuation of the debtor company as a going concern) approves the plan.  A class accepts a restructuring plan if creditors holding more than two-thirds of unsecured claims, by monetary value, or more than three-fourths of secured claims, by monetary value, vote in favor of the plan.  Where a plan affects claims governed by a syndication agreement, the contractual statutory majority applies to the syndicate unless the agreement establishes a lower majority threshold to approve the relevant effects and, if the applicable majority votes in favor, all syndicated claims are deemed to have accepted a plan.

48.     Once the homologation request is filed, the Spanish Court can accept the request for processing, upon which the related order is published in the Public Insolvency Register.  Upon acceptance of the homologation request for processing, an automatic stay under Spanish law occurs, which prohibits any creditors from initiating or continuing judicial or extrajudicial enforcement actions against the Debtors' assets until a final decision on homologation is made. And while the stay is only effective upon the Spanish Court's acceptance of the initial request (not upon filing), the stay should be retroactive to the date of filing the Homologation Request.

---

[13]   Under Insolvency Law, special privilege claims are secured by relevant assets and paid from the sale of those assets, and ordinary privilege claims are unsecured claims that have payment priority over general insolvency claims.

49.     During the homologation process, a debtor's board of directors and management continue to run the company.  Separately, the debtor or creditors representing more than 50 percent of claims affected by the proposed restructuring plan may request the court to appoint a restructuring expert.  In cases where at least one class of creditors does not consent to the restructuring plan, a restructuring expert must be appointed.  The restructuring expert assists in connection with the restructuring plan by, among other things, issuing any reports or certificates that are required in connection with the homologation process.

**B.      Pre-Filing Creditor Negotiations and the Recapitalisation Support Agreement.**

50.     On April 28, 2026, the Debtors requested the appointment of the Restructuring Expert.  The Spanish Court issued an order approving the appointment of the Restructuring Expert on May 14, 2026.[14]

51.     As a result of extensive negotiations, on June 23, 2026, the Debtors, HoldCo, GLAS Specialist Services Limited, and the Original RSA Supporting Creditors[15] holding more than two-thirds of the debt under the Existing Syndicated Facilities executed the Recapitalisation Support Agreement and, on June 24, 2026, the Debtors and a sufficient majority of the Affected Creditors entered into the Spanish Restructuring Plan.  Pursuant to the Recapitalisation Support Agreement, the Original RSA Supporting Creditors committed to, among other things, support and vote in favor of the Spanish Restructuring Plan, and the Debtors agreed to, among other things, take the necessary measures to implement the Restructuring Transactions.  The Recapitalisation Support Agreement establishes a binding framework for the implementation of the Restructuring

---

[14]   The May 14, 2026, order was amended at the request of the Debtors by a rectification order dated June 1, 2026, for the purpose of expressly confirming that the appointment of the Restructuring Expert was made for all of the Debtors.

[15]   The Original RSA Supporting Creditors are comprised of: (1) Banco Santander, S.A.; (2) Banco De Sabadell, S.A.; (3) CaixaBank, S.A.; (4) BBVA; and (5) Bankinter, S.A.

Transactions, including creditor forbearance, support commitments, and the mechanics for consummation.

52. Specifically, during the Support Period, the RSA Supporting Creditors agree to not take actions that would disrupt the implementation of the Restructuring Transactions, including exercising any rights or remedies they may have under the Affected Debt documents or at law as a result of any events of default, among other things, relating to the Spanish Proceeding or the implementation of the Restructuring Transactions, and to support waivers needed to avoid any relevant defaults or interruptions to the implementation of the Restructuring Transactions.

53. After the entry into the Recapitalisation Support Agreement, an accession period was provided for certain Affected Creditors to freely accede to the Recapitalisation Support Agreement and/or express their support for the Spanish Restructuring Plan by July 22, 2026 (subject to extension at the request of the Debtors). Supporting noteholders under the Existing Notes who acceded to the Recapitalisation Support Agreement by July 8, 2026, will receive a lock-up fee of 0.50 percent of the aggregate principal amount of their Existing Notes if the Restructuring Transactions become effective (subject to certain other conditions set out in the Recapitalisation Support Agreement).

54. On July 10, 2026, the Spanish Restructuring Plan was amended for certain technical amendments and certain additional Affected Creditors acceded to the Spanish Restructuring Plan. The Spanish Restructuring Plan was formalized as a public instrument on July 10, 2026, by deed granted before the Notary Public of Madrid, Mr. Francisco Miras Ortiz, acting in substitution for and on the protocol of Mr. Andrés Domínguez Nafría, as required by article 634 of the Insolvency Law. The Restructuring Expert issued the requisite certification of majorities confirming that the

Spanish Restructuring Plan has been approved by the requisite majorities of Affected Creditors in accordance with the voting thresholds prescribed by the Insolvency Law.

**C.      The Debtors' Spanish Restructuring Plan.**

55.      The Spanish Restructuring Plan provides the framework for a comprehensive restructuring of the Debtors' Affected Debt by extending maturities, modifying applicable debt terms, securing committed working capital financing, and preserving Grupo Antolin's business as a going concern.

56.      The framework of the Spanish Restructuring Plan contemplates, among others, the following principal transactions:

a.      **Default treatment of Affected Debt.**  Affected Creditors that do not elect an Alternative Treatment will generally receive an extension of the final maturity of their Affected Debt to December 31, 2035, with full repayment of principal at maturity and without any principal write-off.  The Default Treatment of the Bank Debt, the Existing Notes, and the Existing Guarantee Lines also contemplates a 6.97 percent annual interest rate, payable semi-annually, and the benefit of the Existing Security and Guarantees, New ICA Second-Ranking Security Interests, Third-Ranking Pledge over Accounts, and New ICA Guarantees.

b.      **Alternative treatment of Affected Debt.**  Certain Affected Creditors may elect alternative treatments that provide shorter maturities, enhanced security, and payment priority under the Amended Intercreditor Agreement.

(i)      *Bank Debt*.  Affected Creditors under the Bank Debt that elect the Alternative Treatment of the Bank Debt will commit to subscribe their pro rata share of the New Working Capital Financing Agreement and receive, among other things, an extension of final maturity to August 4, 2032, with a springing maturity to June 30, 2030, in the event that, on or before such date, the New B Notes have not been redeemed, repaid, or refinanced, or the Debtors have not demonstrated binding commitments for their refinancing.  The Alternative Treatment of the Bank Debt also provides for scheduled amortization of outstanding principal (excluding the RCF), an interest rate of EURIBOR *plus* 2.50 percent (with a margin adjustment subject to a leverage ratio), and the benefit of the Existing Security and Guarantees, New ICA First-Ranking Security Interests, Second-Ranking Pledge over Accounts, and New ICA

Guarantees, and a senior payment right of up to €435 million over claims subject to the Default Treatments.

(ii) *Existing Notes*. Affected Creditors under the Existing Notes that elect the Alternative Treatment of the Existing Notes will receive, among other things, a 32.5 percent discount to the nominal principal amount of the Existing Notes, an extension of final maturity to December 31, 2030, a thirty-month non-call period (unless the make-whole premium is paid), and an 8.28 percent annual coupon, subject to an automatic step-up of 2.00 percentage points per annum on each anniversary date commencing on June 30, 2027. The Alternative Treatment of the Existing Notes also provides for the benefit of the Existing Security and Guarantees, New ICA First-Ranking Security Interests, Second-Ranking Pledge over Accounts, and New ICA Guarantees, and a senior payment right of up to €435 million over claims subject to the Default Treatments.

(iii) *Existing Guarantee Lines*. Affected Creditors under the Existing Guarantee Lines that elect the Alternative Treatment of the Existing Guarantee Lines will receive an extension of maturity to August 4, 2032, with a springing maturity to June 30, 2030, on the same terms as the Alternative Treatment of the Bank Debt, an availability period running until six months prior to maturity, and the benefit of the Existing Security and Guarantees, New ICA First-Ranking Security Interests, Second-Ranking Pledge over Accounts, and New ICA Guarantees, and a senior payment right over claims subject to the Default Treatments.

c. **New working capital financing agreement.** The Spanish Restructuring Plan provides for a new Working Capital Financing Agreement, structured as a multi-product facility comprising non-recourse factoring and a revolving credit line with a bonding ancillary facility, in a maximum aggregate amount of up to €220 million with maturity on August 4, 2032, subject to a springing maturity to June 30, 2030, on the same terms as the Alternative Treatment of the Bank Debt. The Working Capital Financing Agreement will be provided by the Affected Creditors under the Bank Debt that elect the Alternative Treatment of the Bank Debt, in proportion to their participation in the Bank Debt. BBVA has assumed a backstop commitment of the Working Capital Financing Agreement from the first euro exceeding €15 million up to €205 million, which was conditioned on Affected Creditors representing at least 65 percent of the Bank Debt electing the Alternative Treatment. The Working Capital Financing Agreement ranks first in priority in the payment waterfall in respect of the obligations with recourse to the Company.

d. **Implementation through amended instruments and new notes.** The Bank Debt will be amended on a non-extinguishing basis through amended

and restated documentation, resulting in the New Syndicated Facilities Agreement, the Amended ICO Facilities Agreement, and the New EIB Financing Agreement. The Existing Notes will be exchanged for New Notes, with Affected Creditors receiving either New A Notes or New B Notes depending on whether they receive the Default Treatment or Alternative Treatment, respectively. The Existing Guarantee Lines will be amended on a non-extinguishing basis, with affected claims treated as Contingent Guarantee Claims or New Guarantee Lines, as applicable. The Intragroup Loans will be extended to January 1, 2036, with all interest capitalized, and subordinated to the remainder of the Affected Debt.

e.   **Security and intercreditor agreements.** The Spanish Restructuring Plan contemplates the ratification and amendment of the Existing Security and Guarantees, the granting of the New ICA First-Ranking and Second-Ranking Security Interests, the New ICA Guarantees, and the Pledges over Accounts, and an amended Intercreditor Agreement, which will provide, among other things, that in respect of enforcement recoveries from the Existing Security and Guarantees (other than the Share Pledge), the New ICA Guarantees, and the New ICA Security Interests, proceeds are applied first to obligations under the Working Capital Financing Agreement and the Extensions of the Existing Syndicated Factoring (in each case, with respect to obligations with recourse to Grupo Antolin), second to Affected Claims of Affected Creditors electing Alternative Treatments up to a maximum of €435 million, and third to the remaining Affected Claims on a pro rata and *pari passu* basis. In respect of enforcement recoveries from the Share Pledge, the existing *pari passu* payment priority waterfall is preserved, amended solely to reflect the post-Restructuring Transaction instruments.

f.   **Interest accruing and payable.** The Spanish Restructuring Plan provides that interest and fees accruing under the Affected Agreements, other than the Intragroup Loans, will continue to accrue and be payable in accordance with the terms of the applicable Affected Debt agreements until the Effective Date. If the Effective Date does not coincide with an ordinary interest or fee payment date, an extraordinary interest and fee settlement will be made on the Closing Date for the period between the last ordinary settlement date and the Effective Date, without any turnover or repayment obligation under the Intercreditor Agreement or any Affected Agreement applying to such payments. From the Effective Date, interest and fees on the Affected Debt will accrue in accordance with the applicable Restructuring Documents.

57. The Spanish Restructuring Plan does not affect all liabilities of Grupo Antolin. Commercial, labor, and public creditors, as well as any creditors holding debt outside the perimeter of the Affected Debt, are not affected by the Spanish Restructuring Plan and are expected to

continue to be paid in the ordinary course and in accordance with their existing terms.  The Spanish Restructuring Plan also does not provide for operational restructuring measures, does not affect public-law claims, and does not affect shareholder rights in their capacity as such.

58.     Following homologation, and once the applicable conditions precedent have been satisfied, the Debtors and their stakeholders will proceed to consummate the Restructuring Transactions in accordance with the Spanish Restructuring Plan and the related Transaction Documents.

**D.     The Debtors' Spanish Proceeding.**

59.     Following the signing and formalization of the amended Spanish Restructuring Plan, on July 10, 2026, the Debtors filed a request for homologation of the Spanish Restructuring Plan with the Spanish Court (the "Homologation Application").  The Spanish Court was deemed to have jurisdiction over the Spanish Proceeding with respect to the Debtors.

60.     On July 20, 2026, the Debtors were notified with a resolution of the Spanish Court issued on July 17, 2026, accepting the Homologation Application for processing, and the related order is expected to be published in the Public Insolvency Register sometime thereafter.  The Spanish Court may issue an order granting or denying the homologation of the Spanish Restructuring Plan (the "Homologation Order") within approximately fifteen business days of publication of the order admitting the Homologation Application for processing in the Public Insolvency Register, although homologation is expected to occur in September or October 2026 in light of the Spanish judicial holidays during the month of August.  If the Spanish Court is satisfied that the Spanish Restructuring Plan meets the applicable requirements of the Insolvency Law, the Spanish Court will homologate the Spanish Restructuring Plan and the effects thereof will become effective immediately, including the extension of the plan's terms to non-participating affected creditors, the protection of the Restructuring Transactions and new financing against

25

claw-back actions, and the extension of the Spanish Restructuring Plan's effects to the Share Pledge. After the Homologation Order is entered, Affected Creditors that did not vote in favor of the Spanish Restructuring Plan may challenge the homologation within fifteen business days of publication of the Homologation Order in the Public Insolvency Register, on grounds prescribed by articles 654 and 655 of the Insolvency Law. Once homologated, the Debtors and their stakeholders will proceed to consummate the Restructuring Transactions in accordance with the Spanish Restructuring Plan and the related Transaction Documents. Recognition of the Spanish Restructuring Plan under chapter 15 of the Bankruptcy Code is a condition precedent to the effectiveness of the Spanish Restructuring Plan.

61.     Based on these facts, I believe that recognition of the Spanish Proceeding as a foreign main proceeding is warranted.

62.     I also believe recognition as the Debtors' "foreign representative" and recognition of the Spanish Proceeding as a "foreign main proceeding" are consistent with the purpose of chapter 15 and will allow the Debtors to restructure in the most efficient manner without jeopardizing the creditors' rights.

63.     The Debtors are affiliates of each other and each of their cases were filed on the Petition Date in this court (the "U.S. Bankruptcy Court"). Accordingly, I believe that joint administration of these chapter 15 cases for procedural purposes only, as well as permitting the filing of consolidated lists of the information required by Bankruptcy Rule 1007(a)(4), will be an administrative convenience for the U.S. Bankruptcy Court, the court clerk's office, and interested parties.

64.     Further, I believe that noticing procedures are appropriate in light of limited affected creditors in this proceeding. Under the facts and circumstances of the Debtors' chapter 15

26

cases, I submit that service of the Notice in the manner proposed in the Scheduling Motion will provide those parties identified as the Notice Parties in the Scheduling Motion with due and sufficient notice of the relief requested in the Scheduling Motion and associated objection deadline and hearing dates.

65.     Also, for the reasons set forth in the Verified Petition, I submit that recognition of the Spanish Proceeding is necessary and appropriate for the benefit of the Debtors, their creditors, and other parties in interest.  In accordance with the foregoing, I present the following consolidated statements for the Debtors as a whole.

**V.      Statement Pursuant to Section 1515 of the Bankruptcy Code.**

66.     I am informed that 11 U.S.C. § 1515 provides, as follows:

**a.**     A foreign representative applies to the court for recognition of a foreign proceeding in which the foreign representative has been appointed by filing a petition for recognition.

**b.**     A petition for recognition shall be accompanied by:

**(i)**     a certified copy of the decision commencing such foreign proceeding and appointing the foreign representative;

**(ii)**    a certificate from the foreign court affirming the existence of such foreign proceeding and of the appointment of the foreign representative; or

**(iii)**   in the absence of evidence referred to in paragraphs (i) and (ii), any other evidence acceptable to the court of the existence of such foreign proceeding and of the appointment of the foreign representative.

**c.**     A petition for recognition shall also be accompanied by a statement identifying all foreign proceedings with respect to the debtor that are known to the foreign representative.

67.     Pursuant to section 1515(b) of the Bankruptcy Code, the board resolutions appointing the Foreign Representative are attached to the Verified Petition.  Each Debtor entity passed board resolutions appointing myself as the Foreign Representative.

27

68.     Pursuant to section 1515(c) of the Bankruptcy Code, I am aware of the definition of a "foreign proceeding" under section 101(23) of the Bankruptcy Code, and I believe the Spanish Proceeding is a "foreign proceeding" as defined therein.  I am aware of no other foreign proceedings with respect to the Debtors.

**VI.     Disclosure Pursuant to Bankruptcy Rule 1007(a)(4).**

69.     I am informed that Bankruptcy Rule 1007(a)(4) provides, as follows:

> In addition to the documents required under § 1515 of the Code, a foreign representative filing a petition for recognition under chapter 15 shall file with the petition: (A) a corporate ownership statement containing the information described in Rule 7007.1; and (B) unless the court orders otherwise, a list containing the names and addresses of all persons or bodies authorized to administer foreign proceedings of the debtor, all parties to litigation pending in the United States in which the debtor is a party at the time of the filing of the petition, and all entities against whom provisional relief is being sought under § 1519 of the Code.

70.     I am further informed that Bankruptcy Rule 7007.1 provides in pertinent part that a corporate ownership statement:

> . . . identif[y] any corporation, other than a governmental unit, that directly or indirectly owns 10% or more of any class of the corporation's equity interests, or states that there are no entities to report under this subdivision.

**A.     Corporate Ownership Statement.**

71.     In compliance with the requirements of Bankruptcy Rule 1007(a)(4)(A), the following is a corporate ownership statement of the Debtors, and the Debtors are each directly or indirectly wholly owned by Grupo Antolin Holdco, S.A.

**B.     List of Administrators.**

72.     In compliance with the requirements of Bankruptcy Rule 1007(a)(4)(B), the Debtors, as directed by the Foreign Representative, shall maintain control of and be authorized to administer the Spanish Proceeding.  The service address for all of the Debtors in these chapter 15

cases is: C/Vitoria número 307 / Burgos / 09007 / Spain.  I am aware of no other persons or bodies authorized to administer the Spanish Proceeding on behalf of the Debtors.

### C.    Provisional Relief.

73.    Through the Provisional Relief Motion, provisional relief is sought with respect to each of the Debtors and their property that is within the territorial jurisdiction of the United States pending a final hearing on recognition of the Spanish Proceeding as a foreign main proceeding.

74.    I commenced these chapter 15 cases to provide the Debtors with the necessary relief to prevent actions being taken by certain holdout creditors while the Spanish Proceeding is pending.  Such provisional relief includes, among other things, the U.S. Bankruptcy Court's immediate ordering of the application of sections 362, and 365(e) of the Bankruptcy Code to these chapter 15 cases.  The risk of enforcement actions has already been threatened against the Debtors—immediately after the announcement of entry into a recapitalisation support agreement (the "Recapitalisation Support Agreement"), counsel to the Foreign Representative received a letter from counsel who asserts they represent a subset of holders of nearly two-third of the 2028 Notes and the 2030 Notes (the "Ad Hoc Group") expressing their opposition to the proposed transactions.  The Ad Hoc Group threatened to exercise remedies and reserved their rights to commence litigation in any relevant jurisdiction—which is particularly important given the Existing Notes are governed by the laws of the state of New York and include New York forum selection clauses.[16]  Two weeks later, counsel to the Foreign Representative received another letter from the Ad Hoc Group, likewise contesting the proposed transactions; but this time, the Ad Hoc Group explicitly requested that counsel to the Foreign Representative consent to the acceptance of

---

[16]    The Existing Notices provide that any actions arising on account of the Existing Notes must be instituted in the state or federal court in the Borough of Manhattan, New York, New York.

service of process for an action the Ad Hoc Group stated it would initiate in the courts in England and Wales in opposition to the proposed transactions, and also attached draft particulars of the alleged claims. Accordingly, the relief requested by the Debtors is required to prevent certain creditors from asserting remedies, including with respect to governance and management control, while the Spanish Proceeding is awaiting Homologation of the Spanish Restructuring Plan.

75. Accordingly, I believe that the provisional relief requested in the Provisional Relief Motion is necessary and appropriate under the circumstances.

[*Remainder of page intentionally left blank.*]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my information and belief.

Burgos, Spain

Dated: July 20, 2026

/s/ Cristina Blanco Santo Tomás

By:  Cristina Blanco Santo Tomás
Chief Executive Officer
Grupo Antolin-Irausa, S.A.U.

**Exhibit A**

